**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **SHANNON BURTON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:    2:07cv548-MHT** |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **AGRICULTURE & INDUSTRIES** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S EVIDENTIARY SUBMISSION IN SUPPORT OF MOTION FOR**
**SUMMARY JUDGMENT**

    **COMES NOW,** the Defendant Alabama Department of Agriculture & Industries, and makes the following Evidentiary Submission in support of the Motion for Summary Judgment contemporaneously filed herewith.

    1      The Affidavit of Lance Hester.

    2      The Affidavit of Teresa Brunson.

    3      Deposition Excerpts of Shannon Burton.

    4.     Written Warning dated November 3, 2005.

    5.     Burton Response to Written Warning.

    6.     Written Reprimand dated November 10, 2005.

    7.     Excerpts of Department of Agriculture Handbook for Employees.

    8.     Burton's 2005 Performance Appraisal.

    9.     Letter of Suspension dated November 22, 2005.

    10.    Letter dated April 27, 2006 from Jackie Graham.

    11.    Plaintiff's EEOC Charge of Discrimination.

_____/s/_____Emily C. Marks_____
EMILY C. MARKS


_____/s/_____E. Hamilton Wilson, Jr.
E. HAMILTON WILSON, JR.
Attorneys for the Defendant


OF COUNSEL:
BALL, BALL, MATTHEWS & NOVAK, P.A.
2000 Interstate Park Drive, Suite 204
Post Office Box 2148
Montgomery, Alabama  36102-2148
Phone:  (334) 387-7680
Fax:      (334) 387-3222

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2008, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system which will send notification of such filing to the following:

Juraldine Battle-Hodge
207 Montgomery St., Ste. 215
Montgomery, AL  36104-3528

/s/ Emily C. Marks
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SHANNON BURTON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:    2:07cv548-MHT |
| | ) | |
| ALABAMA DEPARTMENT OF | ) | |
| AGRICULTURE & INDUSTRIES | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF LANCE HESTER

Before me, the undersigned authority, on this day personally appeared Lance Hester, who being by me first duly sworn, deposed and stated upon his oath the following:

My name is Lance Hester.  I am over the age of twenty-one (21) years and I have personal knowledge of the following:

I am a Division Director with the Alabama Department of Agriculture.  I have been employed with the Alabama Department of Agriculture for 29 years.  Before I became a Division Director, I was the Program Director in the Food Safety Division.  In my capacity as Program Director, I was Shannon Burton's direct supervisor for some time.

In May, 2005, I received complaints about Ms. Burton's behavior at work from her subordinates, Mary Catrett and Ann Williams.  Ms. Williams complained that Ms. Burton often left the office and would instruct Ms. Williams to call her on her cell phone if anyone came looking for her.  I had independently noticed that when I had asked Ms. Williams where Ms. Burton was, she did not know but would attempt to reach her by phone after I left her presence.  Both Ms. Catrett and Ms. Williams had expressed concern that if Ms. Burton found out they had complained about her, she would retaliate against them.  I discussed the complaints about Ms.

Burton with my then-supervisor, Dr. John Bloch and we decided that in order to prevent any further problems in the office, I would take over the supervision of Ms. Catrett and Ms. Williams. I informed Ms. Burton of this transfer of duties in a memo dated May 10, 2005, a true and correct copy of which is attached hereto. Ms. Burton's pay was not reduced nor did she lose any benefits by this shift of duties.

In October, 2005, Ms. Burton was called to jury duty. When she returned to the office after her jury duty had been completed, Ms. Burton came into my office and informed me that unopened mail from the week before was on her desk. I told her I thought Ms. Catrett and Ms. Williams had been opening the mail. Ms. Burton responded in an angry voice that I could look at the postmarks if I did not believe her. She then stated that if she had left the mail unopened, it would have been "a federal case." I told her I would look at the postmarks if she wanted me to, and she replied that it wasn't necessary because I would probably lie about it anyway. Ms. Burton's comments were loud, angry, and disruptive.

I sat down with Ms. Burton to discuss her accusatory and inappropriate comments. I asked her if she honestly thought that I would lie about the mail, and she replied that she did. For approximately three days, I thought about the best course of action to take in response to Ms. Burton's insubordinate outburst. I ultimately determined that the type of behavior Ms. Burton exhibited warranted a written warning because it had been disruptive, disrespectful, unprofessional, and insubordinate.

I gave Ms. Burton a written warning on November 3, 2005 for her insubordinate behavior. I discussed the warning with Ms. Burton and asked her to sign it, acknowledging that we had discussed it and that she received it. I also told her that she could submit a written response to the warning by November 10, 2005. Ms. Burton refused to sign the warning. I tried

to explain to her that her signature did not denote agreement, but was simply an acknowledgment that we had discussed it and she received had received it. Ms. Burton continued to refuse to sign the warning, despite my continued directive to do so.

I consulted with my supervisor, Dr. John Bloch and the State Personnel Department about how to handle Ms. Burton's refusal to sign the warning. I was instructed by the State Personnel Department that Ms. Burton should sign the warning. Because Ms. Burton failed to follow a directive by her supervisor, she received a written reprimand for her continued insubordination. She also refused to sign her written reprimand.

Ms. Burton finally signed the written warning but twice refused to sign her written reprimand. Due to her continued refusal to follow the directives of her supervisors, Ms. Burton was suspended for ten days. Pursuant to Department of Agriculture and State Personnel policy, her appraisal score was reduced by 17 points by the fact of her suspension. If Ms. Burton had simply signed the written warning, denoting that the warning was discussed with her, the matter would have ended there. The level of discipline would not have escalated, nor would her performance appraisal score been reduced. Ms. Burton's performance appraisal has not been revisited because Commissioner Sparks did not accept the Administrative Law Judge's recommendation to overturn her suspension.

Despite the fact that Ms. Burton had a private office, she arranged, without my knowledge to have a cubicle privacy wall put up around her desk. This privacy wall was installed by the night crew of General Services and stayed in place for several months. I had not been aware that the wall was to be installed, and did not authorize its installation. I was displeased with the appearance of the privacy wall and it blocked my view of her work area. I further could not justify the need for a privacy wall because Ms. Burton's office had only one

occupant. The privacy wall was removed and replaced with a conventional desk. Once this change was made, the area was much improved in appearance without affecting functionality.

There had been numerous complaints from employees about excessive gathering and loud noises in Ms. Burton's office, which was disruptive. I attributed the disturbances to the presence of a department refrigerator in her office. The refrigerator was used by many employees on the hall, and Ms. Burton would visit with them when they came into her office to use it. Consequently, the refrigerator that had been located in her office was moved to an area where it could be used by employees without disturbing work areas. The refrigerator was relocated to the end of the hall where it can be easily accessed by employees without creating a disturbance. A drink machine is also located beside the refrigerator.

Although the Department of Agriculture is involved in nutrition projects, it does not have a Nutrition Program. There have never been any job openings at the Department of Agriculture for a Nutrition Program. Along with Education Superintendent, Dr. Joe Morton, the Commissioner of the Department of Agriculture put together a Nutrition Awareness Project for Alabama schools. This involved the development of public relations posters and CDs explaining proper nutrition, and encouraging students to eat more Alabama fruits and vegetables. The Nutrition Awareness Project was not a created program to be staffed with employees.

LANCE HESTER

4

STATE OF ALABAMA

COUNTY OF MONTGOMERY

Before me, the undersigned Notary Public, did personally appear Lance Hester who states to me that he is aware of the contents of the foregoing Affidavit, and that he did execute it voluntarily.

SWORN TO and SUBSCRIBED before me on this the 2th day of May 2008.

NOTARY PUBLIC

5



# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
1445 Federal Drive
Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

MEMORANDUM

DATE:       May 10, 2005

TO:         SHANNON BURTON

FROM:       LANCE HESTER

SUBJECT:    Change of supervisory responsibilities.

    Effective immediately you will no longer be responsible for the supervision of Mary Catrett or Anne Williams.  As Program Director of the Food Safety Section I will assume all supervisory responsibility for these employees.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SHANNON BURTON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:     2:07cv548-MHT |
| | ) | |
| ALABAMA DEPARTMENT OF | ) | |
| AGRICULTURE & INDUSTRIES | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF TERESA BRUNSON

Before me, the undersigned authority, on this day personally appeared Teresa Brunson, who being by me first duly sworn, deposed and stated upon her oath the following:

My name is Teresa Brunson. I am over the age of twenty-one (21) years and I have personal knowledge of the following:

I am a Personnel Assistant III, and serve the Alabama Department of Agriculture and Industries as the Personnel Director. I have been employed with the Alabama Department of Agriculture for 3 years. In my capacity as Personnel Director, I maintain employee personnel files at my office at the Department of Agriculture on Federal Drive. I have never improperly removed documents from Ms. Burton's personnel file. No employee of the Department of Agriculture has every asked me to improperly remove documents from Ms. Burton's personnel file. No employee has improperly removed documents from Ms. Burton's personnel file.

Employee personnel files are also maintained by the State Personnel Department. The Department of Agriculture has no control over the personnel files maintained downtown by the State Personnel Department.

_Teresa Brunson_
TERESA BRUNSON

STATE OF ALABAMA

COUNTY OF MONTGOMERY

Before me, the undersigned Notary Public, did personally appear Teresa Brunson who states to me that she is aware of the contents of the foregoing Affidavit, and that she did execute it voluntarily.

SWORN TO and SUBSCRIBED before me on this the _12_ day of _May_ 2008.

_Karen Gates_
NOTARY PUBLIC

2

Page 1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT

NORTHERN DIVISION


SHANNON BURTON,

     Plaintiff,

vs.                                    CIVIL ACTION NO.
                                       2:07CV-548MHT

ALABAMA DEPARTMENT OF
AGRICULTURE AND INDUSTRIES,

     Defendant.


       * * * * * * * * * *


     DEPOSITION OF SHANNON BURTON, taken
pursuant to stipulation and agreement before
Haley A. Phillips, Certified Court Reporter,
ACCR # 151, and Commissioner for the State of
Alabama at Large, in the Law Offices of Ball, Ball,
Matthews & Novak, 2000 Interstate Park Drive,
Montgomery, Alabama, on Wednesday, March 19, 2008,
commencing at approximately 9:35 a.m.


       * * * * * * * * * * * *

Deposition of Shannon Burton                    March 19, 2008

---

Page 10

1   A.   2004.

2   Q.   Is that from ASU as well?

3   A.   No.  That was from Troy State University in

4        Montgomery.

5   Q.   When did you start your employment with the

6        Department of Agriculture?

7   A.   I think it was September 2000 or 2001.  I

8        think it's 2001.

9   Q.   And prior to working with the Department of

10       Agriculture, where were you employed?

11  A.   I was still with the State with the

12       Department of Revenue.

13  Q.   And how long did you work at the Department

14       of Revenue?

15  A.   One year.

16  Q.   What did you do over there?

17  A.   Assessments.  Final assessments for sales

18       tax.

19  Q.   Who was your supervisor while you were at

20       the Department of Revenue?  Do you

21       remember?

22  A.   James Browder and Harold Daniels.

23  Q.   And you left the Department of Revenue to

Deposition of Shannon Burton                          March 19, 2008

Page 11

1           come to the Department of Agriculture?

2    A.     Yes.

3    Q.     Did you just put your name on a registry?

4    A.     Uh-huh (positive response).  Put my name on

5           a register for a transfer, lateral

6           transfer.

7    Q.     And it was a lateral transfer?

8    A.     Yes.

9    Q.     What was your position there at the

10          Department of Revenue, classification or

11          position?

12   A.     Administrative assistant.

13   Q.     Okay.  And when you went to the Department

14          of Agriculture in September of '01, you

15          would have been in what position?

16   A.     Same.  Administrative assistant.

17   Q.     Were you employed before you worked for the

18          Department of Revenue?

19   A.     Yes.  Department of Mental Health.

20   Q.     And how long were you with the Department

21          of Mental Health?

22   A.     Almost two years.  Maybe about 18 months.

23   Q.     And what was your position with that

Deposition of Shannon Burton                          March 19, 2008

Page 12

1           department?

2    A.     Administrative assistant in the purchasing

3           area.

4    Q.     And was that here -- employed here in

5           Montgomery?

6    A.     Yes.

7    Q.     And who was your supervisor at the

8           Department of Mental Health?

9    A.     Pat Wallace.

10   Q.     At any time while you were employed with

11          the Department of Mental Health, were you

12          reprimanded in any way?

13   A.     No.

14   Q.     Suspended?

15   A.     No.

16   Q.     Terminated?

17   A.     No.

18   Q.     What about with the Department of Revenue?

19   A.     No.

20   Q.     And before your employment with the

21          Department of Mental Health, were you

22          working anywhere?

23   A.     Public safety.

Deposition of Shannon Burton                      March 19, 2008

Page 13

1      Q.    Department of Public Safety?

2      A.    Yes.

3      Q.    Here in Montgomery?

4      A.    Yes.

5      Q.    Were you also going to Alabama State during

6            some of this time?

7      A.    I was in school at Alabama State when I was

8            employed with Department of Mental Health

9            and Department of Revenue and Agriculture.

10     Q.    And you just -- you worked your school

11           schedule around your employment schedule?

12     A.    Yes.

13     Q.    Let me ask you about the Department of

14           Public Safety.  What was your position with

15           the Department of Public Safety?

16     A.    Administrative assistant.  I was in

17           accident and records.

18     Q.    How long were you with the Department of

19           Public Safety?

20     A.    One year.

21     Q.    And why did you leave there?

22     A.    Wanted a better opportunity for a

23           promotion.

Deposition of Shannon Burton                    March 19, 2008

Page 14

1    Q.    So you went to --

2    A.    Mental health.

3    Q.    Mental health.

4          Did you receive a promotion when you

5          went to mental health or were you in the

6          same classification?

7    A.    I got a promotion but it wasn't with mental

8          health.  It was one to go to revenue.  I

9          got on the register for the ASA II and got

10         promoted.  And mental health at the time

11         had some problem with reallocations and

12         said the money wasn't in the budget, so I

13         just took the promotion with revenue.

14   Q.    Okay.  So it was basically a lateral hire

15         from the Department of Public Safety to

16         mental health?

17   A.    Yes.

18   Q.    And when you transferred to Department of

19         Revenue, you actually received a promotion?

20   A.    Yes.

21   Q.    And that would have included a pay raise?

22   A.    Yes.

23   Q.    And you may have -- You told me you were

Deposition of Shannon Burton                    March 19, 2008

Page 15

| | | |
|---|---|---|
| 1 | | with the Department of Public Safety for |
| 2 | | about a year? |
| 3 | A. | Yes. |
| 4 | Q. | Were you working with the State anywhere |
| 5 | | before your position with the Department of |
| 6 | | Public Safety? |
| 7 | A. | I wasn't a permanent employee with the |
| 8 | | State. |
| 9 | Q. | Were you working part-time anywhere for the |
| 10 | | State? |
| 11 | A. | Yes. |
| 12 | Q. | Where? |
| 13 | A. | Department of Mental Health.  I was |
| 14 | | temporary through Manpower. |
| 15 | Q. | How long did you do that? |
| 16 | A. | Off and on almost maybe two years, because |
| 17 | | it was several agencies they had me with. |
| 18 | | Department of Human Resources with Family |
| 19 | | and Children Services and mental health. |
| 20 | Q. | And what were you doing as a temporary |
| 21 | | employee? |
| 22 | A. | With Department of Human Resources, I |
| 23 | | barely can remember.  It was -- I think |

Deposition of Shannon Burton                    March 19, 2008

Page 16

1          mainly dealing with the child support.

2          That's where I were in Family and Children

3          Services.  Assisting everybody who needed

4          help.

5     Q.   As a temporary employee -- you'll have to

6          help me out -- did you have a

7          classification or how were you paid?

8     A.   Through Manpower.

9     Q.   You were paid through Manpower?

10    A.   Yeah.  Manpower sent me a check every week.

11    Q.   So you were not a State employee?

12    A.   No.

13    Q.   You don't receive any credit for those

14         years you worked as a temporary State

15         employee --

16    A.   No, sir.

17    Q.   -- towards State retirement?

18    A.   No, sir.

19    Q.   Thank you.  Took me a while to get there.

20              How long have you been living in the

21         Montgomery area?

22    A.   Since I came to school in 1989.

23    Q.   And when you say you came to school, would

Deposition of Shannon Burton                    March 19, 2008

Page 17

1        that have been at ASU?

2    A.   Uh-huh (positive response).  When I left

3        home from Mobile.

4    Q.   So you went to school at ASU from '89 and

5        finally got -- and got your degree in '02?

6    A.   Yes.

7    Q.   So you were working part-time or working

8        full-time and going to school during those

9        years?

10   A.   Well, no.  In nineteen eighty -- I think I

11       left in '91.  I left in '91 and I returned

12       back to ASU in 1998.

13   Q.   Got you.

14           Did you have any full-time employment

15       between those two -- in that interval

16       between the time you left ASU and the time

17       you went back?

18   A.   Yes.  I was working with EDS, Electronic

19       Data Systems.

20   Q.   And what were you doing for EDS?

21   A.   Student loan consolidation.  And I worked

22       for Regions Mortgage during that time too.

23   Q.   Who was your supervisor over at Regions

Deposition of Shannon Burton                          March 19, 2008

Page 18

1          Mortgage?  Do you remember?

2     A.   I can't remember her last name.  Her first

3          name was Sherry.  In the hazard insurance

4          department.

5     Q.   Making sure that mortgage holders had

6          insurance on the property?

7     A.   That's correct.  I dealt with property

8          taxes and escrows.

9     Q.   When you transferred from revenue to the

10         Department of Agriculture, you -- What was

11         your position when you initially went with

12         the Department of Agriculture?  Still

13         administrative assistant?

14    A.   Administrative assistant.

15    Q.   Okay.  And what department were you -- or

16         where were you assigned when you went to

17         the Department of Agriculture?  What

18         division or ...

19    A.   Ag Compliance.

20    Q.   And tell me a little bit about what you did

21         for Ag Compliance.

22    A.   I assisted the department with feed, lime

23         and I forget what other.  It was several

Deposition of Shannon Burton                    March 19, 2008

Page 19

1           things we did, but mainly the

2           administration part of it where we did all

3           the per diem, all the vehicle reports and

4           whatever Mr. Hitch asked me to assist the

5           department with the inspectors.

6    Q.    Was Mr. Hitch your supervisor?

7    A.    Yes.

8    Q.    And were you assigned an office?

9    A.    No.

10   Q.    Where did you work?  I mean, what was your

11         work -- how did you work?

12   A.    Well, it was three ladies in the office.

13         We were all in one.

14   Q.    And who were the other two individuals?

15   A.    At that particular time -- Well, when I

16         first started, it was just me and Gail

17         Wise.

18   Q.    Gail Wise?

19   A.    Yes.  Brenda Gail Wise.

20   Q.    Is she still with the department?

21   A.    Yes.

22   Q.    Okay.

23   A.    And shortly, I think, within maybe four

Deposition of Shannon Burton                     March 19, 2008

Page 22

1    A.    Yes.  Had a cubicle.

2    Q.    Did each of the three individuals have

3          cubicles?

4    A.    Yes.

5    Q.    But it was all -- The three cubicles

6          located in one office space?

7    A.    One big office, yes.

8    Q.    And how long did you work for Mr. Hitch?

9    A.    Almost three years.

10   Q.    That would have been up until what, latter

11         part of 2004, early 2005?

12   A.    End of two thousand -- Maybe the end of

13         2003.

14   Q.    End of 2003.

15   A.    Uh-huh (positive response).

16   Q.    Did you -- Were your duties reassigned at

17         this point, or did you have a transfer or

18         what happened?

19   A.    I got a promotion.

20   Q.    And what were you promoted to?

21   A.    Administrative Assistant III.

22   Q.    And with that promotion you received a pay

23         raise?

Deposition of Shannon Burton                    March 19, 2008

Page 23

1    A.    Yes, sir.

2    Q.    Was that the first pay raise you had

3          received since you had been to the

4          Department of Agriculture?

5    A.    No.  I got regular annual pay raises when I

6          was first initially hired.

7    Q.    Did you receive any merit pay increase --

8    A.    None.

9    Q.    -- from '01 to '03 or to September of '03?

10   A.    When you say merit, are you speaking

11         outside of my regular annual review?

12   Q.    Yes.

13   A.    No.

14   Q.    And as Administrative Assistant III, where

15         were you assigned or what were your duties

16         and responsibilities?

17   A.    I was assigned upstairs to food safety.

18   Q.    Food safety.

19             And with that promotion, did you

20         receive another office location?

21   A.    Yes.  Upstairs.  I went from the first

22         floor to the second floor.

23   Q.    And what were your duties and

Deposition of Shannon Burton                    March 19, 2008

Page 24

1          responsibilities with food safety?

2     A.   To assist the food safety section with

3          permitting, to supervise two other ladies

4          in the office, to do annual appraisals,

5          performances appraisals, interview

6          potential applicants, to be included in

7          weekly staff meetings, to I guess get the

8          database ready for distributing of over

9          6500 permits for the State of Alabama with

10         the mail-outs.

11    Q.   Those food safety permits?

12    A.   Uh-huh (positive response).  Yes.

13    Q.   And you said you were supervising two other

14         individuals.  Who were they?

15    A.   At the particular time, it was Cynethia.  I

16         can't remember Cynethia's last name.  And

17         Mary Catrett.

18    Q.   Are either of those two individuals with

19         the department?

20    A.   Mary Catrett.

21    Q.   What happened to Cynethia?

22    A.   She quit.

23    Q.   Was she white or black?

Page 25

1    A.    She was black.

2    Q.    Do you know how long she had been with the

3          department before she quit?

4    A.    I want to say maybe two years.

5    Q.    Do you know why she quit?

6    A.    No.  I was downstairs and -- Let me see.

7          When she first started, I was downstairs in

8          Ag Compliance.  So that was the first year

9          when I moved up there.  Something about her

10         grandparents passing or something and she

11         was getting ready to move to another

12         state.  That's all I remember.

13   Q.    And after she left, was she replaced with

14         someone else that you supervised?

15   A.    Yes.  Ann William.

16   Q.    Is Ms. Williams white or black?

17   A.    Black.

18   Q.    Is she still with the department?

19   A.    Yes.

20   Q.    And what were Mary Catrett and Ann

21         Williams' duties and responsibilities?

22   A.    Mary Catrett was mainly to enter the

23         database with the penalties and violations

Deposition of Shannon Burton                    March 19, 2008

Page 27

1       have been Lance Hester?

2   A.  No.  I reported to Lance Hester first.

3   Q.  Okay.

4   A.  Then Dr. Bloch.

5   Q.  That's right.

6       And when Lance Hester was promoted, who

7       did you report to?

8   A.  Still Lance Hester.

9   Q.  Okay.

10  A.  He was the immediate supervisor.  He was

11      still upstairs in the office with me.

12  Q.  Now, let me just ask you about these -- the

13      food safety permits.  Explain that program

14      to me.  Who gets these permits and what's

15      the purpose?  Just kind of educate me.

16  A.  For anybody -- anybody in the state of

17      Alabama who sells potentially hazardous

18      food; milk, dairy, cheese, egg --

19      anybody who -- and meats -- any potentially

20      hazardous food, you are required by the

21      state law to get a food safety permit.

22  Q.  Like if you're a business and you sell

23      dairy products to the public --

Deposition of Shannon Burton                    March 19, 2008

Page 31

1           called in too?

2    A.    Yes.

3    Q.    Now, at what point after September of '03

4          when you were promoted to the food safety

5          division did you -- were you reassigned

6          office space?

7    A.    Reassigned office space?

8    Q.    Well, you told me you were in an office

9          with the cubicles and these two other

10         individuals --

11   A.    Right.

12   Q.    -- that you supervised.

13   A.    No.  No.  Now, when I was in the cubicles,

14         I didn't supervise anybody.

15   Q.    This was --

16   A.    That was in 2001.

17   Q.    Okay.

18   A.    When I was -- In 2001 it was me, Gail Wise

19         and Susan Moore.  And all three of us just

20         shared space.

21   Q.    Right.

22   A.    When I got promoted in 2003, I was in the

23         office adjacent to Lance Hester's office.

Deposition of Shannon Burton                    March 19, 2008

Page 32

1          And Ann Williams and Mary Catrett's office

2          were adjacent to each other.  So it was

3          four offices, but each person was in

4          individual offices.

5    Q.    So you had an individual office?

6    A.    In 2003.

7    Q.    Okay.  Are you still in that office?

8    A.    Yes.

9    Q.    Now, I'm jumping ahead here.  But as we sit

10         here today, you have the things you need in

11         that office to perform your job function?

12   A.    Not fully.

13   Q.    What do you not have that you need?

14   A.    A copier machine.

15   Q.    You need a copy machine in your office?

16   A.    Yes.  A color printer.

17   Q.    Okay.  Do you have access to a copy

18         machine?

19   A.    Yes.

20   Q.    Where is it located?

21   A.    In the basement.

22   Q.    And do you have access to a color printer?

23   A.    No.

Deposition of Shannon Burton                    March 19, 2008

Page 33

| | | |
|---|---|---|
| 1 | Q. | Why do you need a color printer? |
| 2 | A. | For the maps that we send out to our |
| 3 | | inspectors, they're color-coded now.  Each |
| 4 | | inspector knows what territory to cover. |
| 5 | | And it's better to view with it being |
| 6 | | colored so that all inspectors are not |
| 7 | | confused. |
| 8 | Q. | Have you made a request for a copier? |
| 9 | A. | We made a request for a copier in 2003 and |
| 10 | | in 2005. |
| 11 | Q. | And who did you make that request to? |
| 12 | A. | The immediate supervisor, Lance Hester. |
| 13 | Q. | And what was his response? |
| 14 | A. | As long as we keep using other people's he |
| 15 | | didn't see a need. |
| 16 | Q. | What about a color printer? |
| 17 | A. | I made a request in 2005 for a color |
| 18 | | printer, and he said he would work on it |
| 19 | | then.  We never did get it, so we still |
| 20 | | have to borrow somebody else's.  If they |
| 21 | | are at they desk, then we can borrow it. |
| 22 | Q. | Whose would you borrow?  Give me an |
| 23 | | example. |

Deposition of Shannon Burton                    March 19, 2008

Page 34

1    A.    Every now and then the pesticide manager.

2          They were the section adjacent to food

3          safety.

4    Q.    Did you make these requests for a copier or

5          color printer to anyone else other than

6          Lance Hester?

7    A.    I was asking procurement about what would

8          it take.  The people who do the ordering, I

9          just asked them what would it take to get a

10         color printer.  And she just said a letter

11         of justification.

12   Q.    From your supervisor?

13   A.    That's it.

14   Q.    Did you pass that on to Mr. Hester?

15   A.    Yes.

16   Q.    When is the last time you talked to him

17         about that?

18   A.    In 2005.

19   Q.    Do you report -- today do you report to

20         Mr. Hester?

21   A.    No.

22   Q.    To Mr. Scott?

23   A.    Mark Scott.

Deposition of Shannon Burton                    March 19, 2008

Page 35

1    Q.    How long have you been reporting to

2         Mr. Scott?

3    A.    Since April -- Well, since March of 2006.

4    Q.    Have you made a request for Mr. Scott about

5         a copier or a color printer?

6    A.    We just discussed it.  No request.  We just

7         discussed that we needed one -- for a color

8         printer.

9    Q.    Other than those two items, as we sit here

10       today you have the tools you need to

11       perform your job?

12    A.    Yes.

13    Q.    Do you -- Are you assigned a car today?  Do

14       you have a vehicle?

15    A.    My own vehicle.  I have my own vehicle.

16    Q.    I know.  But are you assigned a vehicle

17       from the department?

18    A.    No.

19    Q.    Have you ever been assigned a vehicle by

20       the State?

21    A.    For 24 hours.

22    Q.    Yeah.  I mean, for travel outside the

23       office or that kind of -- But I'm talking

Deposition of Shannon Burton                    March 19, 2008

Page 46

1    Q.    Have you asked your supervisor, Mark Scott,

2          or anyone else with the Department of

3          Agriculture about another position within

4          the Department of Agriculture?

5    A.    I haven't discussed no other position with

6          Mark Scott.

7    Q.    Or anybody else connected with --

8    A.    Commissioner Ron Sparks and Teresa Smiley

9          and Lance Hester.

10   Q.    You have discussed that with those three

11         individuals?

12   A.    Yes.

13   Q.    Tell me when you discussed it with the

14         commissioner.

15   A.    It was through a letter.  I think it was

16         the end of -- maybe sometime in 2004.  He

17         was starting up with this nutrition program

18         and diabetes.  And I wrote him a letter

19         telling him I was interested in the

20         nutrition -- whatever he's going to be

21         doing on that aspect, you know, talking to

22         the different kids, I guess, in different

23         schools, or whatever he was doing.  Anyway,

Deposition of Shannon Burton                    March 19, 2008

Page 47

1           I wanted to be a part of the nutrition

2           thing.

3     Q.    Would that have been a promotion for you?

4     A.    Yes.

5     Q.    Did you receive any kind of response?

6     A.    Yeah.  Gave me my letter back.

7     Q.    Okay.

8     A.    That was my response.  He gave it to Lance

9           Hester with my resume attached and told me

10          to get on as many registries as I could

11          possible.

12    Q.    Did he personally give you the letter back

13          or did Mr. Hester give it back?

14    A.    Mr. Hester gave it back to me and said this

15          is what the commissioner told me to tell

16          you.

17    Q.    To get on as many registries as possible?

18    A.    As possible.

19    Q.    And what does that mean to you?

20    A.    That means to me keep trying because I'm

21          not about to hire you.  That's what that

22          meant to me.

23    Q.    Did you ever have a conversation with the

Deposition of Shannon Burton                    March 19, 2008

Page 49

1          as many registries as well.

2    Q.    And who else did you talk to about it?

3    A.    Teresa Smiley.

4    Q.    Is she a deputy commissioner?

5    A.    Yes, she is.

6    Q.    Okay.  And what did she tell you?

7    A.    She's the one that brought it to my

8          attention that she was going to be working

9          with the commissioner on the food safety

10         and nutrition issue and I needed to get

11         aboard.

12   Q.    Well, have you talked to her about why you

13         didn't get a transfer or a new position or

14         anything of that nature?

15   A.    I just told her what the commissioner told

16         me, to get on as many registries as

17         possible.  And she told me according to her

18         understanding you didn't need to be on any

19         registries because this was his baby and he

20         was creating the positions.

21   Q.    So it's your understanding these were

22         positions that he was creating -- he, the

23         commissioner -- was creating in the

Deposition of Shannon Burton                    March 19, 2008

Page 50

1           Department of Agriculture?

2    A.    Yes.

3    Q.    And it's a position dealing with nutrition?

4    A.    Yes.

5    Q.    And it's a position that you had an

6          interest in?

7    A.    Yes.

8    Q.    And what -- I mean, did it have a title,

9          this position?

10   A.    Well --

11   Q.    I mean, or was this just a generalization?

12   A.    Whatever the title was going to be is going

13         to be -- come up with -- Whoever came up

14         with the title is going to be between the

15         commissioner and State personnel, because

16         they had to get together and do job

17         allotments and allocations and get specific

18         duties for the position.

19   Q.    Was that done?

20   A.    Eventually, yes.  Years later.  Because

21         from my understanding now, we have two or

22         three people that's in that position.  It's

23         always -- A young lady by the name of

Deposition of Shannon Burton                    March 19, 2008

Page 51

| | | |
|---|---|---|
| 1 | | Lauren Stone that does mainly nutrition. |
| 2 | | She cooks on several, I guess, talk shows |
| 3 | | or something every now and then promoting A |
| 4 | | Plus -- promoting Alabama Foods.  And she |
| 5 | | have assistants.  And the Deputy |
| 6 | | Commissioner, Ms. Smiley, was doing it |
| 7 | | before Lauren came, her and Ava. |
| 8 | Q. | And when was Lauren hired?  Do you know? |
| 9 | A. | I don't have the slightest idea.  I'm |
| 10 | | thinking it was at least in the end or |
| 11 | | maybe -- maybe the first of 2005. |
| 12 | Q. | So over a year after you had submitted your |
| 13 | | letter? |
| 14 | A. | No.  I submitted my letter to the |
| 15 | | commissioner in 2000 -- sometime the end of |
| 16 | | 2004. |
| 17 | Q. | Right. |
| 18 | A. | And Lauren, I guess, came maybe within six |
| 19 | | months to a year.  Because that's what she |
| 20 | | told me she was going to be doing, mainly |
| 21 | | nutrition. |
| 22 | Q. | And is she black or white? |
| 23 | A. | She's white. |

Deposition of Shannon Burton                    March 19, 2008

Page 53

1   A.   No.

2   Q.   No one else -- No one at the Department of

3        Agriculture that was an employee of the

4        Department of Agriculture knew you were

5        going to file an EEOC complaint?

6   A.   No.

7   Q.   Did you talk to a lawyer?

8   A.   Yes.  My first attorney.

9   Q.   Who was that?

10  A.   Victor Spencer.

11  Q.   He had represented you at the suspension

12       hearing, appeals hearing?

13  A.   Yes.

14  Q.   Now, did you talk to anyone with the State

15       Employees Association before you filed your

16       EEOC complaint?

17  A.   Yes.

18  Q.   When did you talk to them?

19  A.   It would have to be June, I think.  June of

20       2006 or maybe July 2006.

21  Q.   Okay.  And who did you talk to?

22  A.   I talked to Tanner Shealy and Norbert

23       Williams.

Deposition of Shannon Burton                           March 19, 2008

Page 56

1        Ms. Fitzpatrick on a regular basis, don't

2        you?

3    A.   No, I don't meet with them.

4               MS. BATTLE-HODGE:  I'm going to

5                  object to the form --

6            MR. WILSON:  That's fine.

7            MS. BATTLE-HODGE:  -- of the

8               questions that you're asking.

9            MR. WILSON:  She answered it.

10   Q.   All right.  Let me ask you this.  What was

11       discussed at that meeting with the A --

12       Alabama State Employees Association, ASEA?

13   A.   ASEA.

14           Several things were discussed.

15       Mr. Norbert Williams said we're going to be

16       informal, and he just went around the room

17       and asked a series of questions to each one

18       of us.  I can't mainly remember what

19       everybody discussed.  But when it was my

20       turn to discuss, mine was mainly on the

21       suspension.

22   Q.   And we'll get to that.

23           But your concerns involved the fact

Deposition of Shannon Burton                    March 19, 2008

Page 59

1   Q.   Didn't tell anybody at the department other

2        than these employees that knew?

3   A.   That's right.

4   Q.   Let me ask you a little bit about some

5        allegations in your complaint.  You

6        reference in there that you had -- You were

7        called to jury duty in Montgomery County in

8        October '05; is that right?

9   A.   That's right.

10  Q.   Had you ever served on a jury before?

11  A.   First time.

12  Q.   And I think from reading some of the

13       information that's been provided to me that

14       you actually did serve on a jury that week;

15       is that right?

16  A.   Two unfortunately.

17  Q.   Oh, you did.

18            What was the first case that you served

19       on?

20  A.   DUI.

21  Q.   Do you remember which judge had the case

22       you were in front of?

23  A.   Was it judge -- I think it was Gene Reese.

Deposition of Shannon Burton                    March 19, 2008

Page 61

1          called every day.

2     Q.   And then I think I saw something on that

3          Friday you were dismissed but --

4     A.   Yeah, we had went in --

5     Q.   -- since you had gone, you didn't ...

6     A.   I think we went in for probably one hour

7          and he dismissed us.

8     Q.   And then you took leave for the rest of

9          that day?

10    A.   Right.

11    Q.   Now, just out of curiosity, during that

12         week had you had any contact with anybody

13         with your office about what was going on,

14         what was, you know ...

15    A.   I went into the office and actually sat

16         down when we got a break.  I think maybe

17         that Tuesday or Wednesday was, like, a

18         three -- two and a half, three hour dis --

19         I think a two or three hour break.  And I

20         came back to my desk and actually did some

21         work before I went back to jury duty.

22    Q.   That was either on Tuesday or Wednesday?

23    A.   Yes.

Deposition of Shannon Burton                    March 19, 2008

Page 62

1    Q.    And let me back up.  When you found out
2          that you had been called for jury duty, did
3          you let your supervisor know?
4    A.    Yes.
5    Q.    And do you have to fill out any forms or --
6    A.    Not until you return.
7    Q.    Okay.  You just have to let your supervisor
8          know and then you go to jury duty?
9    A.    Yes.
10   Q.    And your supervisor at that time would have
11         been Mark Scott?
12   A.    Would have been Lance Hester.
13   Q.    I mean, Lance Hester.  I'm with you.
14         October of '05.
15             And when you went back to work either
16         on that Tuesday or Wednesday for that two
17         or three hours, what did you do?
18   A.    Opened up a pile of mail that was on my
19         desk.
20   Q.    And when you say a pile of mail on your
21         desk -- When mail is delivered, does it --
22         do you receive mail directly?
23   A.    Directly.  I either go get it or whoever go

Deposition of Shannon Burton                     March 19, 2008

Page 64

1  Q.   Were you supervising Mary Catrett at this

2       point --

3  A.   At the time --

4  Q.   -- on jury duty?

5  A.   Yes.

6  Q.   Did you inform her that you were going to

7       be on jury duty?

8  A.   Yes.

9  Q.   And Ms. Williams --

10 A.   Yes.

11 Q.   -- she knew you were going to be on jury

12      duty as well?

13 A.   All three.

14 Q.   Did you discuss with them how to handle the

15      mail in your absence?

16 A.   Yes.  They knew how to handle the mail in

17      every absence.  That wasn't the first time

18      I was absent.

19 Q.   Okay.  And as I understand it, there was

20      some issue about the mail when you came

21      back from jury duty.  It hadn't been

22      opened.

23 A.   Yes.  I -- When I returned back that

Deposition of Shannon Burton                    March 19, 2008

Page 65

1          Monday -- I think it was October 31st -- I

2          counted over 500 pieces of mail on my desk

3          unopened for the entire week.

4     Q.   Now, was this mail that had accumulated

5          since you had been there on either the

6          Tuesday or Wednesday or is this the whole

7          week?

8     A.   Over the period because it was several

9          pieces.  It was more than a hundred pieces

10         on my desk when I came back that Tuesday or

11         Wednesday.

12    Q.   Were you able to get those opened?

13    A.   No.  I still left a bulk of that there

14         because I had to go back and report for

15         jury duty.

16    Q.   Did you discuss it with Ms. -- with Mary

17         Catrett or Ms. Williams about what they

18         needed to do with the mail?

19    A.   Lance was not in the office, I think, and

20         Ms. Williams was at lunch the time frame I

21         was there and I did not see Mary.

22    Q.   Did you send them an e-mail?

23    A.   No.

Deposition of Shannon Burton                      March 19, 2008

Page 66

1    Q.    And when you returned from jury duty that
2          following Monday, you had to fill out a
3          form concerning the jury duty and the time
4          you missed; right?
5    A.    Well, not that particular Monday.
6          Eventually it came when it was time to do
7          the time sheets for that time period.
8    Q.    Right.
9    A.    Then I filled out the form for the
10         information about the jury duty.
11   Q.    Right.
12             When you returned and you discovered
13         all this -- 500 pieces of mail on your desk
14         unopened, did you talk with Mary Catrett or
15         Ms. Williams?
16   A.    I talked to the person who was left in
17         charge, which was the division director who
18         is the immediate supervisor, Lance Hester.
19   Q.    But my question was, did you talk to
20         Ms. Williams or Mary Catrett?
21   A.    When I eventually -- When I initially
22         returned, the first person I talked to was
23         Lance Hester.

Deposition of Shannon Burton                    March 19, 2008

Page 67

1    Q.    What did you tell him?

2    A.    I asked him was he aware that the mail was

3          unopened.  And he said he was under the

4          assumption that Mary and Ann was opening up

5          the mail all week.

6    Q.    And you told him that it hadn't been

7          opened?

8    A.    Yes.  Because I brought it in to him and

9          showed him.

10   Q.    What else did he say?

11   A.    And he said that can't be true because he

12         was under the assumption that Mary and Ann

13         were opening the mail.

14   Q.    What -- Was there anything else said?

15   A.    It was several things said.  I didn't get

16         in that day until after twelve, so I don't

17         know if I -- we finished discussing after

18         he came back from lunch.  Yeah, we finished

19         the discussion after he came back from

20         lunch.  And we talked about the mail for at

21         least 45 minutes to an hour.

22   Q.    Why did you get in at twelve on that

23         Monday?

Deposition of Shannon Burton                        March 19, 2008

Page 68

1    A.    Apparently I either had a doctor's

2            appointment or something.  I don't remember

3            why, but I had some type of -- where I had

4            to come in later.

5    Q.    So when you did get in, that's when you

6            took the mail in to Mr. Hester and asked

7            why it hadn't been opened?

8    A.    Right.

9    Q.    And his response was that he assumed that

10          it had been?

11    A.    Yes.

12    Q.    And you showed it to him --

13    A.    Yes.

14    Q.    -- that it hadn't been?

15    A.    Yes.

16    Q.    And y'all talked about that?

17    A.    Yes.

18    Q.    Did you discuss why either Mary Catrett or

19          Ms. Williams had not opened the mail?

20    A.    Yes.  That's what we mainly discussed.  And

21          he was under the impression that she was

22          opening it.  And I went back and told him,

23          I said, well, no, it should have been Ann

Deposition of Shannon Burton                    March 19, 2008

Page 69

1          mainly because I had a leave slip on my

2          desk for two days that Mary Catrett was out

3          on leave.  So the time frame left, Ann

4          Williams would have been the only one there

5          to open up the mail.

6     Q.   Why didn't she open it up?

7     A.   No one knows why.

8     Q.   You never asked her?

9     A.   I asked her.  I asked everybody, and they

10         said, well, I had to do my permits, the

11         ones that were already open.  That's what

12         Ann Williams' response was, she had to do

13         her permits.  But permits are in that mail;

14         requisitions are in that mail.  If the mail

15         is not opened, you can't continue to do

16         your permits.

17    Q.   Let me just ask you this to clarify it in

18         my mind.  As her supervisor do you feel

19         like that she had the time and capability

20         to open that mail while you were on jury

21         duty?

22    A.   Yes, I do.

23    Q.   Now, Mary Catrett had been out two of those

Deposition of Shannon Burton                        March 19, 2008

Page 71

1         under the impression that it was opened

2         every day.  And that's when I brought up

3         the point, I said, well, you can look at

4         the postmark dates on the mail and see that

5         it hasn't been opened every day because

6         it's different days of the week that was on

7         the mail.

8   Q.   And there's an allegation in your complaint

9         that says you stated to Mr. Hester that if

10        you had left the mail opened -- unopened

11        for an entire week a, quote, federal case

12        would have been made out of the situation.

13        What do you mean by that?  Did you make

14        that statement to him?

15   A.   I told him had I left the mail opened it

16        would have been a federal case -- unopened

17        for an entire week.  Meaning, it would be

18        more than just nonchalant.  I mean, because

19        that's the attitude I was receiving from

20        anybody, that it was nonchalant.  Because I

21        got more than just that office.  I mean,

22        labs, they would send in requisitions --

23        emergency requisitions for any equipment

Deposition of Shannon Burton                    March 19, 2008

Page 72

1    they needed down at the labs.  And if the

2    mail is unopened, who is signing

3    requisitions; who is processing

4    transmittals.  I mean, work was not being

5    done.

6         I mean, Lance is the immediate

7    supervisor.  He passed by my office every

8    day and he see the mail sitting there.  I

9    mean, I would think he would delegate.

10   Okay, this mail is sitting on Ms. Burton's

11   desk; can we get it opened; I know it's

12   something in there that's time sensitive.

13 Q.   So you feel like in your absence Lance

14      Hester should have addressed the mail

15      situation?

16 A.   Yes.

17 Q.   In your complaint, you say that before you

18      left his office after this discussion about

19      the mail that you said, quote, it does not

20      matter anyway because if this incident ever

21      comes up again about the mail not being

22      opened, you probably would not remember I

23      told you about the postmark dates on the

Deposition of Shannon Burton                    March 19, 2008

Page 73

1          mail of every day of the week and probably

2          would not tell the truth about the dates.

3          Is that -- Did you make that statement?

4     A.   Yes.

5     Q.   What was that all about?

6     A.   Because Lance is the first one to tell you

7          he has the worst memory.  He sends us memos

8          stating how bad his memory is.

9     Q.   What do you mean by the -- I mean, what's

10         the deal about the postmark dates?  What

11         difference did it matter what the postmark

12         dates were?  The mail was -- it wasn't

13         opened, was it?

14                   MS. BATTLE-HODGE:  Object to the

15                   form of your question.  Just

16                   as to the form of the

17                   question.

18    Q.   You can answer.

19                   MS. BATTLE-HODGE:  If you want --

20                   Would you repeat it?

21              MR. WILSON:  Yeah.

22    Q.   What's the significance about the postmark

23         dates?

Deposition of Shannon Burton                    March 19, 2008

Page 75

1           be a typo on my part.

2                    MR. WILSON:  That's fine.

3   Q.   And then in that next paragraph you state

4        that he had had an appointment and about

5        ten minutes later he came back to your desk

6        and said he had a question regarding the

7        last comment you made.  Do you recall that

8        happening?

9   A.   Yes.

10  Q.   Tell me what happened after that.

11  A.   I think he had someone sitting out in my

12       office waiting to see him.  I was still in

13       his office, and we were still discussing

14       the mail.  And when I looked I saw

15       Ms. Fitzpatrick sitting in my office.  She

16       had an appointment with him, so she went in

17       and met with him for maybe ten or 15

18       minutes.

19            And after their meeting was over,

20       that's when he approached my desk.  He

21       said, I have a rebuttal and a comment about

22       the last statement you made.  And I said,

23       well, what do you mean.  And he said, well,

Deposition of Shannon Burton                    March 19, 2008

Page 76

1          you honestly believe that if this situation

2          was to ever come up again in the future I

3          would not tell the truth about these

4          postmarked dates or the mail.  And I said,

5          yes, I believe that.  Because he's the

6          first one to tell you he has a bad memory.

7     Q.   What does having a bad memory have to do

8          with not telling the truth?

9     A.   You don't remember I brought it to your

10         attention that the mail was unopened on my

11         desk and it would be insignificant to you

12         at the point when I bring it up again.

13         That's what that means to me.  You're not

14         going to be truthful about it anyway,

15         because he does not have a good memory.

16    Q.   It says you said that you answered, yes, I

17         honestly believe that you would not tell

18         the truth.  Did you tell him that?

19    A.   Yes.  Because he asked.  He asked my

20         opinion.

21    Q.   And you believed and your opinion was that

22         he wouldn't tell the truth?

23    A.   Yes.

Deposition of Shannon Burton                    March 19, 2008

Page 78

1          was gone to jury duty, I didn't think they

2          would assist me then, so I just opened it.

3          Since I were they supervisor at the time, I

4          opened the mail.  It had to be done.

5     Q.   Oh, I understand.  But did you ask them?

6     A.   I did not ask them.

7                    (Brief recess was taken.)

8     Q.   Ms. Burton, going back to the initial

9          meeting that you had with Mr. Hester about

10         the mail.  Do you recall making the

11         statement to Mr. Hester that you would

12         probably lie about it anyway?

13    A.   I did not make that statement to

14         Mr. Hester.

15    Q.   How long after the meeting did you receive

16         this warning letter?

17    A.   Thursday.  Maybe the fourth day.  This was

18         Monday when we had the discussion, so I got

19         the letter November 3rd.

20                    (Defendant's Exhibit 1 was marked

21                    for identification.)

22    Q.   Ms. Burton, let me show you what I'm going

23         to mark as Defendant's Exhibit 1, which I

Deposition of Shannon Burton                    March 19, 2008

Page 79

1          represent to you appears to be -- concerns

2          the warning that you received from

3          Mr. Lance Hester.

4     A.   Yes.

5     Q.   Can I see it again?

6               (Off-the-Record discussion.)

7     Q.   Looking at Defendant's Exhibit 1, it states

8          up top that -- it's checked a warning;

9          correct?

10    A.   Yes.

11    Q.   And did you meet with Mr. Hester concerning

12         this warning?

13    A.   Yes.

14    Q.   Was anybody else present?

15    A.   Initially just Mr. Hester and me.

16    Q.   And down there at the bottom it's dated

17         November 3, '05.  Would you agree with

18         that?

19    A.   Yes.

20    Q.   Is that your recollection of when the

21         meeting occurred?

22    A.   Yes.

23    Q.   And was the meeting in -- what, in his

Deposition of Shannon Burton                    March 19, 2008

1          attention.  It says, the behavior is found

2          to be disruptive.

3               And you told me earlier that it's your

4          recollection that you didn't state that he

5          lied.  You didn't use the word "lie", is

6          that your recollection?

7     A.   That's my -- That's my statement.  He did

8          not -- I did not use the word "lie".

9     Q.   Your recollection is that you used the term

10         "probably wouldn't tell the truth about

11         it"?

12    A.   Right.

13    Q.   He also states in there that it also

14         demonstrates a failure to submit to

15         authority.  Do you agree with that or

16         disagree?

17    A.   Disagree.

18    Q.   And he says, and finally the action

19         indicates a demeanor of insubordination and

20         demonstrates a lack of respect for both the

21         person, Lance, and the supervisory

22         position.  Do you agree or disagree with

23         that?

Deposition of Shannon Burton                    March 19, 2008

Page 82

1    A.    Disagree.

2    Q.    Back in October of 2005, did you respect

3          Mr. Hester?

4    A.    I still do.

5    Q.    And did you have an opportunity at that

6          meeting to read this letter, this document?

7    A.    Yes.

8    Q.    And it states down there that the employee,

9          you, was requested to respond in writing

10         how she intends to correct the improper

11         behavior and state that you understand that

12         similar behavior in the future will result

13         in a reprimand or other disciplinary

14         action.  Did you submit anything in writing

15         at that --

16   A.    Yes, I did submit it -- something in

17         writing.  And it also states included in

18         this response should be an acknowledgment

19         that --

20               MS. BATTLE-HODGE:  Let him ask

21                  questions.

22               THE WITNESS:  Okay.

23   A.    But, yes, I did.

Deposition of Shannon Burton                    March 19, 2008

Page 83

1    Q.   It does say in there additionally
2         Ms. Burton indicated that she had done
3         nothing wrong by making the accusation.
4    A.   Where are you reading that?
5    Q.   I think it's right in there somewhere.  Do
6         you see that?
7    A.   Yes.
8    Q.   So you took issue with his position;
9         correct?
10   A.   I took issue that he stated that I accused
11        him of being a liar.
12   Q.   And you took issue with the fact that you
13        didn't think you deserved a warning?
14   A.   Right.
15   Q.   And it says that your written response is
16        to be completed and submitted by November
17        10, 2005.
18   A.   Yes.
19   Q.   Do you see that right above his signature?
20   A.   Yes.
21   Q.   And then there's a -- He signed it next to
22        supervisor's signature; correct?
23   A.   Yes.

Deposition of Shannon Burton                    March 19, 2008

Page 84

1    Q.    You did not sign it?

2    A.    No.

3    Q.    You were asked to sign it?

4    A.    Yes.

5    Q.    And it says down there at the bottom -- It

6          says, employee's signature denoted

7          discussion not necessarily agreement.  The

8          employee may have documents which must be

9          attached to this form.  The form must be

10         given to the employee with copies to the

11         supervisory file and personnel office file

12         in the agency.  Did you read that?

13   A.    Yes.

14   Q.    Did you understand that if you signed this

15         it didn't mean that by signing it that you

16         agreed to what was in it?

17   A.    Yes.  That's why I sent -- did my

18         attachment.

19   Q.    But you didn't sign the form?

20   A.    No.

21   Q.    And you were asked to?

22   A.    Yes.

23   Q.    And then you sent the attachment -- We'll

Deposition of Shannon Burton                    March 19, 2008

1           mark it as Defendant's Exhibit 2.

2                   (Defendant's Exhibit 2 was marked

3                   for identification.)

4                   (Brief recess was taken.)

5       Q.   Picking back up, Ms. Burton.  I think we

6            established that Defendant's Exhibit 1,

7            which was the warning that you received on

8            November 3, 2005, that you were asked to

9            sign it and you did not sign it on that

10           date; is that right?

11      A.   Yes.

12      Q.   And then you were also asked to submit a

13           written response by November 10, 2005,

14           which you did?

15      A.   Yes.

16      Q.   And which we have marked as Defendant's

17           Exhibit 2, which you have there in front of

18           you.  And when did you prepare this

19           response?

20      A.   I think I started on it the same day I

21           received the warning.

22      Q.   And did you do this there at your office at

23           the Department of Agriculture?

Deposition of Shannon Burton                    March 19, 2008

1    Q.    It's stated in there, Mr. Hester stated in

2          his letter --

3                You're talking about the warning,

4          right, Defendant's Exhibit 1?

5    A.    Yes.

6    Q.    -- that my behavior was so severe it

7          warranted immediate attention and that I

8          should write a response after signing his

9          letter.  Mr. Hester gave me a direct order

10         to sign his letter.  And then you say, I

11         cannot sell my soul to anyone; I will not

12         sign a false statement.  What do you mean

13         you can't sell your soul to anyone?

14   A.    By signing that that's agreeing to that

15         liar.

16   Q.    But didn't you understand that by signing

17         it it didn't mean you were agreeing to it?

18   A.    Okay.  That was a warning.  I didn't

19         understand why I was getting a warning for

20         my opinion.  That's why I didn't sign it.

21   Q.    But do you understand now that if you had

22         signed it it doesn't mean that you agree to

23         what's contained therein?

Deposition of Shannon Burton                March 19, 2008

Page 88

1   A.   I understand after the fact of the ALJ's

2        ruling that my submitting this writing was

3        my acknowledgment that I received this

4        warning.

5   Q.   So you contend by your written response on

6        November 10th that was your -- that that

7        equaled signing this warning letter dated

8        November 3, '05?

9   A.   Yes.

10  Q.   And you base that on what the ALJ said in

11       the opinion?

12  A.   Yes.

13  Q.   Now, prior to submitting your response on

14       November 10th, which we've marked as

15       Defendant's Exhibit 2, had anyone asked you

16       again or directed you to sign this warning

17       letter?

18  A.   I think Dr. Bloch.  Yeah, I believe

19       Dr. Bloch did.  Dr. Bloch and Mr. Hester

20       again.

21  Q.   And again you refused?

22  A.   Yes.

23  Q.   Look on the third page, first paragraph,

Deposition of Shannon Burton                    March 19, 2008

Page 96

1          you got a second warning letter.  And you

2          actually got it before you made your

3          response.  It's dated November 8th.

4                    (Off-the-Record discussion.)

5                    (Defendant's Exhibit 3 was marked

6                    for identification.)

7     Q.   This was a memorandum.  It says, corrective

8          copy, 11/14/05 dated November 8, '05.  Was

9          that -- Was the date wrong on that?  Did

10         you get what I've marked as Defendant's

11         Exhibit 3 on the 14th or on the 8th, or do

12         you know?

13    A.   Are you asking me was I given this on the

14         14th?

15    Q.   Yes.

16    A.   Yes, I'm believing that's when I -- because

17         that's the date --

18    Q.   Okay.

19    A.   -- at the bottom that Dr. Bloch witnessed

20         it.  It looks like November 14th.

21    Q.   Is that Dr. Bloch's --

22    A.   Signature.

23    Q.   Okay.  And the purpose of this warning --

Deposition of Shannon Burton                      March 19, 2008

Page 97

1           its subject, the written warning initially

2           you got November 3, 2005; right?

3     A.    This is a reprimand, I believe, and the

4           first one was a warning.

5     Q.    Well -- But I'm talking about up top.  It

6           says the subject --

7     A.    Oh, yes.

8     Q.    -- is just what brought this about?

9     A.    Right.

10    Q.    Okay.  And it concerned your refusal to

11          sign the initial warning back on November

12          3; is that right?

13    A.    That's right.

14    Q.    And was it your understanding that if you

15          continued to sign the written warning that

16          under the progressive discipline you -- the

17          next step would be you'd get a reprimand?

18    A.    No, that was not my understanding.

19    Q.    Well, why didn't you sign the written

20          warning?

21    A.    Because I didn't think I deserved a written

22          warning.

23    Q.    Did you understand after receiving this

Deposition of Shannon Burton                March 19, 2008

Page 99

1        14th.

2    Q.   Well, under the warning -- And we can argue

3         about what's in the documents.  But I'm

4         just trying to establish the fact that, you

5         know, you got the warning.  You filed your

6         response.  After you filed your response,

7         you got a second document we've marked

8         Defendant's Exhibit 3, which tells you

9         you're going to get reprimanded if you

10        don't sign the warning; isn't that correct?

11   A.   That's what they told me.

12   Q.   Okay.

13   A.   But that's still not my understanding.

14   Q.   And, again, you didn't sign the warning?

15   A.   Should be a copy somewhere where I

16        eventually signed one.

17   Q.   You did eventually.  But at that time you

18        didn't?

19   A.   On the 14th, I think, I did, because I

20        signed it under pressure.

21   Q.   And you wrote that on there, I believe.

22        And I'm going to show it to Juraldine.  Let

23        me mark it first.

Deposition of Shannon Burton                    March 19, 2008

Page 103

1    A.    Yes.

2                    (Defendant's Exhibit 5 was marked

3                     for identification.)

4    Q.    I'm going to show you what I've marked as

5          Defendant's Exhibit 5.  It's a letter from

6          Teresa Brunson dated November 17th.  Do you

7          remember receiving that document?

8    A.    Yes.

9    Q.    And in that document what did Ms. Brunson

10         notify you of?

11   A.    That I did not sign the waiver of due

12         process for the suspension hearing and that

13         a hearing would take place Friday, November

14         18th at 10:30.

15   Q.    All right.  And was this letter from

16         Ms. Brunson -- how was it -- was it

17         hand-delivered to you?

18   A.    Jeff Webb brought it to my office.

19   Q.    And then you had a hearing with the

20         commissioner the following morning?

21   A.    The following morning.

22   Q.    Did anybody appear with you?

23   A.    No.  I wasn't given time.

Deposition of Shannon Burton                    March 19, 2008

Page 117

1     suspension?

2  A.  Nothing.  I just waited to hear from the

3      office to see when we were going to go see

4      the ALJ.

5  Q.  Well, I mean, did you file -- ask -- I

6      mean, did you file an appeal?  Did you tell

7      them you wanted to appeal, or how did

8      that --

9  A.  The appeal was written before I left.  I

10     wrote the appeal, I think, November 18th.

11 Q.  That's in your ...

12               (Off-the-Record discussion.)

13               (Defendant's Exhibit 8 was marked

14               for identification.)

15 Q.  This letter of November 18th, is that a

16     letter you gave the commissioner at the

17     time of the hearing that he conducted on

18     your suspension?

19 A.  Yes.

20 Q.  And you say in the first sentence,

21     Ms. Burton, this is a letter of appeal of

22     suspension.  And when you made that

23     statement, are you talking about an appeal

Deposition of Shannon Burton                    March 19, 2008

Page 119

1    Q.    What we referenced in Defendant's Exhibit

2          6?

3    A.    No.  That's in addition, because it doesn't

4          state clear -- I'm talking about the

5          actual -- back in 2005.

6    Q.    Okay.  And then you -- You said the

7          proposed suspension is not consistent with

8          agriculture's actions in similar

9          circumstances in the past.  And then you go

10         on to give an example.  You state, Jamie

11         Baxley used abusive language toward

12         Assistant Commissioner Doug Rigney.  Did

13         you hear Jamie Baxley use abusive language

14         against Assistant Commissioner Doug Rigney?

15   A.    Not directly.

16   Q.    You just heard about it?

17   A.    No.  I had witnesses who heard it, and I

18         subpoenaed them in the ALJ.

19   Q.    They told you about it?

20   A.    Yes.  Because they heard it.

21   Q.    And who were those individuals that heard

22         Jamie Baxley use abusive language against

23         Assistant Commissioner Doug Rigney?

Deposition of Shannon Burton                    March 19, 2008

Page 120

```
 1     A.    Sharqunel Kennedy and Teresa Smiley.

 2     Q.    And what was the abusive language?

 3     A.    Well, things I'd rather not say.  But she

 4           pretty much used foul language, cuss words.

 5     Q.    Is Jamie a female?

 6     A.    Yes.

 7     Q.    Black or white?

 8     A.    White.

 9     Q.    And she was told by the assistant

10           commissioner to leave his office with that

11           attitude?

12     A.    Yes.

13     Q.    Sent home for the rest of the day with pay

14           and not given a written reprimand --

15     A.    Yes.

16     Q.    -- nor was she suspended?

17     A.    Yes.

18     Q.    Do you know if she was given a warning?

19     A.    She wasn't.  Not a written warning.  Not a

20           written warning.

21     Q.    You talk about -- at the bottom of that

22           about freedom of speech and the Supreme

23           Court of the United States.  I mean, is it
```

Deposition of Shannon Burton                    March 19, 2008

Page 127

1           appeal in front of the administrative law

2           judge?

3    A.     By me seeking an attorney?

4    Q.     Yes.  Well, you got an attorney; correct?

5    A.     Right.

6    Q.     And that was Mr. Spencer?

7    A.     Yes.

8    Q.     And he filed something on your behalf

9           requesting this suspension -- appeal of

10          your suspension from the administrative law

11          judge?

12   A.     No.  The commissioner did that.

13   Q.     Okay.  And at that -- When was that hearing

14          held?

15   A.     April -- I'm sorry.  February 21, 2006.

16   Q.     And where was it held?

17   A.     The State House building at the ALJ's

18          office.

19   Q.     And who was the ALJ, Tori Adams?

20   A.     Tori Adams.

21   Q.     And at that hearing you had witnesses that

22          you called?

23   A.     Yes.

Deposition of Shannon Burton                    March 19, 2008

Page 135

1              discipline book.

2      Q.    Does she work for the State Employees

3             Association?

4      A.    No.  She works for State personnel.

5      Q.    State Personnel Department?

6      A.    Uh-huh (positive response).

7      Q.    Is she still there?

8      A.    I don't know.

9      Q.    Anybody else?

10     A.    I said George Paris?

11     Q.    Yes.

12     A.    That's all I remember.  I had several folks

13            there, but all of them was not ...

14     Q.    You make an allegation in your complaint

15            that the day you appealed your suspension

16            on November 18th that the commissioner

17            immediately began retaliating against you.

18            And you state the commissioner instructed

19            maintenance workers and prison inmates to

20            tear down the plaintiff's cubicle.  Tell me

21            about that.

22                 MS. BATTLE-HODGE:  What

23                    paragraph?

Deposition of Shannon Burton                     March 19, 2008

Page 136

1                    MR. WILSON:  Oh, I'm sorry.  27.

2    A.    Yes.  This was immediately after the

3          hearing on the 18th.  Lance Hester

4          approached me and said the commissioner

5          said he didn't want the cubicle up anymore.

6    Q.    And this was -- And I think your complaint

7          says November 18, 2007.  That should be

8          '5.

9    A.    Two years ago.  2005.

10   Q.    So was it that same day that --

11   A.    Same day.

12   Q.    -- the cubicle was taken out?

13   A.    Yes, sir.

14   Q.    Tell me what was in that office at that

15         time.

16   A.    Basically the same thing that's in there

17         now; my computer, fax machine, couple of

18         chairs, desk and my printer.

19   Q.    And the cubicle -- Describe the cubicle to

20         me.

21   A.    I would say maybe it was a four feet --

22         maybe four and a half feet wall that was L

23         shaped with a desk in front of it that was

Deposition of Shannon Burton                    March 19, 2008

Page 137

1          attached to the actual cubicle, the

2          partition itself.  My refrigerator -- I had

3          a -- I don't know -- I guess, four and a

4          half feet refrigerator in there as well.

5          And I think it was only to the right corner

6          of the office.  It wasn't completely from

7          wall to wall.  It was halfway in the office

8          in the L shape that just covered the desk

9          and the computer.

10    Q.    And who had put the cubicle in there or

11          this wall?

12    A.    General services did.

13    Q.    At whose request?

14    A.    At my request.

15    Q.    And when did you have the cubicle put -- or

16          this wall placed in the office?

17    A.    Probably about eight to nine months prior.

18    Q.    And was this before or after you had the

19          refrigerator installed in your office?

20    A.    This was after.  Because I had done had the

21          refrigerator almost three years -- well,

22          total three years.

23    Q.    And this refrigerator, was it your personal

Deposition of Shannon Burton                     March 19, 2008

Page 138

| | | |
|---|---|---|
| 1 | | refrigerator? |
| 2 | A. | No.  That refrigerator was ordered through |
| 3 | | requisition. |
| 4 | Q. | And it was used by other employees other |
| 5 | | than yourself? |
| 6 | A. | Yeah.  Majority of the people on that hall |
| 7 | | probably would come in and store stuff in |
| 8 | | the refrigerator. |
| 9 | Q. | So all these people were coming in and out |
| 10 | | of your office putting stuff in the |
| 11 | | refrigerator and taking stuff out? |
| 12 | A. | No.  Not a lot of people.  Well, mainly I |
| 13 | | can say Sandra, Michelle.  I can say maybe |
| 14 | | five people I can count really that would |
| 15 | | come in two to three times a week. |
| 16 | Q. | When was the refrigerator removed? |
| 17 | A. | Maybe within a week, two weeks after -- I'm |
| 18 | | not sure.  It was either two to three weeks |
| 19 | | after the hearing. |
| 20 | Q. | And after it was removed and the privacy |
| 21 | | wall was removed, you had the entire office |
| 22 | | space to yourself; right? |
| 23 | A. | Uh-huh (positive response).  I've always |

Deposition of Shannon Burton                    March 19, 2008

Page 139

1          had the space to myself.

2     Q.   What did you need the wall for?

3     A.   Privacy wall.  Because, I mean, the inmates

4          was coming in and out of the office.  And I

5          just -- I didn't like, you know, just being

6          in their presence in the first place, so I

7          had that wall --

8     Q.   Why were they coming in and out of your

9          office?

10    A.   They always -- They come in and out of

11         everybody office.  Because, I mean, they

12         come in and they change lights.  Sometimes

13         they come in and fix stuff on the wall

14         units like the heaters, the air

15         conditioner.  They're doing something to

16         the vents all the time.  They was

17         constantly coming in and out of everybody's

18         office.

19    Q.   Do you contend that the removal of the

20         privacy wall and the refrigerator was as a

21         result of your appealing this suspension?

22    A.   Yes.  I believe it's retaliation.

23    Q.   And just so I'm clear on this.  You had the

Deposition of Shannon Burton                    March 19, 2008

Page 143

1        that if the suspension showed it was not

2        warranted I would in no way, shape, form or

3        fashion be penalized monetarily and my

4        evaluation would be redone to reflect the

5        difference.

6   Q.   Right.  And that hasn't been done?

7   A.   Has not been done.

8   Q.   Your suspension has not been overturned?

9   A.   It was recommended that it be rescinded and

10      nobody did it.

11   Q.  Right.  The ALJ recommended -- had made a

12      recommendation to the commissioner which

13      has not been accepted.  Is that your

14      understanding of where we are?

15   A.  I don't know, because he didn't -- the

16      commissioner did not notify me.

17   Q.  Well, you haven't been notified that the

18      suspension has been overturned, have you?

19   A.  No.

20   Q.  You haven't been notified --

21   A.  That it had been --

22   Q.  You haven't been notified that the

23      commissioner has adopted the ALJ's

Deposition of Shannon Burton                        March 19, 2008

Page 144

1           recommendation?

2   A.      No.

3   Q.      Do you understand that there's no

4           requirement that the commissioner has to

5           adopt the ALJ recommendation?

6   A.      I understand that he has to accept, reject

7           or modify and he did neither.

8   Q.      You say he did neither.

9   A.      He did none of the above.

10  Q.      He hasn't overturned the suspension?

11  A.      He hasn't accepted, rejected.

12  Q.      Has the suspension been overturned by the

13          commissioner?

14  A.      Not as of this day.  I mean, I don't know

15          if he has the power to overturn it.  I

16          thought the ALJ would recommend and then

17          follow whatever procedures.

18  Q.      I thought you told me that you did

19          understand that the commissioner could

20          either accept or reject --

21  A.      Or modify.

22  Q.      -- or modify.

23  A.      And none of those three things to this day

Deposition of Shannon Burton                    March 19, 2008

Page 145

1          that I understand has been done.

2     Q.   Well, you don't -- To your knowledge, it

3          hasn't been accepted?

4     A.   It hasn't been accepted.

5     Q.   Hasn't been modified?

6     A.   Hasn't been modified.

7     Q.   And hasn't been overturned?

8     A.   And hasn't been rejected.

9     Q.   Rejected.

10         But your suspension has not been

11         removed from your file?

12    A.   No.

13    Q.   You've not been repaid any money?

14    A.   No.

15    Q.   And as far as your position as a State

16         employee, you had a ten or 12 -- you had a

17         12-day suspension, ten days of which were

18         without pay?

19    A.   Correct.

20    Q.   Now, when you had this meeting with the

21         State Employees Association in June of

22         '06 -- and in your complaint you say it's

23         June 23, '06 -- you told me that your only

Deposition of Shannon Burton                     March 19, 2008

Page 147

```
 1        you're not looked upon as equals.  That's

 2        what we were complaining about.  That's

 3        what I mostly remember everybody else was

 4        saying.  But, like I said, at least

 5        primarily most of my complaint was about my

 6        suspension.

 7    Q.  And in this paragraph you talk about

 8        plaintiff -- that means you -- and your

 9        black coworkers discussed the hiring and

10        promoting disparity and the disparity in

11        issuing State cars.  And I think you told

12        me you don't -- you haven't ever had a

13        State car, so that's not --

14    A.  No.

15    Q.  -- an issue with your complaint that we're

16        here about today; right?

17    A.  No.

18    Q.  In paragraph 42, you say in August of '06

19        you were not placed on the register for the

20        position of agriculture marketing

21        specialist.

22    A.  On 42?

23    Q.  43.
```

Page 148

1    MS. BATTLE-HODGE:  We deleted that

2        one.

3    MR. WILSON:  Okay.

4    MS. BATTLE-HODGE:  Yeah.  Just

5        that -- It kind of explains

6        that one little paragraph

7        there.  43 and ...

8    MR. WILSON:  I got it.

9    MS. BATTLE-HODGE:  You got it.

10   MR. WILSON:  Sorry about that.  So

11       that's not an issue in this

12       case?

13   MS. BATTLE-HODGE:  Right.  We've

14       taken that issue out.

15   MS. MARKS:  All the paragraphs

16       leading up to that are the

17       same, I think.

18   MS. BATTLE-HODGE:  Right.  Just

19       kind of --

20   MR. WILSON:  I think 43 --

21   MS. BATTLE-HODGE:  So now we have

22       a different 43.

23   MR. WILSON:  Okay.

Deposition of Shannon Burton                    March 19, 2008

Page 149

1           MS. MARKS:  That's right.

2      Q.   In your amended complaint, it says in

3           September of '06 -- September 20, '06

4           plaintiff reviewed her personnel file and

5           you discovered and Teresa Brunson witnessed

6           that some documents were missing.  What

7           documents are missing?

8      A.   Majority of them.  The suspension, the

9           recommendation from the ALJ.  That's all I

10          can remember now.  But I know it was more

11          than that.

12     Q.   You -- Well, you've obviously seen the

13          recommendation from the ALJ, have you not?

14     A.   Yes.

15     Q.   And what else -- And the suspension.  What

16          are you talking about the suspension?

17     A.   It was two letters of suspension.  I only

18          received -- I think it was only one copy in

19          there that was dated November 22nd, but the

20          one from November 15th --

21     Q.   Was not in there?

22     A.   -- was not in my file at the time.

23     Q.   But you have a copy of that; right?

Deposition of Shannon Burton                    March 19, 2008

Page 151

1          to EEOC.  I went the same month.  Both

2          situations happened in the same month.

3     Q.   Right.

4               Did you ever check back?

5     A.   No.

6     Q.   At any time have you ever gone back?

7     A.   I went downtown and checked my main file to

8          State personnel, not to agriculture's

9          personnel.

10    Q.   Were --

11    A.   And the recommendation is not in there

12         either.

13    Q.   What recommendation?

14    A.   From the ALJ office.

15    Q.   Has that affected your position with the

16         Department of Agriculture in any way?

17    A.   Yes, it has.

18    Q.   How?

19    A.   Applying for other positions when they go

20         in and see I've been suspended.

21    Q.   What other positions have you applied for?

22    A.   The ones I named earlier about the tax

23         evaluation analyst, health insurance

Deposition of Shannon Burton                    March 19, 2008

Page 152

1          administrator.

2     Q.   These are positions that you've placed your

3          name on the registry for?

4     A.   Uh-huh (positive response).  And over at

5          mental health.

6     Q.   Well, how would the fact that the -- help

7          me out -- that the administrative law

8          judge's recommendation wasn't in your

9          personnel file downtown affect whether or

10         not you could get a job on the registry?

11    A.   Because it does not show that the

12         suspension was recommended to be rescinded.

13    Q.   How do you know that?

14    A.   How do I know what?

15    Q.   That it would affect your -- It could have

16         an effect on your being selected for one of

17         these positions that you --

18    A.   Because from my ten years with the State.

19         Anybody who's looking to hire -- A State

20         employee has a right to go down and look at

21         your personnel file to view it.  Any

22         potential employer has a right to do that.

23    Q.   You don't know that that's happened, do

Deposition of Shannon Burton                              March 19, 2008

Page 153

| 1 | | you? |
|---|---|---|

1     you?

2    A.   I've been told.

3    Q.   By who?

4    A.   Other employees.

5    Q.   I need their names.

6    A.   Well, put it like this.  I've been told

7     that it is possible that some of those

8     employees did look in my file who I applied

9     for positions and that's why I probably

10    didn't get the position.

11   Q.   Well, you need to tell me who told you

12     that.  If you have their names --

13   A.   No, I do not.

14   Q.   -- of somebody that knows that.

15     So nobody -- Has somebody -- You're

16     telling me that somebody has told you

17     that --

18   A.   Just in discussing this with people who

19     work for State personnel.

20   Q.   Right.

21   A.   They're saying it's a possibility.

22   Q.   But nobody has told you that that's

23     actually happened?

Deposition of Shannon Burton                    March 19, 2008

Page 154

1    A.    No, no one has told me that.

2    Q.    You can't -- As we sit here today, you

3          can't tell us that's why you hadn't gotten

4          another job?

5    A.    I can tell you that's a possibility why I

6          haven't got another job, because it's part

7          of the situation.

8    Q.    But you don't have any evidence to support

9          that, that somebody else from another --

10   A.    I'm sure --

11   Q.    -- agency has gone down there and looked --

12         Just let me finish my question.

13               You don't have any evidence as we sit

14         here today that someone from another State

15         agency where you have applied for a job or

16         you're trying to get a job has gone down

17         and looked at your personnel file?

18   A.    I don't have that evidence with me because

19         I haven't gone back to check.  I'm sure if

20         I go back and check with State personnel --

21         Because you are required to sign in and out

22         a person's personnel file when you go to

23         check it out.  So I can't say.  Because I

9ea995e8-29d5-43b8-b97d-b087f8c9fec2

Deposition of Shannon Burton                    March 19, 2008

Page 157

1    Q.    And I think you told me you requisitioned

2          the privacy wall.

3    A.    I requisitioned --

4    Q.    The refrigerator?

5    A.    Yes.

6    Q.    And had the privacy wall installed?

7    A.    Yes.

8    Q.    And did the removal of the privacy wall and

9          refrigerator have an effect on your ability

10         to perform your job function in any way?

11   A.    It was a disruption of the refrigerator

12         being removed but not performing my duties.

13   Q.    Just the removal of the refrigerator itself

14         when they did it?

15   A.    Yes.

16   Q.    I want to ask you about -- You may want to

17         refer to it in your amended complaint.

18         There's a reference to a -- that your

19         duties were changed and there was a Form 40

20         to be completed that was not done.  What is

21         a Form 40?

22   A.    It's a description for State personnel for

23         each position.

Deposition of Shannon Burton                    March 19, 2008

Page 158

1   Q.   Okay.  And when did your duties change that
2        would have required the completion of a
3        Form 40?
4   A.   When I received a letter from Lance, May, I
5        think, of 2005 taking away the supervisory
6        duties and again in April -- it was either
7        April or May or 2006.
8   Q.   Did you say Lance May?
9   A.   Lance gave me the letter in May.
10  Q.   Oh, I'm sorry.  I'm sorry.  I misunderstood
11       you.
12            And you say one was done for Mary
13       Catrett?
14  A.   What was done?
15  Q.   A Form 40.  You say -- You said when a
16       white similarly-situated employee's duties
17       were changed, Mary Catrett, a Form 40 was
18       completed on her?
19  A.   Yes.  To my knowledge a Form 40 was
20       completed on her.  Because she got a
21       promotion.
22  Q.   Right.
23  A.   So she had to do a Form 40.

Deposition of Shannon Burton                    March 19, 2008

Page 161

1    A.    Affected my job?

2    Q.    Well, let me ask you -- Let me strike that.

3    A.    Okay.

4    Q.    The fact that this Form 40 was not

5          completed as you state in paragraph 45 of

6          your amended complaint, did that affect

7          your rate of pay --

8    A.    No.

9    Q.    -- in any way?

10   A.    My rate of pay, no.

11   Q.    Did it affect your employment status or

12         position with the Department of Agriculture

13         in any way?

14   A.    The only thing it affects would show what I

15         do and do not do.

16   Q.    Okay.  Well, you knew you weren't

17         supervising those two employees anymore;

18         correct?

19   A.    Yes.

20   Q.    Do you know why Ann Williams transferred?

21   A.    She said she was getting a better

22         opportunity down the hall, but it wasn't

23         discussed with me why she was transferring.

Deposition of Shannon Burton                    March 19, 2008

Page 162

1        No one --

2    Q.  Did you ever have any --

3    A.  -- told me why.

4    Q.  Did you ever -- You didn't discuss it with

5        her?

6    A.  No.

7    Q.  Did you ever have any differences with her?

8    A.  No.

9    Q.  And she's black; correct?

10   A.  Yes.

11   Q.  You've made a claim for race discrimination

12       in your amended complaint.  What's the

13       basis of your race discrimination claim,

14       Ms. Burton?

15   A.  It's the basis of how I was treated as far

16       as the situation.

17   Q.  With the suspension?

18   A.  With the suspension and everything that led

19       up -- How it was handled and the

20       suspension.

21   Q.  But it all -- I'm just trying to make sure

22       I understand.  Your race discrimination

23       claim is based upon the suspension and how

Deposition of Shannon Burton                    March 19, 2008

Page 163

1        it was handled?

2    A.   Yes.

3    Q.   Anything else that you can think of?

4    A.   Mainly how it was handled and the

5         retaliation and the suspension.

6    Q.   Your retaliation claim, that's also based

7         on the suspension?

8    A.   Yes.

9    Q.   And your due process claim is also based on

10        the suspension and how it was handled?

11   A.   Yes.  The time frame of it.

12   Q.   Right.

13            Now, let me back up just to be sure I'm

14        clear on this, because I think we touched

15        on this earlier and I don't want to repeat

16        anything.  But what positions have you

17        applied for within the Department of

18        Agriculture that you have not been

19        appointed to, if any?

20   A.   I was -- I inquired about the nutrition

21        position through a letter to the

22        commissioner.

23   Q.   Any other -- Other than that inquiry that

Deposition of Shannon Burton                    March 19, 2008

Page 226

1    Q.    Okay.

2    A.    Eventually just a refrigerator was by

3          itself.

4    Q.    But there's a drink machine there now?

5    A.    Yes.

6    Q.    And then on March 22nd, you say the

7          commissioner stood at your entrance and

8          didn't say anything.  You said you spoke to

9          Sparks.  What did you say?

10   A.    Hello.  Can I help you.

11   Q.    And he didn't say anything?

12   A.    Didn't say a word.

13   Q.    And on March 27th that's -- now that's when

14         you say the refrigerator was removed.

15   A.    Yeah.  In March.

16   Q.    So when was your -- Your hearing in front

17         of the ALJ was in February; right?

18   A.    February 21st.

19   Q.    Okay.  And you said that was retaliation

20         for removing your refrigerator?

21   A.    Yes.

22   Q.    Then what's the April 4th incident?  Said

23         something about you were -- at 10:15 a.m.

Deposition of Shannon Burton                    March 19, 2008

Page 227

|    |     |                                           |
|----|-----|-------------------------------------------|
| 1  |     | You were driving down Atlanta Highway.  Was |
| 2  |     | that during the workweek?                 |
| 3  | A.  | Yes.                                      |
| 4  | Q.  | Where were you going?                     |
| 5  | A.  | I was on annual leave that day.           |
| 6  | Q.  | You were -- This was on Federal Drive?    |
| 7  | A.  | Yes.                                      |
| 8  | Q.  | Where were you heading at that time?      |
| 9  | A.  | I was heading to Shear Satisfaction.      |
| 10 |     | That's a hair salon next door to the      |
| 11 |     | department.                               |
| 12 | Q.  | What's your complaint?  I mean, what are  |
| 13 |     | you -- what's --                          |
| 14 | A.  | Why are you circling and following me?    |
| 15 | Q.  | He knew you worked for the Department of  |
| 16 |     | Agriculture, didn't he?                   |
| 17 | A.  | Yeah.                                     |
| 18 | Q.  | Did he know you were on annual leave that |
| 19 |     | day?                                      |
| 20 | A.  | I don't know what he knew.                |
| 21 | Q.  | Well, let's just assume for the purpose of |
| 22 |     | my question that he did recognize you and |
| 23 |     | that he thought you should have been at   |

9ea995e8-29d5-43b8-b97d-b087f8c9fec2

Deposition of Shannon Burton                    March 19, 2008

Page 228

1          work and that he did follow you to find out

2          where you were going.  Would there be

3          anything wrong with that --

4     A.   Yes.

5     Q.   -- as commissioner of agriculture?

6     A.   Because you don't do that to all employees.

7     Q.   Well, you -- every employee for the

8          department is supposed to report to work

9          promptly and work the hours that they're

10         paid for; right?

11    A.   But if I'm on annual leave --

12              MS. BATTLE-HODGE:  That's

13                   argumentative.

14    Q.   I don't want to argue with you.

15              You don't know if the commissioner knew

16         you were on annual leave or not on that

17         day, do you?

18    A.   No.

19    Q.   Are you sure that was the commissioner?

20    A.   I'm positive.

21    Q.   Have you talked to him or anybody else

22         about that incident since March -- or April

23         4th?

Deposition of Shannon Burton                    March 19, 2008

1     Q.   They're not pled in your complaint, are

2           they?

3     A.   They're not what?

4     Q.   They're not pled actually in the

5           complaint.

6     A.   No, I don't think they are.  No.

7     Q.   How do you feel like you were retaliated

8           against if the commissioner of agriculture

9           saw you out during the workweek and

10          followed you in traffic?  How is that

11          retaliation?

12    A.   Why are you following me?

13    Q.   Well, let me ask you.  Did it affect your

14         pay at the Department of Agriculture?

15    A.   By me filing the complaint it affected my

16         pay.

17    Q.   Well, no, I'm talking about by him

18         following you.  That didn't affect your pay

19         in any way, did it?

20    A.   It affect my sense of security.

21    Q.   Well, it hasn't affected your pay to date,

22         has it?

23    A.   No.

Deposition of Shannon Burton                    March 19, 2008

Page 231

1   Q.   Hasn't affected your employment to date,

2        has it?

3   A.   Yes.

4   Q.   How has it affected your --

5   A.   The environment --

6   Q.   I mean, you still work for the department?

7   A.   I still work for the department, but the

8        environment is not --

9   Q.   Just hold on.

10  A.   -- pleasant.

11  Q.   Okay.  And it hasn't affected any benefits

12       that you receive as a State employee at the

13       present time, has it?

14  A.   No.

15  Q.   Hasn't affected your ability to do your job

16       as an employee of the Department of

17       Agriculture, has it?

18  A.   Mentally.  Because I'm always wondering who

19       is looking over my shoulder, who's

20       following me and why.

21  Q.   Is that the only instance that you can

22       refer me to that you think you were being

23       followed?

Deposition of Shannon Burton                    March 19, 2008

Page 243

1              MS. BATTLE-HODGE:  Well, I think

2                  she's answered.  I think she's

3                  saying that at this time she

4                  told you all she can think of,

5                  but she's not --

6    A.    I'm not 100 percent certain of that.

7              MS. BATTLE-HODGE:  -- closing

8                  herself off to anything.

9    A.    I may think of something I just forgot to

10         say today.

11             MS. BATTLE-HODGE:  -- in the

12                 future.

13   Q.    Well, let me ask it this way just so -- I

14         think I already asked you this.  But, I

15         mean, is there anything else -- You've got

16         a claim for race discrimination.  And you

17         told me about your claims.  We've been

18         through the counts in your complaint and

19         all the documents that we've been over.

20             Is there anything else as we sit here

21         that you can think of today that supports

22         your claim for race discrimination against

23         the Department of Agriculture?

Deposition of Shannon Burton                    March 19, 2008

Page 244

| | | |
|---|---|---|
| 1 | A. | Just other incidents that have happened and |
| 2 | | no one else was suspended but me. |
| 3 | Q. | Well, I need to know what those are, then. |
| 4 | A. | Like the -- You read it.  The one |
| 5 | | with Jamie Baxley. |
| 6 | Q. | I mean, you've -- that you haven't already |
| 7 | | told me about. |
| 8 | A. | Oh, that I haven't already told you about. |
| 9 | | It's numerous but -- Referring back to |
| 10 | | Jamie Baxley being able -- I mean, she got |
| 11 | | upset even with Sharon Fulmer.  That's the |
| 12 | | executive assistant to the commissioner. |
| 13 | | She was ticked from my understanding.  Now, |
| 14 | | this is not nothing I got -- |
| 15 | Q. | How does that support your claim -- your |
| 16 | | claim for race discrimination? |
| 17 | A. | I'm trying to give you a comparison.  It's |
| 18 | | not racial.  I'm just talking about |
| 19 | | incident of suspension.  That's what I'm |
| 20 | | referring to at this moment. |
| 21 | Q. | I'm just trying to find out if there's |
| 22 | | anything else that you haven't told me |
| 23 | | that's not contained in your lawsuit and |

Deposition of Shannon Burton                    March 19, 2008

Page 245

1          you haven't told me about today that

2          supports your claim -- count one of your

3          amended complaint of racial

4          discrimination.  You told me basically that

5          it arises out of your suspension?

6     A.   Right.

7     Q.   And the same for your retaliation?

8     A.   Right.

9     Q.   And the same for your due process claim?

10         It arises out of the suspension and the

11         notice and the -- the hearings that were

12         conducted?  You claim that violated your

13         due process rights?

14    A.   Right.  Because of the time frame.

15    Q.   Is there anything else that you claim

16         violated your due process rights other than

17         your suspension and the time frame

18         associated with the hearing?

19    A.   No, not at this time.  No.

20    Q.   All right.  I appreciate your time.  And if

21         you'll try to get that phone and the

22         calendar.  I'm going to ask you for that.

23

THIS IS A   (   ) COUNSELING        ( X ) WARNING       (   ) REPRIMAND

Employee Name        Shannon R. Burton

*State the facts of the performance or work conduct problem:*
On Monday October 31, 2005 an incident occurred as documented in this report.  A discussion took place between myself and Shannon Burton, ASA III.  The discussion was about the incoming mail and whether or not any of the mail had been processed since she was out on jury duty the previous week.  Ms. Burton indicated that the dates on the mail indicated that none had been processed while she was out.  She further indicated that the dates for the mail she had in her hands dated back to October 21, 2005. She asked if I wanted to review the stack to see for myself.  I indicated that I did not feel that was necessary but if she wanted me too I would review the materials.  Ms. Burton then said "it would not matter because you (Lance Hester) would lie about it anyway".  Ms. Burton then exited my office and went to her desk in the office adjacent to mine.  I walked into her office and to her desk and informed Ms. Burton that the statement she made was not acceptable.
The purpose of this warning is to present in writing the improper conduct exhibited by Ms. Burton.  The accusation that I would lie about the situation certainly requires immediate attention.  The behavior is found to be very disruptive.  It also demonstrates a failure to submit to authority.  And finally, the action indicates a demeanor of insubordination and demonstrates a lack of respect for both the person (Lance) and the supervisory position.
*State what actions have been taken with the employee prior to this step of discipline (include counseling, coaching, and/or any disciplinary step):*
Through this warning letter an attempt has been made to document improper behavior.  A warning was necessary because of the severity of the behavior.  Additionally, Ms. Burton indicated that she had done nothing wrong by making the accusation.
*State how the situation can be resolved based on discussion with employee and input from the employee:*
The employee is requested to respond in writing how she intends to correct the improper behavior.  Included in the response should be an acknowledgment that referenced  type of behavior is not acceptable.  Also the employee should state that she understands similar behavior in the future will result in a reprimand or other disciplinary action.

*If a corrective action plan is developed in conjunction with the discipline, include the time frame that is being monitored for change in performance and the follow-up meeting date:*
The written response is to be completed and submitted by November 10, 2005.

Supervisor's Signature:  *Lance M. Hester*

Employee's Signature:  *Shannon Burton* 11/14/05

Date of Meeting:  11-3-05        *Under severe pressure!!!*

Employee's signature denoted discussion not necessarily agreement.  The employee may add comments which must be attached to this form.  The form must be given to the employee with copies to the supervisory file and Personnel Office file in the agency.

*Witness* 11-14-05

**TO:**      Lance Hester

**FROM:**    Shannon Burton

**DATE:**    November 10, 2005

**RE:**      Response to your inaccurate letter of accusations

On Monday October 31, 2005, I came in to work to discover mail in my chair and on my desk that had not been open for an entire week. The week of October 24-28, I was serving on jury duty. When I returned, I was shocked to find so much mail unopened for an entire week. The first thing I thought, no permits have been processed, penalties posted, nor emergency requisitions approved and sent to accounting and procurement for processing. We receive regular requisitions weekly, but often one of the labs will call me and ask what process is one of their requisitions in, because it is an emergency for the product. When I started opening the mail, I discovered several requisitions that had been sitting on my desk the entire week I was away on jury duty. No one took the requisitions to the proper sections of the department for completion. It was very clear that no one cared to open the mail.

I went into Mr. Hester's office and stated in a question form, "Are you aware that the mail has not been opened for an entire week?" Mr. Hester responded, "I was under the assumption that Mary Catrett was opening the mail." I told Mr. Hester that could not have been the case because I have postmark dates on the mail from everyday of the week and it was a tremendous amount of mail. Mary Catrett was on leave October 24-25. That is two days I know for a fact that the mail was not opened. The person who usually brings the mail noticed it accumulating in my chair and asked Anne Williams what did she want her to do with the mail because it was a lot and Mrs. Williams told the young lady to put the mail in my chair. I asked Mr. Hester if he would like to look at the mail in my hands to see the postmarked dates. He stated that he did not think it was necessary, but if it would make me happy, he would look at the mail. I told Mr. Hester it was not about making me happy, it was about the productivity of the office.

I stated that if I had left the mail unopened for an entire week a federal case would have been made out of the situation. At this time, Ms. Wilma Fitzpatrick entered into my office, took a seat, and waited to see Mr. Hester. When I noticed someone was waiting to see Mr. Hester, I made my last comments, which were "it does not matter anyway because if this incident ever comes up again about the mail not being opened, you probably would not remember I told you about the postmark dates on the mail of everyday of the week and probably would not tell the truth about the dates anyway." After my last comments, Ms. Fitzpatrick enters Mr. Hester's office and meet with him for about ten minutes. Mr. Hester came to my desk after Ms. Fitzpatrick left the office and stated, "I have a rebuttal and question for the last comments you made." I then asked Mr. Hester what he needed to know, he stated, "Do you honestly believe I would not tell the truth about the postmark dates on the mail even if I looked at the mail and I stated, "Yes, I

honestly believe that you would not tell the truth. **This is my belief not an accusation.**
Mr. Hester asked me to come into his office and discuss how we could get pass this so we
all could be on the same team. I stated I am willing to be a team player but it takes the
entire office of employees to be willing. Mr. Hester and I talked in his office for
approximately 45 minutes about how he wants all of the employees of the food safety
section to be team players.  Not once did Mr. Hester elaborate on how he felt my
comments about he would probably not tell the truth about the mail were unacceptable to
him, disruptive, indicated a demeanor of insubordination, lack of respect for his position,
nor how it demonstrated a failure to submit to authority. I can elaborate on how Mr.
Hester's comments to me earlier this year, were unacceptable. Mr. Hester saw Joe Barnes
come to my office one afternoon about ten minutes after five, I gave Joe some money.
The next day he saw Ms. Teresa Smiley giving me money and stated, "This is the second
day after five I have seen money being exchanged, **what are you doing, dealing drugs?**"
Joe borrowed money for gas and Ms. Smiley was buying Girl Scout cookies. Mr. Hester's
comments were disrespectful, disruptive, demeaning and racist.  I did not disrespect Mr.
Hester in any shape, form or fashion, nor was my behavior disruptive.  Mr. Hester did not
ask me to perform a task, and I deliberately did not complete the task, so how is this
insubordination. Once again, **this is my belief not an accusation**. I am not aware of any
law or regulation by State Personnel that states an employee must have **"FAITH"** in their
supervisor to work for them. How in the world can Mr. Hester convict me on my
opinion? It is obvious my belief is more important to Mr. Hester than unopened mail for
an entire week.  In my opinion, this demonstrates a lack of supervision of work
productivity and a lack of concern for the consumers of the State of Alabama by Mr.
Hester.

Unopened mail for an entire week means no productivity of work in the food
safety section.  We are experiencing a problem now with consumers calling in everyday
saying they received a **final notice** in the mail from the food safety section and majority
of the consumers state they mailed their application and payment for a permit in July and
in August of this year.  The Food Safety Section did not receive the consumers'
applications and payments.  The calls are overwhelming and several comments have been
made by employees in the food safety section who answers the calls; they state the
consumers are rude and upset.  Consumers are upset that they have to stop payment on
the first check, pay a fee for the stop payment, and send in a second check.  Since the
food safety section is already experiencing an enormous amount of calls from consumers
stating they have received a **final notice** and will be mailing in a second application and
payment; **opening the mail should have been important.**

Mr. Hester stated in his letter that my behavior was so severe it warranted
immediate attention and that I should write a response after signing his letter.  Mr. Hester
gave me a direct order to sign his letter. I cannot sell my soul to anyone. I will not sign a
false statement. He also indicated that in my response to his letter, I should admit to
disruptive behavior, insubordination, failure to submit to authority and state how the
behavior is unacceptable and similar behavior in the future will result in a reprimand and
disciplinary action. I need to know, if my response is to tell my side of the story, why is

Mr. Hester telling me to admit to his accusations in my response. In Mr. Hester's letter a question was asked, what actions have been taken with the employee prior to this step of discipline (include counseling, coaching and/or any disciplinary step)? Mr. Hester's statement to this question was; this is an attempt to document improper behavior. This was necessary because of the severity of the behavior. I have never had a documented or verbal counseling, coaching or any disciplinary steps. Why Mr. Hester chooses to make my belief a disciplinary step, I will never know the truth. What I do know, my belief does not constitute being written up, disrupt the department, interfere with work productivity, indicates failure to submit to neither authority nor insubordination. I do not have to have **"FAITH"** in Mr. Hester to work for him.

It is obvious there is not even a small amount of mutual trust in the food safety section. In an age of such intense competition for both business and personal progress, mutual suspicion has replaced mutual trust. Mutual trust is the basic ingredient of all honest and effective human relationships. In a place of business, it may require an extra measure of mental discipline to become a team player as well as a team leader and I believe this measure should start with the food safety section's leader, Mr. Hester.

C: Ron Sparks, Commissioner
   Teresa Smiley, Deputy Commissioner
   Agriculture's Personnel
   State Personnel

THIS IS A    ( ) COUNSELING    ( ) WARNING    ( X ) REPRIMAND

Employee Name:_____· Shannon R. Burton_____

*State the facts of the performance or work conduct problem*:

On November 3, 2005, you were given a written warning (attached). You have repeatedly refused to sign the document. Written documentation is also given in attached Memorandum to you dated November 8, 2005.

You have refused to follow a directive from your supervisor(s). By State Personnel work rules, this action is defined as insubordination.

*State what actions have been taken with the employee prior to this step of discipline (including counseling, coaching, and/or any disciplinary step):*

A warning notice (attached) was given to you on Thursday, November 3, 2005. The notice was discussed with you for approximately two hours. In addition to you and me, Teresa Smiley and Teresa Brunson were also present. On Monday, November 7, 2005, you were given a directive from Dr. Bloch and myself in the presence of Teresa Smiley to sign the document. It was explained to you that your signature does not denote agreement and you would be provided an opportunity to respond in writing to the information in the warning notice. This information concerning your signature and opportunity for written response is also contained in the attached document. After you refused to sign the document on Monday, November 7, 2005, it was decided that we needed to advise Commissioner Ron Sparks. On Monday, November 7, 2005, we met with Commissioner Sparks and updated him on the situation. Commissioner Sparks requested you to come down to his office. In addition to you and me, Teresa Smiley, Teresa Brunson, Dr. John Bloch, and Commissioner Ron Sparks were present in the meeting. Commissioner Sparks requested I provide the warning notice to you for an additional thirty minutes and instructed you to respond by either signing the document or refusing to sign the document. Commissioner Sparks stated that if you refused to sign the document then the next step in the progressive discipline process will be necessary. Thirty-five minutes after providing you with the warning document you advised Dr. Bloch, Teresa Smiley, and myself that you would not sign the document. A written memorandum to you dated November 8, 2005, is also attached that documents in writing that you were provided information that reflects the necessary steps in the progressive discipline process should you elect to not follow the directive of your supervisor(s).

*State how the situation can be resolved based on discussion with employee and input from employee:*

There needs to be a commitment from you to follow supervisory directives. I need to re-assure you are equipped with information from State Personnel and this department and have a clear understanding of the requirements so that further disciplinary actions are not necessary.

*If a corrective action plan is developed in conjunction with the discipline, include the time frame that is being monitored for change in performance and the follow-up meeting date:*

As a first step it is requested that you acknowledge in writing the requirements of State Personnel work rules relative to following supervisory directives. You should also state an intention and plan to follow directives.

Supervisor's Signature: _____

Employee's Signature: _____

Date of Meeting: _____11/10/05_____

Employee's signature denoted discussion not necessarily agreement. The employee may add comments which must be attached to this form. The form must be given to the employee with copies to the supervisory file and Personnel Office file in the Agency.

Signature page of Reprimand was corrected on 11/14/05 to reflect the correct date (11/10/05) and not 10/11/05.

_11/14/05_

# Handbook
# For
# Employees



**Alabama Department of
Agriculture and Industries**

The reviewing supervisor should hear appeals by the employee if there is disagreement concerning the ratings. This will end the appeal process except where discrimination is alleged. In that case, the employee has the right to have the rating reviewed by the Commissioner or the Assistant Commissioner. An employee has the right to place a statement in their personnel file if they disagree with their rating.

### Transfers:

The Commissioner may assign a classified employee in the Department from one position to another in the same classification if the need arises because of changes in duties of a job or because of funds.

An employee may transfer from one state department to another in the same classification if both department heads and the State Personnel Director have approved the transfer.

### Demotion:

The Commissioner may demote a classified employee from a position in one class to a position in a lower class in the same series. The employee must be given the reasons for the demotion in writing and the action is subject to the approval of the State Personnel Director.

### Promotions:

It is the policy of the Department to fill vacancies from the ranks whenever a qualified employee is available. Employees are encouraged to prepare themselves for promotion to the next higher position. Promotion shall be based upon merit and competition.

### Resignation:

When leaving the classified service, an employee is expected to submit a letter of resignation to the Commissioner with a copy to the Division Head. The letter of resignation should be submitted at least two weeks prior to the effective date. The Commissioner will certify that the employee's service has been satisfactory or unsatisfactory.

and will recommend that the employee should or should not be considered for re-employment.

### Layoff:

The Commissioner can lay off an employee in the classified service whenever he deems it necessary by reason of shortage of work or funds or the abolition of a position or other material change in duties or organization. Seniority in the Department in the classification, service ratings, and veteran's preference are considered in determining the order of layoffs.

### Dismissal:

The Commissioner may dismiss an employee and will provide such employee a written notice of reasons for dismissal and the dismissal date. The Commissioner must also provide the employee with an opportunity for an oral and/or written response to the charges, to include a hearing. If such is requested by the employee. If the employee wishes to appeal the dismissal further, he/she may file such request with the State Personnel Board. This request for a hearing must be received in the State Personnel Department within ten days of the employee's notice of dismissal.

The State Personnel Board can hold a hearing, and approve the dismissal or, if the charges appear to be unjustified, can order reinstatement of the employee to the job with or without back pay.

### Suspension:

The Commissioner may suspend any employee without pay or other compensation as punishment for disciplinary or other just cause. Such suspension shall not exceed thirty days during any twelve month period. The Commissioner must notify the employee in writing of the reasons for the suspension, and the employee may submit in writing any answers or explanations concerning the reasons for the suspension to the Commissioner and/or the State Personnel Director. The employee will be afforded an opportunity to rebut, in a hearing before the Commissioner, the allegations in the letter of suspension before final action is taken.

**Form 13**
**Revised (06/2005)**

### EMPLOYEE PERFORMANCE *APPRAISAL*
### STATE OF ALABAMA
### Personnel Department

Employee Name: <u>SHANNON R BURTON</u>

Social Security Number: <u>418 -25 -9044</u>

Agency: <u>001/AGRICULTURE & INDUSTRIES</u>

Division: <u>2100/FOOD SAFETY</u>

Classification: <u>ADMIN SUPPORT ASST III</u>

Class Code: <u>10198</u> Position #: <u>00338000</u>

Period Covered From: <u>12/01/2004</u> To: <u>12/01/2005</u>

Annual Raise Effective: <u>FEBRUARY 2006</u>

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN 422 - 76 - 2233 | | SSN 420 - 64 - 0581 |
| *Janie M. Hunter* | *Shannon Burton* | |
| Rater Signature | Employee Signature | Reviewer Signature |
| 11-30-05 | 12/13/05 | 12/13/05 |
| Date | Date | Date |
| JH 12-13-05 | S. Burton 12/15/05 | |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

| 28.3 | - | 17 | = | 11.3 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☒ | ☐ | ☐ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

**WORK HABITS:** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary.

| | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | | ✓ | |
| Punctuality | | ✓ | |
| Cooperation with Coworkers | | ✓ | |
| Compliance with Rules | | ✓ | |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1. Write/composes documents | 3 |
| 2. Monitors/distributes FAX information documents | 3 |
| 3. Reviews processes reports | 2 |
| 4. Compiles/constructs quarterly and annual reports | 3 |
| 5. Assist Program Director by performance of special projects | 3 |
| 6. Opens/sorts/distributes mail | 3 |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

| 17 | ÷ | 6 | = | 2.83 | × | 10 | = | 28.3 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be documented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If no disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| **Warning** | **Reprimand** | **Suspension** | **Demotion** |
|---|---|---|---|
| | | X | |

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand, **suspension, and demotion only**. The Disciplinary Score does not include scores for counseling and warnings. To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:** _17_



**STATE OF ALABAMA**

**DEPARTMENT OF AGRICULTURE AND INDUSTRIES**
1445 Federal Drive
Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

<u>VIA Hand Delivery</u>:

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

November 22, 2005

Shannon Burton
Food Safety Division
State of Alabama
Agriculture and Industries
1445 Federal Drive
Montgomery, Alabama 36107

    *RE:*   *Notice of Suspension*

Dear Ms. Burton:

On Thursday, November 17, 2005, you were hand delivered a notice of an internal pre-suspension hearing as required in the Alabama Department of Agriculture and Industries' Handbook for Employees. On Friday, November 18, 2005, you were afforded an opportunity to rebut and informally respond to the charges against you. You appeared at this informal hearing before me, submitted verbal and written answers to the charges against you, and submitted a letter referenced as a "Letter of Appeal of Suspension."

The charges upon which your suspension is based arise from incidents beginning on Monday, October 31, 2005, in which you stated to your supervisor: *"you would probably lie about it anyway."* For this incident, you were given a Letter of Warning, which you refused to sign. Despite several opportunities, you continued to be insubordinate by refusing to obey direct orders to sign the Letter of Warning. Finally, after receipt of a Letter of Reprimand for these acts of insubordination and given another opportunity, you signed the Letter of Warning, but twice refused to sign the Letter of Reprimand.

1.    Therefore, under the State's progressive discipline policy, you are hereby suspended because of your refusal to sign your supervisor's *Letter of Reprimand* on Thursday, November 10, 2005; and,

2.    Refusal to sign your supervisor's *Letter of Reprimand* on Monday, November 14, 2005.

You were warned that continued acts of insubordination would result in more disciplinary action and that failure to sign the disciplinary actions was insubordination. Despite this knowledge, you continued to refuse to sign the disciplinary actions.

# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
1445 Federal Drive
Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

Shannon Burton
Food Safety Division

page 2

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

I have again reviewed and considered the charges against you, your rebuttal, and written notice of appeal from your suspension. My final action is to proceed with the suspension as previously stated; that is to say, *you are hereby suspended for 10 working days without pay which includes the Thanksgiving holidays, starting on Wednesday, November 23, 2005, and ending on Tuesday, December 6, 2005.* You are instructed to return to work on Wednesday, December 7, 2005, at 8:00 A.M.

In view of your appeal from your suspension, you have a right to a post-suspension review. Within 10 days of November 18th, the date of your notice of appeal, I will do one of the following:

a.       Appoint a panel, composed of three individuals with two of whom are in the same or equivalent classification as you, to decide questions of fact, conclusions of law, and make recommendations to the Commissioner; or,

b.       Appoint a designated hearing officer, from an approved ASEA list, who will decide questions of fact, conclusions of law, and make recommendations to the Commissioner.

Once the decision has been made, you will be notified in writing when your post-suspension review will take place.

It is regrettable that this action is necessary, but your actions cannot be condoned.

Sincerely,

RON SPARKS
Commissioner

RS/rss

cc:     Doug Rigney, Assistant Commissioner
Dr. John Bloch
Mr. Lance Hester
Teresa Brunson, Personnel Director
Legal Division

2



# STATE OF ALABAMA
## PERSONNEL DEPARTMENT
300 Folsom Administrative Building
Montgomery, Alabama 36130-4100
Telephone: (334) 242-3389 Fax: (334) 242-1110
www.personnel.state.al.us



Jackie Graham
**State Personnel Director**
Paul D. Thomas
**Deputy Director**

State Personnel Board
Joe Dickson
James Anderson
John McMillan
Ellen G. McNair
Joyce P. O'Neal

April 27, 2006

Commissioner Ron Sparks
Alabama Department of Agriculture & Industries
1445 Federal Drive
Montgomery, Alabama 36107

      RE:    In the Matter of Shannon Burton,
                Recommendation of the Administrative Law Judge

Dear Commissioner Sparks:

I have reviewed the Recommendation of the Administrative Law Judge, in which ALJ Tori Adams recommended that your suspension of Shannon Burton be rescinded because "the record as a whole does not support substantively the imposition of a suspension, in this case." The ALJ based her decision, in part, on the progressive discipline policies and procedures of the State Personnel Department ("SPD"). For the reasons stated below, I respectfully disagree with her interpretation of SPD policies in this matter.

Based on the facts that the ALJ adopted, your recommendation to suspend Ms. Burton was consistent with current SPD disciplinary policies and procedures. According to the facts, Ms. Burton engaged in and was suspended for several incidents of misconduct: (1) calling her supervisor a liar, (2) refusing written and oral instructions from her supervisor to sign a written warning, and (3) refusing to obey orders on two occasions to sign a letter of reprimand.

Citing the SPD Progressive Discipline Manual (2005), the ALJ stated that the suspension was not warranted, because, she says, SPD's policy does not notify a State employee that signing the disciplinary form is required and will subject the employee to separate discipline. The ALJ wrote that SPD's policy requires an employee to provide a signature as acknowledgment of receipt of the disciplinary form is not a mandate that the signature be on the form itself. Instead, the opinion states that "[a] preference is not a mandatory requirement."

Commissioner Sparks
Page 2
April 27, 2006

The ALJ misinterprets and misapplies this SPD policy in this case. The ALJ mischaracterizes Ms. Burton's conduct as a "failure to comply with an optional or preference recommendation in a manual" and does not amount to insubordination, or even "improper behavior." However, the preferred form of acknowledgment of signing the disciplinary form, which the ALJ terms "not a mandatory requirement," became mandatory when Ms. Burton's supervisor instructed her to sign the warning and the reprimand. Thereafter, Ms. Burton's refusals to sign the documents were acts of insubordination and subject to disciplinary action, including suspension.

Rule 670-X-19.01(2)(b) of the State Personnel Board Rules permits suspension or termination on the first offense for serious violations such as insubordination. Insubordination is defined as the "[f]ailure to follow an order; disobedience; failure to submit to authority as shown by demeanor or words, with the one exception of not following an order which the employee has good reason to believe is unsafe or illegal." Ms. Burton's refusal to follow the order of her supervisor to sign the documents is insubordination under this definition. Likewise, her statement in which she called her supervisor a liar is insubordination because she demonstrated a failure to submit to authority through words. The ALJ's characterization of Ms. Burton's conduct as "disrespectful or disruptive" is correct, but contrary to the ALJ's conclusion, is still insubordination and worthy of disciplinary action, including suspension or even termination, as determined by the appointing authority.

The State Personnel Board has had many occasions to interpret "insubordination" as that phrase is used in the SPD Rules. A few examples where the Board found that the employee was insubordinate are as follows:

- In the appeal of a Department of Corrections employee, the Board upheld the termination for the employee failing to obey a direct order as to the placement of his lunch bags.

- Another employee's dismissal for insubordination was upheld when an employee said an expletive in response to a supervisor's instruction and walked out of the room.

- An ABC employee's termination for insubordination was upheld when the employee refused to transfer to a particular ABC store.

- An employee of the Treasurer's Office was terminated for insubordination for failing to obey a direct order to provide a home telephone number and failure to return FMLA paperwork.

- An employee's termination from DOC was upheld for his refusal to provide his supervisor with a copy of documents that he was copying and became loud, abusive and disruptive when ordered to write a statement regarding the incident.

Commissioner Sparks
Page 3
April 27, 2006

- The Public Service Commission dismissed an employee for insubordination for telling her supervisor to "go to hell" and calling him a "horrible man."

- A DOC employee was terminated for becoming "agitated" with his supervisor and telling him to "go for it."

It is clear from the above examples that the State Personnel Board considers "disrespectful and disruptive conduct" to be insubordination. The State Personnel has consistently found that failure to obey a direct order is insubordination. The law is clear: "[S]ubstantial deference [must be given] to [the Personnel Board's] interpretation of its rules and regulations." *Mobile County Pers. Bd. v. Tillman*, 751 So. 2d 517, 518 (Ala. Civ. App. 1999). The Personnel Board's interpretation of its own regulations "must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation." *Ex parte Bd. of School Com'rs of Mobile County*, 824 So. 2d 759, 761 (Ala. 2001) (quoting *Ferlisi v. Alabama Medicaid Agency*, 481 So. 2d 400, 403 (Ala. Civ. App. 1985)). The Personnel Board's interpretation of its own policies "is controlling unless it is plainly erroneous." *Id.* Thus, under the Board's interpretation, Ms. Burton's conduct clearly was insubordinate.

Therefore, for the above-stated reasons, I respectfully disagree with the ALJ's interpretation of State Personnel Department's policies and procedures in relation to this situation. If you have any further questions, please do not hesitate to contact me.

Sincerely,

Jackie Graham
State Personnel Director

(5/01)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | **420-2006-05211** |
| | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mrs. Shannon R. Burton** | **(334) 286-0266** | **11-19-1970** |

| Street Address | City, State and ZIP Code |
|---|---|
| **3253 Capwood Curve, Montgomery, AL 36116** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **AL DEPT OF AGRICULTURE & INDUSTIES** | **201 - 500** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **1445 Federal Drive, Montgomery, AL 36107** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

RECEIVED EEOC
SEP 2 7 2006
MONTGOMERY DISTRICT OFFICE

| DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | Earliest | Latest |
| ☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | **02-21-2006** | **09-27-2006** |
| ☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.) | ☐ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began my employment with the employer named above as an administrative assistant on September 1, 2001. Since on or about February 21, 2006, I have been subjected to adverse terms and conditions of employment to include my having to remove my personal refrigerator from my office, having the privacy wall removed from around my desk, having my job duties and responsibilities changed to include being giving duties that a White female did not want. I have been followed by a member of management while I was off work on annual leave. In August of 2006, I was denied a promotion to the position of agriculture marketing specialist based on my lack of education, although I have a master's degree. However, a lesser qualified white was selected for the position.

I believe that I was discriminated against in violation of Title VII of the 1964 Civil Rights Act, as amended because of my race, Black and in retaliation to my complaint that I was suspended because of my race.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| I declare under penalty of perjury that the above is true and correct. | |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| **Sep 27, 2006**    _Shannon Burton_ | |
| Date          Charging Party Signature | |