IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2008 MAY 30 P 2:19

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

|  |  |  |
|---|---|---|
| SHANNON BURTON, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No: 2:07CV548-T |
| ALABAMA DEPARTMENT OF AGRICULTURE AND INDUSTRIES, | ) | 2: 0807CV548-T |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE AND OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW** the Plaintiff and hereby moves this Honorable Court to deny Defendant's Motion for Summary Judgment.  As grounds therefore, the Plaintiff avers that there is a genuine issue of material fact and the Defendant is not due a Summary Judgment as a matter of law.  In support of his response, Plaintiff relies on the applicable law, pleadings, affidavits and evidentiary materials attached hereto:

1. Exhibit "1"   - Complaint

2. Exhibit "2"   - Answer

3. Exhibit "3"   - Amended Complaint

4. Exhibit "4"   - Answer to Amended Complaint

5. Exhibit "5"    - Plaintiff's Affidavit

6. Exhibit "6"   - Certificate of Jury Service

7.  Exhibit "7"   - Progressive Discipline

8. Exhibit "8"   - Warning, reprimand, suspension

9.  Exhibit "9"    - ALJ Recommendation

10. Exhibit "10"   - Personnel File

11. Exhibit "11"   - Motion to Enforce

12. Exhibit "12"   - EEOC Complaint

13. Exhibit "13"   - Hester Memorandum

14. Exhibit "14"   - Hester's Deposition

15. Exhibit "15"   - Hester's Letter to Plaintiff

16. Exhibit "16"   - Jackie Graham's Letter

17. Exhibit "17"   - Spenser's April 10, 2006,  Letter

18. Exhibit "18"   - Spencer's August 4, 2006 Letter

19. Exhibit "19"   - Orientation Manual

20. Exhibit "20"   - Evaluations

21. Exhibit "21"   - Recordings

**WHEREFORE, THE PREMISES CONSIDERED,** Plaintiff respectfully request that this Honorable Court deny Defendant's Motion for Summary Judgment and allow this case to move forward.

Respectfully submitted on this the 30th day of May 2008.

_____
Juraldine Battle-Hodge (3072-G-61J)
Attorney for Plaintiff

OF COUNSEL:
**LAW OFFICE OF JURALDINE BATTLE-HODGE, P.C.**
318 N. Decatur Street
Montgomery, AL 36104
Telephone:   (334) 262-1177
Facsimile:    (334) 263-5569

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of May 2008, the foregoing document was served upon the following counsels of record by placing a copy of the same in the U.S. Mail, First Class postage prepaid, addressed as follows:

Hon. Emily C. Marks
Hon. E. Hamilton Wilson, Jr.
BALL, BALL, MATTHEWS & NOVAK, P.A.
2000 Interstate Park Drive, Suite 204
Post Office Box 2148
Montgomery, AL 36102-2148


_____
Of Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2007 JUN 20  A 11: 40

SHANNON BURTON,                     )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )       Case No. _____
                                    )
ALABAMA DEPARTMENT OF               )       JURY DEMAND
AGRICULTURE & INDUSTRIES,           )
                                    )
                                    )
        Defendant.                  )

## COMPLAINT

**COMES NOW** Shannon Burton (Plaintiff), and for her complaint against Alabama Department of Agriculture & Industries and its agents and representatives (Defendant) hereby complains as set forth herein below.

## JURISDICTION

1.    This Court has jurisdiction over the litigation herein pursuant to 28 U.S.C. Sections 1331 and 1343, 42 U.S.C., Section 2000e, the 14th Amendment to the Constitution of the United States of America and Retaliation.

2.    Plaintiff has fulfilled all conditions precedent to the institution of this action.

## VENUE

3.    Defendant is located and/or doing business within this judicial district (Middle District and the Northern Division of Alabama). This action is brought within the judicial district wherein the unlawful employment practices were committed, making venue proper under

1

*Exhibit 1*

42 U.S.C. Section 2000(e)-5(f) (3), 28 U.S.C. Section 1391(b), the 14th Amendment to the Constitution of the United States of American and Retaliation.

## PARTIES

4.  Plaintiff Shannon Burton, hereinafter referred to as "Plaintiff," is an African-American female resident of the United States, residing in Montgomery County, Alabama. Plaintiff is a resident of this judicial district, and has been employed by Defendant at all times material hereto. Plaintiff is a member of the protected class for race within the meaning of Title VII. Plaintiff is also an employee of Defendant within the meaning of Title VII.

5.  Defendant, Alabama Department of Agriculture & Industries, hereinafter referred to as "Defendant" is a state agency and is authorized to do business in the State of Alabama, and employs at least fifteen (15) persons and otherwise meets the jurisdictional prerequisites of Title VII.

## NATURE OF THE CASE

6.  This is a lawsuit brought by Plaintiff seeking permanent relief from unlawful discriminating practices by Defendant. Plaintiff has been adversely affected by discrimination involving promotion, compensation, assignments, retaliation, violation of due process, and other terms and conditions of employment as a result of Defendant failing to remedy systemic employment discrimination on the basis of race, due process and retaliation. The practices committed and continuing to be committed by Defendant violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e, et seq. ("Title VII").

2

## FACTUAL BACKGROUND

7.     Plaintiff first began working for Defendant on or about September 1, 2001.

8.     Plaintiff is employed as an ASA III.

9.     Plaintiff was summoned to serve as a petit juror in the Circuit Court of Montgomery County from October 24, 2005 through October 28, 2005.

10.     Plaintiff returned to work on October 31, 2005.

11.     Upon returning to work, Plaintiff discovered mail in her chair and on her desk that had not been opened the entire week she was on jury duty.

12.     The unopening of the mail was a major concern to Plaintiff due to the sensitive nature of the mail.  Many of the pieces of mail were date sensitive and required immediate attention.

13.     Plaintiff proceeded to Lance Hester's (Program Director) office. Mr. Hester is the Plaintiff's immediate supervisor.  The Plaintiff asked Mr. Hester, "Are you aware that the mail has not been opened for an entire week?" Mr. Hester responded, "I was under the assumption that Mary Catrett was opening the mail.  Plaintiff responded to Mr. Hester that that had not happened.  Ms. Catrett was on leave from October 24, 2005 to October 25, 2006 (two of the five days that Plaintiff was on jury duty). However, she was at work for the three remaining days.

14.     Plaintiff asked Mr. Hester if he would like to look at the postmark dates on the mail. Mr. Hester told Plaintiff that that was not necessary, but if it would make her happy he would. Plaintiff explained to Mr. Hester that his looking at the mail was not about making her happy; it was about the productivity of the office.

15.  Plaintiff stated to Mr. Hester that if she had left the mail unopened for an entire week, a "federal" case would have been made out of the situation.

16.  At that time, Plaintiff realized that Mr. Hester had another appointment.    Before Plaintiff left Mr. Hester's office she commented, "It does not matter anyway because if this incident ever comes up again about the mail not being opened, you probably would not remember I told you about the postmark dates on the mail of everyday of the week and probably would not tell the truth about the dates." Plaintiff then left Mr. Hester's office.

17.  Mr. Hester only met with his appointment for approximately ten (10) minutes.    He then came to Plaintiff's desk and stated, "I have a question regarding the last comment you made."    Plaintiff then asked Mr. Hester what he would like to know." Mr. Hester asked, "Do you honestly believe that I would not tell the truth about the postmark dates on the mail even if I looked at the mail?" Plaintiff, answered, "Yes, I honestly believe that you would not tell the truth." This was Plaintiff's belief, not an accusation.

18.  At that time Mr. Hester asked the Plaintiff to come to his office to see how they could move pass this.  Plaintiff agreed.  Plaintiff and Mr. Hester spoke for approximately 45 minutes.  At no time did Mr. Hester indicate that Plaintiff had a demeanor of insubordination, showed lack of respect for his position, or indicated that Plaintiff's statement demonstrated a failure to submit to authority.

19.  To Plaintiff's surprise, there was no further discussion about the unopened mail. Mr. Hester was totally focused on Plaintiff's statement of her opinion.

20.  On November 3, 2005, Lance Hester issued a written reprimand and warning to the Plaintiff for her statement of opinion.

21.  He indicated in the warning that Plaintiff's behavior was so severe that it warranted immediate attention.  He directed Plaintiff to write

a response after signing his warning. Plaintiff was instructed to admit to disruptive behavior, insubordination, failure to submit to authority. She was further directed to admit that her behavior was unacceptable and was advised that similar behavior in the future would result in a reprimand and disciplinary action.

22. Plaintiff did not initially sign this warning.

23. On November 10, 2005, Plaintiff responded to Mr. Hester's written warning.

24. As a result, Plaintiff was issued a second written reprimand and warning and instructed that failure to sign the letter or reprimand and warning would lead to further disciplinary action. Plaintiff signed the warning on November 14, 2005.

25. On November 15, 2005, Plaintiff received a letter of suspension. The letter of suspension was a result of Ron Sparks, Commissioner, upholding Mr. Hester's recommendation. The Plaintiff was suspended from November 21, 2005, through December 2, 2005. Plaintiff was instructed to return to work on December 5, 2005, at 8:00 a.m. The disciplinary action that Plaintiff was subjected to was extremely severe and did not fit the allegations.

26. Plaintiff appealed the suspension on November 18, 2007. Ron Sparks, the Commissioner, immediately began retaliating against the Plaintiff once she filed the appeal.

27. On the same day that Plaintiff filed her appeal, the Commissioner instructed the maintenance workers and prison inmates to tear down the Plaintiff's cubicle. The cubicle had been in Plaintiff's office for almost a year and there was no mention that the cubicle was a problem. There was no reason to tear the cubicle down other than to send Plaintiff a message that he, the Commissioner, was in control. Plaintiff's computer and other work equipment were simply left on the Plaintiff's floor. The office was left in complete disorder.

5

28. In Plaintiff's appeal she indicated that the Defendant did not give her a reasonable amount of notice for her hearing. Plaintiff was given notice of the hearing at 4:45 p.m. on November 17, 2005, indicating that her suspension hearing would be held on November 18, 2005, at 10:30 a.m. This was clearly a violation of the Plaintiff's procedural due process rights under the Constitution of the United States of America.

29. Per Plaintiff's suspension orders, Plaintiff began serving her suspension on November 21, 2005.

30. On November 22, 2005, the Defendant, Commissioner Sparks, upheld the suspension.

31. In this notice, Plaintiff's suspension days were changed from November 21, 2005 through December 2, 2005, returning December 5, 2005, to November 23, 2005, returning on December 7, 2005. As a result two additional days were added to Plaintiff's suspension. Due to Defendant's error, Plaintiff served twelve (12) days on suspension and had to be given administrative leave to rectify the mistake.

32. In the November 22, 2005, letter upholding Plaintiff's suspension, Plaintiff was notified that she would receive a post-suspension review.

33. On November 30, 2005, Plaintiff received her annual appraisal. Plaintiff received her appraisal while she was on suspension. Plaintiff's appraisal was decreased from a score of "Exceeds Standards" to a score of "Partially Meets Standards" due to the suspension. Alabama State Personnel states that the employer should not begin the "Progressive Discipline" two months prior to the employee's evaluation period. The employee should be evaluated during the entire year. Plaintiff's warning, reprimand and suspension all occurred within a two week time frame (11/3 – 11/15/05). Plaintiff's evaluation was due in December 2006. The

steps that Defendant took were in retaliation for Plaintiff appealing her suspension, which is statutorily protected activity.

34. On December 7, 2005, the Defendant appointed a hearing officer to preside over Plaintiff's review. The Defendant chose an Administrative Law Judge from the Attorney General's Office.

35. On December 13, 2005, Plaintiff received a letter from Lance Hester, with regard to her appraisal and her pending suspension. In said letter Mr. Hester stated, "If the hearing on your appeal of the suspension was not proper, we will change or re-do your evaluation to reflect that decision. Also, if the hearing outcome results in a change in your evaluation that affects step raises, it will be handled in a manner that you would not in any way be penalized monetarily." Even though, Mr. Hester made this promise, it would ultimately have to be approved by the Commissioner, Ron Sparks. On December 15, 2005, the Plaintiff responded to the unfair appraisal.

36. A hearing before the Administrative Law Judge with regard to Plaintiff's suspension was held on February 21, 2006.

37. The Administrative Law Judge's (ALJ) decision was rendered on April 18, 2006. Said ALJ recommended that the suspension of Plaintiff for ten (10) days without pay during November 23, 2005 through December 7, 2005, period be rescinded. It was noted in the recommendation that "This is not a final decision. No rights are finally determined until the Commissioner decides whether to accept, reject, or modify this recommendation." Notwithstanding Mr. Hester's promise on December 13, 2005 - "If the hearing on your appeal of the suspension was not proper, we will change or re-do your evaluation to reflect that decision. Also, if the hearing outcome results in a change in your evaluation that affects step raises, it will be handled in a manner that you would not in any way be penalized," - the Commissioner chose not to stand behind the

7

promise made by Mr. Hester by accepting the ALJ's recommendation. In fact, the Commissioner took no action whatsoever. He refused to accept, reject or modify the recommendation.

38. More than fourteen (14) months have passed since the final hearing and the Commissioner has refused to accept, reject or modify the ALJ's recommendation. The Commissioner's refusal to act is in retaliation against Plaintiff for appealing his decision.

39. The Commissioner's refusal to accept, reject or modify the ALJ's recommendation was not only retaliation against Plaintiff; he also failed to follow the Defendant's Policy of Progressive Discipline. The policy in part states," Suspension may be appealed in writing to the Commissioner's office within 10 days of the notice. Upon appeal, the Commissioner will appoint a panel or hearing officer to review the action. The Commissioner will not be bound by their recommendations. <u>The Commissioner will inform the employee in writing of these findings and his final decision."</u> The policy clearly <u>requires</u> that the Commissioner inform the employees in writing of his final decision. The Commissioner has violated the Plaintiff's procedural due process rights by not issuing a final decision.

40. On or about April 10, 2006, the Plaintiff's attorney, Victor R. Spencer, contacted the Defendant and warned the Commissioner about the retaliation that the Plaintiff was being subjected to since she appealed suspension. Among other things, Plaintiff was being followed by the Commissioner. The attorney's advice was not adhered to.

41. On June 23, 2006, Plaintiff, among other black employees, complained to the Alabama State Employee Association that Blacks were being discriminated against by the Defendant. Plaintiff and her black co-workers discussed the hiring and promoting disparity, and the disparity in issuing of state cars.

42.    On August 4, 2006, Attorney Spencer wrote the Commissioner a letter requesting that he act on the ALJ's recommendations. The Commissioner took no action despite the attorney's request. The Commissioner's non-action was taken in retaliation of the Plaintiff's appeal of the suspension.

43.    In August of 2006, Plaintiff was not placed on the register for the position of Agriculture Marketing Specialists. The reason given to Plaintiff for not being placed on the register was her education. Plaintiff was eligible as the Plaintiff has a master's degree. Plaintiff's name was not added to the register, yet white employees, Lauren Stone and Harold McClendon were added. The Plaintiff was not placed on the register because of her race and in retaliation for her complaint that she was suspended because of her race and her appeal of the Commissioner's suspension.

44.    On September 20, 2006, Plaintiff reviewed her personnel file. Plaintiff discovered and Teresa Brunson witnessed that some documents were missing from Plaintiff's file.

45.    Plaintiff's duties were changed and her supervisory authority was stripped from her.   The removal of Plaintiff's duties was in furtherance of the Commissioner's retaliation against Plaintiff.

46.    When Plaintiff's duties were changed policy required that a Form 40 be completed on Plaintiff.  This was not done.  However, when a white similarly situated employee's duties were changed, Mary Catherine, a Form 40 was completed on her.  The difference in the treatment in the employees was based on their race.

47.    On or about April 11, 2007, Plaintiff filed a Motion to Enforce the recommendation of the Administrative Law Judge.   Again, the Commissioner refused to act.   The Commissioner continues to retaliate against Plaintiff for participating in statutorily protected activity when she filed her appeal.

## COUNT ONE

## RACE DISCRIMINATION – TITLE VII

48.   Plaintiff adopts realleges and incorporates by reference paragraphs one through forty-seven above, the same as if more fully set herein, and further alleges anew.

49.   In taking the above described actions, Defendant intentionally discriminated against Plaintiff on the basis of her race when it did place her on the register for the position of Agriculture Marketing Specialist, but placed two similarly situated white employees on the register and when Defendant refused to complete a form 40 on Plaintiff, but completed one for a similarly situated white employee.

50.   As a proximate consequence of the violations of Title VII based on race by Defendant, Plaintiff has suffered and will continue to suffer damage to her professional life and current and future career opportunities.   Further, Plaintiff has suffered future pecuniary losses, emotional pain, inconvenience, mental anguish, loss of enjoyment of life and non-pecuniary damages.

## COUNT TWO
## RETALIATION

51.   Plaintiff adopts realleges and incorporates by reference paragraphs one through fifty above, the same as if more fully set herein, and further alleges anew.

52.   In taking the above described actions, Defendant retaliated against Plaintiff, when the Commissioner refused to enforce the ALJ's recommendation, ransacked Plaintiff's office and reduced Plaintiff's appraisal score.

53.   As a direct result of the ongoing retaliation against Plaintiff, Plaintiff's constitutional rights have been abridged.

54.    As a proximate cause of the Defendant's actions, Plaintiff has been injured and damaged, as set forth in paragraphs above.

## COUNT THREE
## DUE PROCESS (FOURTEENTH AMENDMENT)

55.    Plaintiff adopts realleges and incorporates by reference paragraphs one through fifty-four above, the same as if more fully set herein, and further alleges anew.

56.    In taking the above described actions, Defendant violated Plaintiff's procedural due process rights when it failed to adhere to the requirements of procedural due process. Procedural Due Process requires the Plaintiff to be given (1) proper and timely notice or the allegations or charges against him or her and (2) an opportunity to present evidence on the matter. Defendant failed to give Plaintiff adequate notice of her appeals hearing and refused to issue Plaintiff a final decision with regard to her suspension.

57.    As a direct result of the violation of Plaintiff's procedural due process rights, Plaintiff's constitutional rights have been abridged.

58.    As a proximate cause of the Defendant's actions, Plaintiff has been injured and damaged, as set forth in paragraphs above.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays that this Honorable Court grant the following:

a)    Assume jurisdiction over this action;

b)    A judgment declaring that Defendant violated 28 U.S.C. Sec. 1331, 42 U.S.C. Sec. 2000(e), et seq. and Retaliation and Due Process;

c) All backpay and fringe benefits as a result of the 10 day suspension which includes the Plaintiff's two-step raise and all that the Plaintiff would have received during the wrongful suspension;

d) Attorney's fees for Attorney Victor Spencer and Attorney Juraldine Battle-Hodge;

e) All suspension information removed from Plaintiff's personnel file at Agriculture and Industries and Alabama State Personnel.

f) Costs;

g) Prejudgment interest;

h) An award of such compensatory damages for any loss of wages, and loss of benefits, including, but not limited to, retirement pension benefits, mental anguish, emotional distress, and embarrassment, both past, present and future to which the Plaintiff may be entitled; and such further, other and different legal or equitable relief as the Court may deem appropriate or which she may be entitled, and

i) Punitive damages.

## JURY DEMAND

Plaintiff demands trial by jury on each and every cause of action.

Respectfully submitted,

Juraldine Battle-Hodge (BAT033)

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY ON ALL CLAIMS SO TRIABLE.**

OF COUNSEL

**PLEASE SERVE DEFENDANT BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| SHANNON BURTON | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No.:    **2:07cv548-MHT** |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **AGRICULTURE & INDUSTRIES** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ANSWER

**COMES NOW,** the defendant, Alabama Department of Agriculture & Industries, and in answer to plaintiff's Complaint, states as follows:

1.      The defendant admits the existence of federal question jurisdiction. However, the defendant denies that unlawful discrimination occurred and demands strict proof thereof.

2.      Denied.

3.      Defendant admits proper venue; however, defendant denies any unlawful employment practices were committed and demands strict proof thereof.

4.      Admitted.

5.      The defendant admits it is a state agency and is authorized to do business in the State of Alabama. Defendant admits it employees at least 15 persons. Defendant denies the remainder of Paragraph 5 and demands strict proof thereof.

6.      Denied.

7.      Defendant admits that the plaintiff began her employment in September, 2001.

8.      Admitted.

*Exhibit 2*

9.    Defendant admits that the plaintiff was called to jury duty the week of October 24, 2005.

10.    Admitted.

11.    Defendant does not have enough information to admit or deny the allegations in Paragraph 11.

12.    Defendant does not have enough information to admit or deny the allegations in Paragraph 12.

13.    Defendant admits that Lance Hester was the plaintiff's immediate supervisor and that they had a discussion regarding the opening of mail.

14.    Defendant admits that Mr. Hester and the plaintiff had a conversation regarding the opening of mail.  The defendant denies the remainder of the allegations contained in Paragraph 14 and demands strict proof thereof.

15.    Admitted.

16.    Denied.

17.    Defendant admits that Mr. Hester spoke with the plaintiff regarding an accusatory comment she had made to him.  The defendant denies the remainder of the allegations contained in Paragraph 17 and demands strict proof thereof.

18.    Defendant admits that Mr. Hester asked the plaintiff to meet with him regarding the plaintiff's accusation against him.  The defendant denies the remainder of the allegations contained in Paragraph 18 and demands strict proof thereof.

19.    Denied.

20.    Denied.

21.    Denied.

2

22.    Admitted.

23.    Defendant admits that plaintiff responded to a written warning.

24.    Defendant admits that plaintiff was informed that failure to sign an acknowledgement of receipt of a written warning could result in discipline. Defendant further admits the plaintiff eventually signed such an acknowledgement of receipt. The defendant denies the remainder of the allegations contained in Paragraph 24 and demands strict proof thereof.

25.    Denied.

26.    Defendant admits that plaintiff appealed her suspension. Defendant denies the remainder of the allegations contained in Paragraph 26 and demands strict proof thereof.

27.    Denied.

28.    Defendant admits that the plaintiff was given notice that she would have an opportunity to be heard regarding her suspension. The defendant denies the remainder of the allegations contained in Paragraph 28 and demands strict proof thereof.

29.    Denied.

30.    Defendant admits that Commissioner Sparks issued his decision regarding the plaintiff's suspension in a letter dated November 22, 2005. Defendant denies the remainder of the allegations contained in Paragraph 30 and demands strict proof thereof.

31.    Denied.

32.    Defendant admits that plaintiff received notice that she could receive a post-suspension review.

33.    Denied.

34.    Defendant admits that an Administrative Law Judge presided over plaintiff's post-suspension review.  Defendant denies the remainder of the allegations contained in Paragraph 34 and demands strict proof thereof.

35.    Defendant admits that Lance Hester sent a memorandum to the plaintiff dated December 13, 2005 and that the memorandum speaks for itself.  The defendant denies the remainder of the allegations contained in Paragraph 35 and demands strict proof thereof.

36.    The defendant admits that the plaintiff's post-suspension review was conducted by an Administrative Law Judge on February 21, 2006.

37.    The defendant admits that the Administrative Law Judge rendered an opinion regarding plaintiff's suspension and that the opinion speaks for itself.  The defendant denies the remainder of the allegations contained in Paragraph 37 and demands strict proof thereof.

38.    Denied.

39.    Denied.

40.    Defendant admits that plaintiff's attorney contacted the defendant regarding plaintiff's suspension.  The defendant denies the remainder of the allegations contained in Paragraph 40 and demands strict proof thereof.

41.    Defendant does not have enough information to admit or deny the allegations contained in Paragraph 41.

42.    Defendant admits that plaintiff's attorney contacted the defendant regarding the plaintiff's suspension.  The defendant denies the remainder of the allegations contained within Paragraph 42 and demands strict proof thereof.

4

43.    The defendant denies that it discriminated against the plaintiff on the basis of her race or retaliated against her and demands strict proof thereof.  The defendant does not have enough information to admit or deny the remaining allegations contained in Paragraph 43.

44.    Defendant denies that any documents are impermissibly omitted from the plaintiff's personnel file and demands strict proof thereof.

45.    Defendant admits that some of plaintiff's job responsibilities were changed during the course of her employment.  The defendant denies the remainder of the allegations contained within Paragraph 45 and demands strict proof thereof.

46.    Denied.

47.    Defendant admits that plaintiff filed a motion to enforce the recommendation of the Administrative Law Judge.  The defendant denies the remainder of the allegations contained in Paragraph 47 and demands strict proof thereof.

48.    Defendant realleges and incorporates responses to Paragraphs 1 through 47 by reference as if fully set forth herein.  To the extent called for, defendant also adopts and incorporates responses to Paragraphs 49 through 58 as if fully set forth herein.

49.    Denied.

50.    Denied.

51.    Defendant realleges and incorporates responses to Paragraphs 1 through 50 by reference as if fully set forth herein.  To the extent called for, defendant also adopts and incorporates responses to Paragraphs 52 through 58 as if fully set forth herein.

52.    Denied.

53.    Denied.

54.    Denied.

5

55.    Defendant realleges and incorporates responses to Paragraphs 1 through 54 by reference as if fully set forth herein.   To the extent called for, defendant also adopts and incorporates responses to Paragraphs 56 through 58 as if fully set forth herein.

56.    Denied.

57.    Denied.

58.    Denied.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a cause of action against this defendant upon which relief may be granted to the plaintiff.

## SECOND AFFIRMATIVE DEFENSE

The defendant pleads the general issue.

## THIRD AFFIRMATIVE DEFENSE

The defendant pleads not guilty.

## FOURTH AFFIRMATIVE DEFENSE

The defendant avers that it is not guilty of any violation of the plaintiff's employment rights.

## FIFTH AFFIRMATIVE DEFENSE

The defendant pleads the statute of limitations.

## SIXTH AFFIRMATIVE DEFENSE

The plaintiff has failed to exhaust her administrative remedies.

## SEVENTH AFFIRMATIVE DEFENSE

The defendant affirmatively avers that any actions it took, having any bearing whatsoever on plaintiff, were taken for legitimate nondiscriminatory reasons and were an appropriate exercise of its authority without intent to discriminate against plaintiff.

## EIGHTH AFFIRMATIVE DEFENSE

The plaintiff's claim for relief is barred for a failure to mitigate her damages, if any.

## NINTH AFFIRMATIVE DEFENSE

The defendant denies that it acted with any discriminatory intent.

## TENTH AFFIRMATIVE DEFENSE

The defendant avers that all actions were taken in good faith.

## ELEVENTH AFFIRMATIVE DEFENSE

The defendant avers that all actions were made for bona fide business purposes.

## TWELFTH AFFIRMATIVE DEFENSE

All of the acts or omissions alleged by the plaintiff were for legitimate, nondiscriminatory reasons.

## THIRTEENTH AFFIRMATIVE DEFENSE

Defendant avers that all employment decisions were made as a result of business necessity.

## FOURTEENTH AFFIRMATIVE DEFENSE

Defendant denies that any violation of Title VII has occurred and demands strict proof thereof.

## FIFTEENTH AFFIRMATIVE DEFENSE

At all times relevant to this Complaint defendant acted based on reasonable factors other than sex or race in dealing with the plaintiff.

7

## SIXTEENTH AFFIRMATIVE DEFENSE

The plaintiff contributed to any of the alleged damages or injuries received.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The plaintiff is not entitled to punitive damages in this action and any order of punitive damages against this defendant would amount to a violation of this defendant's constitutional rights.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The plaintiff's alleged injuries and damages resulted from her own conduct, and she contributed to any of the alleged damages or injuries received. She should be estopped from any cause of action in this matter.

## NINETEENTH AFFIRMATIVE DEFENSE

Defendant pleads the ninety (90) day time limitation contained in 42 U.S.C. §2000e-5(f).

## TWENTIETH AFFIRMATIVE DEFENSE

To the extent that plaintiff asserts claims that arose more than 180 days prior to the filing of an EEOC charge, those claims are barred for failure to satisfy the statutory prerequisites to suit.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

To the extent that plaintiff asserts claims that arose more than 180 days prior to the filing of an EEOC charge, those claims are time-barred and due to be dismissed.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff is estopped from seeking equitable relief as she comes into this Court with unclean hands.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

Defendant pleads accord and satisfaction.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

Defendant denies any wrongful, tortious, fraudulent or improper conduct.

### TWENTY-FIFTH AFFIRMATIVE DEFENSE

Defendant avers that plaintiff is limited to the scope of the EEOC charge of discrimination. Defendant pleads the applicability of 42 U.S.C. §1981a and the damage limitations contained therein.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

The award of discretionary, compensatory damages for mental suffering on behalf of Plaintiff violates the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the Constitution of the United States because there are no fixed standards for the ascertainment of compensatory damages recoverable for mental suffering. The amount of damage for such a claim is left to the sound discretion of the jury with no specific, much less objective standard for the amount of the award. Therefore, the procedure pursuant to which compensatory damages for mental suffering are awarded violates the Constitution because: (a) it fails to provide a reasonable limit on the amount of the award against Defendants, which thereby violates the due process clause of the Fourteenth amendment of the Constitution of the United States, (b) it fails to provide specific standards for the amount of the award of compensation, which thereby violates the due process clause of the Fourteenth Amendment of the United States Constitution, (c) it results in the imposition of different compensation for the same or similar acts, and, thus, violates the equal protection clause of the Fourteenth Amendment of the United States Constitution; and, (d) it

constitutes deprivation of property without due process of law required under the Fifth and Fourteenth Amendment of the United States Constitution.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

The award of discretionary compensatory damages for mental suffering to the Plaintiff violates the due process clause of Article One, Section 6 of the Constitution of Alabama because it fails to provide a limit on the amount of the award against this Defendant, it is unconstitutionally vague, it fails to provide specific standards in the amount of the award of such damages, and it constitutes a deprivation of property without the due process of the law.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

1.      Defendant avers that the Complaint fails to state a claim upon which punitive damages may be awarded to Plaintiff.

2.      Defendant avers that any award of punitive damages to the Plaintiff in this case would be violative of the constitutional safeguards provided to Defendant under the Constitution of the State of Alabama.

3.      Defendant avers that any award of punitive damages to the Plaintiff in this case would be violative of the constitutional safeguards provided to Defendant under the Constitution of the United States of America.

4.      Defendant avers that any award of punitive damages to the Plaintiff in this case would be violative of the constitutional safeguards provided to the Defendant under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States in that the determination of punitive damages under Alabama law is vague, is not based upon any objective standards, is in fact standardless, and is not rationally related to legitimate government interests.

10

5.    Defendant avers that any award of punitive damages to the Plaintiff in this case would be violative of Article I, Section 6 of the Constitution of the State of Alabama which provides that no person shall be deprived of life, liberty, or property except by due process of law, in that punitive damages are vague and are not rationally related to legitimate government interests.

6.    Defendant avers that any award of punitive damages to the Plaintiff in this case would be violative of the procedural safeguards provided to defendant under the Sixth Amendment to the Constitution of the United States in that punitive damages are penal in nature and consequently, Defendant is entitled to the same procedural safeguards accorded to criminal defendants.

7.    It is violative of the self-incrimination clause of the Fifth Amendment to the Constitution of the United States of America to impose against this Defendant punitive damages, which are penal in nature, yet compel Defendant to disclose documents and evidence.

8.    It is violative of the self-incrimination clause of Article I, Section 6 of the Constitution of the State of Alabama to impose against this Defendant punitive damages, which are penal in nature, yet compel Defendant to disclose documents and evidence.

9.    Plaintiff's claim of punitive damages violates the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the Constitution of the United States, on the following grounds:

a)    It is a violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution to impose punitive damages, which are penal in nature, against a civil defendant upon the plaintiff's satisfying a burden of proof which is less than the "beyond a reasonable doubt" burden of proof required in criminal cases;

b)    The procedures pursuant to which punitive damages are awarded fail to provide a reasonable limit or, the amount of the award against defendant, which thereby violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

c)    The procedures pursuant to which punitive damages are awarded fail to provide specific standards for the amount of the award of punitive damages which thereby violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

d)    The procedures pursuant to which punitive damages are awarded result in the imposition of different penalties for the same or similar acts and, thus, violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

e)    The procedures pursuant to which punitive damages are awarded permit the imposition of punitive damages in excess of the maximum criminal fine for the same or similar conduct, which thereby infringes the Due Process Clause of the Fifth and Fourteenth Amendments and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; and

f)    The procedures pursuant to which punitive damages are awarded may result in the award of joint and several judgments against multiple defendants for different alleged acts of wrongdoing, which infringes the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution.

10.    Plaintiff's claim of punitive damages violates the Due Process Clause of Article I, Section 6, of the Constitution of Alabama, on the following grounds:

a)    It is a violation of the Due Process Clause to impose punitive damages, which are penal in nature, upon a civil defendant upon the plaintiff's satisfying a burden of proof less than the "beyond a reasonable doubt" burden of proof required in criminal cases;

b)    The procedures pursuant to which punitive damages are awarded fail to provide a limit on the amount of the award against this defendant;

c)    The procedures pursuant to which punitive damages are awarded are unconstitutionally vague;

d)    The procedures pursuant to which punitive damages are awarded fail to provide specific standards for the amount of the award of punitive damages;

e)    The award of punitive damages in this case would constitute a deprivation of property without due process of law; and

12

  f)  The procedures pursuant to which punitive damages are awarded fail
to provide a limit on the amount of the award against this defendant.

  11.  Plaintiff's attempt to impose punitive or extracontractual damages on this Defendant,
on the basis of vicarious liability for the conduct of others, violates the Fifth, Eighth and Fourteenth
Amendments of the United States Constitution.

  12.  The award of punitive damages to the Plaintiff in this action would constitute a
deprivation of property without due process of law required under the Fifth and Fourteenth
Amendments of the United States Constitution.

  13.  The award of punitive damages against Defendant in this action would violate the
prohibition against laws that impair the obligations of contracts in violation of Article I, Section 22
of the Constitution of Alabama.

  14.  The Complaint fails to state a claim for punitive damages under Alabama Code §§
6-11-20 to 6-11-30 (1975) and is barred.

  15.  It is violative of the self-incrimination clause of Article I, Section 6 of the
Constitution of the State of Alabama to impose against this Defendant punitive damages, which are
penal in nature, yet compels Defendant to disclose evidence.

  16.  Plaintiff's claim for punitive damages is limited to the amount recoverable as set
forth in §6-11-21, Ala.Code, 1975.  This defense is intended to challenge the ruling stated in
Henderson v. Alabama Power Co., 627 So. 2d 878 (Ala. 1993).


      _____/s/_____Emily C. Marks_____
      EMILY C. MARKS

      _____/s/_____E. Hamilton Wilson, Jr._____
      E. HAMILTON WILSON, JR.
      Attorneys for the Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2007, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system which will send notification of such filing to the following:

Juraldine Battle-Hodge
207 Montgomery St., Ste. 215
Montgomery, AL  36104-3528

/s/ Emily C. Marks_____
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

SHANNON BURTON,            )
                          )
        Plaintiff,         )
                          )
v.                        )        Case No. 2:07cv548-MHT
                          )
ALABAMA DEPARTMENT OF     )
AGRICULTURE & INDUSTRIES, )
                          )
                          )
        Defendant.        )

## AMENDED COMPLAINT

**COMES NOW** Shannon Burton (Plaintiff), and amends her Complaint by
deleting paragraph 43 and modifying paragraph 49 of her complaint against
Alabama Department of Agriculture & Industries and its agents and
representatives (Defendant) hereby complains as set forth herein below.

## JURISDICTION

1.    This Court has jurisdiction over the litigation herein pursuant to 28
      U.S.C. Sections 1331 and 1343, 42 U.S.C., Section 2000e, the 14th
      Amendment to the Constitution of the United States of America and
      Retaliation.

2.    Plaintiff has fulfilled all conditions precedent to the institution of this
      action.

## VENUE

3.    Defendant is located and/or doing business within this judicial
      district (Middle District and the Northern Division of Alabama).  This
      action is brought within the judicial district wherein the unlawful

1

*Exhibit 3*

employment practices were committed, making venue proper under 42 U.S.C. Section 2000(e)-5(f) (3), 28 U.S.C. Section 1391(b), the 14th Amendment to the Constitution of the United States of American and Retaliation.

## PARTIES

4.    Plaintiff Shannon Burton, hereinafter referred to as "Plaintiff," is an African-American female resident of the United States, residing in Montgomery County, Alabama.  Plaintiff is a resident of this judicial district, and has been employed by Defendant at all times material hereto.  Plaintiff is a member of the protected class for race within the meaning of Title VII.  Plaintiff is also an employee of Defendant within the meaning of Title VII.

5.    Defendant, Alabama Department of Agriculture & Industries, hereinafter referred to as "Defendant" is a state agency and is authorized to do business in the State of Alabama, and employs at least fifteen (15) persons and otherwise meets the jurisdictional prerequisites of Title VII.

## NATURE OF THE CASE

6.    This is a lawsuit brought by Plaintiff seeking permanent relief from unlawful discriminating practices by Defendant.  Plaintiff has been adversely affected by discrimination involving promotion, compensation, assignments, retaliation, violation of due process, and other terms and conditions of employment as a result of Defendant failing to remedy systemic employment discrimination on the basis of race, due process and retaliation.   The practices committed and continuing to be committed by Defendant violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e, et seq. ("Title VII").

2

## **FACTUAL BACKGROUND**

7.    Plaintiff first began working for Defendant on or about September 1, 2001.

8.    Plaintiff is employed as an ASA III.

9.    Plaintiff was summoned to serve as a petit juror in the Circuit Court of Montgomery County from October 24, 2005 through October 28, 2005.

10.   Plaintiff returned to work on October 31, 2005.

11.   Upon returning to work, Plaintiff discovered mail in her chair and on her desk that had not been opened the entire week she was on jury duty.

12.   The unopening of the mail was a major concern to Plaintiff due to the sensitive nature of the mail.  Many of the pieces of mail were date sensitive and required immediate attention.

13.   Plaintiff proceeded to Lance Hester's (Program Director) office. Mr. Hester is the Plaintiff's immediate supervisor.  The Plaintiff asked Mr. Hester, "Are you aware that the mail has not been opened for an entire week?" Mr. Hester responded, "I was under the assumption that Mary Catrett was opening the mail.   Plaintiff responded to Mr. Hester that that had not happened.  Ms. Catrett was on leave from October 24, 2005 to October 25, 2006 (two of the five days that Plaintiff was on jury duty). However, she was at work for the three remaining days.

14.   Plaintiff asked Mr. Hester if he would like to look at the postmark dates on the mail. Mr. Hester told Plaintiff that that was not necessary, but if it would make her happy he would. Plaintiff explained to Mr. Hester that his looking at the mail was not about making her happy; it was about the productivity of the office.

15. Plaintiff stated to Mr. Hester that if she had left the mail unopened for an entire week, a "federal" case would have been made out of the situation.

16. At that time, Plaintiff realized that Mr. Hester had another appointment. Before Plaintiff left Mr. Hester's office she commented, "It does not matter anyway because if this incident ever comes up again about the mail not being opened, you probably would not remember I told you about the postmark dates on the mail of everyday of the week and probably would not tell the truth about the dates." Plaintiff then left Mr. Hester's office.

17. Mr. Hester only met with his appointment for approximately ten (10) minutes. He then came to Plaintiff's desk and stated, "I have a question regarding the last comment you made." Plaintiff then asked Mr. Hester what he would like to know." Mr. Hester asked, "Do you honestly believe that I would not tell the truth about the postmark dates on the mail even if I looked at the mail?" Plaintiff, answered, "Yes, I honestly believe that you would not tell the truth." This was Plaintiff's belief, not an accusation.

18. At that time Mr. Hester asked the Plaintiff to come to his office to see how they could move pass this. Plaintiff agreed. Plaintiff and Mr. Hester spoke for approximately 45 minutes. At no time did Mr. Hester indicate that Plaintiff had a demeanor of insubordination, showed lack of respect for his position, or indicated that Plaintiff's statement demonstrated a failure to submit to authority.

19. To Plaintiff's surprise, there was no further discussion about the unopened mail. Mr. Hester was totally focused on Plaintiff's statement of her opinion.

20. On November 3, 2005, Lance Hester issued a written reprimand and warning to the Plaintiff for her statement of opinion.

21. He indicated in the warning that Plaintiff's behavior was so severe that it warranted immediate attention. He directed Plaintiff to write

a response after signing his warning.  Plaintiff was instructed to admit to disruptive behavior, insubordination, failure to submit to authority.  She was further directed to admit that her behavior was unacceptable and was advised that similar behavior in the future would result in a reprimand and disciplinary action.

22.    Plaintiff did not initially sign this warning.

23.    On November 10, 2005, Plaintiff responded to Mr. Hester's written warning.

24.    As a result, Plaintiff was issued a second written reprimand and warning and instructed that failure to sign the letter or reprimand and warning would lead to further disciplinary action.  Plaintiff signed the warning on November 14, 2005.

25.    On November 15, 2005, Plaintiff received a letter of suspension. The letter of suspension was a result of Ron Sparks, Commissioner, upholding Mr. Hester's recommendation. The Plaintiff was suspended from November 21, 2005, through December 2, 2005.  Plaintiff was instructed to return to work on December 5, 2005, at 8:00 a.m.  The disciplinary action that Plaintiff was subjected to was extremely severe and did not fit the allegations.

26.    Plaintiff appealed the suspension on November 18, 2007. Ron Sparks, the Commissioner, immediately began retaliating against the Plaintiff once she filed the appeal.

27.    On the same day that Plaintiff filed her appeal, the Commissioner instructed the maintenance workers and prison inmates to tear down the Plaintiff's cubicle. The cubicle had been in Plaintiff's office for almost a year and there was no mention that the cubicle was a problem.  There was no reason to tear the cubicle down other than to send Plaintiff a message that he, the Commissioner, was in control.  Plaintiff's computer and other work equipment were simply left on the Plaintiff's floor. The office was left in complete disorder.

5

28. In Plaintiff's appeal she indicated that the Defendant did not give her a reasonable amount of notice for her hearing. Plaintiff was given notice of the hearing at 4:45 p.m. on November 17, 2005, indicating that her suspension hearing would be held on November 18, 2005, at 10:30 a.m. This was clearly a violation of the Plaintiff's procedural due process rights under the Constitution of the United States of America.

29. Per Plaintiff's suspension orders, Plaintiff began serving her suspension on November 21, 2005.

30. On November 22, 2005, the Defendant, Commissioner Sparks, upheld the suspension.

31. In this notice, Plaintiff's suspension days were changed from November 21, 2005 through December 2, 2005, returning December 5, 2005, to November 23, 2005, returning on December 7, 2005. As a result two additional days were added to Plaintiff's suspension. Due to Defendant's error, Plaintiff served twelve (12) days on suspension and had to be given administrative leave to rectify the mistake.

32. In the November 22, 2005, letter upholding Plaintiff's suspension, Plaintiff was notified that she would receive a post-suspension review.

33. On November 30, 2005, Plaintiff received her annual appraisal. Plaintiff received her appraisal while she was on suspension. Plaintiff's appraisal was decreased from a score of "Exceeds Standards" to a score of "Partially Meets Standards" due to the suspension. Alabama State Personnel states that the employer should not begin the "Progressive Discipline" two months prior to the employee's evaluation period. The employee should be evaluated during the entire year. Plaintiff's warning, reprimand and suspension all occurred within a two week time frame (11/3 – 11/15/05). Plaintiff's evaluation was due in December 2006. The

6

steps that Defendant took were in retaliation for Plaintiff appealing her suspension, which is statutorily protected activity.

34.    On December 7, 2005, the Defendant appointed a hearing officer to preside over Plaintiff's review. The Defendant chose an Administrative Law Judge from the Attorney General's Office.

35.    On December 13, 2005, Plaintiff received a letter from Lance Hester, with regard to her appraisal and her pending suspension. In said letter Mr. Hester stated, "If the hearing on your appeal of the suspension was not proper, we will change or re-do your evaluation to reflect that decision. Also, if the hearing outcome results in a change in your evaluation that affects step raises, it will be handled in a manner that you would not in any way be penalized monetarily." Even though, Mr. Hester made this promise, it would ultimately have to be approved by the Commissioner, Ron Sparks. On December 15, 2005, the Plaintiff responded to the unfair appraisal.

36.    A hearing before the Administrative Law Judge with regard to Plaintiff's suspension was held on February 21, 2006.

37.    The Administrative Law Judge's (ALJ) decision was rendered on April 18, 2006.  Said ALJ recommended that the suspension of Plaintiff for ten (10) days without pay during November 23, 2005 through December 7, 2005, period be rescinded. It was noted in the recommendation that "This is not a final decision. No rights are finally determined until the Commissioner decides whether to accept, reject, or modify this recommendation." Notwithstanding Mr. Hester's promise on December 13, 2005 - "If the hearing on your appeal of the suspension was not proper, we will change or re-do your evaluation to reflect that decision. Also, if the hearing outcome results in a change in your evaluation that affects step raises, it will be handled in a manner that you would not in any way be penalized," - the Commissioner chose not to stand behind the

7

promise made by Mr. Hester by accepting the ALJ's recommendation.    In fact, the Commissioner took no `action whatsoever.    He refused to accept, reject or modify the recommendation.

38.    More than fourteen (14) months have passed since the final hearing and the Commissioner has refused to accept, reject or modify the ALJ's recommendation. The Commissioner's refusal to act is in retaliation against Plaintiff for appealing his decision.

39.    The Commissioner's refusal to accept, reject or modify the ALJ's recommendation was not only retaliation against Plaintiff; he also failed to follow the Defendant's Policy of Progressive Discipline. The policy in part states," Suspension may be appealed in writing to the Commissioner's office within 10 days of the notice. Upon appeal, the Commissioner will appoint a panel or hearing officer to review the action. The Commissioner will not be bound by their recommendations. <u>The Commissioner will inform the employee in writing of these findings and his final decision.</u>" The policy clearly <u>requires</u> that the Commissioner inform the employees in writing of his final decision. The Commissioner has violated the Plaintiff's procedural due process rights by not issuing a final decision.

40.    On or about April 10, 2006, the Plaintiff's attorney, Victor R. Spencer, contacted the Defendant and warned the Commissioner about the retaliation that the Plaintiff was being subjected to since she appealed suspension. Among other things, Plaintiff was being followed by the Commissioner. The attorney's advice was not adhered to.

41.    On June 23, 2006, Plaintiff, among other black employees, complained to the Alabama State Employee Association that Blacks were being discriminated against by the Defendant.  Plaintiff and her black co-workers discussed the hiring and promoting disparity, and the disparity in issuing of state cars.

8

42.    On August 4, 2006, Attorney Spencer wrote the Commissioner a letter requesting that he act on the ALJ's recommendations. The Commissioner took no action despite the attorney's request. The Commissioner's non-action was taken in retaliation of the Plaintiff's appeal of the suspension.

43.    On September 20, 2006, Plaintiff reviewed her personnel file. Plaintiff discovered and Teresa Brunson witnessed that some documents were missing from Plaintiff's file.

44.    Plaintiff's duties were changed and her supervisory authority was stripped from her.   The removal of Plaintiff's duties was in furtherance of the Commissioner's retaliation against Plaintiff.

45.    When Plaintiff's duties were changed policy required that a Form 40 be completed on Plaintiff.  This was not done.  However, when a white similarly situated employee's duties were changed, Mary Catherine, a Form 40 was completed on her.  The difference in the treatment in the employees was based on their race.

46.    On or about April 11, 2007, Plaintiff filed a Motion to Enforce the recommendation of the Administrative Law Judge.   Again, the Commissioner refused to act.   The Commissioner continues to retaliate against Plaintiff for participating in statutorily protected activity when she filed her appeal.

## COUNT ONE

## RACE DISCRIMINATION – TITLE VII

47.    Plaintiff adopts realleges and incorporates by reference paragraphs one through forty-seven above, the same as if more fully set herein, and further alleges anew.

48.    In taking the above described actions, Defendant intentionally discriminated against Plaintiff on the basis of her race when it refused to complete a form 40 on Plaintiff, but completed one for a similarly situated white employee.

9

49.   As a proximate consequence of the violations of Title VII based on race by Defendant, Plaintiff has suffered and will continue to suffer damage to her professional life and current and future career opportunities.   Further, Plaintiff has suffered future pecuniary losses, emotional pain, inconvenience, mental anguish, loss of enjoyment of life and non-pecuniary damages.

## COUNT TWO
## RETALIATION

50.   Plaintiff adopts realleges and incorporates by reference paragraphs one through fifty above, the same as if more fully set herein, and further alleges anew.

51.   In taking the above described actions, Defendant retaliated against Plaintiff, when the Commissioner refused to enforce the ALJ's recommendation, ransacked Plaintiff's office and reduced Plaintiff's appraisal score.

52.   As a direct result of the ongoing retaliation against Plaintiff, Plaintiff's constitutional rights have been abridged.

53.   As a proximate cause of the Defendant's actions, Plaintiff has been injured and damaged, as set forth in paragraphs above.

## COUNT THREE
## DUE PROCESS (FOURTEENTH AMENDMENT)

54.   Plaintiff adopts realleges and incorporates by reference paragraphs one through fifty-four above, the same as if more fully set herein, and further alleges anew.

55.   In taking the above described actions, Defendant violated Plaintiff's procedural due process rights when it failed to adhere to the requirements of procedural due process.   Procedural Due Process

10

requires the Plaintiff to be given (1) proper and timely notice or the allegations or charges against him or her and (2) an opportunity to present evidence on the matter. Defendant failed to give Plaintiff adequate notice of her appeals hearing and refused to issue Plaintiff a final decision with regard to her suspension.

56.    As a direct result of the violation of Plaintiff's procedural due process rights, Plaintiff's constitutional rights have been abridged.

57.    As a proximate cause of the Defendant's actions, Plaintiff has been injured and damaged, as set forth in paragraphs above.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that this Honorable Court grant the following:

a) Assume jurisdiction over this action;

b) A judgment declaring that Defendant violated 28 U.S.C. Sec. 1331, 42 U.S.C. Sec. 2000(e), et seq. and Retaliation and Due Process;

c) All backpay and fringe benefits as a result of the 10 day suspension which includes the Plaintiff's two-step raise and all that the Plaintiff would have received during the wrongful suspension;

d) Attorney's fees for Attorney Victor Spencer and Attorney Juraldine Battle-Hodge;

e) All suspension information removed from Plaintiff's personnel file at Agriculture and Industries and Alabama State Personnel.

f) Costs;

g) Prejudgment interest;

h) An award of such compensatory damages for any loss of wages, and loss of benefits, including, but not limited to, retirement pension benefits, mental anguish, emotional distress, and

embarrassment, both past, present and future to which the Plaintiff may be entitled; and such further, other and different legal or equitable relief as the Court may deem appropriate or which she may be entitled, and

i)  Punitive damages.

Respectfully submitted,

_____
Juraldine Battle-Hodge (BAT033)

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing by placing same in the United States Mail, postage pre-paid and properly addresses, on this the 30th day of November 2007, upon the following::

Hon. E. Ham Wilson, Jr.
Hon. Emily C. Marks
Ball, Ball, Matthews & Novak, P.A.
P.O. Box 2148
Montgomery, AL 36102-2148

OF COUNSEL:

_____
Juraldine Battle-Hodge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **SHANNON BURTON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:    2:07cv548-MHT** |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **AGRICULTURE & INDUSTRIES** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ANSWER TO AMENDED COMPLAINT

**COMES NOW,** the defendant, Alabama Department of Agriculture & Industries, and in answer to plaintiff's Amended Complaint, states as follows:

1.    The defendant admits the existence of federal question jurisdiction. However, the defendant denies that unlawful discrimination occurred and demands strict proof thereof.

2.    Denied.

3.    Defendant admits proper venue; however, defendant denies any unlawful employment practices were committed and demands strict proof thereof.

4.    Admitted.

5.    The defendant admits it is a state agency and is authorized to do business in the State of Alabama. Defendant admits it employees at least 15 persons. Defendant denies the remainder of Paragraph 5 and demands strict proof thereof.

6.    Denied.

7.    Defendant admits that the plaintiff began her employment in September, 2001.

8.    Admitted.

*Exhibit 4*

9.     Defendant admits that the plaintiff was called to jury duty the week of October 24, 2005.

10.     Admitted.

11.     Defendant does not have enough information to admit or deny the allegations in Paragraph 11.

12.     Defendant does not have enough information to admit or deny the allegations in Paragraph 12.

13.     Defendant admits that Lance Hester was the plaintiff's immediate supervisor and that they had a discussion regarding the opening of mail.

14.     Defendant admits that Mr. Hester and the plaintiff had a conversation regarding the opening of mail.   The defendant denies the remainder of the allegations contained in Paragraph 14 and demands strict proof thereof.

15.     Admitted.

16.     Denied.

17.     Defendant admits that Mr. Hester spoke with the plaintiff regarding an accusatory comment she had made to him.   The defendant denies the remainder of the allegations contained in Paragraph 17 and demands strict proof thereof.

18.     Defendant admits that Mr. Hester asked the plaintiff to meet with him regarding the plaintiff's accusation against him.   The defendant denies the remainder of the allegations contained in Paragraph 18 and demands strict proof thereof.

19.     Denied.

20.     Denied.

21.     Denied.

22.    Admitted.

23.    Defendant admits that plaintiff responded to a written warning.

24.    Defendant admits that plaintiff was informed that failure to sign an acknowledgement of receipt of a written warning could result in discipline. Defendant further admits the plaintiff eventually signed such an acknowledgement of receipt. The defendant denies the remainder of the allegations contained in Paragraph 24 and demands strict proof thereof.

25.    Denied.

26.    Defendant admits that plaintiff appealed her suspension. Defendant denies the remainder of the allegations contained in Paragraph 26 and demands strict proof thereof.

27.    Denied.

28.    Defendant admits that the plaintiff was given notice that she would have an opportunity to be heard regarding her suspension. The defendant denies the remainder of the allegations contained in Paragraph 28 and demands strict proof thereof.

29.    Denied.

30.    Defendant admits that Commissioner Sparks issued his decision regarding the plaintiff's suspension in a letter dated November 22, 2005. Defendant denies the remainder of the allegations contained in Paragraph 30 and demands strict proof thereof.

31.    Denied.

32.    Defendant admits that plaintiff received notice that she could receive a post-suspension review.

33.    Denied.

34.    Defendant admits that an Administrative Law Judge presided over plaintiff's post-suspension review.  Defendant denies the remainder of the allegations contained in Paragraph 34 and demands strict proof thereof.

35.    Defendant admits that Lance Hester sent a memorandum to the plaintiff dated December 13, 2005 and that the memorandum speaks for itself.  The defendant denies the remainder of the allegations contained in Paragraph 35 and demands strict proof thereof.

36.    The defendant admits that the plaintiff's post-suspension review was conducted by an Administrative Law Judge on February 21, 2006.

37.    The defendant admits that the Administrative Law Judge rendered an opinion regarding plaintiff's suspension and that the opinion speaks for itself.  The defendant denies the remainder of the allegations contained in Paragraph 37 and demands strict proof thereof.

38.    Denied.

39.    Denied.

40.    Defendant admits that plaintiff's attorney contacted the defendant regarding plaintiff's suspension.  The defendant denies the remainder of the allegations contained in Paragraph 40 and demands strict proof thereof.

41.    Defendant does not have enough information to admit or deny the allegations contained in Paragraph 41.

42.    Defendant admits that plaintiff's attorney contacted the defendant regarding the plaintiff's suspension.  The defendant denies the remainder of the allegations contained within Paragraph 42 and demands strict proof thereof.

43.    Defendant denies that any documents are impermissibly omitted from the plaintiff's personnel file and demands strict proof thereof.

44.     Defendant admits that some of plaintiff's job responsibilities were changed during the course of her employment. The defendant denies the remainder of the allegations contained within Paragraph 44 and demands strict proof thereof.

45.     Denied.

46.     Defendant admits that plaintiff filed a motion to enforce the recommendation of the Administrative Law Judge. The defendant denies the remainder of the allegations contained in Paragraph 46 and demands strict proof thereof.

47.     Defendant realleges and incorporates responses to Paragraphs 1 through 46 by reference as if fully set forth herein. To the extent called for, defendant also adopts and incorporates responses to Paragraphs 48 through 57 as if fully set forth herein.

48.     Denied.

49.     Denied.

50.     Defendant realleges and incorporates responses to Paragraphs 1 through 49 by reference as if fully set forth herein. To the extent called for, defendant also adopts and incorporates responses to Paragraphs 51 through 57 as if fully set forth herein.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Defendant realleges and incorporates responses to Paragraphs 1 through 53 by reference as if fully set forth herein. To the extent called for, defendant also adopts and incorporates responses to Paragraphs 55 through 57 as if fully set forth herein.

55.     Denied.

56.     Denied.

57.    Denied.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a cause of action against this defendant upon which relief may be granted to the plaintiff.

## SECOND AFFIRMATIVE DEFENSE

The defendant pleads the general issue.

## THIRD AFFIRMATIVE DEFENSE

The defendant pleads not guilty.

## FOURTH AFFIRMATIVE DEFENSE

The defendant avers that it is not guilty of any violation of the plaintiff's employment rights.

## FIFTH AFFIRMATIVE DEFENSE

The defendant pleads the statute of limitations.

## SIXTH AFFIRMATIVE DEFENSE

The plaintiff has failed to exhaust her administrative remedies.

## SEVENTH AFFIRMATIVE DEFENSE

The defendant affirmatively avers that any actions it took, having any bearing whatsoever on plaintiff, were taken for legitimate nondiscriminatory reasons and were an appropriate exercise of its authority without intent to discriminate against plaintiff.

## EIGHTH AFFIRMATIVE DEFENSE

The plaintiff's claim for relief is barred for a failure to mitigate her damages, if any.

## NINTH AFFIRMATIVE DEFENSE

The defendant denies that it acted with any discriminatory intent.

6

## TENTH AFFIRMATIVE DEFENSE

The defendant avers that all actions were taken in good faith.

## ELEVENTH AFFIRMATIVE DEFENSE

The defendant avers that all actions were made for bona fide business purposes.

## TWELFTH AFFIRMATIVE DEFENSE

All of the acts or omissions alleged by the plaintiff were for legitimate, nondiscriminatory reasons.

## THIRTEENTH AFFIRMATIVE DEFENSE

Defendant avers that all employment decisions were made as a result of business necessity.

## FOURTEENTH AFFIRMATIVE DEFENSE

Defendant denies that any violation of Title VII has occurred and demands strict proof thereof.

## FIFTEENTH AFFIRMATIVE DEFENSE

At all times relevant to this Complaint defendant acted based on reasonable factors other than sex or race in dealing with the plaintiff.

## SIXTEENTH AFFIRMATIVE DEFENSE

The plaintiff contributed to any of the alleged damages or injuries received.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The plaintiff is not entitled to punitive damages in this action and any order of punitive damages against this defendant would amount to a violation of this defendant's constitutional rights.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The plaintiff's alleged injuries and damages resulted from her own conduct, and she contributed to any of the alleged damages or injuries received. She should be estopped from any cause of action in this matter.

## NINETEENTH AFFIRMATIVE DEFENSE

Defendant pleads the ninety (90) day time limitation contained in 42 U.S.C. §2000e-5(f).

## TWENTIETH AFFIRMATIVE DEFENSE

To the extent that plaintiff asserts claims that arose more than 180 days prior to the filing of an EEOC charge, those claims are barred for failure to satisfy the statutory prerequisites to suit.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

To the extent that plaintiff asserts claims that arose more than 180 days prior to the filing of an EEOC charge, those claims are time-barred and due to be dismissed.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff is estopped from seeking equitable relief as she comes into this Court with unclean hands.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Defendant pleads accord and satisfaction.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Defendant denies any wrongful, tortious, fraudulent or improper conduct.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Defendant avers that plaintiff is limited to the scope of the EEOC charge of discrimination. Defendant pleads the applicability of 42 U.S.C. §1981a and the damage limitations contained therein.

8

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

The award of discretionary, compensatory damages for mental suffering on behalf of Plaintiff violates the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the Constitution of the United States because there are no fixed standards for the ascertainment of compensatory damages recoverable for mental suffering. The amount of damage for such a claim is left to the sound discretion of the jury with no specific, much less objective standard for the amount of the award. Therefore, the procedure pursuant to which compensatory damages for mental suffering are awarded violates the Constitution because: (a) it fails to provide a reasonable limit on the amount of the award against Defendants, which thereby violates the due process clause of the Fourteenth amendment of the Constitution of the United States, (b) it fails to provide specific standards for the amount of the award of compensation, which thereby violates the due process clause of the Fourteenth Amendment of the United States Constitution, (c) it results in the imposition of different compensation for the same or similar acts, and, thus, violates the equal protection clause of the Fourteenth Amendment of the United States Constitution; and, (d) it constitutes deprivation of property without due process of law required under the Fifth and Fourteenth Amendment of the United States Constitution.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

The award of discretionary compensatory damages for mental suffering to the Plaintiff violates the due process clause of Article One, Section 6 of the Constitution of Alabama because it fails to provide a limit on the amount of the award against this Defendant, it is unconstitutionally vague, it fails to provide specific standards in the amount of the award of such damages, and it constitutes a deprivation of property without the due process of the law.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

1.     Defendant avers that the Complaint fails to state a claim upon which punitive damages may be awarded to Plaintiff.

2.     Defendant avers that any award of punitive damages to the Plaintiff in this case would be violative of the constitutional safeguards provided to Defendant under the Constitution of the State of Alabama.

3.     Defendant avers that any award of punitive damages to the Plaintiff in this case would be violative of the constitutional safeguards provided to Defendant under the Constitution of the United States of America.

4.     Defendant avers that any award of punitive damages to the Plaintiff in this case would be violative of the constitutional safeguards provided to the Defendant under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States in that the determination of punitive damages under Alabama law is vague, is not based upon any objective standards, is in fact standardless, and is not rationally related to legitimate government interests.

5.     Defendant avers that any award of punitive damages to the Plaintiff in this case would be violative of Article I, Section 6 of the Constitution of the State of Alabama which provides that no person shall be deprived of life, liberty, or property except by due process of law, in that punitive damages are vague and are not rationally related to legitimate government interests.

6.     Defendant avers that any award of punitive damages to the Plaintiff in this case would be violative of the procedural safeguards provided to defendant under the Sixth Amendment to the Constitution of the United States in that punitive damages are penal in nature and consequently, Defendant is entitled to the same procedural safeguards accorded to criminal defendants.

7.      It is violative of the self-incrimination clause of the Fifth Amendment to the

Constitution of the United States of America to impose against this Defendant punitive damages,

which are penal in nature, yet compel Defendant to disclose documents and evidence.

8.      It is violative of the self-incrimination clause of Article I, Section 6 of the

Constitution of the State of Alabama to impose against this Defendant punitive damages, which are

penal in nature, yet compel Defendant to disclose documents and evidence.

9.      Plaintiff's claim of punitive damages violates the Fourth, Fifth, Sixth, Eighth and

Fourteenth Amendments of the Constitution of the United States, on the following grounds:

a)      It is a violation of the Due Process and Equal Protection Clauses of
the Fourteenth Amendment of the United States Constitution to
impose punitive damages, which are penal in nature, against a civil
defendant upon the plaintiff's satisfying a burden of proof which is
less than the "beyond a reasonable doubt" burden of proof required in
criminal cases;

b)      The procedures pursuant to which punitive damages are awarded fail
to provide a reasonable limit or, the amount of the award against
defendant, which thereby violates the Due Process Clause of the
Fourteenth Amendment of the United States Constitution;

c)      The procedures pursuant to which punitive damages are awarded fail
to provide specific standards for the amount of the award of punitive
damages which thereby violates the Due Process Clause of the
Fourteenth Amendment of the United States Constitution;

d)      The procedures pursuant to which punitive damages are awarded
result in the imposition of different penalties for the same or similar
acts and, thus, violate the Equal Protection Clause of the Fourteenth
Amendment of the United States Constitution;

e)      The procedures pursuant to which punitive damages are awarded
permit the imposition of punitive damages in excess of the maximum
criminal fine for the same or similar conduct, which thereby infringes
the Due Process Clause of the Fifth and Fourteenth Amendments and
the Equal Protection Clause of the Fourteenth Amendment of the
United States Constitution; and

f)      The procedures pursuant to which punitive damages are awarded may result in the award of joint and several judgments against multiple defendants for different alleged acts of wrongdoing, which infringes the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution.

10.     Plaintiff's claim of punitive damages violates the Due Process Clause of Article I, Section 6, of the Constitution of Alabama, on the following grounds:

a)      It is a violation of the Due Process Clause to impose punitive damages, which are penal in nature, upon a civil defendant upon the plaintiff's satisfying a burden of proof less than the "beyond a reasonable doubt" burden of proof required in criminal cases;

b)      The procedures pursuant to which punitive damages are awarded fail to provide a limit on the amount of the award against this defendant;

c)      The procedures pursuant to which punitive damages are awarded are unconstitutionally vague;

d)      The procedures pursuant to which punitive damages are awarded fail to provide specific standards for the amount of the award of punitive damages;

e)      The award of punitive damages in this case would constitute a deprivation of property without due process of law; and

f)      The procedures pursuant to which punitive damages are awarded fail to provide a limit on the amount of the award against this defendant.

11.     Plaintiff's attempt to impose punitive or extracontractual damages on this Defendant, on the basis of vicarious liability for the conduct of others, violates the Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

12.     The award of punitive damages to the Plaintiff in this action would constitute a deprivation of property without due process of law required under the Fifth and Fourteenth Amendments of the United States Constitution.

13.    The award of punitive damages against Defendant in this action would violate the prohibition against laws that impair the obligations of contracts in violation of Article I, Section 22 of the Constitution of Alabama.

14.    The Complaint fails to state a claim for punitive damages under Alabama Code §§ 6-11-20 to 6-11-30 (1975) and is barred.

15.    It is violative of the self-incrimination clause of Article I, Section 6 of the Constitution of the State of Alabama to impose against this Defendant punitive damages, which are penal in nature, yet compels Defendant to disclose evidence.

16.    Plaintiff's claim for punitive damages is limited to the amount recoverable as set forth in §6-11-21, Ala.Code, 1975.  This defense is intended to challenge the ruling stated in Henderson v. Alabama Power Co., 627 So. 2d 878 (Ala. 1993).


_____/s/_____Emily C. Marks_____
EMILY C. MARKS

_____/s/_____E. Hamilton Wilson, Jr._____
E. HAMILTON WILSON, JR.
Attorneys for the Defendant

13

## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2007, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system which will send notification of such filing to the following:

Juraldine Battle-Hodge
207 Montgomery St., Ste. 215
Montgomery, AL  36104-3528


/s/ Emily C. Marks_____
OF COUNSEL

## AFFIDAVIT OF SHANNON BURTON

My name is Shannon Burton and I have personal knowledge of the following:

I am currently an Administrative Support Assistant III with Alabama Department of Agriculture and Industries. I have been employed with Alabama Department of Agriculture and Industries since September 2001. I started employment in the Agriculture's Compliance Division. Benny Hitch was my immediate supervisor. I worked in this division until I was promoted and moved to the Food Safety Division August 2003. I was assigned to Food Safety at Lance Hester's and Dr. John Bloch's request. Lance Hester was my immediate supervisor until April of 2006.

On Monday October 31, 2005, I came in to work to discover mail in my chair and on my desk that had not been open for an entire week. The week of October 24-28, 2005 I was serving on jury duty. When I returned, I was shocked to find so much mail unopened for an entire week. The first thing I thought, no permits have been processed, penalties did not post, nor emergency requisitions approved and sent to accounting and procurement for processing. We receive regular requisitions weekly, but often one of the labs will call me and ask what process is one of their requisitions in, because it is an emergency for the product. When I started opening the mail, I discovered several requisitions that had been sitting on my desk the entire week I was away on jury duty. No one took the requisitions to the proper sections of the department for completion. It was very clear that no one cared to open the mail.

I went into Mr. Hester's office and stated in a question form, "Are you aware that the mail has not been opened for an entire week?" Mr. Hester responded, "I was under the assumption that Mary Catrett was opening the mail."

I told Mr. Hester that could not have been the case because I have postmark dates on the mail from everyday of the week and it was a tremendous amount of mail. Mary Catrett was on leave October 24-25. That is two days I know for a fact that the mail was not opened. I went to my immediate supervisor because I no longer supervised Anne Williams and Mary Catrett. Lance Hester is the Division Director and he delegated office tasks. The person who usually brings the

1

Exhibit 5

mail noticed it accumulating in my chair and asked Anne Williams what did she want her to do with the mail because it was a lot and Mrs. Williams told the young lady to put the mail in my chair. I asked Mr. Hester if he would like to look at the mail in my hands to see the postmarked dates. He stated that he did not think it was necessary, but if it would make me happy, he would look at the mail. I told Mr. Hester it was not about making me happy, it was about the productivity of the office.

I stated that if I had left the mail unopened for an entire week a federal case would have been made out of the situation. At this time, Ms. Wilma Fitzpatrick entered into my office, took a seat, and waited to see Mr. Hester. When I noticed someone was waiting to see Mr. Hester, I made my last comments, which were "it does not matter anyway because if this incident ever comes up again about the mail not being opened, you probably would not remember I told you about the postmark dates on the mail of everyday of the week and probably would not tell the truth about the dates anyway." After my last comments, Ms. Fitzpatrick enters Mr. Hester's office and meets with him for about ten minutes. Mr. Hester came to my desk after Ms. Fitzpatrick left the office and stated, "I have a rebuttal and question for the last comments you made."

I then asked Mr. Hester what he needed to know, he stated, "Do you honestly believe I would not tell the truth about the postmark dates on the mail even if I looked at the mail?" I stated, "Yes, I honestly believe that you would not tell the truth." Mr. Hester tells people all the time he has a bad memory. He addressed a memorandum to me and seven other supervisors dated April 11, 2005 that stated, "I have been receiving notices from each of you in different ways. **With a memory like mine**, I need a more formal way to handle the information." **This was my belief not an accusation**. Mr. Hester asked me to come into his office and discuss how we could get pass this so we all could be on the same team. I stated I am willing to be a team player but it takes the entire office of employees to be willing. Mr. Hester and I talked in his office for approximately 45 minutes about how he wants all of the employees of the food safety section to

be team players. Not once did Mr. Hester elaborate on how he felt my comments about he would probably not tell the truth about the mail were unacceptable to him, disruptive, indicated a demeanor of insubordination, lack of respect for his position, nor how it demonstrated a failure to submit to authority. I can elaborate on how Mr. Hester's comments to me in 2005 were unacceptable. Mr. Hester saw Joe Barnes come to my office one afternoon about ten minutes after five, I gave Joe some money. The next day he saw Ms. Teresa Smiley (Deputy Commissioner) giving me money and stated, "This is the second day after five I have seen money being exchanged, **what are you doing, dealing drugs**?" Joe borrowed money for gas and Ms. Smiley was buying Girl Scout cookies. Mr. Hester's comments were disrespectful, demeaning and racist. The Deputy Commissioner Teresa Smiley told me that Lance Hester's comments about me **dealing drugs** were offensive to her. She was present when Mr. Hester made these comments. I did not disrespect Mr. Hester in any shape, form or fashion, nor was my behavior disruptive. Mr. Hester did not ask me to perform a task, and I deliberately did not complete the task, so how is this insubordination? Once again, **this was my belief not an accusation**. It is obvious my belief was more important to Mr. Hester than unopened mail for an entire week. In my opinion, this demonstrates a lack of supervision of work productivity and a lack of concern for the consumers of the State of Alabama by Mr. Hester.

Unopened mail for an entire week means no productivity of work in the Food Safety Division. The Food Safety Division did not receive the consumer's applications and payments. The Food Safety Division has over seven thousand consumers that require a Food Safety Permit. **Opening the mail should have been a priority and important.**

Mr. Hester stated in his letter that my behavior was so severe it warranted immediate attention and that I should write a response after signing his letter. He also indicated that in my response to his letter, I should admit to disruptive behavior, insubordination, failure to submit to authority and state how the behavior is unacceptable and similar behavior in the future will result in a reprimand and disciplinary action. I need to know, if my response is to tell my side of the story,

why Mr. Hester told me to admit to his accusations in my response.  In Mr. Hester's letter a question was asked, what actions have been taken with the employee prior to this step of discipline (include counseling, coaching and/or any disciplinary step)?  Mr. Hester's statement to this question was; this is an attempt to document improper behavior.  This was necessary because of the severity of the behavior. What was so severe about my opinion? I have never had a documented or verbal counseling, coaching or any disciplinary steps.

Why Mr. Hester chooses to make my opinion a disciplinary step, I will never know the truth. What I do know, my opinion that Lance Hester asked for did not constitute being written up, disrupted the department, interfered with work productivity, indicated failure to submit to neither authority nor insubordination. I do not have to have **"FAITH"** in Mr. Hester to work for him. How in the world can Mr. Hester convict me on an opinion he asked for? The question was, **"If this situation comes up in the future, do you honestly believe I would not tell the truth about the postmark dates?"** I was suspended for a **FUTURE INCIDENT.** How was that possible? Lance Hester and Commissioner Ron Sparks did not comply with relevant portions of State Personnel Polices and Procedures and the Department of Agriculture and Industries Polices and Procedures regarding "Progressive Discipline. The suspension was not warranted and there were mitigating circumstances that suggested that a less drastic action was appropriate. Prior to 2005, I had no discipline action letters in my immediate supervisor's file (Benny Hitch). No discipline action letters in Lance Hester's supervisory file. All of my evaluations since 1999 are **Exceed Standards. My evaluations for 2006-2007 and 2007-2008 are Exceed Standards**. The State Government Orientation Merit System and Personnel Training Guide 2005 page 52 states that the supervisor should look at a subordinate's total performance and focus on significant, not trivial, or insignificant behavior requiring improvement. The warning letter Lance Hester issued me alluded to disruptive behavior, failure to submit to authority and insubordination. My opinion that if the subject came up in the future about the postmark dates on mail October 24-28, 2005, that Lance Hester would not be truthful about the dates; in no way demonstrates disruptive behavior,

*4*

insubordination nor did I fail to submit to authority.

The last statement on the warning letter states, "If a corrective action plan is developed in conjunction with the discipline, include the timeframe that is being monitored for change in performance and the follow-up meeting date". Lance Hester stated that he followed all of State Personnel's Training Manuals for disciplining an employee. If so, why wasn't I given a corrective action plan and a time frame to be monitored?

I have never had a documented or verbal warning, coaching, counseling, reprimand or suspension. My evaluation score during the suspension was **Exceed Standards. In the Work Habits Section** of the evaluation Attendance, Punctuality, Cooperation with Coworkers and Compliance with Rules all were checked satisfactory, but Lance Hester still recommended suspension. The suspension decreased my score to **Partially Meets Standards**. Alabama State's Personnel Performance Appraisal Manual states that an employee should be evaluated the entire year. Progressive Discipline process was started with me the same month my annual evaluation was done. My evaluation is due in December. The warning, reprimand and suspension all occurred within a **two week time frame (11/3-11/15).**

Lance Hester and Commissioner Ron Sparks did not comply with relevant portions of State Personnel Polices and Procedures and the Department of Agriculture and Industries Polices and Procedures regarding "Progressive Discipline. The suspension was not warranted and there were mitigating circumstances that suggested that a less drastic action was appropriate. I was given a letter of suspension dated November 15, 2005 that stated I was suspended starting November 21, 2005 through December 2, 2005. I was instructed to return to work Monday December 5, 2005.

I returned to work on the 5th of December and was told by Attorney Jeff Webb that I was not supposed to return to work until the 7th of December 2005. Jeff Webb told me he came by house during the Thanksgiving Holidays and put a second letter of suspension in the side door of my house. I did not get the second letter of suspension until I returned to work on the 5th of

December. I asked Jeff Webb why the Department of Agriculture and Industries did not send the second letter of suspension certified mail with return receipt of my signature so the department would know I received the second letter of suspension. I was suspended before Commissioner Ron Sparks granted a hearing for me to address the charges for suspension. The Commissioner only granted the hearing after Sharleen Smith (Training Coordinator from State Personnel called Teresa Brunson and notified them of their mistake. This is why I received a letter from Teresa Brunson about a hearing at 4:45 p.m. November 17, 2005. The letter stated the Commissioner scheduled a hearing at 10:30 am Friday November 18, 2005. I was not given enough time to secure legal representation. The State of Alabama Law and the State Personnel Board Rules require that you give the employee who is about to be suspended, a reasonable amount of notice for his or her hearing.  The Department of Agriculture and Industries did not comply with the law or rule.  I was given a letter at 4:45 p.m. November 17, 2005, that stated I will be able to rebut the suspension in a hearing before the Commissioner on Friday, November 18, 2005 at 10:30 a.m.  I need to know why this letter was not given to me with the suspension letter dated November 15, 2005.  In the suspension letter a Waiver for Suspension Hearing for me to sign away my rights to a hearing that expired November 17, 2005 at 3:00 p.m., but failed to include the letter of hearing for November 18, 2005 at 10:30 a.m.

Lance Hester nor the Commissioner told me the final decision of the hearing that took place that morning. I already received a letter of suspension dated November 15, 2005; this is why I left work on the 18th of November expecting to return to work on the 5th of December. I did a time sheet that reflects the dates of suspension that Deputy Commissioner Teresa Smiley approved before I left for suspension. A copy of a second timesheet was given to me by Jeff Webb when I returned to work on the 5th of December. Jeff Webb stated Lance Hester completed another timesheet to reflect the new dates of suspensions. By returning to work on the 7th of December I was suspended a total of 12 days.

The proposed suspension was not consistent with Agriculture's actions in similar

circumstances in the past (2004).  **Example:**  Jamie Baxley used abusive language toward the

Asst. Commissioner Doug Rigney and was told by the Asst. Commissioner to leave his office

with that attitude.  Mrs. Baxley was sent home for the rest of that day with pay and was not given

a written reprimand nor was she suspended. I got this information from Deputy Commissioner

Teresa Smiley who stated Charlenthia Canidate heard the abusive language because her office at

that time was directly across from Doug Rigney. I feel like I was treated differently.  Under all of

the circumstances, does a suspension present a fair and honest reason, regulated by good faith for

an employee's **belief, not an accusation?**  There were mitigating circumstances which suggest

that a less drastic action was appropriate.

   The Department of Agriculture and Industries is not fair or consistent with punishment for

actions of employees.  I tried to tell the Commissioner I was on jury duty for an entire week and

the mail was not open.

He did not want to hear my side of the story because Mr. Hester and Dr. Bloch had done such a

good job of explaining my side of the story to the Commissioner. How is it possible for Dr. Bloch

to explain anything when he was on leave on November the third, the date Mr. Hester presented

me with the written warning?  **Another example of inconsistency:**  In October of 2004, over a

hundred thousand dollars in unprocessed checks and money orders for renewals from Consumers

of The State of Alabama were found in Pat Burgess's office and there was still a problem in 2005.

She was not given a reprimand nor suspended.  In the beginning of 2004 the Food Safety Section

was seeking to fill an ASA I position.  Mr. Hester asked me if I knew of anyone that was

interested and I told him Mary Catrett had mentioned Pat Burgess.  Mr. Hester stated, "He had

already spoken to Dr. Bloch about Pat and Dr. Bloch told him we (The Food Safety Section) did

not need that headache." That statement alone lets everyone know that Dr. Bloch has had a

problem with Pat Burgess failure to perform her job properly and inconsistencies with

punishment for the action.

   In March of 2004 Commissioner Sparks called a minority meeting where only black

employees of the Department of Agriculture and Industries attended the meeting.  The only white employees present were David Hooks (retired), Doug Rigney (Asst. Commissioner) and Sharon Fulmer (Executive Assistant).  The black employees in this building are still confused about what you thought you accomplished in the meeting because there is still obvious mistreatment of minorities in the building. It appears to me to be a pattern of inconsistency with what constitute punishment for an employee's action.

**A final example**:  Dr. Hester a federal employee that works in the Richard Beard Building called an Agriculture's state employee a **"FAT BROAD"** (April Lovelady, no longer employed as of 2006).  Everyone saw April crying after that comment made by Dr. Hester.  No actions were taken against Dr Hester?

Lance Hester gave me a letter dated December 13, 2005 that stated, **"If the hearing on your appeal of the suspension determines that the suspension was not proper, we will change or re-do your evaluation to reflect that decision. Also, if the hearing outcome results in a change in your evaluation that affects step raises, it will be handled in a manner that you would not in any way be penalized monetarily."** As of May 29, 2008 my evaluation has not been re-done.

Lance Hester and Mary Catrett moved out of the Food Safety Division to the first floor. I knew nothing about this move until General Services came to move the office furniture to the first floor. No one told me anything.  General Services had the inmates paint Lance Hester's old office and during this time I asked why the office is being painted and I was told that Mark Scott would be moving into Lance Hester old office.

In May of 2006, Lance Hester had a meeting with the Food Safety Division office employees. This is when I was assigned additional duties and told that Mark Scott would be my immediate supervisor. I was assigned the duty of answering Food Safety Division's main phone line. This

*8*

was always Mary Catrett's duty. Processing returned checks, monthly sample schedule and PY

156 egg inspection reports were all Mary Catrett's duties.

_____
Shannon Burton

STATE OF ALABAMA                    )
                                    )
MONTGOMERY COUNTY                   )

I, _Ursula Caldwell_ a Notary Public for the State at Large, hereby certify that **Shannon Burton,** whose name is signed to the foregoing Affidavit, and who is known to me, acknowledged before me on this day that being informed of, and understanding the contents of same, she executed the same voluntarily on the same bears date.

GIVEN under my hand and seal on this _29TH_ day of _MAY_, 2008.

_____
Notary Public
Commission Expires _3/25/12_

9

JSP.U04                 ALABAMA JUDICIAL DATA CENTER

                             CERTIFICATE

                                  OF

                             JURY SERVICE

                          MONTGOMERY COUNTY


        JUROR:  SHANNON P BURTON
                3253 CAPWOOD CURV
                MONTGOMERY        AL   36116




     I CERTIFY THAT THE ABOVE NAMED PERSON SERVED AS A PETIT JUROR IN

     THE CIRCUIT COURT OF THIS COUNTY ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

     FOR A PERIOD OF 04 DAYS AND RECEIVED *********42.80.




                           MELISSA RITTENOUR (CC)
                           COUNTY COURTHOUSE
                           MONTGOMERY        AL   36104
                           PH: 334-832-1261



     NOTE:  UNDER THE LAW OF THE STATE OF ALABAMA (CODE OF ALABAMA,

            1975, 12-19-210); A JUROR IS PAID AN EXPENSE ALLOWANCE

            OF $10 PER DAY PLUS AN ADDITIONAL MILEAGE EXPENSE OF 5¢

            PER MILE.  SINCE THIS IS NOT A FEE FOR JURY SERVICE, THE

            AMOUNT PAID SHOULD NOT BE DEDUCTED FROM THE REGULAR

            COMPENSATION DUE THIS JUROR FROM HIS/HER EMPLOYER.

     ISSUED: 10/28/2006   BY: REG

                                              *Exhibit 6*



# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
### Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-03

May 16, 2005

Memorandum

This is a copy of our Progressive Discipline Policy.  Please copy and distribute to all of your employees.

# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
### Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

Mailing Address:
Post Office Box 3336
Montgomery, AL  36109-033

# Policy
# Progressive Discipline

Failure by a permanent Merit System employee to conform to the policies, procedures and directives of the Department of Agriculture and Industries and the State Personnel Department may result in disciplinary action.

Progressive discipline is a system of escalated penalties which are imposed with increasing severity for repeated infractions.  The steps are listed below.

1. Warning
2. Reprimand
3. Suspension
4. Termination

This procedure is in accordance with the progressive discipline procedure as outlined in the Progressive Discipline Manual (2005 Edition) of the Training Division of the State Personnel Department.  The goal of this procedure is for a supervisor to make an employee aware of his or her weakness in a job related area and to allow an employee to change the undesired behavior to the desired result.

At each step, the supervisor provides a clear statement of the problem behavior, what to do to correct the problem, a time limit for correction and consequences of continued misconduct. Reprimands and suspensions will result in points being deducted from the performance appraisal score. This will in turn affect the amount of the annual raise, if any.  The employee has the right to file a rebuttal in their personnel file to any charge brought by their supervisor.  In the event of serious misconduct, the department reserves the right to bypass the lower steps, such as warning and reprimand, and proceed to suspension or termination.

Suspensions and terminations require a hearing before the Commissioner or his representative before going into effect.  However, an employee may be placed on mandatory leave until the time of the hearing and the final determination.

The Commissioner will inform the employee in writing of the charges and the time and place of the hearing.  At this hearing the employee will be given the opportunity to tell their side of the story.  The Commissioner will inform the employee of his decision in writing after the hearing. Both suspensions and terminations may be appealed as detailed below.

Suspensions may be appealed in writing to the Commissioner's Office within 10 days of notice. Upon appeal, the Commissioner will appoint a panel or hearing officer to review the action.  The Commissioner is not bound by their recommendations.  The Commissioner will inform the employee in writing of these findings and his final decision.  Terminations are appealable in writing to the State Personnel Board within ten days of receipt of notice of such action.

1

The following is a list of infractions that may result in disciplinary action but is not meant to be all-inclusive:

Misuse or abuse of equipment
Unexcused, excessive or unreported abscesses
Failure to perform job properly
Theft of or unauthorized possession of State property, documents or the personal property of another employee
Violation of a specific department rule
Participation in an unauthorized activity
Unauthorized operation of vehicles or equipment
Habitual tardiness
Job abandonment
Fighting
Disruptive conduct
Threatening gestures
Abusive or threatening language
Insubordination
Falsification of records
Possession or use of alcohol, narcotics or dangerous weapons

Probationary and provisional employees and employees in unskilled positions (Form 8's) may be dismissed at any time without benefit of a hearing. Criminal violations shall also be subject to prosecution in accordance with the Alabama Criminal Statutes.

This is not a new policy but, the formalization of an existing procedure.

Approved: _____            3-8-05
              Ron Sparks                              Date
              Commissioner

2

# STATE OF ALABAMA
# PROGRESSIVE DISCIPLINE MANUAL



## State of Alabama Personnel Department
## Training Division

## 2005 Edition

Revised September 26, 2005

## INTRODUCTION

### REASONS FOR A DISCIPLINE SYSTEM

The State's discipline system, once called Positive Discipline, is now termed as "Progressive Discipline." The form of discipline system is of progressive discipline steps. It is a way for the supervisor to make the employee aware of a weakness in a job-related area. This allows an employee the opportunity to change the undesired behavior. The discipline process is a management tool used to teach an employee the correct conduct and/or behavior. The objective of this discipline is not punishment, but to bring a change in the employee's behavior through a series of steps starting with counseling and progressive in severity. In many case, the employee will change with a simple counseling session. This change leads toward the desired result required in the position.

The discipline process involves four steps. Usually it is used in a progressive format from the first step to the fourth step. Each step is a more involved process to allow the employee continued awareness and accountability of the problem and offer opportunity to change behavior. This process makes sense from several angles. First of all, use of the four step process is good business management. It communicates the weak area to the employee and provides an opportunity for the employee to change performance. At this point, the employee becomes a productive member of the agency again. Second, it is the standard by which discipline procedures, in general, are judged. This process is the ruler by which discipline procedures are measured to see if they are defensible and fair in court, agency hearings, or State Personnel Department hearings.

The discipline system is to be used hand-in-hand with the performance appraisal system. These are the two most important management tools a supervisor possesses in state government. The management role of a supervisor's job is to get work done through others. In some cases, a supervisor may find that an employee's behavior is hindering productivity. Counseling should be used at the time a supervisor is monitoring performance and notices the problem. If the problem behavior continues, then discipline may need to be brought into the situation. If discipline is used, at any level, the behavior warranting the corrective action should be documented on the Employee Performance Appraisal. Deductions for severe disciplinary actions are discussed in "Steps of the Discipline Process." This situation, then, may lower the appraisal score as a reflection of what occurred during the year. Since appraisal is not the discipline tool, the lower appraisal score is simply the result of the discipline that occurred during the year. Figuratively speaking, performance appraisal is a mirror that reflects what has occurred during the year. Positive discipline is the corrective tool to use at the time an infraction occurs in work conduct.

Some supervisors think that ignoring a problem employee will help the problem go away by not drawing attention to the situation. Some supervisors think that for a minor problem the problem is best served by laying a severe step of discipline on the employee - not using the system progressively. Both of these thoughts are incorrect. In fact, if a work unit or office has an employee with a conduct problem, it is imperative for the supervisor to take action. Progressive discipline is the most effective means to dealing problem situations.

6

If a problem is not dealt with, it hurts the work quality and productivity in the area. First, it hurts the employee with the problem because their performance is suffering in some way. If productive employees see the problem employee getting away with less than "the load" each one carries, the productive employees will loose motivation. However, that is not all it hurts. It also damages other employees and the supervisor's image. Employees need to be treated similarly if their performance and conduct on the job is similar. If a supervisor allows one employee to continually be tardy, have absenteeism problems, be insubordinate, etc. it will cause morale and motivation issues with the other employees that abide by policies and support management. Productivity, quality, morale, harmony and other healthy workplace attributes will decline. Respect for the supervisor will also decline if problems are left unattended. Credibility and perceived loyalty of the supervisor will decrease.

On the other hand, it is equally ineffective and often harmful to handle a minor problem with an employee by over reacting and/or using harsh discipline. This improper use of discipline usually occurs when a supervisor does not think through the consequences of their management or treats employees differently based on biases. It is especially harmful if the supervisor has not taken time to tell the employee the needed change. This supervise damages the office and employee motivation because the discipline is being used a punishment not a teaching tool. Now, there are times when the offense is critical enough that steps of discipline may need to be skipped. However, in most cases that is not appropriate. When other productive employees see the outburst of discipline taken on the employee only after one occasion of a lesser problem, they also become weary that the supervisor is "out to catch people doing something wrong" instead of looking to catch people doing something right. 

The appropriate supervisory action is to treat workers according to their actions, work history, and performance issues. This means rewarding performance above standards and progressively disciplining employees with conduct problems.

Remember, the object of using the discipline process is to identify unwanted behavior on the part of an employee and bring it to the employee's attention. Most importantly, a change in behavior that leads the employee back to productive performance should be the method. It is the only method that yields desirable results.

Studies have shown that it is less costly to correct performance of an existing employee than to terminate the employee and hire a replacement. Rehabilitating an existing employee will save in the areas of recruitment, lost time in the job, initial training costs of a new employee, quality lost in the change of employees, and shutdown of productivity until a new employee has been trained and is on board. These are only a few reasons why it pays to work with an employee through the discipline process in order to change the unwanted behavior.

On the other hand, improperly dealing with discipline will spark an increase in absenteeism, turnover, hostility at work between productive and unproductive employees, and employees seeking positions elsewhere.

7

However, there may be times when the employee does not change the undesirable conduct and the discipline will lead to termination. On these occasions, the supervisor must think of the responsibility of state employees. Each Merit System employee is to receive their position based on merit and competence. Each Merit System employee is to be promoted because of merit and competence. Likewise, each Merit System employee is to maintain their job based on merit and competence in fulfillment of their responsibilities. An employee that fails to demonstrate this competence and fulfillment of duties, after extensive time and effort working through the discipline process, may need to be terminated. A supervisor's job is to manage their employees, maintain quality services, and foster a productive and effective work environment.

In most cases, the discipline process will restore the employee to a productive and effective work style. Some employees just need the reminder of discipline to spur them back into the right conduct or behavior. It may be that just a word will turn performance around. Often, an employee's problem area can be handled by a simple word. The employee changes the behavior with this knowledge. This is the supervisory responsibility of coaching. A supervisor should coach employees in areas of strength, weakness, and even fully competent performance.

In other cases it may take more time and effort through the more severe steps of discipline to show an employee the need to maintain productive work conduct. Therefore, the discipline system offers a four step procedure to be used in this event. The four steps are warning, reprimand, suspension, and termination.

In any case, the supervisor's management and leadership abilities are the vehicle and avenue to get their employees to enhance and progress in performance of quality services. State employees are servants of the people. As such, should maintain service excellence.

## COUNSELING BEFORE DISCIPLINE

It is easy to forget when faced with a "problem employee," to stop, think, and act only after you have considered the proper judgment call. In Performance Appraisal, a supervisor is advised to counsel an employee whenever they see performance or work conduct issues arise. Counseling should be conducted prior to jumping into discipline with the employees. One, it shows that the supervisor has properly communicated and given the employee an opportunity to change. Second, an employee needs a simple reminder of the proper path to take. In any case, counseling is a sure way to start when a problem arises to inform the employee does not allow the opportunity to change. If a formal counseling session is going to be used in the Work Habit section of the Appraisal, it must be made "officially." The best way to ensure that supervisory actions are appropriately conducted with proper documentation is to put the counseling in writing in a memo, corrective action plan, or sample form found in this manual.

However, having stated that most offences are first addressed with a counseling prior to proceeding to disciplinary steps, in rare occasions counseling may be skipped to reach a higher step of the discipline system because of the severity of the offence. For example, in most agencies infractions in punctuality, dress code, or excessive use of telephone for



personal calls would be addressed by use of each step of discipline but beginning with counseling. Theft, gross insubordination, fighting, use of alcohol/drugs while on duty, for example, would probably bypass counseling and proceed to a more severe step of discipline. Use of discipline other than step-by-step should be discussed with the Personnel Office or Legal Office of the particular agency.

## THE DISCIPLINARY SESSION WITH THE EMPLOYEE

A session between supervisor and employee should be conducted at each step of the discipline process. In fact, more than one session may be necessary in order to complete a particular step. Sessions should always be held strictly confidential and held in private. It may be that someone else (i.e. Legal Staff, personnel staff, reviewing supervisor) is present. Other than necessary individuals, the meeting should be held in a private office.

The supervisor needs to anticipate the reaction of the employee to the disciplinary session. This anticipation is for several reasons. It is important for the supervisor to have information planned out so that the purpose and problem is clearly explained. Also it is important to state the desired results. The supervisor should be in control so the agenda may be covered with as few problems as possible. Since an employee may demonstrate any one of an array of emotions, the supervisor should be prepared to handle these situations.

It is wise to let the employee talk. This may be best to pose questions regarding correct actions or ask the employee to suggest possible solutions. Allowing an employee to talk may even assist with a change in conduct if they can just talk it out. In other words, this may be a dialogue instead of one-way communication.

The supervisor should be sure that the employee is told what will happen if the lack of proper behavior continues. In most cases this will be the next step of the discipline process.

The supervisor should document what happened in the session after the session is over. The documentation should include information regarding the conversation between the supervisor and employee such as points that were covered, the corrective action plan, discussions, and other areas of the session that could be important for future reference.

## STEPS OF THE DISCIPLINE PROCESS

### STEP ONE: WARNING

The first step of discipline is a warning. A warning must be documented in writing. Make sure that the warning has the word "Warning" on it so that there is no doubt as to what step of discipline the supervisor has taken. The supervisor must provide the employee with the warning in the method of a memo, letter, or form. A sample form is included in this section on which to document the reprimand. A supervisor should hold a formal session (meeting) with the employee.

The session should outline the unwanted behavior and desired changes. The supervisor should be specific in describing the issues and the change needed by the employee. Supervisors should not take for granted that employees automatically know the specifics of the desired change. It is best for supervisors to be direct but show that they care about the employee's performance. After all, the supervisor is the team coach of the office or group.

The supervisor would be wise to let the employee repeat back to them the needed change in behavior. The most effective way to talk with the employee is for the supervisor to ask the employee about solutions to the performance issues. If the supervisor "asks" for solutions rather than "tells" the employee their solution, the employee will be more apt to look at the discipline as constructive rather than punishment. This action allows the employee to take responsibility in his/her performance changes. In addition, the employee should be informed of further disciplinary actions that will occur if the behavior does not change.

It would be helpful to set up a corrective plan of action for the employee. This corrective action plan lets an employee know what behavior needs to be changed, the results that are desired, and a time period in which the behavior will be monitored. How the supervisor will assist and a follow-up date to review performance should be included in the corrective action plan. To learn more about corrective action plans, please refer to Corrective action plan section of this Manual. The supervisor should document the discussion regarding the warning and corrective action plan, if used, in his or her own supervisory files. Supervisory file means the informal notes that each supervisor should maintain on each employee. These informal supervisory files are also mentioned in the Performance Appraisal Manual as documentation that is collected in order to justify ratings at the en of the year and serve as a memory source for that appraisal.

The supervisor is to wait until after the session with the employee and then proceeds to write a warning. The wait is suggested because, if the supervisor has used appraisal and discipline correctly, this meeting is conducted only after one or two counseling sessions (in most situations). Therefore, the meeting may result in the employee providing information that may change the perspective of the supervisor. For example, information from the employee indicates that in the particular situation, no infraction actually occurred – it was

10

hearsay. However, in most cases, the supervisor proceeds with the warning if the there is no change in perspectives and it is fair for the employee to receive a warning.

The employee must sign that she/he received a copy of that warning. This is best documented on the actual warning. This warning is given to the employee after the session has been held. The supervisor should document appropriate information in the supervisory file regarding what occurred in the meeting with the employee. The discussion should include the information as discussed in the session to include the problem area, the correct behavior, future consequences if behavior does not change, date of the session, and the agreement made between the employee and supervisor. An appropriate corrective action plan is written for the employee as an agreement to change within a certain period. Any corrective action plan is to be given to the employee immediately after the disciplinary session. A copy of the warning and corrective action plan should be kept in the supervisory file. A copy of the warning is given to the reviewing supervisor. A copy of the warning and corrective action plan must be sent to the central Personnel Office of the agency. Any other copies should be handled according to department policy. A sample form is included in this section or one may use a letter or memo format.

A warning is documented on the Employee Performance Appraisal at the end of the appraisal year for the employee. The documentation simply explains the situation for which a warning was given. In addition, a work habit area or responsibility should reflect that discipline took place. However, no points are deducted under "Disciplinary Score" on the Employee Performance Appraisal. Counseling and warnings are giving the employee an opportunity to change behavior with no future action that would deduct points from the appraisal. This documentation on the appraisal form (with no points deducted) is also a record of when troublesome behavior started in case it continues into the next appraisal period. The appraisal will either support or refute future personnel actions.

Remember if, a warning is placed in a formal file of the employee, a copy should be given to the employee within ten days of receipt into the file. Failure to do so can result in the warning being made null or void, as dictated by state law.

The warning and session, openly labeled as a warning, should set the employee on the right track. However, there are those times when the conduct of an employee continues to deteriorate. In this case, the next step of the discipline system should be taken. The next step is a reprimand.

11

## STEP TWO: REPRIMAND

The second step of the discipline system is referred to as a reprimand. This involves a more serious approach to problem areas. A reprimand is documented in writing. A letter, form or memo should be written to the employee should clearly state it is a "Reprimand." The employee must sign that they received the reprimand.

Additionally, a reprimand should state the continued or additional unwanted behavior and the necessity of the desired behavior. It should state that further disciplinary action would take place if the behavior does not come in line with the job standards. Again, a corrective action plan should be developed if possible. The supervisor may choose to discuss the corrective action plan then or in another session. The letter or memo may include both the reprimand and the corrective action plan. A supervisor may reprimand the employee in conjunction with a corrective action plan. A sample form is included in this section or one may use a letter or memo to document the reprimand. *My reprimand stated I did not sign the letter of warning. 2 separate issues!!*

The supervisor is to hold a disciplinary session with the employee. The supervisor should talk through the problem area including correct behavior and future consequences. The employee must sign that they received the reprimand. The best way to document that signature is to have a place provided on the form for the employee to sign. The employee is given the reprimand letter or form as the session ends.

A copy of the letter is given to the reviewing supervisor. A copy is maintained in the supervisor's file. A copy is maintained in the official employee files of the Personnel Office of the agency. Departmental procedure should dictate whether any other copies are to be maintained. All sessions with the employee should be documented in supervisory files.

Remember if, a reprimand is placed in a formal file of the employee, a copy should be given to the employee within ten days of receipt into the file. Failure to do so can result in the warning being made null or void, according to state law.

A written reprimand is documented on the Employee Performance Appraisal at the end of the employee's appraisal year. The work habit area or responsibility of poor performance should reflect the discipline that occurred. This reprimand should be documented in the "Disciplinary Action" section of the Employee Performance Appraisal. In addition, one or more reprimands, if the most severe step taken with the employee during an appraisal year, results in 7 points being calculated in the "Disciplinary Score" section of the Employee Performance Appraisal.

Unfortunately, there will be times when a warning and a reprimand does not change behavior. In this case further disciplinary action should be taken. The next step of the discipline process is suspension.

| SAMPLE FORM THAT MAY BE USED FOR A COUNSELING, WARNING OR REPRIMAND |
| --- |

THIS IS A    ☐   COUNSELING

              ☐   WARNING

              ☐   REPRIMAND

Employee Name

_____

State the facts of the performance or work conduct problem:

_____
_____
_____
_____

State what actions have been taken with the employee prior to this step of discipline (include counseling, coaching, and/or any disciplinary step):

_____
_____
_____
_____

State how the situation can be resolved based on discussion with employee and input from the employee:

_____
_____
_____
_____

If a corrective action plan is developed in conjunction with the discipline, include the time frame that is being monitored for change in performance and the follow-up meeting date:

_____
_____

Supervisor's Signature: _____

Employee's Signature: _____

Date of Meeting _____

Employee's signature denotes discussion not necessarily agreement.  The employee may add comments which must be attached to this form.  The form must be given to the employee with copies to the supervisory file and Personnel Office file in the agency.

13

## STEP THREE: SUSPENSION

The third step of the disciplinary procedure is suspension. This is a severe and extremely serious step in the employee's career in state government. It is important for the employee to realize this fact. An employee may be suspended for up to 30 days in one year. Suspension is always Leave Without Pay.

The supervisor must contact the agency Personnel Office and Legal Staff regarding the recommendation for suspension. A letter should be written regarding the recommendation for suspension and include the continued problems of employee performance and the counseling and disciplinary actions that have been taken with the employee thus far. Depending upon the agency, the letter may be written by the supervisor, division chief, attorney, or Personnel manager. The letter should be written based on the continued documentation of the supervisor to include dates of problems, dates of counseling/disciplinary sessions, goals, and discussions with the employee. In addition, other pertinent information that provides detail and evidence of infractions and the opportunities provided to the employee to change behavior. The employee is to be told the suspension is a time for the employee to consider the criticality of the continued offenses and to decide if he or she would like to continue employment in state government.

As with all personnel actions, a letter must be written to the employee informing him/her of the decision and the dates of suspension. Departmental procedure governs any other necessary paperwork and communication processes.

Upon the employee's return, the employee should be required to give the supervisor an answer as to their decision regarding behavior change and employment with the department.

The supervisor should carefully document each action and each discussion with the employee. Again, note that the agency Personnel Office and Legal Staff must be contacted before any action or discussion takes place between a supervisor and an employee regarding a suspension.

A suspension is documented on the Employee Performance Appraisal at the end of the employee's appraisal year. The work habit area or responsibility of poor performance should reflect discipline occurred. This suspension should be documented in the "Disciplinary Action" section of the Employee Performance Appraisal. In addition, if the most severe step of the appraisal year is one or more suspensions, 17 is deducted in the "Disciplinary Score" section of the Employee Performance Appraisal.

Unfortunately, there are a few cases where an employee's conduct does not change even after suspension. Perhaps the employee came back from the suspension and stated they were willing to change the deviant conduct and desired to continue employment with the department. However, the unwanted behavior starts again. In this case, it may be necessary to take the fourth step of the discipline process known as termination.

14

**Agencies must have chosen one of two ways in which to conduct a suspension:**

The law on suspensions has recently been expanded to include appeals in certain cases. Employees who work for agencies that did not have in place by August 1, 2001 a procedure that provided for a due process hearing are entitled to an appeal.  Ala. Code 1975, §36-26-28 SUSPENSIONS provides:

1.    A suspension with a right to appeal.

An appointing authority, from time to time, may peremptorily suspend any employee without pay or other as punishment for improper behavior, but such suspension or total suspension by such appointing authority of such person shall not exceed thirty (30) days in any year of service.  Such suspension with loss of pay may be affected by service upon the employee by the appointing authority of written charges setting out clearly the delinquency for which the suspension was made, a copy of which must be at the same time mailed or delivered to the director.  The suspended employee does have the right to file with the Board and the appointing authority a written answer or explanation of such charges.

The suspended employee may within 10 days after notice pursuant to this section file a written notice of appeal from the suspension.  If the suspended employee gives notice of appeal from the suspension, the appointing authority shall have the discretion of whether to stay the suspension pending the disposition of the appeal or proceed with the suspension and provide the employee with a post-suspension review subject to the time frames prescribed herein.

If a timely notice of appeal is filed, the appointing authority shall elect between one of the following methods of reviewing the claim.  The appointing authority shall, within 10 days after receipt of the appeal, do one of the following: *The Commissioner took 19 days before he notified me about the ALJ hearing!!*

a.    Appoint a panel as provided for in subsection (c) to decide questions of fact, conclusions of law, and make recommendations to the appointing authority.    *Letter of Appeal date 11/18/05*

    Appoint a designated hearing officer as provided for in subsection (d) who will decide questions of fact, conclusions of law and make recommendations to the appointing authority.    *ALJ Hearing Letter Date 12/7/05!!*

This subsection shall apply only to a department or agency of the state that has 25 or more employees for each working day during each of 20 or more calendar weeks in the current or preceding calendar year.

In instances where the appointing authority elects to appoint a panel, the panel shall consist of three individuals, two of whom shall be in the same or equivalent classification as the suspended employee.

The panel, by majority vote, may recommend to the appointing authority, after a hearing, either of the following:

(1)    That the charges are unwarranted and that the suspension be revoked.

(2)    That the charges are warranted and that the suspension be upheld.

In instances where an appointing authority elects to appoint a hearing officer, the hearing officer shall be selected from a jointly approved list of individuals agreed upon by the Alabama State Employees Association and the respective department or agency. This process shall be repeated annually.

Irrespective of which method the appointing authority selects for adjudicating suspension appeal hearing, all hearings shall be conducted in accordance with notions of due process.

The burden of proof shall lie with the appointing authority to prove the charges forming the basis of the suspension.

Those departments or agencies currently having an existing process for suspension hearings may continue to use the existing process, provided that they observe tenets of due process including that the burden of proof shall lie with the appointing authority.

Further, this section shall not apply to any department which currently employs and continues to employ as a standard practice in such cases a pre-disciplinary hearing before an independent hearing officer who makes a recommendation for disciplinary action to the appointing authority based upon a  fair hearing of the matter.

Further, this section shall not apply to any department which currently employs and continues to employ as a standard practice in such cases an appeal hearing before an in-house hearing officer independent of the division or area in which the employee works. Said hearing officer shall be selected from an approved list of individuals who shall be jointly agreed upon by the Alabama State Employees Association and the respective department or agency. This process shall be repeated annually.

The employee may file for an appeal within 10 days after the notice may file an appeal. The appointing authority has the discretion to stay the suspension or proceed with the suspension and provide a post-suspension review.  The appointing authority, within 10 days after receipt of the appeal must determine whether to appoint a hearing officer or a panel.  The employee should receive due process concerning the hearing.  The letters and meetings occurring up to and including the suspension hearing are applying the due process.  Due process should involve a notice of intention of the appeal hearing and a meaningful opportunity for the employee to respond.

2.    A due process hearing prior to a suspension with no appeal rights.

In this situation, the employee is served with a letter detailing the charges.  Prior to the decision of the suspension, the employee is entitled to advance written notice, a full due process hearing with witnesses and exhibits.  Again, due process should involve a notice of

intention of the appeal hearing and a meaningful opportunity for the employee to respond. The employee is to be told the length of the recommended suspension.

A letter is to be given to the employee that outlines the details of a pre-suspension hearing including the location, date, and time. The letter must include the facts regarding the employee's allowance to bring representation. It should be noticed that only the employee is allowed to speak in the hearing unless determined otherwise by the agency policy. In addition, the letter should inform the employee that a hearing would result in the employee being given the opportunity to answer the charges made against the past performance. Prior to the hearing, an employee is to be told about the option of signing a Waiver of Due Process Suspension Hearing. If the employee decides to sign the waiver, no hearing is held and the suspension is immediately enacted.

If the employee decides the option of a pre-suspension hearing, the hearing officer holds a hearing as stated in the letter. The hearing officer recommends whether to uphold or revoke the suspension recommendation, based on the facts. The appointing authority's decision to suspend or revoke the suspension is final in the agency. If revoked, the employee simply continues to work without disruption.

However, if the suspension is upheld, the employee is sent a letter of suspension including the duration of suspension and dates of suspension. The employee is to be informed to consider the criticality of the continued offenses and to decide if he or she would like to continue employment in state government. This decision is based upon whether the employee will change the undesirable behavior after returning from suspension. Mentioning this to an employee gives the employee the opportunity to know that continued performance problems may lead to termination.

---

## EFFECTIVE PRACTICES WITH DISCIPLINE

---

## PRACTICAL APPLICATION OF THE DISCIPLINE STEPS

The discipline process is to be utilized at management's judgment of the situation(s) or event(s) of the employee's undesirable behavior. This supervisory judgment is critical and must not be taken lightly since the supervisor must decide which step of discipline is appropriate. There are two areas that must be examined when using supervisory judgment in determining when to use discipline or what step of discipline to take. The two areas are as follows: 1) The work history of the employee and 2) the severity of the conduct or performance.

Discipline, especially the last two steps, is serious business. Management must make decisions on each employee situation. Yet, while looking at an individual situation, the supervisor must be consistent with past discipline taken with other employees

First, a supervisor examines the past work history of the employee. Have there been continual problems for five years non-stop? Or is this the first time in ten years the employee has ever been out of line? Has the employee worked for you twenty years with "Meets Standards" performance or is the employee eight weeks into probation and has already received a warning?

Second, the supervisor has to examine the severity or frequency of the offense or problem. For example, one employee is five minutes tardy. Another employee comes in drunk on alcohol or stoned on marijuana. Which one will you obviously deal with first? Which one will receive harsher discipline? The severity of the offense or the number (frequency) of occurrences of the infraction contribute to the decision if which step of discipline to take. It is management's judgment whether to progress from counseling and through the four steps, one-by-one, or move to a more severe step immediately.

Part of supervisory judgment is to determine the point in the employee's behavior at which to implement the discipline process. For example, an employee violates the punctuality policy and is tardy. Does the employee receive a step of discipline the first time a supervisor sees the employee walk in late? Or is discipline administered after four or five tardy situations? Is discipline administered if the tardiness is five minutes? Or does discipline start when tardiness is consistently twenty minutes after the start time?

It is up to supervisory judgment as to what determines the applications of discipline. One way to understand more about supervisory judgment is to discuss these type issues in a supervisory meeting. Usually there are no set numeric policies within agencies. Typically, agencies set generic rules that supervisors must make specific additions to agency procedures. Senior supervisors are another source of assistance. If a supervisor has been around for years and had proper management skills, she or he may be able to helpful with which action to administer. Another source of expertise is the agency Personnel Office. Discipline actions must be administered consistent with what has been done in the past.

28

For the most part, the steps of discipline are to be adhered to in order of progression. There may be occasions where repeating an earlier step is appropriate. For example, if it has been determined that there is a problem with an employee's tardiness, a counseling may be given. If the tardiness continues, the supervisor may determine that a warning is necessary. If the tardiness becomes greater and more frequent in occurrence and has not improved, the supervisor may chose to reprimand the employee. In this example, the tardiness continues and inappropriate attendance problems start occurring. A suspension may be warranted. However, it is not appropriate, in most circumstances, to give another written warning after the suspension if similar offenses continue.

However, the discipline application may change if, after the counseling, warning, reprimand, and suspension for attendance and punctuality problems, a verbal conflict with a coworker occurred. It may be that the supervisor determines that another reprimand is in order because the conflict with the coworker was dramatically different and apart from the problem with punctuality and/or attendance. At this point, on most occasions, future infractions would be looked at in a cumulative manner so as not to digress in the disciplinary steps. It is probable that suspension and eventually termination would occur if other tardiness, attendance, outbursts, or new infractions occur.

Most employee infractions in disciplinary terms are examined in an accumulative manner. Of course, this is considering the work history of the employee. A situation where a supervisor might consider starting over in the discipline process is if considerable time has passed since a particular problem needing discipline occurred. In addition, during this lapsed time, the employee's conduct has been fully competent. Consider the example used earlier. The employee had a problem with tardiness, attendance, and coworker conflict. A counseling, warning, reprimand, and suspension have taken place. The employee improves to comply with the departmental policy. Two years have gone by and no problem has occurred. Two performance appraisals have been given and indicate no problems in the performance of the employee. Then, the employee starts work habits problems again. The supervisor would be wise to begin with a warning again – certainly not start where the discipline left off two years ago and proceed with a termination.

Again discipline is not a science. Most infractions are not identical in nature from year to year or employee to employee. However, as a supervisor grows in their management skills and leadership judgment, so will their judgment in employee discipline.

## CORRECTIVE ACTION PLAN

A corrective action plan is recommended for the first three steps of the discipline process. A corrective action plan should be used with a warning, reprimand, and suspension. In fact, a corrective action plan is useful for any performance problem.

A corrective action plan consists of five areas. Each area needs to be communicated to the employee. This is best done through written means such as a memo or form. It may be communicated during the disciplinary session that is held in conjunction with the discipline process. Again, remember that discipline is to assist an employee in changing undesirable



behavior to desirable performance. A corrective action plan assists in this goal by providing an orderly, precise, and practical plan to overcome the weak area.

There are five areas included in a corrective action plan. The supervisor should:

1.  State the behavior or area of conduct that is deficient and needs to change. Be very specific in this explanation. It is helpful to include examples of actual situations when the conduct occurred. It helps an employee understand the importance of changing if a supervisor lets them know the consequences that make the conduct undesirable.

2.  State the desired behavior or conduct. Be specific as to what actions would be appropriate and provide the necessary change. This part may be as simple as writing the policy regarding the area or a complicated as explaining work operations or processes.

3.  Set a time frame that will be used to monitor the behavior to assure that the employee changes the conduct to proper behavior. This time frame should be long enough such that the area in question can be observed enough times to ensure the proper behavior are occurring. For example, a month – four work weeks – would be appropriate if punctuality is an issue.

4.  State any assistance that the supervisor or department will provide to the employee, if appropriate. For example, the employee may need training or additional resources such as equipment or supplies. If so, those should be outlined. There is no actual assistance on the part of the agency or supervisor if the problem is a Work Habit.

5.  Set a follow-up date and time to meet with the employee. This meeting should be at the end of the time frame that was set. For example, a supervisor set six weeks as the time frame in which to monitor a change in employee behavior. The supervisor should set a day and time for a meeting at the end of the six weeks to conduct a session with the employee. This session should be written into the corrective action plan. It gives the employee a point of closure to determine whether a change in conduct has occurred or not. It is important for this session to be conducted and not neglected even if the employee's behavior appears to have improved.

A corrective action plan will clarify to the employee the importance of the situation. A corrective action plan demonstrates that conduct is a critical part of performance. Again, a corrective action plan is appropriate at any time an employee's performance is not up to standards, policies, or procedures.

## DOCUMENTATION OF DISCIPLINE

Documentation is extremely important in today's litigious environment. In fact, "If it is not written down, a situation did not happen" is a phrase frequently used to emphasize the

importance.  If documentation of a negative light regarding the employee's performance is included in the agency's Personnel Office file.  This is not just proper management but also a state law.

The term "file" is usually perceived differently depending upon the employee, supervisor, or agency.  Therefore, it is important to know the work "file" has specific meanings as referred to while reading the Progressive Discipline Manual.  The supervisory file is the first "file" that has more detailed notes contained in it regarding employee's performance.  Documentation may include the daily and weekly notes of performance of responsibilities whether the information demonstrates weak performance areas, excellent performance, or fully competent performance.  Coaching and counseling is kept in the supervisory files.  For example, a supervisor may keep up with dates and times of punctuality for an employee.  Of course, this type documentation would only be in the supervisory file.  Many supervisors use a calendar to document performance, some use a notebook or file, a few maintains documentation on electronic files.  Regardless of the method, all supervisory file should be secured and confidential.

The next level of "files" as paperwork goes up the chain of command or agency is the division, branch, unit, county or regional office file.  Agencies are all divided into sub groups based on location around the state or the discipline/career field in which one works.  In large agencies, these decisions (i.e. regional sections of the state based on geographical location) may have units within the division.  It is up to departmental procedure for the division of departments and where files are mandatory to be maintained.  The next level of "files" is usually the agency Personnel Office field.  This one is referred to as the official departmental file.  Lastly, but foremost, is the employee file that is maintained at the State Personnel Department.

By law, a copy of any documentation or information that is provided to the unit, division, branch, county and, certainly, agency files must be given to the employee within ten days of putting it in the formal file(s).

Having defined the term "files, this section of the manual refers to the documentation by the supervisor during the year.  This information contains helpful hints.  It does not refer to documentation written on the Employee Performance Appraisal Form.  Please refer to the "Steps of the Discipline Process" for information on the Employee Performance Appraisal and deductions.  Additionally refer to the State of Alabama Performance Appraisal Manual for documentation associated with form and supervisory file documentation.

Any memos or letters written in the administration of discipline is also considered documentation and should adhere to good documentation techniques.  The original of such memos or letters should be given to the employee.  The supervisor should maintain a copy in the informal supervisory files.  However, formal notices of personnel actions must also be sent to the agency Personnel Office according to departmental procedures.

The supervisor should document specific incidences of improper conduct as it is observed or investigated.  Specifically, the behavior should be documented as it is occurs.  Daily and weekly informal documentation is usually the backbone of whether an agency will proceed with a severe step of discipline.  A paper trail must clearly show the improper conduct or

31

continual failure to perform duties properly. In addition, notes need to consist of actions, conversations, and employee responses during the disciplinary session for a warning, reprimand, and/or suspension. This type of documentation is typically referred to as supervisory documentation and maintained in informal supervisory files.

Good documentation techniques can be summed up in the first three letters of the alphabet. This is referred to as the "A, B, C's of Documentation." "A" stands for "accurate." "B" stands for "behavioral." "C" stands for "consistent."

Documentation should be accurate. A supervisor should never back date or falsify notes. The supervisor should document the truth. Documentation should be behavioral. It should contain actual examples of conduct, behavior, or performance. It should not include references to personality or ambiguous labels such as "slow service," "poor attitude," or "bad employee." It should include specific examples of behavior and actions of the inappropriate performance. For example, the documentation for "poor attitude" should read "the employee screamed at the supervisor, left the office, and slammed the door while the supervisor was still talking." In addition, documentation should be consistent. It should include documentation on all employees throughout the year.

There are many types of documentation. The most recognized forms of documentation are diary keeping, summary, and critical incident. The method called "critical incident" is the best suited for discipline and performance problems. A supervisor documents performance leading to the counseling, warning, reprimand, suspension. A supervisor documents what occurs in the meetings with the employee associated with the personnel actions mentioned above. Documentation should include corrective action plans, follow-up on performance and/or continued employee actions as incidents occur. Note that the critical incident method is also used to record examples of good performance.

## PROPER DISCIPLINE TECHNIQUES

There are certain characteristics that add to the success of disciplinary actions. These characteristics add to the employee's return to proper performance. Proper discipline is initiated in a timely manner. This means disciplinary action takes place as the unwanted action is identified or when there is a pattern of inappropriate conduct. The only time discipline would not take place immediately is when an investigation is being conducted. Otherwise, the intervention is immediate. Likewise, the consequence should be immediate. After the unwanted behavior has been brought to the attention of the employee, the consequence of such unwanted conduct should be specified. Again, the only time this may differ is when an investigation is pending.

Discipline should be non-discriminatory. It should be based on nothing more than the infraction. It should not be based on race, sex, personality, associations, age, etc. The discipline should be individualized based on the work history of the employee and the length of employment. For example, there may be a twenty-year employee that demonstrates tardiness for the first time in their work history. Then, there may be a probationary employee employed with the state for the first time. The tardiness of this employee has increased consistently during the first three months. A supervisor may

32

determine to take action with both employees. However, the supervisor may mention the problem earlier to the probationary employee. The supervisor may decide to administer different steps of the discipline process. At the same time keep in mind that discipline is consistently applied.

Another characteristic of proper discipline concerns feedback to the employee. Feedback should be specific and accurate. Supervisory actions and employee responses should be documented. Disciplinary actions should be documented on the appraisal form as well.

# STATE LAW

## TABLE OF CONTENTS

Employee Disciplinary Actions in the Merit System ................................ 51

Where Does the Concept of Property Interest Originate ........................ 51

Disciplinary Actions Requiring Due Process ........................................... 52

The Appointing Authority ...................................................................... 52

**Demotions** ............................................................................................. 53

State Personnel Board Rule .................................................................... 53

Procedural Requirements for a Valid Demotion ..................................... 53

**Suspensions** .......................................................................................... 54

State Personnel Board Rule .................................................................... 56

Requirements for a Valid Suspension ..................................................... 56

A Valid Suspension Hearing .................................................................... 56

Why is a Suspension Hearing Required Prior to the Imposition of the
   Suspension ........................................................................................ 56

Satisfying Due Process Requirements With a Hearing .......................... 57

A Hearing Prior to the Deprivation of Property is Required ................... 57

What Should Notice to the Employee Consist Of ................................... 57

What Should the Employee's Right to Tell His Side Consist Of ............. 57

Emergency Suspensions ......................................................................... 58

State Personnel Board Rule .................................................................... 58

Recommendations in an Emergency Situation ....................................... 59

**Dismissals** ............................................................................................. 60

State Personnel Board Rule .................................................................... 60

Requirements for a Dismissal ................................................................ 60

49

# EMPLOYEE DISCIPLINARY ACTIONS IN THE MERIT SYSTEM OF THE STATE OF ALABAMA

The state law creating the merit system of the State of Alabama[1] establishes provisions governing certain disciplinary actions taken against State employees. Unlike private employment, public employment for the State of Alabama guarantees employees rights that protect the employees from an unlawful "taking" of their jobs. The basis of this protection is drawn from state and federal law. Because of this protection, the procedures for termination must meet procedural due process under the United States Constitution, specifically the Fourteenth Amendment as well as all state law requirements.

This handout will cover the procedures the State must follow in order to take certain disciplinary actions. The requirements of this process are detailed in the Code of Alabama and the Rules of the Personnel Board of the State of Alabama. As long as a supervisor follows a progressive (Positive) disciplinary process, taking disciplinary action against State employees is not a difficult duty of management.

## WHERE DOES THE CONCEPT OF PROPERTY INTEREST ORIGINATE?

For due process purposes, property interests are created and defined by reference to state law. A public employee enjoys a property interest in his [or her] employment only if he [or she] has an expectation of continued employment. The Courts have ruled that the provisions of the Alabama Merit System Act provide employees with a "legitimate claim of entitlement" to continued state employment, thus triggering the Fourteenth Amendment's due process clause.[2] The FOURTEENTH AMENDMENT to the UNITED STATES CONSTITUTION provides:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the law.

The act of taking away the job of a classified merit system employee is an act of the State; therefore, the State may not take away the property of a classified merit system employee without due process of law. Due process of law amounts to affording the employee a hearing prior to taking away their property.

---

[1]    See Ala. Code 1975, §36-26-1 et seq.

[2]    Lassiter v. Covington, 861 F2d 680, 682 (11th Cir. 1988); Best v. Boswell, 696 F.2d 1282 (11th Cir. 1983).

Not all employees of the State are entitled to a due process hearing. Probationary employees are not vested with a property interest and, therefore, are not entitled to Fourteenth Amendment protection.

## DISCIPLINARY ACTIONS REQUIRING DUE PROCESS

Not every disciplinary action taken by a supervisor requires due process. For example, giving an employee a written warning does not activate any due process rights. It is the cumulative effect of the Positive Discipline system that eventually can lead to a due process hearing.

Should an employee not respond to the Positive Discipline process and correct the behavior that is adverse to the workplace, a supervisor must eventually take a stronger disciplinary action to try to correct the behavior. A supervisor has three types of major disciplinary actions available to use in the disciplinary process:

1.    Demotions[3]

2.    Suspensions[4]

3.    Dismissals[5]

All of these actions result in a "taking" of the property interest of a state employee which creates the need for a due process hearing. Each of these acts of discipline and the rules governing their use will be explained in detail.

## THE APPOINTING AUTHORITY

The act of suspending, demoting, or dismissing an employee must be done by the appointing authority. The appointing authority is defined in Ala. Code 1975, §36-26-2(1) to be:

The officer, board, commission, person, or group of persons having the power to make appointment to offices or positions of trust or employment in the state service.[6]

The act of demoting, suspending, or dismissing a state merit system employee may be done only by the appointing authority. This does not mean a supervisor cannot take these actions,

---

[3]See §36-26-25

[4]See §36-26-28

[5]See §36-26-27

[6]  The Alabama Court of Civil Appeals held that a facility director and a regional director for the Department of Mental Health and Retardation were appointing authorities under the Merit System and had the authority to terminate employees. Department of Mental Health and Mental Retardation v. Bendolph et al., **808 So. 2d 54 (Ala. Civ. App. 2001).**

only that the acts must be upheld or adopted by the appointing authority prior to the implementation of the discipline.

## DEMOTIONS

**Ala. Code** 1975, §36-26-25 provides:

An appointing authority may, upon giving written notice and stating reasons to and with the approval of the Director, demote a classified employee under his jurisdiction from a position in one class to a position in a lower class.

## STATE PERSONNEL BOARD RULE

The Rules of the State Personnel Board provide in Rule 670-X-9-.04(3) DEMOTIONS:

> An appointing authority, upon giving notice stating reasons to the Director and to the employee, may, with the approval of the Director, demote a classified employee under his jurisdiction from a position in one class to a position in a lower class in the same series. This written notice of intention to effect a demotion shall be given a reasonable time, depending upon the circumstances involved, before the date it is intended that it shall become effective. The director shall make such investigation of the circumstances as he may consider necessary and then, not later than ten (10) days after the receipt of the notice of the intention to demote the employee, shall either approve the demotion, approve the transfer of the employee to a position under a jurisdiction of another appointing authority, or order a hearing before the Personnel Board or a hearing examiner to determine the merits of the proposed action. If a hearing is ordered, the demotion shall not become effective until it has been ordered by the Board or hearing examiner. A transfer under such circumstances shall be approved by the director and the appointing authority having jurisdiction over the position to which the employee is to be transferred, but not necessarily by the appointing authority intending to effect the demotion.

## PROCEDURAL REQUIREMENTS FOR A VALID DEMOTION

1.   The appointing authority must give notice to the director and to the employee.

2.   The appointing authority must state reasons to the director and the employee for the demotion.

3.   The appointing authority must hold a hearing in order to protect the constitutional rights of the employee to be demoted.[7]

---

[7] The constitutional requirements for a hearing will be discussed under Suspensions and Dismissals.

53

4.    The Director may conduct such investigation as is necessary.

5.    The Director must approve the demotion or set a date for a hearing or argument within ten (10) days of receipt of the notice of intent to demote.

## SUSPENSIONS    *Agree Find Employee Handbook date April 2000*

The law on suspensions has recently been expanded to include appeals in certain cases. Employees who work for agencies that did not have in place by August 1, 2001 a procedure that provided for a due process hearing are entitled to an appeal. Ala. Code 1975, §36-26-28 SUSPENSIONS provides:

(a) An appointing authority, from time to time, may peremptorily suspend any employee without pay or other as punishment for improper behavior, but such suspension or total suspension by such appointing authority of such person shall not exceed thirty (30) days in any year of service. Such suspension with loss of pay may be affected by service upon the employee by the appointing authority of written charges setting out clearly the delinquency for which the suspension was made, a copy of which must be at the same time mailed or delivered to the director. The suspended employee does have the right to file with the Board and the appointing authority a written answer or explanation of such charges.

(b) (1) The suspended employee may within 10 days after notice pursuant to this section file a written notice of appeal from the suspension. If the suspended employee gives notice of appeal from the suspension, the appointing authority shall have the discretion of whether to stay the suspension pending the disposition of the appeal or proceed with the suspension and provide the employee with a post-suspension review subject to the time frames prescribed herein.

(2) If a timely notice of appeal is filed, the appointing authority shall elect between one of the following methods of reviewing the claim. The appointing authority shall, within 10 days after receipt of the appeal, do one of the following:

a.    Appoint a panel as provided for in subsection (c) to decide questions of fact, conclusions of law, and make recommendations to the appointing authority.

b.    Appoint a designated hearing officer as provided for in subsection (d) who will decide questions of fact, conclusions of law and make recommendations to the appointing authority.



(3)    This subsection shall apply only to a department or agency of the state that has 25 or more employees for each working day during each of 20 or more calendar weeks in the current or preceding calendar year.

(c)    In instances where the appointing authority elects to appoint a panel, the panel shall consist of three individuals, two of whom shall be in the same or equivalent classification as the suspended employee.

The panel, by majority vote, may recommend to the appointing authority, after a hearing, either of the following:

(1)    That the charges are unwarranted and that the suspension be revoked.

(2)    That the charges are warranted and that the suspension be upheld.

(d) In instances where an appointing authority elects to appoint a hearing officer, the hearing officer shall be selected from a jointly approved list of individuals agreed upon by the Alabama State Employees Association and the respective department or agency. This process shall be repeated annually.

(e) Irrespective of which method the appointing authority selects for adjudicating suspension appeal hearing, all hearings shall be conducted in accordance with notions of due process.

(f) The burden of proof shall lie with the appointing authority to prove the charges forming the basis of the suspension.

(g) Those departments or agencies currently having an existing process for suspension hearings may continue to use the existing process, provided that they observe tenets of due process including that the burden of proof shall lie with the appointing authority.

(h) Further, this section shall not apply to any department which currently employs and continues to employ as a standard practice in such cases a pre-disciplinary hearing before an independent hearing officer who makes a recommendation for disciplinary action to the appointing authority based upon a fair hearing of the matter.

(i) Further, this section shall not apply to any department which currently employs and continues to employ as a standard practice in such cases an appeal hearing before an in-house hearing officer independent of the division or area in which the employee works. Said hearing officer shall be selected from an approved list of individuals who shall be jointly agreed upon by the Alabama State Employees Association and the respective department or agency. This process shall be repeated annually.

## STATE PERSONNEL BOARD RULE

The Rules of the State Personnel Board provide in Rule 670-X-18-.03 SUSPENSIONS:
(Has not yet been revised to new Law as mentioned above on Alabama Code.)

## REQUIREMENTS FOR A VALID SUSPENSION

1.    The act of suspending the employee must be done by the appointing authority.

2.    The suspension must be for improper behavior; the functional equivalent of a disciplinary action.

3.    Ala. Code 1975, §36-26-28 applies to "employee" and makes no distinction between probationary and permanent status employees.  A very important distinction should be made between a probationary employee and a permanent status employee when a termination is involved.

4.    The suspension may not exceed thirty (30) calendar days during any twelve (12) month period.[8]

5.    Specific written charges must be served upon the employee prior to the suspension.

6.    The employee must have had an opportunity for a pre-suspension hearing.[9]

## A VALID SUSPENSION HEARING

The State Personnel Board adopted Rule 670-X-18-.03 SUSPENSIONS.  That Personnel Board Rule requires an appointing authority to give the employee an opportunity for a hearing prior to the employee's suspension.

## WHY IS A SUSPENSION HEARING REQUIRED PRIOR TO THE IMPOSITION OF THE SUSPENSION?

The Court of Appeals in Best v. Boswell[10] held that a state merit system employee has a property interest in their job.  A property interest is created when a person's job may not

---

[8]A proposed rule to define a suspension as a workday was rejected by the State Personnel Board in favor of an understanding that a suspension is for a calendar day and not a workday.  Contrast Brown v. Dept. of Justice, 715 F.2d 662 (D.C. Cir. 1983) indefinite suspension pending outcome of criminal charges.

[9]See Rule 670-X-18-.03 SUSPENSIONS

[10]supra at 1290.

56

be taken away except for cause.  Since a classified employee of the State Merit System may not have his job taken away except for cause, then that classified merit system employee has a property interest in his job.

## SATISFYING DUE PROCESS REQUIREMENTS WITH A HEARING

Prior to depriving the employee of his property interest the due process clause requires, at a minimum, that the deprivation must ~~be preceded by notice and opportunity for hearing~~ appropriate to the nature of the case.  *I was suspended before I got a hearing!*

## A HEARING PRIOR TO THE DEPRIVATION OF PROPERTY IS REQUIRED.

Elements that are required in a pre-suspension hearing to meet procedural due process are clear.  These elements are:

1.  Notice of the charges against the employee, including a summary of the evidence against the employee.

2.  An opportunity for the employee to present his side of the story.

## WHAT SHOULD NOTICE TO THE EMPLOYEE CONSIST OF?

Notice should consist of a plain and clear statement of what the employee has done. There is no requirement that the statement of charges against the employee be couched in legal language; just simply tell the employee what they have done or what they have not done.

## WHAT SHOULD THE EMPLOYEE'S RIGHT TO TELL HIS SIDE OF THE STORY CONSIST OF?

Generally the pre-suspension hearing should consist of an opportunity for the employee to show that the charges against him are in error or a mistake, or that he is not the guilty party, and that he has an opportunity to request mitigation.

Since the Constitution requires an effective opportunity to rebut the charges, the amount of hearing given to the employee depends upon the facts and circumstances surrounding the specific event(s) for which the suspension is being imposed.

The question boils down to how much of a hearing should an employee be given prior to suspension.  In some cases, appeals are not available and there will be no opportunity short of a lawsuit to correct an error in a suspension, therefore, a strong argument must be made that a pre-suspension hearing should be thorough and complete and allow the opportunity for a full airing of the matter.

## EMERGENCY SUSPENSIONS

Any person will understand the situations in which an emergency may arise that requires the removal of an employee from the work site immediately. The United States Supreme Court in Gilbert v. Homar,, 117 S.Ct. 1807 (1997) held that where states must act quickly, or where it would be impractical to provide predeprivation process to a public employee dismissible only for cause, post deprivation process satisfies requirements of due process. An employee may, in limited circumstances, be suspended prior to a hearing as long as the employee receives an adequately prompt post-suspension hearing. It should be recognized that a suspension without prior due process should only be done in exceptional circumstances, clearly indicating an emergency. In Homar, a state correctional officer was arrested on drug-related charges and the employer suspended the employee prior to a hearing. The Supreme Court held that not all situations require a pre-suspension hearing and remanded the case to the Third Circuit only to determine whether the post-suspension hearing was adequate.

In Thurston v. Dekle [11] the Court discussed extraordinary situations which might allow a post termination or post-suspension hearing to be held rather than a pre-termination or pre-suspension hearing. The circumstances set out by the Court in that case should be considered to be nonexclusive. Those situations were:

(1)    Circumstances where retention of the employee would result in damage to municipal property.

(2)    Circumstances where retention of the employee would result in an effect detrimental in the interest of government.

(3)    Circumstances where retention would result in an injury to the employee, to a fellow employee, or to the general public.

It is clear that even if extraordinary or emergency situations exist, the employer is bound to give an adequately prompt post-suspension hearing. In one case, the opportunity for the post-suspension hearing was held to be required within twenty days. Twenty days should not be considered to be a "magic number." The Court implied that this matter should be resolved as quickly as possible.

## STATE PERSONNEL BOARD RULE

The State Personnel Board passed a rule to deal with the emergency situation:

670-X-15-.06 Mandatory Annual Leave and/or Leave Without Pay

---

[11] Thurston v. Dekle 531 F. 2d 1264 (5th Cir. F76)

(1)    An appointing authority, with the approval of the Personnel Director, may require an employee to use accumulated annual leave under certain circumstances when the appointing authority deems the employee's absence from work to be in the best interests of the agency.   Examples of such circumstances would include a period of time when the employee is under investigation leading to disciplinary proceedings, the period of time pending a disciplinary hearing after the employee has received notice of such hearing, and at such times as the employee is physically incapacitated from performing the work assignment (such as in a state of intoxication).

(2)    Under similar circumstances as enumerated in (1) above, when the employee has no accumulated annual leave or insufficient annual leave, the appointing authority may nevertheless require the employee to vacate the work station for a specified period of time in the status of leave without pay.  Such action by the appointing authority should be preceded by a notice to the employee that such action is contemplated and an opportunity for the employee to be heard in response.

(3)    The Director shall have the discretion to restore accumulated annual leave expended under the provisions of (1) above, and/or approve a subsequent reinstatement of pay forfeited by the employee during the leave without pay status provided for in (2) above.

(Statutory Authority, Section 36-29-9, Code of Alabama 1975; To replace Emergency Rule adopted November 17, 1987, effective November 18, 1987; Permanent Rule adopted January 21, 1988, effective March 3, 1988)


## RECOMMENDATIONS IN AN EMERGENCY SITUATION

Based upon the above information, an appointing authority should take the following steps in a true emergency situation.

1.    If the circumstances are such that a hearing can be held, then the employee should be made aware of the specific charges against him and given an opportunity to respond to those charges.

2.    If the circumstances are such that the appointing authority does not have a complete grasp of the facts or if the employee must immediately be removed from the work site, then the employee may be placed on annual leave or leave without pay pursuant to Rule 670-x-15-.06 Mandatory Annual Leave and/or Leave Without Pay.  Such leave must be used only after approval of the State Personnel Director

or his designee. Only 10 days of mandatory leave will be approved absent exceptional circumstances.

3. In limited circumstances, an employee may be suspended in a true emergency situation, as long as a prompt adequate post-deprivation hearing is held.

The recommended course of action, if possible, is that the employee be told of the charges against him (preferably in writing even though the situation is an emergency) and be given a brief opportunity to respond to the charges. The appointing authority can then formalize the charges against the employee and conduct a post-suspension hearing. If such notice is not possible, then the employee can be suspended, but must be provided with an adequately prompt post-suspension hearing.

## DISMISSALS

Ala. Code 1975, §36-26-27 provides:

An appointing authority may dismiss a classified employee whenever he considers the good of the service will be served thereby, for reasons which shall be stated in writing, served on the affected employee and a copy furnished to the director which action shall become a public record. The dismissed employee may, within ten days after notice, appeal from the action of the appointing authority by filing with the Board and the appointing authority a written answer to the charges. The Board shall, if demand is made in writing by the dismissed employee within ten days after notice of discharge, order a public hearing and if the charges are proved unwarranted, order the reinstatement of the employee under such conditions as the Board may determine. Upon a majority vote of the Board, the Board may impose a punishment other than termination including but not limited to a reinstatement with forfeiture of back wages and benefits between the date of termination and the date of the Board's Order reinstating the employee, or a suspension up to and including thirty days.

## STATE PERSONNEL BOARD RULE

Rule 670-X-18-.02 provides the same rights to the employee as does §36-26-27(a). The State Personnel Board Rule does have one additional requirement. Subsection 5 of the Rule provides:

In all cases, before dismissing a permanent employee, the appointing authority shall consider the previous disciplinary and performance history of the employee and any progressive discipline received.

## REQUIREMENTS FOR A DISMISSAL

Ala. Code 1975, §36-26-27 imposes the following requirements:

THIS IS A     (   ) COUNSELING          ( X )WARNING          (   )REPRIMAND

Employee Name _____ Shannon R. Burton

*State the facts of the performance or work conduct problem:*
On Monday October 31, 2005 an incident occurred as documented in this report.  A
discussion took place between myself and Shannon Burton, ASA III.  The discussion was
about the incoming mail and whether or not any of the mail had been processed since she
was out on jury duty the previous week.  Ms. Burton indicated that the dates on the mail
indicated that none had been processed while she was out.  She further indicated that the
dates for the mail she had in her hands dated back to October 21, 2005.  She asked if I
wanted to review the stack to see for myself.  I indicated that I did not feel that was
necessary but if she wanted me too I would review the materials.  Ms. Burton then said
"it would not matter because you (Lance Hester) would lie about it anyway".  Ms. Burton
then exited my office and went to her desk in the office adjacent to mine.  I walked into
her office and to her desk and informed Ms. Burton that the statement she made was not
acceptable.
The purpose of this warning is to present in writing the improper conduct exhibited by
Ms. Burton.  The accusation that I would lie about the situation certainly requires
immediate attention.  The behavior is found to be very disruptive.  It also demonstrates a
failure to submit to authority.  And finally, the action indicates a demeanor of
insubordination and demonstrates a lack of respect for both the person (Lance) and the
supervisory position.
*State what actions have been taken with the employee prior to this step of discipline
(include counseling, coaching, and/or any disciplinary step):*
Through this warning letter an attempt has been made to document improper behavior.  A
warning was necessary because of the severity of the behavior.  Additionally, Ms. Burton
indicated that she had done nothing wrong by making the accusation.
*State how the situation can be resolved based on discussion with employee and input
from the employee:*
The employee is requested to respond in writing how she intends to correct the improper
behavior.  Included in the response should be an acknowledgment that referenced  type of
behavior is not acceptable.  Also the employee should state that she understands similar
behavior in the future will result in a reprimand or other disciplinary action.

*If a corrective action plan is developed in conjunction with the discipline, include the
time frame that is being monitored for change in performance and the follow-up
meeting date:*
The written response is to be completed and submitted by November 10, 2005.

Supervisor's Signature: *Lance M. Hester*

Employee's Signature: *Shannon Burton*  11/14/05

Date of Meeting: 11-3-05                    Under Severe
                                            Pressure!!!

Employee's signature denoted discussion not necessarily agreement.  The employee may add comments
which must be attached to this form.  The form must be given to the employee with copies to the
supervisory file and Personnel Office file in the agency.



# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
**1445 Federal Drive**
**Montgomery, Alabama 36107-1123**



November 15, 2005

*Ron Sparks*
Commissioner

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-03

Mrs. Shannon Burton
Alabama Dept. of Agriculture and Industries
Food Safety Section
Richard Beard Building
Montgomery, Alabama 36107

*I rcvd. 2 Letters of Suspenion!!*

Dear Mrs. Burton:

It has been recommended to me by your supervisor, Lance Hester, that you be suspended. ~~The reason for suspension is for insubordination, based upon your behavior on October 31, 2005, and subsequent insubordination in your failure to follow supervisory directives.~~ According to the documents submitted, you had a discussion with Mr. Hester about the handling of the mail while you were out on jury duty. You asked Mr. Hester if he wanted to see the dates on the mail in order to verify them. Mr. Hester responded that it would not be necessary for him to review the dates at which point you stated that "you (Lance Hester) would probably lie about it anyway". The description of the event is included in the attached warning document. It is noted that, while you did not agree that you made that statement, you did indicate that you said, "you probably would not tell the truth anyway."

You were presented with a written warning (Attachment 1); instructed that your signature denoted discussion not agreement; instructed that you had the right to rebut the allegation and have the rebuttal placed in your personnel file, along with the written warning; and, you were given a directive to sign the document (Attachment 2, corrected copy). After a lengthy discussion of the insubordinate behavior, with other people present, you refused to sign. You were made aware that refusal to sign would result in the next step in the progressive discipline process, which is a written reprimand.

Subsequently you were given a written reprimand (Attachment 3) and directed to sign both the reprimand and the warning and instructed that failure to do so would lead to further disciplinary action (Attachment 4). At the November 14th deadline, you signed the warning, but were again insubordinate by refusing to sign the reprimand after being given a direct order to do so.

Therefore, due to your continued pattern of insubordinate behavior in refusing to follow directives from your supervisors and myself, you are being suspended for a period of ten work days without pay which includes the Thanksgiving holidays. Your suspension will begin on Monday, November 21, 2005, and extend through December 2, 2005. You are instructed to return to work on Monday, December 5, 2005, at 8:00 a.m. You will have ten days, from the date of this letter to appeal your suspension to me, in writing. Due to the tenth day falling on a holiday, you will have until November 28, 2005, to appeal.

Mrs. Shannon Burton
November 15, 2005
Page 2

~~Should you choose to accept this suspension and waive an appeal hearing, your suspension will be reduced to three work days.~~ Should you choose this option, you will need to sign the attached waiver (Attachment 5) and return it to me by 3:00 p.m. on Thursday, November 17, 2005, and your suspension will begin on Friday, November 18, 2005, and end on Tuesday, November 22, 2005. You will return to work on Wednesday, November 23, 2005.

It is my wish and expectation that a harmonious and productive work environment be of utmost importance within this department. Disrespect, insubordination, and disruptiveness are not conducive to this expected work environment and will not be tolerated in the future. I also expect for this matter to be resolved so that we can return to the business of the Department of Agriculture and Industries.

Sincerely,

Ron Sparks
Commissioner

Attachments (5)

C:      Mr. B. J. Russell
        Dr. John Bloch
        Mr. Lance Hester
        Ms. Teresa Brunson
        State Personnel Department
        Department of Agriculture and Industries personnel file

Documents labeled Attachment 1, 2, 3, 4, 5, are attached hereto and incorporated herein by reference.



# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES

### 1445 Federal Drive
### Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

VIA Hand Delivery:

*[handwritten: This is the letter except letter of suspension]*

November 22, 2005

*[handwritten: First Letter Dated 11/15/05 Why is the letter Dated 11/15/05 not in my file?]*

Shannon Burton
Food Safety Division
State of Alabama
Agriculture and Industries
1445 Federal Drive
Montgomery, Alabama 36107

RE:    *Notice of Suspension*

Dear Ms. Burton:

On Thursday, November 17, 2005, you were hand delivered a notice of an internal pre-suspension hearing as required in the Alabama Department of Agriculture and Industries' Handbook for Employees. On Friday, November 18, 2005, you were afforded an opportunity to rebut and informally respond to the charges against you. You appeared at this informal hearing before me, submitted verbal and written answers to the charges against you, and submitted a letter referenced as a "Letter of Appeal of Suspension."

The charges upon which your suspension is based arise from incidents beginning on Monday, October 31, 2005, in which you stated to your supervisor: *"you would probably lie about it anyway."* For this incident, you were given a Letter of Warning, which you refused to sign. Despite several opportunities, you continued to be insubordinate by refusing to obey direct orders to sign the Letter of Warning. Finally, after receipt of a Letter of Reprimand for these acts of insubordination and given another opportunity, you signed the Letter of Warning, but twice refused to sign the Letter of Reprimand.

1.    Therefore, under the State's progressive discipline policy, you are hereby suspended because of your refusal to sign your supervisor's *Letter of Reprimand* on Thursday, November 10, 2005; and,
2.    Refusal to sign your supervisor's *Letter of Reprimand* on Monday, November 14, 2005.

You were warned that continued acts of insubordination would result in more disciplinary action and that failure to sign the disciplinary actions was insubordination. Despite this knowledge, you continued to refuse to sign the disciplinary actions.





# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
### Montgomery, Alabama 36107-1123

*Ron Sparks*
Commissioner

Shannon Burton
Food Safety Division

page 2

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

I have again reviewed and considered the charges against you, your rebuttal, and written notice of appeal from your suspension. My final action is to proceed with the suspension as previously stated; that is to say, *you are hereby suspended for 10 working days without pay which includes the Thanksgiving holidays, starting on Wednesday, November 23, 2005, and ending on Tuesday, December 6, 2005.* You are instructed to return to work on Wednesday, December 7, 2005, at 8:00 A.M.

In view of your appeal from your suspension, you have a right to a post-suspension review. Within 10 days of November 18th, the date of your notice of appeal, I will do one of the following:

a.      Appoint a panel, composed of three individuals with two of whom are in the same or equivalent classification as you, to decide questions of fact, conclusions of law, and make recommendations to the Commissioner; or,

b.      Appoint a designated hearing officer, from an approved ASEA list, who will decide questions of fact, conclusions of law, and make recommendations to the Commissioner.

Once the decision has been made, you will be notified in writing when your post-suspension review will take place.

It is regrettable that this action is necessary, but your actions cannot be condoned.

Sincerely,

RON SPARKS
Commissioner

RS/rss

cc:    Doug Rigney, Assistant Commissioner
       Dr. John Bloch
       Mr. Lance Hester
       Teresa Brunson, Personnel Director
       Legal Division

2




# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
1445 Federal Drive
Montgomery, Alabama 36107-1123

*Ron Sparks*
Commissioner

**Memorandum** *(corrected copy, 11/14/05)*

Date:  November 8, 2005

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

To:    Shannon Burton, ASA III

From:  Lance Hester, Program Director
       Food Safety Section

Subject:  Written warning dated November 3, 2005

The purpose of this memorandum is to present in writing information concerning the above referenced document (copy attached) and your refusal to sign the document. The warning notice was given to you on Thursday November 3, 2005. The notice was discussed with you for approximately two hours. Present during the discussion was Shannon Burton, Teresa Smiley, Teresa Brunson, and Lance Hester. On ~~Friday November 4, 2005~~ Monday November 7, 2005 you were given a directive from Dr. Bloch and myself in the presence of Teresa Smiley to sign the document. It was explained to you that your signature does not denote agreement and you would be provided an opportunity to respond in writing to the information in the warning notice. This information concerning your signature and opportunity for written response is also contained in the attached document.

After you refused to sign the document on ~~Friday November 4, 2005~~ Monday November 7, 2005 it was decided that we needed to advise Commissioner Ron Sparks. On Monday November 7, 2005 we met with Commissioner Sparks and updated him on the situation. Commissioner Sparks requested you to come down to his office. Present in the meeting in addition to you were Teresa Smiley, Teresa Brunson, Dr. John Bloch, Commissioner Ron Sparks, and myself. Commissioner Sparks requested I provide the warning notice to you for an additional thirty minutes and instructed you to respond by either signing the document or refusing to sign the document. Commissioner Sparks stated that if you refused to sign the document then the next step in the progressive discipline process will be necessary.

Again, the purpose of this memorandum is to confirm that you have been properly advised and this memorandum serves as written documentation and confirmation. You have been given a directive from your supervisor(s) and through this memorandum you are again being given a directive to sign the warning notice. Failure to follow the directive by not signing the document is insubordination and shall be addressed through the progressive discipline process.

The next step in the progressive discipline process is a reprimand. You should be aware that a reprimand would be placed in your personnel file and would deduct points from your performance appraisal rating.

Should you choose to follow supervisory directives and sign the warning document and you desire to attach comments you will be provided time during the work day to write your comments. Your written comments are required to be submitted to my office by 5:00 P. M. the day following your receipt of this memorandum

This memorandum given to Shannon Burton on (Date) _11/14/05_
Witnessed by: _____

3

BEFORE THE STATE OF ALABAMA
DEPARTMENT OF AGRICULTURE AND INDUSTRIES

In The Matter Of:                          )
                                           )
Shannon Burton                             )
                                           )
Suspension Hearing                         )


# RECOMMENDATION OF THE ADMINISTRATIVE LAW JUDGE


The Alabama Department of Agriculture and Industries (AG & I)

requested that an administrative disciplinary appeal hearing be conducted,

pursuant to § 36-26-8, Code of Alabama, 1975, Rule 670-X-18-.03 Rules of the

State of Alabama Personnel Board, The Handbook For Employees, AG & I, and

Handbook of Progressive Discipline, State of Alabama Personnel Department

(2005 Edition), regarding the post-suspension appeal filed by Ms. Shannon

Burton, an employee of the AG & I.  The undersigned was designated to serve

as the Administrative Law Judge and convene the appeal hearing for the

purpose of issuing a recommendation to the Commissioner of AG & I,

concerning whether the suspension action taken on November 22, 2005, by the

AG & I against the employee, Ms. Burton, should be upheld.  The hearing was

held on February 21, 2006[1], at the Alabama State House, Governor's

---

[1]The post-suspension hearing was initially set for January 4, 2006.  A
continuance was granted on behalf of the Appellant Burton which delayed the
hearing until the February 21, 2006 setting.

PLAINTIFF'S
EXHIBIT

6-Hester , 1 a

Conference Room, 11 South Union Street, Montgomery, Alabama. The

Department of AG & I was represented by Attorney Jeff Webb. Ms. Burton, the

Appellant was represented by Attorney Victor R. Spencer.


## ISSUE PRESENTED

According to the appeal notice dated November 18, 2005, the issue for

review consists of the following: "This is a letter of appeal of suspension. I am

asking that you resend the suspension because of the unfairness of the

suspension; my behavior was not adverse to the workplace, disruptive, abusive,

threatening nor insubordinate." (AG & I, Exh. 16, p. 1) (Burton Exh. 4, p. 1).

According to the appointing authority, the suspension was based upon the

following:

> The charges upon which your suspension is
> based arise from incidents beginning on Monday,
> October 31, 2005, in which you stated to your
> supervisor: *"you would probably lie about it
> anyway."* For this incident, you were given a Letter of
> Warning, which you refused to sign. Despite several
> opportunities, you continued to be insubordinate by
> refusing to obey direct orders to sign the Letter of
> Warning. Finally, after receipt of a Letter of
> Reprimand for these acts of insubordination and given
> another opportunity, you signed the Letter of Warning,
> but twice refused to sign the Letter of Reprimand.

> 1.  Therefore, under the State's
>     progressive discipline policy, you are
>     hereby suspended because of your
>     refusal to sign your supervisor's
>     *Letter of Reprimand* on Thursday,
>     November 10, 2005; and

2

2.    Refusal to sign your supervisor's
      *Letter of Reprimand* on Monday,
      November 14, 2005.

You were warned that continued acts of
insubordination would result in more disciplinary
action and that failure to sign the disciplinary actions
was insubordination.  Despite this knowledge, you
continued to refuse to sign the disciplinary actions.

I have again reviewed and considered the
charges against you, your rebuttal, and written notice
of appeal from your suspension.  My final action is to
proceed with the suspension as previously stated; that
is to say, *you are hereby suspended for 10 working
days without pay which includes the
Thanksgiving holidays, starting on Wednesday,
November 23, 2005, and ending on Tuesday,
December 6, 2005*.  You are instructed to return to
work on Wednesday, December 7, 2005, at 8:00 A.M.

(AG & I, Exh. 11,
pp. 1-2).

By letter dated December 7, 2005, the appointing authority,

Commissioner Ron Sparks, issued the following request to the Administrative

Hearings Division:  "As the appointing authority in an Agriculture and

Industries employee suspension matter, I am requesting that an Administrative

Law Judge be assigned to serve as hearing officer in a post-suspension review."

(AG & I, Exh. 12).

FINDINGS OF FACT

The Appellant, Ms. Shannon Burton, is an Administrative Support

Assistant III employee of the Food Safety Division of the State of Alabama

3

Department of Agriculture and Industries. Ms. Burton has been employed by

the Agency some five (5) years. Mr. Lance Hester, the Program Director for the

Food Safety Section is Ms. Burton's immediate supervisor. He has been Ms.

Burton's supervisor for approximately three (3) years. Ms. Burton was ordered

to appear for jury duty the week of October 24 through 28, 2005. She returned

to work following jury duty on October 31, 2005. A part of the job

responsibilities of Ms. Burton requires the opening and processing of mail vital

to food safety permitting by AG & I. (Burton Exh. 3).

I find and adopt the following facts as reported in Ms. Burton's response

letter regarding the relevant underlying events of October 31, 2005:

> On Monday October 31, 2005, I came in to work
> to discover mail in my chair and on my desk that had
> not been open for an entire week. The week of October
> 24-28, I was serving on jury duty. When I returned, I
> was shocked to find so much mail unopened for an
> entire week. The first thing I thought, no permits have
> been processed, penalties posted, nor emergency
> requisitions approved and sent to accounting and
> procurement for processing. We receive regular
> requisitions weekly, but often one of the labs will call
> me and ask what process is one of their requisitions
> in, because it is an emergency for the product. When I
> started opening the mail, I discovered several
> requisitions that had been sitting on my desk the
> entire week I was away on jury duty. No one took the
> requisitions to the proper sections of the department
> for completion. It was very clear that no one cared to
> open the mail.
>
> I went into Mr. Hester's office and stated in a
> question form, "Are you aware that the mail has not
> been opened for an entire week?" Mr. Hester
> responded, "I was under the assumption that Mary
> Catrett was opening the mail." I told Mr. Hester that

4

could not have been the case because I have postmark dates on the mail from everyday of the week and it was a tremendous amount of mail. Mary Catrett was on leave October 24-25. That is two days I know for a fact that the mail was not opened. The person who usually brings the mail noticed it accumulating in my chair and asked Anne Williams what did she want her to do with the mail because it was a lot and Mrs. Williams told the young lady to put the mail in my chair. I ask Mr. Hester if he would like to look at the mail in my hands to see the postmarked dates. He stated that he did not think it was necessary, but if it would make me happy, he would look at the mail. I told Mr. Hester it was not about making me happy, it was about the productivity of the office.

I stated that if I had left the mail unopened for an entire week a federal case would have been made out of the situation. At this time, Ms. Wilma Fitzpatrick entered into my office, took a seat, and waited to see Mr. Hester. ... (omitted statement) After my last comments, Ms. Fitzpatrick enters Mr. Hester's office and meet with him for about ten minutes. Mr. Hester came to my desk after Ms. Fitzpatrick left the office and stated, "I have a rebuttal and question for the last comments you made." I then asked Mr. Hester what he needed to know, he stated, "Do you honestly believe I would not tell the truth about the postmark dates on the mail even if I looked at the mail and I stated, "Yes, I honestly believe that you would not tell the truth. **This is my belief not an accusation.** Mr. Hester asked me to come into his office and discuss how we could get pass this so we all could be on the same team. I stated I am willing to be a team player but it takes the entire office of employees to be willing. Mr. Hester and I talked in his office for approximately 45 minutes about how he wants all of the employees of the food safety section to be team players.

(Burton Exh. 3, pp. 1-2).

Because I find that either of the following statements had the same negative effect in the workplace either statement one or statement two below by Ms. Burton was made to Mr. Hester during the "omitted" portion of the events adopted above:

> 1.    Ms. Burton then said it would not matter because you (Lance Hester) would lie about it anyway.
>
>                    (AG & I Exh. 1, ¶ 1).
>
>              or
>
> 2.    When I noticed someone waiting to see Mr. Hester, I made my last comments, which were "it does not matter anyway because if this incident ever comes up again about the mail not being opened, you probably would not remember I told you about the postmark dates on the mail of everyday of the week and probably would not tell the truth about the dates anyway."
>
>                    (Burton Exh. 3, p. 1, ¶ 3).

Thereafter, in a meeting held on November 3, 2005, Ms. Burton was provided the written warning comprising AG & I Exhibit One (1). The bottom portion of Exhibit One (1) contains the following statement: "The written response is to be completed and submitted by November 10, 2005." Ms. Burton refused to sign Exhibit One (1) on November 3, 2005. On November 7, 2005, a meeting was held among Commissioner Ron Sparks, Ms. Burton, Ms. Teresa Smiley, Ms. Teresa Brunson, Dr. John Bloch, and Mr. Lance Hester to discuss the warning. Ms. Burton was provided an additional thirty minutes

6

following the meeting to sign the warning notice or be subject to "the next step in the progressive discipline process". (AG & I Exh. 2).

A corrected copy dated November 14, 2005, of the memorandum memorializing the November 7, 2005 meeting contains, in part, the following information:

> Again, the purpose of this memorandum is to confirm that you have been properly advised and this memorandum serves as written documentation and confirmation. You have been given a directive from your supervisor(s) and through this memorandum you are again being given a directive to sign the warning notice. Failure to follow the directive by not signing the document is insubordination and shall be addressed through the progressive discipline process.
>
> The next step in the progressive discipline process is a reprimand. You should be aware that a reprimand would be placed in your personnel file and would deduct points from your performance appraisal rating.
>
> Should you choose to follow supervisory directives and sign the warning document and you desire to attach comments you will be provided time during the work day to write your comments. Your written comments are required to be submitted to my office by 5:00 P.M. the day following your receipt of this memorandum
>
> This memorandum given to Shannon Burton on (Date) 11/14/05
>
> > (AG & I Exh. 2).

Approximately thirty-five (35) minutes after the November 7, 2005, meeting referenced above, Ms. Burton notified Mr. Hester, Dr. Bloch, and Deputy

Commissioner Teresa Smiley that she would not sign the warning disciplinary

form. (AG & I Exh. 3). Ms. Burton was on sick leave status on November 8

and 9, 2006.

On November 10, 2005, Ms. Burton issued a written "response to your

inaccurate letter of accusation" to Commissioner Sparks, Deputy

Commissioner Smiley, Agriculture's Personnel, and State Personnel. In

addition to the portions adopted herein the letter also contained the following

regarding AG & I Exhibit One (1) (the warning form):

> Mr. Hester stated in his letter that my behavior
> was so severe it warranted immediate attention and
> that I should write a response after signing his letter.
> Mr. Hester gave me a direct order to sign his letter. I
> cannot sell my soul to anyone. I will not sign a false
> statement. He also indicated that in my response to
> his letter, I should admit to disruptive behavior,
> insubordination, failure to submit to authority and
> state how the behavior is unacceptable and similar
> behavior in the future will result in a reprimand and
> disciplinary action. I need to know, if my response is
> to tell my side of the story, why is Mr. Hester telling
> me to admit to his accusations in my response. In Mr.
> Hester's letter a question was asked, what actions
> have been taken with the employee prior to this step of
> discipline (include counseling, coaching and/or any
> disciplinary step)? Mr. Hester's statement to this
> question was; this is an attempt to document improper
> behavior. This was necessary because of the severity
> of the behavior. I have never had a documented or
> verbal counseling, coaching or any disciplinary steps.
> Why Mr. Hester chooses to make my belief a
> disciplinary step, I will never know the truth. What I
> do know, my belief does not constitute being written
> up, disrupt the department, interfere with work

8

> productivity, indicates failure to submit to neither
> authority nor insubordination.
>
> (Burton Exh. 3,
> pp. 2-3).[2]

This response by Ms. Burton acknowledged her receipt of the warning notice by

the mandatory response time of November 10, 2006, required by AG & I.

On November 10, 2005, Ms. Burton was provided the memorandum

comprising AG & I Exhibit 4. The memorandum gave Ms. Burton a deadline of

"the close of business on November 14, 2005 to sign both" the written warning

and the written reprimand. The memorandum notified Ms. Burton that AG & I

was issuing a written reprimand to her based upon her failure to sign the

written warning form and the failure to sign the written reprimand form would

result in suspension. Between November 10, 2005 and November 14, 2005,

Ms. Burton was provided a written reprimand form which contained an

incorrect date. (Burton Exh. 1, p. 2). According to Dr. Bloch, Mr. Paris, and

Ms. Burton, this incorrect written reprimand form was also utilized in a

meeting held on November 14, 2005, wherein Ms. Burton was requested to sign

both the warning and the incorrect reprimand form.[3] In the November 14,

---

[2]Several specific phrases from AG & I Exhibit One (1) are contained in
the Burton response.

[3]Ms. Burton was not formally disciplined by AG & I for any actions prior
to November 2005.

9

2005, meeting Ms. Burton signed the warning form (AG & I Exh. 5) but refused to sign the incorrect written reprimand form. (Burton Exh. 1). Ms. Burton was informed by Dr. Bloch at the November 14, 2005, meeting that a corrected form would be presented to her. It does not appear that Ms. Burton was ever provided a corrected copy of the reprimand prior to the pre-suspension hearing with the Commissioner on November 18, 2005. Dr. Bloch, the person who was to correct the form, did not recall if Ms. Burton was provided the corrected form.[4]

On November 15, 2005, Ms. Burton was provided a notice of suspension letter which **concluded** that Ms. Burton was being suspended for a "continued pattern of insubordinate behavior in refusing to follow directions ..." . (AG & I Exh. 6). The November 15, 2005, letter also included in part:

> Therefore, due to your continued pattern of insubordinate behavior in refusing to follow directives from your supervisors and myself, you are being suspended for a period of ten work days without pay which includes the Thanksgiving holidays. Your suspension will begin on Monday, November 21, 2005, and extend through December 2, 2005. You are instructed to return to work on Monday, December 5, 2005, at 8:00 a.m. You will have ten days, from the date of this letter to appeal your suspension to me, in writing. Due to the tenth day falling on a holiday, you will have until November 28, 2005, to appeal.

---

[4]Thus the reference in the Commissioner's letter of November 15, 2005 that Ms. Burton received "(attachment 3)" with the corrected date is inaccurate. (AG & I Exhs. 3, 6).

Should you choose to accept this suspension and waive an appeal hearing, your suspension will be reduced to three work days. Should you choose this option, you will need to sign the attached waiver (Attachment 5) and return it to me by 3:00 p.m. on Thursday, November 17, 2005, and your suspension will begin on Friday, November 18, 2005, and end on Tuesday, November 22, 2005. You will return to work on Wednesday, November 23, 2005.

(AG & I Exh. 6, p. 1-2).

Final action had been determined and specified as indicated on November 15, 2005.

At approximately 4:45 p.m. on November 17, 2005, Ms. Burton was provided the following correspondence from Personnel Director Teresa Brunson which provided in substance:

You had until 3:00 p.m. on Thursday, November 17, 2005, to sign the Waiver of Due Process for Suspension Hearing. You have failed to do so. In accordance with the Alabama Department of Agriculture and Industries' Handbook for Employees, you will be afforded the opportunity to rebut your suspension in a hearing before the Commissioner. This hearing will take place on Friday, November 18, 2005, at 10:30 a.m. in the Commissioner's Office.

Additionally, you have not waived the opportunity of a hearing before a panel. That hearing will be scheduled at a later date.

(AG & I Exh. 7).

Thus, less than 24 hours notice was provided to Ms. Burton of the November 18, 2005, meeting with the Commissioner. This timing problem was raised in

11

the "notice of appeal of suspension" letter written by Ms. Burton to the

Commissioner dated the day of the hearing:

> The State of Alabama Law and the State
> Personnel Board Rules require that you give the
> employee who is about to be suspended, a reasonable
> amount of notice for his or her hearing. You did not
> comply with the law or rule. I was given a letter at
> 4:45 p.m. November 17, 2005, that stated I will be able
> to rebut the suspension in a hearing before the
> Commissioner on Friday, November 18, 2005 at 10:30
> a.m. I need to know why this letter was not given to
> me with the suspension letter dated November 15,
> 2005. In the suspension letter you included a Waiver
> for Suspension Hearing for me to sign away my rights
> to a hearing that expired November 17, 1005 at 3:00
> p.m., but failed to include the letter of hearing for
> November 18, 2005 at 10:30 a.m.

> (Burton Exh. 4).

A November 22, 2005, notice of suspension was issued to Ms. Burton.

The letter provided in part:

> On Thursday, November 17, 2005, you were
> hand delivered a notice of an internal pre-suspension
> hearing as required in the Alabama Department of
> Agriculture and Industries' Handbook for Employees.
> On Friday, November 18, 2005, you were afforded an
> opportunity to rebut and informally respond to the
> charges against you. You appeared at this informal
> hearing before me, submitted verbal and written
> answers to the charges against you, and submitted a
> letter referenced as a "Letter of Appeal of Suspension."

> The charges upon which your suspension is
> based arise from incidents beginning on Monday,
> October 31, 2005, in which you stated to your

12

supervisor: "*you would probably lie about it anyway*." For this incident, you were given a Letter of Warning, which you refused to sign. Despite several opportunities, you continued to be insubordinate by refusing to obey direct orders to sign the Letter of Warning. Finally, after receipt of a Letter of Reprimand for these acts of insubordination and given another opportunity, you signed the Letter of Warning, but twice refused to sign the Letter of Reprimand.

1. Therefore, under the State's progressive discipline policy, you are hereby suspended because of your refusal to sign your supervisor's **Letter of Reprimand** on Thursday, November 10, 2005; and,

2. Refusal to sign your supervisor's **Letter of Reprimand** on Monday, November 14, 2005.

You were warned that continued acts of insubordination would result in more disciplinary action and that failure to sign the disciplinary actions was insubordination. Despite this knowledge, you continued to refuse to sign the disciplinary actions.

(AG & I Exh. 11).

AG & I Exhibits One (1) through Sixteen (16) were offered and admitted, for the hearing. AG & I Exhibit Seventeen (17) was offered but not admitted. AG & I Post-Hearing Exhibit A was offered and admitted[5] following completion of the hearing. Burton Exhibits One (1) through Four (4) were offered and admitted for the hearing.

---

[5]No objection was filed on behalf of Ms. Burton to the admissibility of AG & I Post-Hearing Exhibit A, after a copy was provided to counsel for Ms. Burton.

13

CONCLUSIONS OF LAW

Section 36-26-28(a), (b), (d), (e), and (f), Code of Alabama 1975, provides:

§ 36-26-28.  Suspensions.

(a)    An appointing authority may, from time to time, peremptorily suspend any employee without pay or other compensation as punishment for improper behavior, but the suspension or total suspension by the appointing authority of the person shall not exceed 30 days in any year of service.  The suspension with loss of pay may be effected only by service upon the employee by the appointing authority of written charges setting out clearly the delinquency for which the suspension was made, a copy of which must at the same time be mailed or delivered to the State Personnel Director, and a written notice of the right to appeal the suspension as provided in subsection (b).  The suspended employee shall have the right to file with the appointing authority a written answer or explanation of the charges.

(b)(1) The suspended employee may within 10 days after notice pursuant to this section file a written notice of appeal from the suspension.  If the suspended employee gives notice of appeal from the suspension, the appointing authority shall have the discretion of whether to stay the suspension pending the disposition of the appeal or proceed with the suspension and provide the employee with a post-suspension review subject to the time frames prescribed herein.

(2)    If a timely notice of appeal is filed, the appointing authority shall elect between one of the following methods of reviewing the claim.  The appointing authority shall, within 10 days after receipt of the appeal, do one of the following:

14

a.    Appoint a panel as provided for in subsection (c) to decide questions of fact, conclusions of law, and make recommendations to the appointing authority.

b.    Appoint a designated hearing officer as provided for in subsection (d) who will decide questions of fact, conclusions of law, and make recommendations to the appointing authority.

(3)    This subsection shall apply only to a department or agency of the state that has 25 or more employees for each working day during each of 20 or more calendar weeks in the current or preceding calendar year.

* * *

(d)    In instances where an appointing authority elects to appoint a hearing officer, the hearing officer shall be selected from a jointly approved list of individuals who shall be agreed upon by the Alabama State Employees Association and the respective department or agency. This process shall be repeated annually.

(e)    Irrespective of which method the appointing authority selects for adjudicating suspension appeal hearings, all hearings shall be conducted in accordance with notions of due process.

(f)    The burden of proof shall lie with the appointing authority to prove the charges forming the basis of the suspension.

* * *

The Handbook For Employees, AG & I provides in regards to suspensions:

15

<u>Suspension</u>:

The Commissioner may suspend any employee without pay or other compensation as punishment for disciplinary or other just cause. Such suspension shall not exceed thirty days during any twelve month period. The Commissioner must notify the employee in writing of the reasons for the suspension, and the employee may submit in writing any answers or explanations concerning the reasons for the suspension to the Commissioner and/or the State Personnel Director. The employee will be afforded an opportunity to rebut, in a hearing before the Commissioner, the allegations in the letter of suspension before final action is taken.

(AG & I Exh. 8).

Selected provisions of the <u>Handbook of Progressive Discipline</u>, <u>State of Alabama</u> <u>Personnel Department</u> (2005 Edition) provide:

<u>STEP TWO:  REPRIMAND</u>

* * *

The supervisor is to hold a disciplinary session with the employee. The supervisor should talk through the problem area including correct behavior and future consequences. The employee must sign that they received the reprimand. The best way to document that signature is to have a place provided on the form for the employee to sign. The employee is given the reprimand letter or form as the session ends.

* * *

(AG & I Exh. 14, p. 12).

STEP THREE:  SUSPENSION

The third step of the disciplinary procedure is suspension.  This is a severe and extremely serious step in the employee's career in state government.  It is important for the employee to realize this fact.  An employee may be suspended for up to 30 days in one year.  Suspension is always Leave Without Pay.

The supervisor must contact the agency Personnel Office and Legal Staff regarding the recommendation for suspension.  A letter should be written regarding the recommendation for suspension and include the continued problems of employee performance and the counseling and disciplinary actions that have been taken with the employee thus far.  Depending upon the agency, the letter may be written by the supervisor, division chief, attorney, or Personnel manager.  The letter should be written based on the continued documentation of the supervisor to include dates of problems, dates of counseling/disciplinary sessions, goals, and discussions with the employee.  In addition, other pertinent information that provides detail and evidence of infractions and the opportunities provided to the employee to change behavior.  The employee is to be told the suspension is a time for the employee to consider the criticality of the continued offenses and to decide if he or she would like to continue employment in state government.

As with all personnel actions, a letter must be written to the employee informing him/her of the decision and the dates of suspension.  Departmental procedure governs any other necessary paperwork and communication processes.

* * *

(AG & I Exh. 14, p. 14).

REQUIREMENTS FOR A VALID SUSPENSION

1.  The act of suspending the employee must be done by the appointing authority.

17

2.  The suspension must be for improper behavior; the functional equivalent of a disciplinary action.

3.  <u>Ala. Code</u> 1975, §36-26-28 applies to "employee" and makes no distinction between probationary and permanent status employees. A very important distinction should be made between a probationary employee and a permanent status employee when a termination is involved.

4.  The suspension may not exceed thirty (30) calendar days during any twelve (12) month period. (footnote omitted)

5.  Specific written charges must be served upon the employee prior to the suspension.

6.  The employee must have had an opportunity for a pre-suspension hearing. (footnote omitted)

<u>A VALID SUSPENSION HEARING</u>

The State Personnel Board adopted Rule 670-X-18-.03 <u>SUSPENSIONS</u>. That Personnel Board Rule requires an appointing authority to give the employee an opportunity for a hearing prior to the employee's suspension.

* * *

(AG & I Exh. 14, p. 56).

<u>SATISFYING DUE PROCESS REQUIREMENTS</u>
<u>WITHOUT A HEARING</u>

Prior to depriving the employee of his property interest the due process clause requires, at a minimum, that the deprivation must be preceded by notice and opportunity for hearing appropriate to the nature of the case.

<u>A HEARING PRIOR TO THE DEPRIVATION OF</u>
<u>PROPERTY IS REQUIRED</u>.

18

Elements that are required in a pre-suspension
hearing to meet procedural due process are clear.
These elements are:

1.    Notice of the charges against the employee,
      including a summary of the evidence against the
      employee.

2.    An opportunity for the employee to present his
      side of the story.

* * *

(AG & I Exh. 14, p. 57).

As provided in § 36-26-28(f), <u>Code of Alabama</u> 1975, AG & I has the

"burden of proof ... to prove the charges forming the basis of the suspension".

A covered employee is not entitled to directly appeal any disciplinary action

taken prior to the suspension stage of the progressive discipline scheme.  In

this case, the employee received a written warning; a written reprimand, and a

suspension.  This report and recommendation pertains to the suspension since

the warning and reprimand are not reviewable.

Following a departmental pre-suspension hearing with the appointing

authority on November 18, 2005, Ms. Burton was provided a notice of

suspension letter dated November 22, 2005.  Notice of the pre-suspension

hearing was provided the afternoon (approximately 4:45 p.m.) prior to the pre-

suspension hearing to take place at 10:30 a.m. the following day.

I find that there were several procedural and substantive defects

employed by the Agency in the issuance of the suspension.  First, although

19

state law, rule, policy, and procedure does not define sufficient notice (date, time, place, issues) prior to a pre-suspension hearing, less than twenty-four (24) hours notice of the scheduled hearing is not sufficient. (See, AG & I Exh. 16, ¶2). Particularly where the suspension step "is a severe and extremely serious step in the employee's career in state government", basic reasonableness in the timing of the pre-suspension hearing should be implemented by the state appointing authority. Since the underlying charges only related to a "refusal to sign" issue, the situation did not warrant an immediate pre-suspension hearing (within twenty-four (24) hours) which would have been appropriate for emergency, health or safety concerns. (AG & I Exhs. 4, p. 11, 14). The very short notice time simply did not comport with fundamental "notice of due process". § 36-26-28(e), Code of Alabama. Ms. Sharleen Smith, Training Coordinator for the State Personnel Department recommended five (5) to ten (10) days notice as reasonable prior to a pre-suspension hearing.

Secondly, the completed written reprimand form initially presented to Ms. Burton contained an incorrect date (11-10-05 transposed on the form as 10-11-05). (Burton Exh. 1). Both parties agreed that Ms. Burton had no prior disciplines before November 2005. It appears from the testimony of Dr. John Bloch, Mr. George Paris, and Ms. Burton, that it was explained to Ms. Burton, that Dr. Bloch or another supervisor would correct the date error for re-presentation to Ms. Burton. Dr. Bloch nor Mr. Paris were clear if the

20

corrected reprimand form was ever re-presented to Ms. Burton prior to the

notice of suspension. (AG & I Exh. 3)[6]. Thus AG & I did not establish that a

timely corrected letter of reprimand was presented to her for an effective refusal

to sign. (See, In accord, Garan v. Roney Plaza Management Corp., 777 So.2d

418 (Fla.Dist.Ct.App. 1999); Raphael v. Okyiri, 740 A.2d 935 (D.C.Ct.App.

1999).

     The "notice of suspension" letter of November 22, 2005, lists the reasons

for the suspension as:

> The charges upon which your suspension is
> based arise from incidents beginning on Monday,
> October 31, 2005, in which you stated to your
> supervisor: *"you would probably lie about it
> anyway."* For this incident, you were given a Letter of
> Warning, which you refused to sign. Despite several
> opportunities, you continued to be insubordinate by
> refusing to obey direct orders to sign the Letter of
> Warning. Finally, after receipt of a Letter of
> Reprimand for these acts of insubordinate and given
> another opportunity, you signed the Letter of Warning,
> but twice refused to sign the Letter of Reprimand.
>
> 1.     Therefore, under the State's progressive
>        discipline policy, you are hereby
>        suspended because of your refusal to sign
>        your supervisor's **Letter of Reprimand** on
>        Thursday, November 10, 2005; and,
>
> 2.     Refusal to sign your supervisor's **Letter of
>        Reprimand** on Monday, November 14,
>        2005.

------------

     [6]A corrected reprimand form admitted as an exhibit reflects its use as an
Attachment 3 to the November 15, 2005, suspension letter.

> You were warned that continued acts of
> insubordination would result in more disciplinary
> action and that failure to sign the disciplinary actions
> was insubordinate.  Despite this knowledge, you
> continued to refuse to sign the disciplinary actions.

(AG & I Exh. 11).

Thus, Ms. Burton was suspended for her refusal to sign a letter of reprimand

on two occasions as determined by the Commissioner.  However, the record as

a whole does not support substantively the imposition of a suspension, in this

case.

Thirdly, the suspension was not warranted because neither the

disciplinary form utilized by AG & I nor the Handbook of Progressive Discipline,

State of Alabama Personnel Department notifies a state employee, including

Ms. Burton, that signing **the form** is required, to subject the employee to

separate discipline.  AG & I Exhibits One (1), Three (3), and Five (5) contain the

following statement at the bottom of each form:  "Employee's signature denoted

discussion not necessarily agreement.  The employee may add comments which

must be attached to this form.  The form must be given to the employee with

copies to the supervisory file and Personnel Office file in the Agency."  (AG & I

Exhs. 1, 3, 5).

Page twelve (12) paragraph three (3) of the Handbook of Progressive

Discipline, State of Alabama Personnel Department (2005 Edition) contains the

following statement:

> The employee must sign that they received the
> reprimand. The best way to document that signature
> is to have a place provided on the form for the
> employee to sign. The employee is given the
> reprimand letter or form as the session ends.

(AG & I Exh. 14, p. 12)[7].

The import of the signature language on the disciplinary form and in the

Handbook is to establish that the employee must acknowledge receipt of the

form or letter by signature. Neither of these instructional statements mandates

acknowledgement of receipt **by signature on the form**. Rather, the Handbook

provides that signature on the form is the preferred acknowledgment. A

preference is not a mandatory requirement. Ms. Burton clearly acknowledged

receipt of the suspension letter in her correspondence to the AG & I

Commissioner dated November 18, 2005[8]. Thus, it was improper to suspend

Ms. Burton for her failure to acknowledge receipt of a private reprimand as

insubordination, wherein acknowledgement on the disciplinary form is not

required and she in fact acknowledged receipt in her correspondence dated

November 18, 2005.

---

[7]In similar statements appears in the warning section of the Handbook at
page eleven (11). (AG & I Exh. 14, p. 11).

[8]Ms. Burton also evidenced her receipt of the warning in her
correspondence dated November 10, 2005.

Fourth, a part of the reasoning for the suspension apparently was based upon action the Agency deemed[9] as "continued acts of insubordination". Since the October 31, 2005, incident does not definitionally qualify as insubordination and the absence of insubordination in the signature context, (i.e., not requirement or duty of the employee to acknowledge receive **on** the form), there were no continued acts of insubordination to justify the suspension. The order to sign the reprimand was not under the circumstances a requirement which the superior were "entitled to have obeyed". As reflected in the State Handbook of Progressive Discipline suspension requirement provision indicates that "suspension must be for improper behavior". The failure to comply with an optional or preference recommendation in a manual does not constitute improper behavior.

Fifthly, each of the AG & I supervisors confirmed that a warning was appropriate for the underlying incident which occurred on October 31, 2005. The record of this hearing is devoid of a justifiable basis for the escalation of the discipline from a warning to suspension, for an employee without prior

---

[9]Although this review concerns the suspension only, it does not appear that the underlying statement to Mr. Hester on October 31, 2005, definitionally qualifies as insubordination. (The Alabama Court of Civil Appeals in *Heath v. Ala. State Tenure Comm., 401 So.2d 68, 70 (Ala.Civ.App. 1981*), has recognized the definition of insubordination "as the refusal to obey some order which a superior officer is entitled to give and entitled to have obeyed so long as such order is reasonably related to the duties of the employee".) Rather the conduct could be properly defined as disrespectful or disruptive in the workplace. Ms. Burton's belief that Mr. Hester's dishonesty affected the workplace should clearly have been resolved in another manner.

24

discipline problems. The failure to sign forms does not justify the escalation or suspension, given the initial position of the supervisors. (See similar cases in other jurisdictions, <u>DelPino v. Arrow Air Inc.</u>, (D.Ct.App. Fla. 2006).

<u>CONCLUSION AND RECOMMENDATION</u>

A covered employee is not entitled to directly appeal any disciplinary action taken by the appointing authority prior to the suspension stage of the progressive discipline scheme. For the reasons stated herein, the ten (10) day suspension imposed on Ms. Shannon Burton based upon a refusal to sign letters of reprimand, was not justified based upon the law and facts presented. I recommend pursuant to § 36-26-28(b), <u>Code of Alabama</u> 1975, the <u>Handbook for Employees</u>, <u>AG & I</u>, and the <u>Handbook of Progressive Discipline</u> (2005 Edition), that the suspension of Ms. Shannon Burton for ten (10) days without pay during the November 23, 2005 through December 7, 2005 period, is due to be rescinded.

Done this the 18th day of April, 2006.

Tori L. Adams
Administrative Law Judge
Administrative Hearings
11 South Union Street
Montgomery, Alabama 36130
Telephone: (334) 242-7433
Fax:        (334) 353-9050

25

cc:    Victor R. Spencer, Esquire
        3026 Ensley Avenue
        Birmingham, Alabama 35208
        (1st Class and Certified Mail)

        Jeff Webb, Esquire
        Department of Agriculture & Industries
        Legal Division
        1445 Federal Drive
        Montgomery, Alabama 36107-1123
        (1st Class and Certified Mail)

        Mr. Ron Sparks, Commissioner
        Department of Agriculture & Industries
        1445 Federal Drive
        Montgomery, Alabama 36107-1123
        (1st Class and Certified Mail)

**NOTE:**

**    This is not a final decision.  No rights are finally determined until the Commissioner decides whether to accept, reject or modify this recommendation.**

**Form 13P**
**Revised (06/2005)**

**EMPLOYEE PERFORMANCE *PREAPPRAISAL***
**STATE OF ALABAMA**
**Personnel Department**

*not all documents are in Personnel file as of 9/20/06 Regina Brunson*

Employee Name: SHANNON R BURTON

Social Security Number:

Agency: 001/AGRICULTURE & INDUSTRIES

Division: 2100/FOOD SAFETY

Classification: ADMIN SUPPORT ASST III

Class Code: 10198

Period Covered From: 12/01/2005 To: 12/01/2006

Position Number: 00338000

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These factors should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on specifics of preparing, conducting, and completing the Preappraisal. Refer to the same manual for information concerning how to develop responsibilities and results.

A. Writes/composes documents to include letters, memorandums, and directives following oral and/or written supervisory directives in order to comply with requests and provide records and information as needed.

B. Monitors/distributes information that comes in through our FAX system to include notification of Food Safety Supervisor and the appropriate warehouse in the case of destination inspection requirements, distribution of food safety alerts and recalls to the Program Director, and maintain FAX equipment to include assurance that paper is installed in both treys, and notify the Program Director immediately if equipment is not properly functioning in order to provide timely delivery of received documents, process of destination inspection notification is initiated quickly, and assure an orderly flow of information that in many instances is time sensitive.

C. Reviews/processes per diem reports, automotive reports, purchase orders, and time sheets for Food Safety Section so that per diem reports are delivered to Accounting section within three working days of receipt in your office, time sheets are delivered to accounting no later than the Thursday following the end of the pay period, automotive reports are delivered to General Services in the time frame specified, records are maintained that reflect dates received and delivered for the respective reports, and the Program Director is notified if the date we receive the reports from the employee prohibits the time specification from being met.

D. Compiles/constructs quarterly and annual reports regarding inspectional activities, samples collected, and permits issued so that the reports are accurate and are completed in a timely manner.

E. Assist Program Director by performance of special projects as assigned, responds to routine instructions from the Commissioner's office that requires notification and coordination with other Section Employees, maintains Program Director's calendar schedule, and updates the Program Director concerning equipment or supply needs.

F. Opens/sorts/distributes mail following oral and or written supervisory directives, standard office procedures and own initiative in order to maintain work flow efficiency and productivity.

*Somethings are Pending per MS. Brunson 9/20/06*

*Exhibit 10*

**WORK HABITS:** Provide a check in the appropriate space to document that the policies and procedures concerning the following areas have been discussed with the employee. For instructions, refer to the Performance Appraisal Manual and policies of the agency.

CHECK WHEN DISCUSSED:

_____ ✓ _____     Attendance

_____ ✓ _____     Punctuality

_____ ✓ _____     Cooperation with Coworkers

_____ ✓ _____     Compliance with Rules

---

**PREAPPRAISAL SIGNATURES:** Signatures are mandatory.

Date the Preappraisal Session was held with the employee: _____ 12-13-05 _____

Employee Signature: (denotes discussion and receipt of form, not agreement) _Shannon Burton_

Rater Signature: (denotes discussion and employee receipt of form) _Lance M. Lester_

Reviewer Signature: _____

---

## EMPLOYEE PERFORMANCE *MIDAPPRAISAL*

Describe any employee's strength(s) in performing responsibilities and/or conducting work habits, as observed, during the first half of the appraisal period. _Employee has a good knowledge of office management, and reacts quickly to disintegrate information to the proper person._

Describe any area(s) that the employee needs to improve in performance of responsibilities and/or work habits, as observed, during the first half of the appraisal period. Document any actions taken or the corrective action plan that was developed to improve the areas of weakness. If a plan has not been developed, it is appropriate for the rater to consider developing a plan at this time.

_____

_____

_____

State the areas where the employee has performed in a fully competent manner during the first half of the appraisal period. Documentation in this area means that the employee performed to the expected level of performance as discussed in the Preappraisal session. If there is no documentation in the first two areas, this section should be completed.

_____

_____

_____

A Midappraisal session has been held on this date and performance has been discussed: _07-07-06_

Employee Signature: _Shannon Burton_  7/11/06    Initial if comments attached: _____

Rater Signature: _Manet Scott_    Initial if comments attached: _____

Reviewer Signature: _Lance Lest_    Initial if comments attached: _____

(Signatures denote that a Midappraisal session has been held between the supervisor and employee. Signatures are mandatory. Employee signature does not denote agreement but discussion of the form and rater comments. Comments may be attached. The person attaching comments must initial in the appropriate space.)



# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
### Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

**VIA Hand Delivery:**

November 22, 2005

Shannon Burton
Food Safety Division
State of Alabama
Agriculture and Industries
1445 Federal Drive
Montgomery, Alabama 36107

    **RE:**   *Notice of Suspension*

Dear Ms. Burton:

On Thursday, November 17, 2005, you were hand delivered a notice of an internal pre-suspension hearing as required in the Alabama Department of Agriculture and Industries' Handbook for Employees. On Friday, November 18, 2005, you were afforded an opportunity to rebut and informally respond to the charges against you. You appeared at this informal hearing before me, submitted verbal and written answers to the charges against you, and submitted a letter referenced as a "Letter of Appeal of Suspension."

The charges upon which your suspension is based arise from incidents beginning on Monday, October 31, 2005, in which you stated to your supervisor: *"you would probably lie about it anyway."* For this incident, you were given a Letter of Warning, which you refused to sign. Despite several opportunities, you continued to be insubordinate by refusing to obey direct orders to sign the Letter of Warning. Finally, after receipt of a Letter of Reprimand for these acts of insubordination and given another opportunity, you signed the Letter of Warning, but twice refused to sign the Letter of Reprimand.

1. Therefore, under the State's progressive discipline policy, you are hereby suspended because of your refusal to sign your supervisor's *Letter of Reprimand* on Thursday, November 10, 2005; and,
2. Refusal to sign your supervisor's *Letter of Reprimand* on Monday, November 14, 2005.

You were warned that continued acts of insubordination would result in more disciplinary action and that failure to sign the disciplinary actions was insubordination. Despite this knowledge, you continued to refuse to sign the disciplinary actions.



# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
### Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

Shannon Burton
Food Safety Division

page 2  Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

I have again reviewed and considered the charges against you, your rebuttal, and written notice of appeal from your suspension. My final action is to proceed with the suspension as previously stated; that is to say, *you are hereby suspended for 10 working days without pay which includes the Thanksgiving holidays, starting on Wednesday, November 23, 2005, and ending on Tuesday, December 6, 2005.* You are instructed to return to work on Wednesday, December 7, 2005, at 8:00 A.M.

In view of your appeal from your suspension, you have a right to a post-suspension review. Within 10 days of November 18th, the date of your notice of appeal, I will do one of the following:

a.      Appoint a panel, composed of three individuals with two of whom are in the same or equivalent classification as you, to decide questions of fact, conclusions of law, and make recommendations to the Commissioner; or,

b.      Appoint a designated hearing officer, from an approved ASEA list, who will decide questions of fact, conclusions of law, and make recommendations to the Commissioner.

Once the decision has been made, you will be notified in writing when your post-suspension review will take place.

It is regrettable that this action is necessary, but your actions cannot be condoned.

Sincerely,

RON SPARKS
Commissioner

RS/rss

cc:    Doug Rigney, Assistant Commissioner
       Dr. John Bloch
       Mr. Lance Hester
       Teresa Brunson, Personnel Director
       Legal Division




# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
### Montgomery, Alabama 36107-1123

*Ron Sparks*
Commissioner

December 13, 2005

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

MEMORANDUM:

TO:        Teresa Brunson
           Personnel Coordinator

FROM:      Lance Hester, Program Director
           Food Safety Section

SUBJECT:   Appraisal for Shannon Burton

On December 13, 2005 I met with Shannon Burton to discuss her appraisal.
Mrs. Burton plans to attach her comments to the appraisal.  She has agreed to turn the
comments in to Christine Medina by 10:00 A. M. on Thursday December 15, 2005.  At
that time she will need to record the date and initial the form.

**TO**:             Lance Hester

**FROM**:       Shannon Burton

**DATE**:        December 15, 2005

**RE**:             Comments to my appraisal/evaluation

Mr. Lance Hester has not complied with relevant portions of State Personnel Policies and Procedures and The Department of Agriculture and Industries Policies and Procedures regarding "Progressive Discipline". The suspension was not warranted and there are mitigating circumstances which suggested that a less drastic action was appropriate. Under all of the circumstances, does a suspension present a fair and honest reason, regulated by good faith, not **my way or the hi-way,** for an employee's **belief, not an accusation?** Mr. Hester asked me, "Do you honestly believe I would not tell the truth about the postmark dates on the mail even if I looked at the mail" and I stated, "Yes, I honestly believe that you would not tell the truth." **This is simply my belief, not an accusation.** I am not aware of any rule, policy, law or regulation enforced by neither Alabama State's Personnel nor The Department of Agriculture and Industries that states an employee must have **"FAITH"** in their supervisor to work for neither that individual nor the employing agency.

I have never had a documented or verbal warning counseling, coaching, reprimand or any disciplinary step. Why Mr. Hester chooses to make my belief a disciplinary step and suspend me, I will never know the truth, but I pray it is not racially motivated. My evaluation score is **"Exceeds Standards"** but the suspension decreases my score to **"Partially Meets Standards"**. Alabama State Personnel states that you should not start the "Progressive Discipline" two months prior to the employee's evaluation period. The employee should be evaluated during the entire year. The warning, reprimand and suspension all occurred within a **two week time frame (11/3-11/15)**. My evaluation is due in December.

Once again, my statement was not adverse to the workplace, disruptive, abusive, threatening nor insubordinate. The statement made was **simply my belief, not an accusation.**

C: Teresa Brunson, Agriculture's Personnel
   Alabama State's Personnel

**Form 13**
**Revised (1/1/1999)**

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
**Personnel Department**

☐ Number of Steps

Employee Name: SHANNON R BURTON          Social Security Number: _

Agency: 001/AGRICULTURE & INDUSTRIES          Division: 2100/FOOD SAFETY

Classification: ADMIN SUPPORT ASST III          Class Code: 20198

Period Covered From: 12/01/2003   To: 12/01/2004     Annual Raise Effective: FEBRUARY 2005

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN 422 76 2233 | | SSN 420 64 0581 |
| Signature _Lane M Welt_ | Signature _Shannon Burton_ | Signature |
| Date 11-23-04 | Date 11/23/04 | Date 11/24/04 |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 28.3 | − | 0 | = | 28.3 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period.  See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

**RESPONSIBILITIES:** List an ~~eviated~~ version of the employee's resp~~~~bilities below as documented on and discussed during the Preappraisa~~.~~ Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1. Reviews and evaluates Documents | 3 |
| 2. Trains and instructs subordinates | 3 |
| 3. Observes and evaluates performance of subordinates | 3 |
| 4. Compiles data such as quarterly and annual reports | 3 |
| 5. Post and maintains records | 2 |
| 6. Types and composes documents | 3 |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

| 17 | ÷ | 6 | = | 2.83 | x | 10 | = | 28.3 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _____

**Form 13F**    **EMPLOYEE PROBATIONARY PERFORMANCE APPRAISAL**
Revised (6/1/1998)                    STATE OF ALABAMA
                                     Personnel Department

Employee Name: _SHANNON R BURTON_                    Social Security Number: _          _

Agency: _001/AGRICULTURE & INDUSTRIES_              Division: _2100/FOOD SAFETY_

Classification: _ADMIN SUPPORT ASST III_            Class Code: _10198_

Period Covered From: _08/09/2003_ To: _02/08/2004_  Position Number: _0338000_

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

SSN _422_-_76_-_2233_    _Lance M. Hester_          _1-16-04_
RATING SUPERVISOR        Signature                   Date / Initial if comments are attached

                         _Shannon Burton_            _1-16-04_
                         EMPLOYEE Signature          Date / Initial if comments are attached

SSN _420_-_64_-_0581_    _Johnny A Bloch_            _1/16/04_
REVIEWING SUPERVISOR     Signature                   Date / Initial if comments are attached

It is recommended that the employee be:
_____ Continued probationally in the position named (reason stated in Disciplinary Actions area)
_X_ Given permanent status in the position. Probationary increase to $ _897.00_ Step _05_ Effective _02-21-04_
_____ Terminated before or at the end of the probationary period (reason stated in Disiplinary Actions Area)

_Ken Spa___                          _1-21-04_
APPOINTING AUTHORITY Signature        Date

---

**PROBATIONARY PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Probationary Performance Appraisal Score.

_28.3_              _  −  _    _0_             _=_    _28.3_
Responsibility              Disciplinary            Probationary Performance Appraisal
Score                      Score                    Score

---

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the probationary period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

                              Compliance        Noncompliance

Attendance                      ☑                 ☐
Punctuality                     ☑                 ☐
Cooperation with Coworkers      ☑                 ☐
Compliance with Rules           ☑                 ☐

***RESPONSIBILITIES:*** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this probationary period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1. Review and elvaluates documents to update and verify accuracy | 2 |
| 2. Trains and instructs subordinates | 2 |
| 3. Observes and evaluates performance of subordinates | 3 |
| 4. Compiles data such as quarterly and annual reports | 4 |
| 5. Posts and maintains records in order to retain current data | 3 |
| 6. Types and composes documents | 3 |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

$$\underline{17} \div \underline{6} = \underline{2.83} \quad \times \quad 10 \quad = \quad \underline{28.3}$$

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | Responsibility Score |
|---|---|---|---|

***DISCIPLINARY ACTIONS:*** Any disciplinary action taken with the employee during this probationary period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this probationary period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _____0_____

**Form 13**
**Revised (1/1/1999)**

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

Number
of Steps

Employee Name: SHANNON R BURTON

Social Security Number:

Agency: 001/AGRICULTURE & INDUSTRIES

Division: 3340/AGRICULTURAL COMPLIANCE

Classification: ADMIN SUPPORT ASST II

Class Code: 10197

Period Covered From: 01/01/2002    To:    01/01/2003

Annual Raise Effective:    MARCH 2003

---

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN 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 | | SSN 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 |
| _Ben B. Hitch_ | _Shannon Burton_ | _W. L. Highfield_ |
| Signature | Signature | Signature |
| 12/16/02 | 12/16/02 | 12/16/02 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

***PERFORMANCE APPRAISAL SCORE:*** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 32 | − | 0 | = | 32 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

---

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |

---

***WORK HABITS :*** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

**RESPONSIBILITIES:** List an ab        iated version of the employee's respons        ties below as documented on and discussed during the Preappraisal.  Record the appropriate rating in the box for each responsibility.  Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

---

**Responsibility**                                                                                                 **Rating**

1. _____ Open/sorts/distributes mail following oral and/or written supervisory directives                         3

2. _____ Receives/routes/screens phone calls, visitors and other departmental personnel                           3

3. _____ Writes/composes documents to include letters and memos                                                   4

4. _____ Process leave cards, vehicle reports, and all administration paper work                                  3

5. _____ Office records liaison, manage office and field personnel inventory                                      3

6. _____

7. _____

8. _____

9. _____

10. _____

---

**RESPONSIBILITY SCORE:**

$\underline{16}$ ÷ $\underline{5}$ = $\underline{3.2}$   x   10 = $\underline{32}$

| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

---

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below.  For each area, list the specific disciplinary step taken,  the date of action,  and the reason or unwanted behavior it involved.  Copies of disciplinary documentation are to be maintained in the agency's personnel files.  Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

---

**DISCIPLINARY SCORE:  This section should include the use of the discipline steps of reprimand and suspension only**.  The Disciplinary Score does not  include warnings (oral).  Warnings are documented only in the Work Habits and Disciplinary Actions areas.  Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period.  If the most severe step was one or more reprimands, the Disciplinary Score will be 7.  If the most severe step was one or more suspensions, the Disciplinary Score will be 17.  Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:  0

**Form 13P**  
Revised (1/1/1998)

**EMPLEE PERFORMANCE APPRᴀ AL**  
**STATE OF ALABAMA**  
**Personnel Department**

*PREAPPRAISAL*

Employee Name: SHANNON R BURTON                    Social Security Number: _____

Agency: 001/AGRICULTURE & INDUSTRIES              Division: 3340/AGRICULTURAL COMPLIANCE

Classification: ADMIN SUPPORT ASST II             Class Code: 10197

Period Covered From: 01/01/2002    To: 01/01/2003

---

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

<u>**RESPONSIBILITIES/RESULTS**</u>

A. Open/sorts/distributes mail following oral and/or written supervisory directives, standard office procedures and own initiative in order to maintain updated departmental communications.

B. Receives/routes/screens phone calls and visitors and other departmental personnel following oral and/or written supervisory directives, standard office procedures in order to facilitate the functioning of the office/division/department and present a positive image to the public and employees.

C. Writes/composes documents to include letters, memos, and directives following oral and/or written supervisory directives, follow standard office procedures, process office personnel and inspector's form 13p (Preappraisal) and form 13 (Annual Appraisal), ensure that forms are in Agriculture's Personnel Office by due date and keeping up with each employee's mid-appraisal and annual appraisal dates by departmental rules and regulations, and own initiative in order to comply with requests and provide records and information as needed.

D. Processes leave cards, automotive reports and gas receipts, reimbursement vouchers, per diem reports and receipts, itineraries and time sheets for seventeen inspectors, purchase orders, attaching invoices with material receipts to submit to accounting for prompt payment, follow standard office procedures in order to determine accurate financial and numerical records and enter reports of inspection for compliance in Microsoft Access.

**WORK HABITS:** Provide ̱ ̱heck in the appropriate space when th ̱ ̱licies and procedures concerning the following areas have been discussed with the employee. In particular, the attendance and punctuality policies should be provided to the employee in writing. For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED:

✓ Attendance

✓ Punctuality

✓ Cooperation with Coworkers

✓ Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Date of Session: _1/3/02_

Employee Signature: _Shannon Burton_

Rater Signature: _Ben B. Hitch_

Reviewer Signature: _Guy XXX_

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_Employee works well with others and is very reliable_

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

Document the action plan that has been discussed to improve the areas of weakness.

A midappraisal has been held and performance has been discussed:

Date: _7/31/02_

Employee Signature: _Shannon Burton_    Rater Signature: _Benny Hitch_

**Form 13**
**Revised (1/1/1999)**

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

☐ Number of Steps

Employee Name: SHANNON R BURTON

Social Security Number: _____

Agency: 001/AGRICULTURE & INDUSTRIES

Division: 3340/AGRICULTURE COMPLIANCE

Classification: ADMIN SUPPORT ASST II

Class Code: 10197

Period Covered From: 01/01/2001  To: 01/01/2002

Annual Raise Effective: MARCH 2002

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN 423 - 60 - 6909 | | SSN 421 - 68 - 8679 |
| *Ben B. Hitch* | *Shannon Burton* | *Guy W Kan* |
| Signature | Signature | Signature |
| 1/3/02 | 1 \ 3 \ 02 | 1-3-02 |
| Date | Date | Date |
| BBH | | |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$28.0 - 0 = 28.0$$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |

---

This employee's work:

☐ Does Not Meet Standards (6.6 or below)

☐ Partially Meets Standards (6.7 – 16.6)

☐ Meets Standards (16.7 – 26.6)

☒ Exceeds Standards (26.7 – 36.6)

☐ Consistently Exceeds Standards ( 36.7 – 40 )

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. ₂cord the appropriate rating in the bo    r each responsibility. Rating(s) of appropriate responsibilities should ₂eflect any disciplinary action(s) that ha₂ been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1. _____ Open/sorts/distributes mail following oral and/or written supervisory directives | 2 |
| 2. _____ Receives/routes/screens phone calls, visitors and other departmental personnel | 3 |
| 3. _____ Writes/composes documents to include letters and memos | 3 |
| 4. _____ Process office personnel and inspector's preappraisal and annual appraisal forms | 3 |
| 5. _____ Process leave cards, vehicle reports, and all administration paper work | 3 |
| 6. _____ | |
| 7. _____ | |
| 8. _____ | |
| 9. _____ | |
| 10. _____ | |

**RESPONSIBILITY SCORE:**

$$\underline{14} \div \underline{5} = \underline{2.8} \times 10 = \underline{28.0}$$

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | Responsibility Score |
|---|---|---|---|

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    0

# STATE OF ALABAMA
# PERSONNEL DEPARTMENT
# TRAINING

*This certificate is to acknowledge the completion of the following training course:*

## Family and Medical Leave Act
## January 17, 2006

*by the following individual:*

## Shannon Burton

*Thank you for your participation in training and development of state employees for the betterment of services to State of Alabama taxpayers.*

*Presenter:  Sharleen Smith*
*State Personnel Training Director*

| SSN: | |
|---|---|
| NAME: | Shannon R Burton |
| DIVISION/SECTION | Ag Compliance |
| LENGTH OF SERVICE DATE: | 5/24/98 |
| Leave Progression Start Date: | 5/24/98 |



S . A T E O F A L A B A M A
PERSONNEL DEPARTMENT
5% ACROSS THE BOARD ADJUSTMENT

EFFECTIVE DATE: 09/01/2006

SSAN: ([redacted]) NAME: SHANNON R BURTON

AGENCY: 001 ORG: 2100

TITLE: 10198 ADMIN SUPPORT ASST III

OLD RATE: 1030.00 STEP: 05

NEW RATE: 1081.50 STEP: 05

S T A T E O F A L A B A M A
PERSONNEL DEPARTMENT
6% ACROSS THE BOARD ADJUSTMENT

EFFECTIVE DATE: 09/03/2005

SSAN: NAME: SHANNON R BURTON

AGENCY: 001 ORG: 2100

TITLE: 10198 ADMIN SUPPORT ASST III

OLD RATE: 897.00 STEP: 05

NEW RATE: 950.80 STEP: 05

### STATE OF ALABAMA

### DEPARTMENT OF AGRICULTURE AND INDUSTRIES
1445 Federal Drive
Montgomery, Alabama 36107-1123

*Ron Sparks*
Commissioner

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

January 20, 2004

Ms. Shannon Burton
Food Safety

Dear Ms. Burton:

    I am attaching a copy of your final probationary report that gives you permanent status as a/an Administrative Support Assistant III (10198). You will receive a probationary raise which will increase your salary from $853.80 biweekly to $897.00 biweekly effective February 21, 2004. This increase will be reflected in the check you receive on March 19, 2004. In accordance with the rules and regulations of the State Personnel Department, your new annual raise date will be February 2005.

    Your diligent work is appreciated.

Sincerely,

Ron Sparks
Commissioner

RS/dh
Attachment

C:    personnel file

# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
1445 Federal Drive
Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

January 8, 2004

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

## M E M O R A N D U M

TO:        Lance Hester
           Food Safety

FROM:      Timikel Robinson
           Personnel Assistant

RE:        SIX-MONTH PROBATIONARY INCREASE

**Shannon Burton** (

is eligible to receive a six-month probationary increase from $853.80 (step 03) biweekly to:

    Select One:

      [ ]  one-step increase -    $874.90

      [✓] two-step increase-    $897.00

The effective date of this increase will be *February 21, 2004*.

Please make your salary recommendation above, sign below, and **return this form** to the Personnel Section along with the original Employee Probationary Performance Appraisal (Form 13). **You should keep the original Preappraisal form (13P).**    Please return by: **January 21, 2004.**

The Preappraisal form is to be completed, reviewed with the employee, and signed.  The original form will be maintained **in your office** and at the appropriate time you are to conduct your midappraisal session.  Once you have completed the midappraisal session, return the original form to be filed in the employee's personnel file in our office.

Date: *1-16-04*        Signed: *Lance M. Hester*

# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
### Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

February 10, 2003

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-033€

Ms. Shannon Burton
Agricultural Compliance

Dear Ms. Burton:

Based upon your recent performance evaluation, you are eligible to receive an annual raise which will increase your salary from $774.00 biweekly to $812.90 (Step 10) biweekly. Your raise is effective March 8, 2003 and will be reflected in the check you receive on April 4, 2003. Your new annual raise date will be March 2004.

Your continued diligence to your work and the good of this agency is appreciated.

Sincerely,

Ron Sparks
Commissioner

RS/dh

C:     Personnel File

S   A T E   O F   A L A B A M A
PERSONNEL DEPARTMENT
3% ACROSS THE BOARD ADJUSTMENT

EFFECTIVE DATE: 09/07/2002

SSAN:                     NAME: SHANNON R BURTON

AGENCY: 001     ORG: 3340

TITLE: 10197     ADMIN SUPPORT ASST II

OLD RATE:       751.40    STEP:    08

NEW RATE:       774.00    STEP:    08



# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
### Montgomery, Alabama 36107-1123



*Charles Bishop*
Commissioner

*Ron Sparks*
Asst. Commissioner

February 12, 2002

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

Ms. Shannon Burton
Agricultural Compliance

Dear Ms. Burton:

Based upon your recent performance evaluation, you are eligible to receive an annual raise which will increase your salary from $715.30 biweekly to $751.40 (Step 08) biweekly. Your raise is effective March 9, 2002 and will be reflected in the check you receive on April 5, 2002. Your new annual raise date will be March 2003.

Your continued diligence to your work and the good of this agency is appreciated.

Sincerely,

Charles Bishop
Commissioner

CB/dh

C:     Personnel File



# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
### Montgomery, Alabama 36107-1123



*Charles Bishop*
Commissioner

*Ron Sparks*
Asst. Commissioner

## ACKNOWLEDGEMENT OF RECEIPT OF POLICIES
## OF THE ALABAMA DEPARTMENT OF AGRICULTURE

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

I, _Shannon Burton_, hereby certify that I have received a

copy of the following policies, agreements, handbook, and instructions:

_____ Employee Handbook

_SB_ Equal Employment Opportunity Policy

_SB_ Sexual Harassment Policy

_SB_ *Drug Free Work Place Policy

_SB_ *Compensatory Time Agreement

_SB_ Employee Injury Instructions

_SB_ *Form I-9, Employment Eligibility Verification (must submit acceptable documents
which will be photocopied and retained on file.)

_SB_ *New Hire Reporting Form (NH-1)

_SB_ *Employee Emergency Data Sheet (to be retained by the supervisor)

_____ *Selective Service Form (Males only)

_SB_ Family and Medical Leave Act of 1993

Please initial each item that you have received. Other forms will also be required for the
Payroll Section. If you have questions, please feel free to contact David Hooks,
Personnel Manager, or Timikel Robinson, Personnel Assistant at 240-7120.

Signature: _Shannon Burton_ Date: _9/10/01_

Social Security #: _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_

Division/Section: _AG Compliance_    Witness: _____

*Denotes forms that you will also need to complete and sign.

# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
### Montgomery, Alabama 36107-1100



**CHARLES BISHOP**
**COMMISSIONER**

Mailing Address:
Post Office Box 3336
Montgomery, Alabama 36109-0336
Phone: (334) 240-7100
Fax: (334) 240-7190

## ACKNOWLEDGEMENT OF DRUG POLICY

I, _Shannon Burton_, hereby certify that I have received a copy of the policy regarding the maintenance of a drug-free workplace.

I realize that the <u>unlawful</u> manufacture, distribution, dispensation, possession, or use of a controlled substance, as such is defined under Federal and Alabama law, is prohibited on any premise under the possession or control of the State Department of Agriculture and Industries, and that violation of this policy can subject me to discipline up to and including termination of employment.

I further certify that I will notify my supervisor of any criminal drug conviction, suffered by me, which occurred in my work place, no later than five days after such conviction.

I realize that federal law mandates that the Department of Agriculture and Industries must notify the federal agency supplying federal funds to the Division within which I work of this conviction and I hereby grant permission for conveyance of this information.

_9 | 10 | 01_
**Date**

_Shannon Burton_
**Employee Signature**

_AG Compliance_
**Division**

STATE OF ALABAMA

DEPARTMENT OF AGRICULTURE AND INDUSTRIES

COMPENSATORY TIME AGREEMENT

I, the undersigned, accept as a condition of employment that any overtime hours worked may be compensated for through the use of compensatory time off in lieu of monetary payment. I understand that such decisions will be consistent with applicable laws and regulations and will govern only those employees ruled eligible for overtime compensation.

Shannon Burton

Employee's Signature

9 | 10 | 01

Date Signed

Form 11 Revised 5/88

Submit in Duplicate

STATE OF ALABAMA PERSONNEL DEPARTMENT
## RECOMMENDATION FOR PERSONNEL ACTION

| 1. Name of Employee<br><br>Shannon Burton<br>First      MI      Last | 2. Social Security Number | 3. Salary<br><br>$ 950.80 B/W |
|---|---|---|
| 4. Position Number<br>0338000 | 5. Class Title/Code<br>ASA III          (10198) | 6. Class Option Title/Code        ) |
| 7. Department<br>Agriculture & Industries | 8. Division/Code<br>Food Safety       (2100) | 9. Effective Date<br>11/23/05 |

| INSTRUCTIONS | KIND OF ACTION | |
|---|---|---|
| Item 11 requires signature of both department heads | 10. Transfer within dept ----☐ | 18. Retirement -----------------☐<br>Disability ---☐ Service -----☐ |
| Items 11, 13, 14, 15, 21 require approval of Personnel Director before action is official. | 11. Transfer to another dept.☐ | 19. Expiration of temporary appt--☐ |
| | 12. Suspension-------------- ☒ | 20. Expiration of provisional appt☐ |
| Items 12,13,14,15 must have copy of letter to employee attached. If voluntary demotion, letter from employee should be attached. | 13. Demotion --------------- ☐ | 21. Leave Without Pay -----------☐ |
| | 14. Layoff ---------------- ☐ | 22. Returned from LWOP ----------☐ |
| | 15. Dismissal ------------- ☐ | 23. Returned from military leave--☐ |
| Item 17 should have copy of letter of resignation or confirmatory letter from department attached. | 16. Separation by death -----☐ | 24. Change of Name --------------☐ |
| | 17. Resignation -----------☐ | 25. Other ----------------------☐ |

| ITEMS AFFECTED BY ACTION | FROM: | TO: |
|---|---|---|
| 26. Department<br>(Items 10 and 11) | | |
| 27. Division/Code<br>(Items 10 and 11) | ) | ) |
| 28. County of Employment/Code<br>(Items 10 and 11) | ) | ) |
| 29. Class Title/Code<br>(Items 10, 11, 13) | ) | ) |
| 30. Class Option/Code<br>(Items 10, 11, 13) | | |
| 31. Dates<br>(Items 12, 21, 22, and 23) | 11/23/05 | 12/06/05 |
| 32. Name<br>(Item 24) | | |

| 33. If action is separation, is reemployment recommended? | Yes ☐   No ☐ | (If "No," explanation must be given) |
|---|---|---|

34. Remarks

See attached letter of suspension.

| 35. Signed<br>(Appointing Authority) | Date    12/01/05 |
|---|---|
| 36. Signed<br>(Appointing Authority) | Date |
| 37. Approved<br>(Personnel Director) | Date |

| Action | Sex | Race | Co Res | Edu | VP | Dept | Div | Emp Type | Co Emp | Part Time | How Paid | Range Diff. | Emp Sub | Annl Raise | Prob EndDate | Lve Stat | RFL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | |

F        Revised 5/88                                                    Submit in Duplicate

STATE OF ALABAMA PERSONNEL DEPARTMENT
## RECOMMENDATION FOR PERSONNEL ACTION

| 1. Name of Employee | | | 2. Social Security Number | 3. Salary |
|---|---|---|---|---|
| Shannon Burton | | | | $ 950.80 B/W |
| First | MI | Last | | |

| 4. Position Number | 5. Class Title/Code | 6. Class Option Title/Code |
|---|---|---|
| 0338000 | ASA III                    (10198) | ) |

| 7. Department | 8. Division/Code | 9. Effective Date |
|---|---|---|
| Agriculture & Industries | Food Safety          (2100) | 11/23/05 |

**KIND OF ACTION**

| INSTRUCTIONS | | |
|---|---|---|
| Item 11 requires signature of both department heads | 10. Transfer within dept ----☐ | 18. Retirement -----------------☐<br>Disability ---☐ Service -----☐ |
| Items 11, 13, 14, 15, 21 require approval of Personnel Director before action is official. | 11. Transfer to another dept.☐ | 19. Expiration of temporary appt--☐ |
| | 12. Suspension--------------☒ | 20. Expiration of provisional appt☐ |
| Items 12,13,14,15 must have copy of letter to employee attached. If voluntary demotion, letter from employee should be attached. | 13. Demotion ---------------☐ | 21. Leave Without Pay -----------☐ |
| | 14. Layoff ----------------☐ | 22. Returned from LWOP -----------☐ |
| | 15. Dismissal --------------☐ | 23. Returned from military leave--☐ |
| Item 17 should have copy of letter of resignation or confirmatory letter from department attached. | 16. Separation by death ----☐ | 24. Change of Name --------------☐ |
| | 17. Resignation -----------☐ | 25. Other ----------------------☐ |

| ITEMS AFFECTED BY ACTION | FROM: | TO: |
|---|---|---|
| 26. Department<br>     (Items 10 and 11) | | |
| 27. Division/Code<br>     (Items 10 and 11) | ) | ) |
| 28. County of Employment/Code<br>     (Items 10 and 11) | ) | ) |
| 29. Class Title/Code<br>     (Items 10, 11, 13) | ) | ) |
| 30. Class Option/Code<br>     (Items 10, 11, 13) | | |
| 31. Dates<br>     (Items 12, 21, 22, and 23) | 11/23/05 | 12/06/05 |
| 32. Name<br>     (Item 24) | | |

| 33. If action is separation, is reemployment recommended? | Yes ☐  No ☐ | (If "No," explanation must be given) |
|---|---|---|

34. Remarks

See attached letter of suspension.

| 35. Signed<br>     (Appointing Authority) | Date        12/01/05 |
|---|---|
| 36. Signed<br>     (Appointing Authority) | Date |
| 37. Approved<br>     (Personnel Director) | Date      12-06-05 |

| Action | Sex | Race | Co Res | Edu | VP | Dept. | Div | Emp Type | Co Emp | Part Time | How Paid | Range Diff. | Emp Sub | Annl Raise | Prob EndDate | Lve Stat | RFL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | |

# PERSONNEL ACTION NOTIFICATION

# FORM

| | |
|---|---|
| EMPLOYEE NAME: | Shannon Burton |
| SOCIAL SECURITY NUMBER: | |
| SECTION: | Food Safety (2100) |
| CLASS CODE: | ASA III (10198) |
| SALARY: | $950.80 |
| PERSONNEL ACTION: | suspension |
| EFFECTIVE DATE: | 11/23/05 |
| LENGTH OF SERVICE DATE: | |
| POSITION NUMBER | 0338000 |
| COMMENTS: | Suspended on LWOP from 11/23/05 to 12/06/05 |

12/8/2005

Form 11 Revised 5/88                                                    Submit in Duplicate

STATE OF ALABAMA PERSONNEL DEPARTMENT
## RECOMMENDATION FOR PERSONNEL ACTION

| 1. Name of Employee<br><br>Shannon Burton | 2. Social Security Number | 3. Salary<br><br>$ 950.80 B/W |
|---|---|---|
| First            MI              Last | | |

| 4. Position Number<br>0338000 | 5. Class Title/Code<br>ASA III                    (10198) | 6. Class Option Title/Code<br>                                    ) |
|---|---|---|

| 7. Department<br>Agriculture & Industries | 8. Division/Code<br>Food Safety                (2100) | 9. Effective Date<br>11/23/05 |
|---|---|---|

| INSTRUCTIONS | KIND OF ACTION | |
|---|---|---|
| Item 11 requires signature of both department heads | 10. Transfer within dept ----☐ | 18. Retirement -----------------☐<br>      Disability ---☐ Service -----☐ |
| Items 11, 13, 14, 15, 21 require approval of Personnel Director before action is official. | 11. Transfer to another dept.☐<br><br>12. Suspension--------------☒ | 19. Expiration of temporary appt--☐<br><br>20. Expiration of provisional appt☐ |
| Items 12,13,14,15 must have copy of letter to employee attached. If voluntary demotion, letter from employee should be attached. | 13. Demotion ---------------☐<br><br>14. Layoff  ----------------☐<br><br>15. Dismissal -------------☐ | 21. Leave Without Pay -----------☐<br><br>22. Returned from LWOP -----------☐<br><br>23. Returned from military leave--☐ |
| Item 17 should have copy of letter of resignation or confirmatory letter from department attached. | 16. Separation by death ----☐<br><br>17. Resignation -----------☐ | 24. Change of Name --------------☐<br><br>25. Other ----------------------☐ |

| ITEMS AFFECTED BY ACTION | FROM: | TO: |
|---|---|---|
| 26. Department<br>    (Items 10 and 11) | | |
| 27. Division/Code<br>    (Items 10 and 11) | ) | ) |
| 28. County of Employment/Code<br>    (Items 10 and 11) | ) | ) |
| 29. Class Title/Code<br>    (Items 10, 11, 13) | ) | ) |
| 30. Class Option/Code<br>    (Items 10, 11, 13) | | |
| 31. Dates<br>    (Items 12, 21, 22, and 23) | 11/23/05 | 12/06/05 |
| 32. Name<br>    (Item 24) | | |

| 33. If action is separation, is reemployment recommended? | Yes ☐   No ☐ | (If "No," explanation must be given) |
|---|---|---|

34. Remarks

See attached letter of suspension.

| 35. Signed<br>    (Appointing Authority) | Date    12/01/05 |
|---|---|
| 36. Signed<br>    (Appointing Authority) | Date |
| 37. Approved<br>    (Personnel Director) | Date |

| Action | Sex | Race | Co Res | Edu | VP | Dept | Div | Emp Type | Co Emp | Part Time | How Paid | Range Diff | Emp Sub | Annl Raise | Prob EndDate | Lve Stat | RFL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | |



**STATE OF ALABAMA**

**DEPARTMENT OF AGRICULTURE AND INDUSTRIES**
1445 Federal Drive
Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

August 13, 2003

Ms. Shannon Burton
3253 Capwood Curve
Montgomery Al 36116

Dear Ms. Burton:

The Commissioner has approved your promotion to the classification of Administrative Support Assistant III effective, August 9, 2003. Your new rate of pay will be $853.80 biweekly. This will be reflected in the check you receive on September 5, 2003.

You and your supervisor should complete a Pre-Appraisal Form (13P) to cover the six months probationary period. You will be eligible for a pay raise at the successful completion of that time.

Congratulations! Your service to this Department is appreciated.

Sincerely,

David Hooks
Personnel Manager

C: Lance Hester




# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
### Montgomery, Alabama 36107-1123

*Charles Bishop*
Commissioner

*Ron Sparks*
Asst Commissioner

## MEMORANUM

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

**TO**:       Ronnie Murphy

**FROM**:   Shannon Burton

**DATE**:    February 7, 2002

**RE**:       Educational Leave

I am requesting Educational Leave to go to a Micro Computer class on my lunch hour on Tuesdays and Thursdays. The class is from 2:30 to 3:45 and is not offered any other time this semester.  My instructor has agreed to let me leave class early so I can return to work by 4:00.  This class ends May 9th.  This is my last year; I need this course to complete my graduation requirement.  I would appreciate your consideration on this matter.

c Benny Hitch

Form 11 Revised 5/88

Submit in Duplicate

## STATE OF ALABAMA PERSONNEL DEPARTMENT
# RECOMMENDATION FOR PERSONNEL ACTION

| 1. Name of Employee | | | 2. Social Security Number | | 3. Salary |
|---|---|---|---|---|---|
| **Shannon** | | **Burton** ✓ | | | 715.30 |
| First | MI | Last | | | |

| 4. Position Number | 5. Class Title/Code | | 6. Class Option Title/Code |
|---|---|---|---|
| 4233000 ✓ | ASA II | (10197) | ( ) |

| 7. Department | 8. Division/Code | 9. Effective Date |
|---|---|---|
| Revenue (019) | Sales & Use Tax (7700) | 9-08-01 |

| INSTRUCTIONS | KIND OF ACTION |
|---|---|

**INSTRUCTIONS**

Item 11 requires signature of both department heads.

Items 11, 13, 14, 15, 21 require approval of Personnel Director before action is official.

Items 12, 13, 14, 15 must have copy of letter to employee attached. If voluntary demotion, letter from employee should be attached.

Item 17 should have copy of letter of resignation or confirmatory letter from department attached.

**KIND OF ACTION**

10. Transfer within department ......... ☐
11. Transfer to another department ...... ☒
12. Suspension ...................... ☐
13. Demotion ....................... ☐
14. Layoff ......................... ☐
15. Dismissal ...................... ☐
16. Separation by death ............. ☐
17. Resignation .................... ☐
18. Retirement ..................... ☐
    Disability ....... ☐ Service ...... ☐
19. Expiration of temporary appointment ☐
20. Expiration of provisional appointment ☐
21. Leave Without Pay .............. ☐
22. Returned from LWOP ............ ☐
23. Returned from military leave ...... ☐
24. Change of name ................ ☐
25. Other ......................... ☐

| ITEMS AFFECTED BY ACTION | FROM: | TO: 0333301 ✓ |
|---|---|---|
| 26. Department (Items 10 and 11) | Revenue | Agriculture |
| 27. Division/Code (Items 10 and 11) | Sales & Use Tax ✓ (7700) | Ag Compliance ✓ (3340) |
| 28. County of Employment/Code (Items 10 and 11) | Montgomery ✓ (51) | Montgomery (51) |
| 29. Class Title/Code (Items 10, 11, 13) | ASA II (10197) | ASA II (10197) |
| 30. Class Option/Code (Items 10, 11, 13) | | |
| 31. Dates (Items 12, 21, 22, and 23) | | |
| 32. Name (Item 24) | | |

APPROVED
SEP 12 2001
POSITION CONTROL AND PAY DIVISION
CLASSIFICATION AND PAY DIVISION

33. If action is separation, is reemployment recommended?   Yes ☐   No ☐   (If "No", explanation must be given.)

34. Remarks. Leave balances will transfer via GHRS.
LSD: 5-26-98
Annual raise month: 3-01-02

| 35. Signed (Appointing Authority) | Cynthia Underwood/no | Date | 9/5/01 |
|---|---|---|---|
| 36. Signed (Appointing Authority) | | Date | 9-7-01 |
| 37. Approved (Personnel Director) | Flowers | Date | SEP 12 2001 |

| ACTION | SEX | RACE | CO RES | EDU | VP | DEPT | DIV | EMP TYPE | CO. EMP | PART TIME | HOW PAID | RANGE DIFF. | EMP SUB | ANNUAL RAISE | PROBATION END DATE | LEAVE STATUS | RFI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | |

# CERTIFICATION OF CANDIDATES
## STATE OF ALABAMA
### Personnel Department

CERTIFICATION NUMBER 0330300048

| CLASSIFICATION (CODE/TITLE) | CLASS OPTION (CODE/TITLE) | PAGE |
|---|---|---|
| 10198 ADMIN SUPPORT ASST III | | 1 |

| APPOINTMENT TYPE | COUNTY | VACANCIES | RACE | AGE LIMIT | SEX | O/N TRAVEL | SHIFT WORK | SALARY |
|---|---|---|---|---|---|---|---|---|
| PERMANENT | 51 MONTGOMERY | 1 | | | | N | 1 | 832.90 |

POSITION NUMBERS
TEN PLUS TIES   0338000

511 TYPING

SELECTIVE CERTIFICATION CODE
(3) 853.70

| NAME AND ADDRESS | RACE | V.P. | GRADE | ACT. | POSITION NO. OF APPT. | APPT. DATE |
|---|---|---|---|---|---|---|
| BROWN PATRICIA A 4402 LAWNWOOD DR MONTGOMERY AL 36109 | 2 | | BAND01 | C | | |
| BURTON SHANNON R 3253 CAPWOOD CURVE MONTGOMERY AL 36116 | 2 | | BAND01 | A | 0338000 | 8-9-03 |
| HUFFMAN SALLETTA M 720 E GARDENDALE DR MONTGOMERY AL 36110 | 2 | | BAND01 | C | | |
| SLADE ANGELA B 4110 FITZPATRICK BLVD APT 1507 MONTGOMERY AL 36116 | 2 | | BAND01 | C | | |
| MOORE LATONYA D 3529 CASTLE RIDGE ROAD MONTGOMERY AL 36116 | 2 | | BAND02 | C | | |
| VESSELS ROBIN A 676 LEE RD 191 #8 AUBURN AL 36830 | 1 | | BAND02 | C | | |
| FUQUA ROBBIN L 105 AUSTIN LN WETUMPKA AL 36092 | 1 | | BAND03 | C | | |
| MANNING PEGGY E 1820 COUNTY ROAD 21 NORTH PRATTVILLE AL 36067 | 1 | | BAND03 | C | | |
| MCLENDON WENDY K 507 HARVEST LOOP PRATTVILLE AL 36066 | 1 | | BAND03 | C | | |
| WRIGHT MARGARET M P O BOX 8235 MONTGOMERY AL 36110 | 1 | | BAND03 | C | | |

| CERTIFIED-PERSONNEL DIRECTOR | DATE CERTIFIED | CERTIFICATION RETURNED-APPOINTING AUTHORITY | DATE RETURNED |
|---|---|---|---|
| Flowers | 8/7/03 | | 8-15-03 |

**IMPORTANT: SEE INSTRUCTIONS ON REVERSE SIDE**

AGENCY COPY

BEFORE THE STATE OF ALABAMA
DEPARTMENT OF AGRICULTURE AND INDUSTRIES

In The Matter of:                          )
                                           )
Shannon Burton                             )
                                           )
Suspension Hearing                         )

## MOTION TO ENFORCE THE RECOMMENDATION
## OF THE ADMINISTRATIVE JUDGE

COMES NOW, Shannon Burton (Appellant), by and through her attorney, Juraldine Battle-Hodge, and files this her Motion to Enforce the Recommendation of the Administration Judge, and as reasons states the following:

Shannon Burton (Appellant) filed a post-suspension appeal with regard to her November 23, 2005 – December 6, 2005, suspension.  As a result, pursuant to Section 36-26-8, <u>Code of Alabama, 1975</u>, Rule 670-X-18.03 <u>Rules of the State of Alabama Personnel Board</u>, <u>The Handbook for Employees</u>, <u>AG & I</u>, and <u>Handbook of Progressive Discipline</u>, <u>State of Alabama Personnel Department</u> (2005 Edition), the Alabama Department of Agriculture and Industries (AG & I) requested an administrative disciplinary appeal hearing.  Said hearing was heard by the Honorable Tori L. Adams, Administrative Law Judge.   The post-suspension hearing was held on February 21, 2006, at the Alabama State House, Governor's Conference Room, 11 South Union Street, Montgomery, Alabama.  The Department of AG & I was represented by Attorney Jeff Webb. The Appellant was represented by Attorney Victor R. Spencer.

1

*Exhibit 11*

<u>ISSUE</u>

The question on appeal was whether the suspension of the Appellant is due to be rescinded. According to testimony taken at the appeal's hearing, the suspension was based on the following:

"The charges upon which your suspension is based arise from incidents beginning on Monday, October 31, 2005, in which you stated to your supervisor: **'you would probably lie about it anyway.'** For this incident, you were given a Letter of Warning, which you refused to sign. Despite several opportunities, you continued to be insubordinate by refusing to obey direct orders to sign the Letter of Warning. Finally after a receipt of a Letter or Reprimand for these acts of insubordination and given another opportunity, you signed the Letter or Warning, but twice refused to sign the Letter of Reprimand.

1. Therefore, under the State's progressive discipline policy, you are hereby suspended because of your refusal to sign your supervisor's **Letter of Reprimand** on Thursday, November 10, 2005; and

2. Refusal to sign your supervisor's **Letter of Reprimand** on Monday, November 14, 2005.

You were warned that continued acts of insubordination would result in more disciplinary action and that failure to sign the disciplinary actions was insubordination. Despite this knowledge, you continued to refuse to sign the disciplinary actions.

I have again reviewed and considered the charges against you, your rebuttal, and written notice of appeal from your suspension. My final action is to proceed with the suspension as previously stated; that is to say, **you are hereby suspended for 10 working days without pay which includes the Thanksgiving holidays, starting on Wednesday, November 23, 2005, and ending on Tuesday, December 6, 2005.** You are instructed to return to work on Wednesday, December 7, 2005, at 8:00 A.M."

2

## TAKING OF TESTIMONY AND CONCLUSION AND RECOMMEDNATION

After the taking of testimony and law from the Appellant and the Department of AG & I, the following conclusion and recommendation was given:

> "A covered employee is not entitled to directly appeal any disciplinary action taken by the appointing authority prior to the suspension stage of the progressive discipline scheme. For the reasons stated herein, the ten (10) day suspension imposed on Ms. Shannon Burton based upon refusal to sign letters of reprimand, was not justified based upon the law and facts presented. I recommend pursuant to Section 36-26-28(b), Code of Alabama 1975, the Handbook for employees, AG & I, and the Handbook of Progressive Discipline (2005 Edition), that the suspension of Ms. Shannon Burton for ten (10) days without pay during the November 23, 2005 through December 7, 2005 period, is due to be rescinded."

The recommendation of the Administrative Judge was signed on April 18, 2006. It was noted in the recommendation that, "This is not a final decision. No rights are finally determined until the Commissioner decides whether to accept, reject or modify this recommendation." As of April 18, 2007, or shortly thereafter, the Commissioner will have been in receipt of the recommendation for one year. During said year, the Commissioner has failed to accept, reject, or modify the recommendation. Due to the Commissioner's non-action, the Appellant moves that by operation of law the recommendation be deemed accepted as final and fully enforced.

Further the Department of AG & I, provided in its memorandum (See Attachment "A" – Memorandum) to the Appellant, dated December 13, 2005, in part that, "If the hearing on your appeal of the suspension determines that the suspension was not proper, we will change or re-do your evaluation to reflect that

decision. Also, if the hearing outcome result is a change in your evaluation that affects step raises, it will be handled in a manner that you would not in any way be penalized monetarily." The Appellant further moves that the Commissioner be ordered to carry out the terms of said memorandum.

**WHEREFOR, THE PREMISES CONSIDERED,** the Appellant prays that:

1. The Recommendation of the Administrative be fully enforced.

2. The Department of AG &I is ordered to adhere to memorandum dated December 13, 2005, by restoring Appellant's step-raise and reimbursing appellant the back pay, with interest, she did not receive due to her not receiving a step raise.

3. The Department of AG & I is ordered to pay Appellant reasonable attorney's fees for representation at her appeals hearing and the enforcement of the Recommendation of the Administrative Judge.

Respectfully submitted,

Juraldine Battle-Hodge
Attorney for the Appellant
207 Montgomery Street, Suite 215
Montgomery, AL 36104
Telephone:    (334) 262-1177
Facsimile:    (334) 263-5569

4

## CERTIFICATE OF SERVICE

I, hereby certify that on April 11, 2007, a copy of the foregoing was served upon the following via United States First Class mail.

Jeff Webb, Esquire
Department of Agriculture & Industries
Legal Division
1445 Federal Drive
Montgomery, AL 36107-1123


Mr. Ron Sparks, Commissioner
Department of Agriculture & Industries
1445 Federal Drive
Montgomery, AL 36107-1123

_____
OF COUNSEL

BEFORE THE STATE OF ALABAMA
DEPARTMENT OF AGRICULTURE AND INDUSTRIES

In The Matter of:                    )
                                     )
Shannon Burton                       )
                                     )
Suspension Hearing                   )

## MOTION TO ENFORCE THE RECOMMENDATION
## OF THE ADMINISTRATIVE JUDGE

COMES NOW, Shannon Burton (Appellant), by and through her attorney, Juraldine Battle-Hodge, and files this her Motion to Enforce the Recommendation of the Administration Judge, and as reasons states the following:

Shannon Burton (Appellant) filed a post-suspension appeal with regard to her November 23, 2005 – December 6, 2005, suspension. As a result, pursuant to Section 36-26-8, Code of Alabama, 1975, Rule 670-X-18.03 Rules of the State of Alabama Personnel Board, The Handbook for Employees, AG & I, and Handbook of Progressive Discipline, State of Alabama Personnel Department (2005 Edition), the Alabama Department of Agriculture and Industries (AG & I) requested an administrative disciplinary appeal hearing. Said hearing was heard by the Honorable Tori L. Adams, Administrative Law Judge. The post-suspension hearing was held on February 21, 2006, at the Alabama State House, Governor's Conference Room, 11 South Union Street, Montgomery, Alabama. The Department of AG & I was represented by Attorney Jeff Webb. The Appellant was represented by Attorney Victor R. Spencer.

1

*Exhibit 11*

ISSUE

The question on appeal was whether the suspension of the Appellant is due to be rescinded. According to testimony taken at the appeal's hearing, the suspension was based on the following:

"The charges upon which your suspension is based arise from incidents beginning on Monday, October 31, 2005, in which you stated to your supervisor: *'you would probably lie about it anyway.'* For this incident, you were given a Letter of Warning, which you refused to sign. Despite several opportunities, you continued to be insubordinate by refusing to obey direct orders to sign the Letter of Warning. Finally after a receipt of a Letter or Reprimand for these acts of insubordination and given another opportunity, you signed the Letter or Warning, but twice refused to sign the Letter of Reprimand.

1. Therefore, under the State's progressive discipline policy, you are hereby suspended because of your refusal to sign your supervisor's **Letter of Reprimand** on Thursday, November 10, 2005; and

2. Refusal to sign your supervisor's **Letter of Reprimand** on Monday, November 14, 2005.

You were warned that continued acts of insubordination would result in more disciplinary action and that failure to sign the disciplinary actions was insubordination. Despite this knowledge, you continued to refuse to sign the disciplinary actions.

I have again reviewed and considered the charges against you, your rebuttal, and written notice of appeal from your suspension. My final action is to proceed with the suspension as previously stated; that is to say, *you are hereby suspended for 10 working days without pay which includes the Thanksgiving holidays, starting on Wednesday, November 23, 2005, and ending on Tuesday, December 6, 2005.* You are instructed to return to work on Wednesday, December 7, 2005, at 8:00 A.M."

2

**TAKING OF TESTIMONY AND CONCLUSION AND RECOMMEDNATION**

After the taking of testimony and law from the Appellant and the Department of AG & I, the following conclusion and recommendation was given:

> "A covered employee is not entitled to directly appeal any disciplinary action taken by the appointing authority prior to the suspension stage of the progressive discipline scheme. For the reasons stated herein, the ten (10) day suspension imposed on Ms. Shannon Burton based upon refusal to sign letters of reprimand, was not justified based upon the law and facts presented. I recommend pursuant to Section 36-26-28(b), Code of Alabama 1975, the Handbook for employees, AG & I, and the Handbook of Progressive Discipline (2005 Edition), that the suspension of Ms. Shannon Burton for ten (10) days without pay during the November 23, 2005 through December 7, 2005 period, is due to be rescinded."

The recommendation of the Administrative Judge was signed on April 18, 2006. It was noted in the recommendation that, "This is not a final decision. No rights are finally determined until the Commissioner decides whether to accept, reject or modify this recommendation." As of April 18, 2007, or shortly thereafter, the Commissioner will have been in receipt of the recommendation for one year. During said year, the Commissioner has failed to accept, reject, or modify the recommendation. Due to the Commissioner's non-action, the Appellant moves that by operation of law the recommendation be deemed accepted as final and fully enforced.

Further the Department of AG & I, provided in its memorandum (See Attachment "A" – Memorandum) to the Appellant, dated December 13, 2005, in part that, "If the hearing on your appeal of the suspension determines that the suspension was not proper, we will change or re-do your evaluation to reflect that

decision. Also, if the hearing outcome result is a change in your evaluation that affects step raises, it will be handled in a manner that you would not in any way be penalized monetarily." The Appellant further moves that the Commissioner be ordered to carry out the terms of said memorandum.

**WHEREFOR, THE PREMISES CONSIDERED,** the Appellant prays that:

1. The Recommendation of the Administrative be fully enforced.

2. The Department of AG &I is ordered to adhere to memorandum dated December 13, 2005, by restoring Appellant's step-raise and reimbursing appellant the back pay, with interest, she did not receive due to her not receiving a step raise.

3. The Department of AG & I is ordered to pay Appellant reasonable attorney's fees for representation at her appeals hearing and the enforcement of the Recommendation of the Administrative Judge.

Respectfully submitted,

Juraldine Battle-Hodge
Attorney for the Appellant
207 Montgomery Street, Suite 215
Montgomery, AL 36104
Telephone:    (334) 262-1177
Facsimile:    (334) 263-5569

4

## CERTIFICATE OF SERVICE

I, hereby certify that on April 11, 2007, a copy of the foregoing was served upon the following via United States First Class mail.

Jeff Webb, Esquire
Department of Agriculture & Industries
Legal Division
1445 Federal Drive
Montgomery, AL 36107-1123

Mr. Ron Sparks, Commissioner
Department of Agriculture & Industries
1445 Federal Drive
Montgomery, AL 36107-1123

_____
OF COUNSEL

5

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To |
|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) |
|---|---|
| **Mrs. Shannon R. Burton** | **(334) 28_ 6_** |

| Street Address | City, State and ZIP Code |
|---|---|
| **3253 Capwood Curve, Montgomery, AL 36116** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members |
|---|---|
| **AL DEPT OF AGRICULTURE & INDUSTIES** | **201 - 500** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1445 Federal Drive, Montgomery, AL 36107** | |

| Name | No. Employees, Members |
|---|---|
| | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest  02-21-200_

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began my employment with the employer named above as an administrative assistant on S___. Since on or about February 21, 2006, I have been subjected to adverse terms and conditions include my having to remove my personal refrigerator from my office, having the privacy w___ around my desk, having my job duties and responsibilities changed to include being giving d___ female did not want. I have been followed by a member of management while I was off work___. In August of 2006, I was denied a promotion to the position of agriculture marketing specialist of education, although I have a master's degree. However, a lesser qualified white was position.

I believe that I was discriminated against in violation of Title VII of the 1964 Civil Rights Act, as a___ because of my race, Black and in retaliation to my complaint that I was suspended because of n___

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Sep 27, 2006**    *Shannon Burton*<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |



# State of Alabama

## Department of Agriculture and Industries
### 1445 Federal Drive
### Montgomery, Alabama 36107-1123

*Ron Sparks*
Commissioner

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0

## Memorandum

To:  Wayne Adcock                    Danny LeCompt
     Patricia Mason                  Mark Scott
     Shannon Burton                  John Crayton
     Wilma Fitzpatrick               Benny Hitch
     George Paris

     Lance Hester
        Program Director, Food Safety Section
        Division Director, Agriculture and Animal Protection

Subject:  Annual Leave, Sick Leave and Itineraries

Date :  April 11, 2005

I want to thank you for keeping me informed relative to the above referenced items.  Most of the time you have done a good job of requesting leave in advance or notifying me if a situation arose that required you to take leave without prior notice.

Any problems that we have encountered may have been due to my lack of instruction to each of you.  The following is a list of the guidelines that should be followed to assure I am made aware of your plans:

1)    Itineraries:  I need a copy of your weekly itinerary no later than 10:00 am on Tuesday of the week represented.

2)    Annual Leave and Sick Leave:  Request for annual leave should be made in advance if at all possible.  A form is attached that can be copied and utilized for this purpose.  Upon receipt of the form, I will review & sign if approved and return a copy to you.

*Exhibit 12*

3)     If a situation arises where a prior request is not practical ( illness, personal business need etc.) please notify my office in the following order:

       a) Contact me directly  (240-7203)
       b) Contact Shannon Burton  (240-7204)
       c) Or leave a message on my voicemail  (240-7203)


I have been receiving notices from each of you in different ways.  With a memory like mine. I need a more formal way to handle the information.

Thank you in advance for your cooperation and assistance in making my responsibilities easier to address.


Cc: Dr. John Bloch
     Ronnie Murphy
     Teresa Smiley
     Doug Rigney

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DISTRICT

4

5    CIVIL ACTION NUMBERS

6    2:07 cv626

7    2:07 cv519

8    2:07 cv548

9

10   JOHN L. CRAYTON

11   WILMA FITZPATRICK

12   SHANNON BURTON,

13        Plaintiff(s),

14   vs.

15   ALABAMA DEPARTMENT OF

16   AGRICULTURE & INDUSTRIES,

17        Defendant(s).

18            DEPOSITION TESTIMONY OF:

19                 LANCE HESTER

20   May 6, 2008

21   9:55 AM

22   SELAH M. DRYER, CCR

23   ACCR #: 393



*Exhibit 14*
COPY

```
 1                    S T I P U L A T I O N S

 2         IT IS STIPULATED AND AGREED by and between

 3     the parties through their respective counsel

 4     that the deposition of LANCE HESTER, may be

 5     taken before Selah M. Dryer, Notary Public,

 6     State at Large, at the law office(s) of Ball,

 7     Ball, Matthews & Novak, 2000 Interstate Park

 8     Drive, Suite 204, Montgomery, Alabama  36109, on

 9     May 6, 2008, commencing at approximately 9:55

10     AM.

11         IT IS FURTHER STIPULATED AND AGREED that

12     the signature to and the reading of the

13     deposition by the witness is waived, the

14     deposition to have the same force and effect as

15     if full compliance had been had with all laws

16     and rules of Court relating to the taking of

17     depositions.

18         IT IS FURTHER STIPULATED AND AGREED that it

19     shall not be necessary for any objections to be

20     made by counsel to any questions, except as to

21     form or leading questions, and that counsel for

22     the parties may make objections and assign

23     grounds at the time of trial or at the time said
```

1    deposition is offered in evidence, or prior

2    thereto.

3         In accordance with Rule 5(d) of the Alabama

4    Rules of Civil Procedure, as amended, effective

5    May 15, 1988, I, Selah M. Dryer, am hereby

6    delivering to Juraldine Battle-Hodge, Esq. the

7    original transcript of the oral testimony taken

8    May 6, 2008, along with exhibits.

9         Please be advised that this is the same and

10   not retained by the Court Reporter, nor filed

11   with the Court.

12

13

14

15

16

17

18

19

20

21

22

23

4

```
1                    I N D E X
2    EXAMINATION BY:                PAGE NO.
3    Mrs. Battle-Hodge                  7
4    Certificate                      161
5
6              INDEX OF EXHIBITS
7    EXHIBITS                        PAGE NO.
8    PLAINTIFF(S) 1                     48
9    PLAINTIFF(S) 2                     61
10   PLAINTIFF(S) 3                     71
11   PLAINTIFF(S) 4                     74
12   PLAINTIFF(S) 5                     82
13   PLAINTIFF(S) 6                    100
14   PLAINTIFF(S) 7                    103
15   PLAINTIFF(S) 8                    110
16   PLAINTIFF(S) 9                    141
17   PLAINTIFF(S) 10                   143
18
19
20
21
22
23
```

```
 1              A P P E A R A N C E S
 2   FOR THE PLAINTIFF(S):
 3        Juraldine Battle-Hodge, Esq.
 4        Law Offices of Juraldine Battle-Hodge
 5        207 Montgomery Street
 6        Suite 215
 7        Montgomery, Alabama   36104
 8
 9   FOR THE DEFENDANT(S):
10        E. Hamilton Wilson, Jr., Esq.
11        Emily C. Marks, Esq.
12        BALL, BALL, MATTHEWS & NOVAK
13        2000 Interstate Park Drive
14        Suite 204
15        Montgomery, Alabama   36109
16
17   ALSO PRESENT:
18        John L. Crayton
19        Wilma Fitzpatrick
20        Shannon Burton
21        Jeff Webb, Esq.
22        Robert J. Russell
23        Ronnie Murphy
```

1      I, Selah M. Dryer, a Notary Public for the

2 State of Alabama at Large, acting as

3 Commissioner, certify that on this date,

4 pursuant to the Alabama Rules of Civil

5 Procedure, and the foregoing stipulation of

6 counsel, there came before me at the law

7 office(s) of Ball, Ball, Matthews & Novak,

8 2000 Interstate Park Drive, Suite 204,

9 Montgomery, Alabama  36109, commencing at

10 approximately 9:55 AM on May 6, 2008, LANCE

11 HESTER, witness in the above cause, for oral

12 examination, whereupon the following proceedings

13 were had:

14

15             LANCE HESTER,

16 being first duly sworn, was examined and

17 testified as follows:

18

19             COURT REPORTER:  Usual

20 stipulations?

21             MRS. BATTLE-HODGE:  Yes.

22             MR. WILSON:  Yes.

23

EXAMINATION BY MRS. BATTLE-HODGE:

    Q.    Good morning, Mr. Hester.

    A.    Good morning.

    Q.    I'm Juraldine Battle-Hodge, I'm the plaintiffs' attorney.  We have a little odd situation here in that I'll be asking questions here about all three of my clients.  We have three separate lawsuits.  I tend to talk a little fast, so if you don't understand what I'm saying, just ask me to slow down or repeat the question.  Of course, I'm sure you know that if you need to take a break or whatever, please do so and -- ask for that and we will be happy to stop and let you have that opportunity.  Have you ever given a deposition before?

    A.    I don't think so.

    MR. WILSON:  Let me just interrupt one second.  I think you just covered this, but for the purposes of this deposition today you are actually taking this deposition in the three cases that we have pending?

    MRS. BATTLE-HODGE:  Yes, that's correct.

8

1          MR. WILSON:  This will be his

2    deposition for all three of those cases?

3          MRS. BATTLE-HODGE:  That's

4    correct.

5          MR. WILSON:  I also want to be

6    sure that we have a court reporter here that's

7    transcribing this and taping it and that no one

8    else is running a tape recorder in the room,

9    because that would be a violation of the Federal

10   Rules of Civil Procedure.  I just want to be

11   sure that everybody understands that.

12          MRS. BATTLE-HODGE:  Okay.

13       Q.    (By Ms. Battle-Hodge)  You say you

14   don't think you have taken a deposition before?

15       A.    No.

16       Q.    Would you state your full name,

17   please?

18       A.    Lance McCoy Hester.

19       Q.    What's your address, Mr. Hester?

20       A.    1141 Grassfarm Road, Titus,

21   Alabama.

22       Q.    What county is that in?

23       A.    Elmore County.

```
1          Q.      How long have you lived at that

2    address?

3          A.      Sixteen years.

4          Q.      Mr. Hester, are you married?

5          A.      Yes.

6          Q.      What's your wife's name?

7          A.      Leanne Hester.

8          Q.      Do you and Leanne have any

9    children, Mr. Hester?

10         A.      Yes.

11         Q.      How many children do you have?

12         A.      We have a stepdaughter and a

13   stepson.

14         Q.      How old are they?

15         A.      The daughter is 27, the son is 29.

16         Q.      The daughter that's 27, what's her

17   name?

18         A.      Autumn Lindsey.

19         Q.      Where does Autumn live,

20   Mr. Hester?

21         A.      In Wetumpka.

22         Q.      She's in Elmore County -- and the

23   son, what's his name?
```

10

```
1          A.      Andert Allen Lindsey.

2          Q.      Where does he live?

3          A.      I believe it's Pike Road, in that

4   area out there.

5          Q.      Is that in Montgomery County?

6          A.      Yes.

7          Q.      Do you or your wife have any other

8   relatives who live in the Middle District, that

9   would be Montgomery County, other than your

10  adult children?

11         A.      I have a cousin that lives in

12  Montgomery.

13         Q.      Woman, man?

14         A.      Dr. O. W. Hester.

15         Q.      That's a --

16         A.      Veterinarian.

17         Q.      Is that a female or male?

18         A.      Male.

19         Q.      Any other relatives in Montgomery

20  County?

21         A.      I don't think so.

22         Q.      What about Elmore County?

23         A.      I don't think so.
```

11

1       Q.    What about in the state of

2  Alabama, do you have any more relatives that you

3  can think of in this area?

4       A.    In the state of Alabama?

5       Q.    Yes.

6       A.    I have a brother that lives in

7  Cherokee County.

8       Q.    But no one in this area?

9       A.    No.

10      Q.    Mr. Hester, when did you graduate

11  from high school?

12      A.    1971.

13      Q.    Where did you go to high school?

14      A.    Cherokee County High School.

15      Q.    I know Cherokee County is not near

16  here, but where --

17      A.    Centre, Alabama.

18      Q.    After you completed high school,

19  what did you do after that?

20      A.    Worked in the summer and went to

21  school at Gadsden State Junior College.

22      Q.    So when you finished high school

23  did you immediately enter into Gadsden State?

1     A.     No, not that summer, the following

2  fall.

3     Q.     That was in 1971?

4     A.     That's correct.

5     Q.     How long were you at Gadsden

6  State?

7     A.     Until 1973 -- I did not attend

8  every quarter, my father passed away during that

9  time.

10     Q.     In the interim, did you complete a

11  degree at Gadsden State?

12     A.     I transferred to -- I started

13  school at Auburn in '73.

14     Q.     How long were you at Auburn?

15     A.     Graduated in '77.

16     Q.     So you were at Auburn from 1973 to

17  1977?

18     A.     That's correct.

19     Q.     Were you a full-time student?

20     A.     Yes, I did not attend during the

21  summertime.

22     Q.     What did you receive your degree

23  in, Mr. Hester?

```
1         A.      Agricultural Science.

2         Q.      And that's a BS?

3         A.      Yes.

4         Q.      After receiving your BS in 1977,

5    did you further your education -- what did you

6    do after you received your degree?

7         A.      Went back home and went to work in

8    Cedartown, Georgia.

9         Q.      You went back home?

10        A.      Went to work for about two years.

11        Q.      Where did you go to work?

12        A.      Star Manufacturing Company.

13        Q.      What did you do there?

14        A.      They manufactured steel buildings,

15   so anything dealing with manufacturing and I

16   worked in the shipping department.

17        Q.      You worked there until 1979; is

18   that correct?

19        A.      Uh-huh.

20        Q.      After 1979 what happened next,

21   where did you go next?

22        A.      Started working for the State in

23   May of 1979.
```

```
 1          Q.      What department or what agency?

 2          A.      Alabama Department of Agriculture

 3   and Industries.

 4          Q.      And that was in 19?

 5          A.      '79.

 6          Q.      So have you been at the Department

 7   of Ag from 1979 until present?

 8          A.      That's correct.

 9          Q.      When you were hired at the

10   Department of Agriculture, what position were

11   you hired in?

12          A.      Food and drug inspector.

13          Q.      How long did you serve in that

14   position?

15          A.      I believe five years.

16          Q.      So would it be accurate 1999 until

17   about 1984; is that correct?

18          A.      1979 to 1984.

19          Q.      Yes, I'm sorry -- in 1984 were you

20   promoted or what happened?

21          A.      I was promoted to supervisor --

22   agricultural commodities supervisor.

23          Q.      How long did you stay in that
```

1   position?

2        A.      The position by that name, it

3   changed names a couple of times.

4        Q.      Was it the same position?

5        A.      At one time it changed to

6   agricultural commodities director, and I was

7   doing the same thing.  My duties changed from

8   what I was doing then I think I want to say '98,

9   '99.  When Commissioner Bishop came in, he

10  changed some of our responsibilities.

11       Q.      When you were hired in 1979 as a

12  food and drug inspector, what were your duties

13  at that time?

14       A.      I was based in the Auburn/Opelika

15  area, and I worked the territory out of that

16  area, primarily inspecting retail stores and

17  grocery store warehouses and drug stores.

18       Q.      When you say you inspected them

19  for compliance, or for what?

20       A.      Yeah, compliance with our food and

21  safety laws.

22       Q.      When you were promoted to -- what

23  did you say?

1       A.      Agricultural commodities
2   supervisor.
3       Q.      What were your duties in that
4   position?
5       A.      I was over the food and safety and
6   over the agricultural commodities to include
7   feed, fertilizer, liming materials during that
8   time, and also petroleum products at that time.
9       Q.      In your first position did you
10  supervise anyone when you were first hired?
11      A.      No.
12      Q.      In your second position did you
13  supervise anyone?
14      A.      Yes.
15      Q.      Who did you supervise?
16      A.      A chief inspector on the food
17  safety side, a chief inspector on the ag
18  commodities side and clerical employees,
19  administrative support systems.
20      Q.      You say that in 1999 the job title
21  or duties changed; is that right?
22      A.      I'm trying to think when
23  Commissioner Bishop came in, I think that was

1    '96 -- anyway when he came in I was assigned

2    duties in food safety only.  Now at this time, I

3    did also have responsibility for food safety

4    laboratories and the State chemical laboratory

5    in Auburn and the State pesticide residue

6    laboratory in Auburn prior to Commissioner

7    Bishop coming in.

8        Q.    When Commissioner Bishop came in,

9    you were specific to the one area, is that what

10   you are saying?

11       A.    Well, it was changed to include

12   food safety, food safety laboratory, pesticide

13   residue laboratory -- that's not a change -- I

14   already had all that -- also for a while I had

15   meat inspection.

16       Q.    You stayed in that position until

17   1999?

18       A.    There was a reclassification of a

19   lot of jobs with the Department of Agriculture

20   and I think it was '98, '99.  The name of the

21   position changed, mine and several others

22   changed from whatever they were before to

23   program directors.

1    Q.    So are you saying that you are

2  doing the duties of what is now a program

3  director then, but the job title just changed,

4  is that what you're saying?

5    A.    That's correct.

6    Q.    And that was in 1999?

7    A.    Somewhere in that area.

8    Q.    As program director, how long did

9  you stay in that position?

10    A.    Until 2003.

11    Q.    What position --

12    A.    I was promoted to division

13  director.

14    Q.    Is that your current position?

15    A.    That is my current position.

16    Q.    So from 2003 to the present you

17  are division director?

18    A.    Correct.

19    Q.    So what are your duties and

20  responsibilities as division director?

21    A.    Currently my responsibilities -- I

22  still have responsibilities for food safety and

23  on the ag and agricultural animal protection

1    division, I'm the division director and that

2    includes:  Feed, fertilizer, liming materials,

3    shipping point inspection, ag compliance on the

4    ag animal protection side.

5          Q.     That's in addition to --

6          A.     Yeah, I was asked to retain my

7    previous duties of food safety.

8          Q.     Just for my clarification, the new

9    duties are what, the additional duties, I guess?

10         A.     Let me get back on the time line.

11               MR. WILSON:  Right now.

12         A.     Right now, compared to?

13         Q.     (By Mrs. Battle-Hodge) You said

14    that you kept your previous responsibilities

15    duties.

16         A.     Yes.

17         Q.     Were there any additional duties

18    and responsibilities added?

19         A.     Okay, let me go back just a little

20    bit, because when Commissioner Bishop came in I

21    was almost exclusively food safety.  When

22    Commissioner Sparks came in, I was reassigned

23    some duties -- when I was promoted to ag

1      division director, that included some duties I

2      hadn't had before that had been changed, and

3      then so I'm back to where -- I'm now again

4      responsible for feeding, fertilizer, liming

5      materials, audits and reports, shipping point

6      inspection -- that was new to me.  There might

7      have been some duties in and out along the way

8      that I had responsibilities for, but that's what

9      they currently are.  Food safety and ag

10     commodities, and I'm still responsible for three

11     laboratories, the director for three

12     laboratories.

13          Q.     But the additional duties are

14     what?

15          A.     In 2003 additional duties?

16          Q.     Right.

17          A.     Feed, fertilizer, liming

18     materials, shipping point -- we had the seed

19     laboratory at that time.  I'm no longer involved

20     in the seed laboratory.

21          Q.     That was removed when you became

22     the division director?

23          A.     No, that was changed in 2006.

```
 1          Q.      2006, the seed --

 2          A.      Seed laboratory, uh-huh.

 3          Q.      You said it was changed, how was

 4     it changed?

 5          A.      It was placed under a different

 6     deputy commissioner who then had responsibility

 7     for the seed laboratory.

 8          Q.      What deputy commissioner was it

 9     placed under?

10          A.      Ray Gilbert.

11          Q.      Are you saying that it was under

12     your direction before that?

13          A.      It was under -- yes, it was under

14     me before that, yes.

15          Q.      As program director you were over

16     the seed --

17          A.      As division director.

18          Q.      Before --

19          A.      I know it's confusing.

20          Q.      It is.

21          A.      As division director I originally

22     had the responsibility for the seed laboratory.

23          Q.      So then you became division
```

22

1    director in 2003.

2         A.    Yes.

3         Q.    At that time were the seed

4    responsibilities placed under you?

5         A.    Yes.

6         Q.    At what point were they removed

7    from you?

8         A.    In 2006.

9         Q.    Now, were you directly responsible

10   between 2003 and 2006 for the seed lab?

11        A.    Yes.

12        Q.    Is it still currently with Deputy

13   Hillburn?

14        A.    Yes.

15        Q.    Now Mr. Hester, who do you report

16   to?

17        A.    Mr. Ronnie Murphy, who's deputy

18   commissioner.  On food safety issues I report to

19   Mr. Doug Rigby, who's the assistant

20   commissioner.

21        Q.    Tell me again what Mr. Murphy's

22   position is.

23        A.    He's deputy commissioner.

1        Q.      Would you do this for me, would

2   you give me the hierarchy of how the Department

3   of Agriculture is set up managerially?

4        A.      I can try to.

5        Q.      Yes, if you would.

6        A.      Well, of course, you have the

7   commissioner, then underneath you have the

8   deputy commissioners -- I mean, this is related

9   to me because, I'm not sure of all the other

10  departments.  And under Mr. Murphy, the ag and

11  animal protection -- underneath him, I am the

12  division director.

13       Q.      And under you what do we have?

14       A.      We have a program director on ag

15  commodities, we have a program director that

16  handles -- addresses food safety and quality

17  assurance in laboratories.  I have three

18  laboratory directors.  I have a shipping point

19  director -- I'm not sure exactly what -- it's a

20  state and federal program --

21       Q.      Would you say that again,.shipping

22  point --

23       A.      Shipping point director.

1    Q.    Director?

2    A.    Yes.  I think that covers that

3    level.

4    Q.    Then under that what do you have,

5    just after the shipping point director, what's

6    under it?

7    A.    You would have some field

8    supervisors and things under him.  Underneath

9    the program director for ag commodities there is

10   a field supervisor -- in food safety there is a

11   unit manager and a field supervisor.

12   Q.    Under food safety there is a unit

13   manager and a field supervisor.

14   A.    I think it's just agricultural

15   supervisor.

16   Q.    So we have the commissioner; is

17   that correct?

18   A.    Uh-huh.

19   Q.    Then the deputy commissioner --

20   there's more than one under you -- yours is

21   Ronnie Murphy, correct?

22   A.    On the ag commodity side.

23   Q.    Then you also report to

1    Mr. Rigby -- then under we have the ag and
2    animal, is that --
3        A.    Ag and commodities underneath --
4    where are we?
5        Q.    We are at the deputy commissioner
6    level.  And I'm trying to figure out the ag and
7    animal, what's that?
8        A.    That's ag and animal protection is
9    the name of the division.
10        Q.    So is that person above you?
11        A.    Deputy Commissioner, Mr. Ronnie
12    Murphy is above me.
13        Q.    So the ag person is equal to you,
14    or how does that --
15        A.    The Deputy Commissioner.
16        Q.    No, no.
17        A.    The program director?
18        Q.    Yeah, because you named it in
19    order, Commissioner, Deputy Commissioner, then
20    you said ag and animal -- just correct me if you
21    didn't -- you said the Deputy Commissioner
22    Murphy.
23        A.    Yes.

1          Q.      Then you said -- what did you say?

2          A.      I'm next, division director.

3          Q.      So the division director is next.

4    Then after you, you have these program directors

5    under you; is that correct?

6          A.      Yes.

7          Q.      Are they equal?

8          A.      Yes.

9          Q.      Then the laboratory directors, are

10   they equal to the program directors or are they

11   sub?

12         A.      They're a different

13   classification -- I'm not sure.  They may be one

14   step difference in pay range out there.

15         Q.      The Deputy Commissioner is

16   Mr. Murphy; is that correct?  The one that we

17   referred to -- I know we have more than one.

18         A.      Yeah.

19         Q.      The division director, that's you;

20   is that correct?

21         A.      Yes.

22         Q.      Your program director for ag, who

23   is that?

1          A.      Ag commodities?

2          Q.      Right.

3          A.      Ben Hitch.

4          Q.      Your program director for food and

5    safety?

6          A.      We don't have a program director,

7    we have a unit manager.

8          Q.      You have a unit manager, you said

9    under that you have quality assurance.

10         A.      Yeah, for our laboratories.

11         Q.      But they are under food and

12   safety?

13         A.      That is a program director.

14         Q.      So quality assurance is a program

15   director?

16         A.      Yes.

17         Q.      But for food and safety there's

18   not a program director level, is there?

19         A.      No.  I'm sorry, I didn't quite

20   understand because that program director is

21   involved in food safety, so I just need to

22   distinguish --

23         Q.      Food and safety is under quality

1    assurance?

2        A.    No.

3        Q.    Is that the same person?

4        A.    No.  Under food safety -- in the

5    -- a program director answering to me, has

6    responsibility for quality assurance in a food

7    safety laboratory, a pesticide laboratory, and a

8    state chemical feed and fertilizer laboratory

9    and other laboratories that we hadn't gotten

10   that person involved in yet.

11       Q.    Who is that person?

12       A.    Ms. Wilma Fitzpatrick.

13       Q.    And your laboratory directors, who

14   are they, your three laboratory directors?

15       A.    The food and safety laboratory is

16   Trisha Mason; the pesticide residue laboratory

17   is Danny LeCompte.

18       Q.    Spell that.

19       A.    I don't know.  Big L, little E and

20   then C-O-M-P-T-E, I think.

21       Q.    So that's two.

22       A.    The feed and fertilizer

23   laboratory, or it's called the state chemical

```
1    laboratory is Lane Adcock.
2         Q.    Who is your shipping?
3         A.    Darrell Buckston.
4         Q.    Say the last name again.
5         A.    Buckston.
6         Q.    Do you have various field
7    supervisors?
8         A.    Yes.
9         Q.    Do you have any idea how many
10   employees the department has?
11        A.    Somewhere around 400, I think.
12        Q.    Does the department have any
13   procedures in place for reporting any problems
14   whatsoever that an employee may have?  Is the
15   department set up where if I'm an employee and I
16   have a problem with a supervisor -- be it
17   because in this case discrimination, or if I'm
18   just having problems in general -- who do I go
19   to?
20        A.    I'm not sure exactly what you
21   mean.  We would operate under the State
22   Personnel rules.
23        Q.    What are those rules?
```

1          A.     You will have to be a little more
2     specific.
3          Q.     You say you operate under the
4     State Personnel rules.  So if I'm an employee
5     who has a complaint about whatever,
6     discrimination or whatever, what's the process?
7     You say you go by personnel rules -- what are
8     personnel's rules?
9          A.     I'm not sure who exactly they are
10    supposed to go to.
11         Q.     Do you know if the department has
12    any procedures in place for reporting sexual or
13    race discrimination?
14         A.     I'm not sure.
15         Q.     Do you know if the department --
16         A.     We would refer them to our
17    personnel department.
18         Q.     So if there is a problem, you
19    immediately refer them to your personnel
20    department?
21         A.     Yes.
22         Q.     Is there any place within the
23    department to go to?

1        A.      No, I mean, our personnel

2   department.

3        Q.      Not the State Personnel

4   Department, your department.

5        A.      Uh-huh.

6        Q.      Are you aware of any seminars or

7   anything that your personnel department or the

8   department itself has had on race discrimination

9   or sex discrimination?

10       A.      I remember there have been some

11  meetings, but I couldn't tell you exactly the

12  name of each one.

13       Q.      You say the name, could you tell

14  me the particulars of the meetings?

15       A.      One was sensitivity training,

16  something along that line.

17       Q.      When was that?

18       A.      I'm trying to remember which

19  commissioner it was, somewhere in the last 5 to

20  10 years.

21       Q.      2003, are you saying there was

22  one?

23       A.      No -- you asked about the

1   department putting on courses.  There are all

2   kinds of classes available through the State

3   Personnel.

4       Q.     But in the department you are

5   aware of one?

6       A.     I'm not sure if that was put on by

7   the department, or if that was put on at the

8   department's request by State Personnel.  No,

9   I'm not saying that's the only one.

10       Q.     I'm just asking you what you are

11   aware of.

12       A.     I remember attending one of

13   those.  I think all of the department attended

14   it.  It was all the supervisors, managers.  I'm

15   not sure who else -- it was a large crowd.

16       Q.     You are saying that's been maybe 5

17   to 10 years ago?

18       A.     Yes -- and there may have been

19   others.

20       Q.     Aside from the three complaints

21   that we are here about today against the

22   department, are there currently any other

23   complaints filed against the department?

1       A.      I'm not aware of any.

2       Q.      When you say you're not aware of

3  any, are you referring to lawsuits in Federal

4  Court or EEOC complaints, or both?

5       A.      I'm not aware of either.

6       Q.      Over the last year how many

7  complaints of discrimination have been filed

8  against the Department of Agriculture?

9               MR. WILSON:  If you know.

10      Q.      (By Mrs. Battle-Hodge) Over the

11 last year -- that's currently.

12              MR. WILSON:  He's an employee

13 of the department just like your clients are

14 employees of the department.

15              MRS. BATTLE-HODGE:  I

16 understand that.

17              MR. WILSON:  You're asking if

18 he knows.

19              MRS. BATTLE-HODGE:  Right,

20 that's all I'm asking.

21      Q.      (By Mrs. Battle-Hodge)  Over the

22 last year, are you aware of any complaints that

23 have been -- lawsuits or EEOC complaints that

1    have been filed against the department?

2         A.    I'm aware of these.

3         Q.    Aside from the three.

4         A.    No.

5         Q.    In your position as division

6    director and when you were a program director,

7    did you have the authority, or do you have the

8    authority to promote, demote or replace any

9    employees within the department?

10        A.    Within the rules -- within the

11   rules of State Personnel and upon approval of my

12   supervisors.

13        Q.    So is that a yes?

14        A.    The commissioner is the appointing

15   authority.

16        Q.    So what's your answer, yes or no?

17   Do you have the authority?

18               MR. WILSON:  Object to the

19   form.  You can answer.

20        A.    I have the authority to recommend.

21        Q.    (By Mrs. Battle-Hodge) Let's move

22   on to the three complaints that we have here.

23   For I guess simplicity, I'm going to ask you

```
 1    questions about one at a time.  So we will start
 2    with Shannon Burton.   Okay?
 3         A.    Yes.
 4         Q.    How do you know Ms. Shannon
 5    Burton?  In what capacity do you know her?  Do
 6    you know Ms. Burton?
 7         A.    Yes.
 8         Q.    How do you know her?
 9         A.    Well, she's worked for the
10    department before she ever was -- received a
11    position in my section at that time.
12         Q.    So did you know her before she
13    came to work for you?
14         A.    I had met her.
15         Q.    Do you know what her position is
16    currently?
17         A.    Yes.
18         Q.    What is it?
19         A.    ASA 3.
20         Q.    What are her duties?
21         A.    Currently?
22         Q.    Yes, sir.
23         A.    Answer the phone for the section.
```

1          Q.      Say it again.  I'm sorry.

2          A.      Answer the phone for the section.

3   She answers directly right now to Mark Scott,

4   the unit director, so he would be -- if anything

5   has been changed, that I wasn't aware about --

6   I'm just stating what I know.

7          Q.      That's all I'm asking about today,

8   is what you know.

9          A.      Processes the mail, she assists in

10  the permitting, reviewing some of the documents

11  when they come in, comparing them to the

12  database.  She does any correspondence for

13  Mr. Scott.  She does the quarterly reports that

14  go to our accounting section on our quarterly

15  activities -- I believe she does the quarterly

16  reports.  I'm not sure, Mr. Scott may do that

17  himself.  Dealing with our ag inspection and

18  monthly reports on our school lunch destination

19  inspections.

20         Q.      You mentioned Mr. Scott.

21         A.      Uh-huh.

22         Q.      Is he her current supervisor?

23         A.      That's correct.

1   Q.  What's his first name again?

2   A.  Mark.

3   Q.  Has she ever worked directly for

4 you?

5   A.  Has she ever worked directly for

6 me?

7   Q.  Yes.

8   A.  Yes.

9   Q.  When did she work for you?

10   A.  I'm not sure the date it started.

11 I would say maybe 2001, 2002, somewhere along in

12 there.

13   Q.  That's when she started?

14   A.  I'm not sure -- I'm not sure.

15   Q.  Just give me your best estimate.

16   A.  2000.

17   Q.  I understand that's just an

18 estimate, 2000.  How long did she work for you?

19   A.  Until March of '06.

20   Q.  You are saying she worked for you

21 from approximately 2000 to March of '06, about

22 six years.  You listed earlier what you

23 believe -- and you explained to me you don't

1  know for sure what Mr. Scott has her doing --

2  these duties here that she has under Mr. Scott,

3  are those the same duties that she had while she

4  was under you?

5       A.     I'm sure there has been some

6  changes over time -- I don't know.

7       Q.     What were her responsibilities

8  when you were her supervisor?

9       A.     I don't think she --

10               MR. WILSON:  Tell her what she

11  did.

12       A.     She had primary responsibility for

13  mail.  She did my correspondence, any projects I

14  had she assisted with those.  Other than that, I

15  think that's very similar to what I just

16  described.

17       Q.     (By Mrs. Battle-Hodge) When she

18  worked for you, she was your assistant, for lack

19  of better words, she was your assistant?

20       A.     She was an ASA 3.

21       Q.     Did she have any supervisory

22  responsibility when she worked under you?

23       A.     She did.

1        Q.      Tell me about that.

2        A.      At that time there were two other

3    clerical employees, I'm not sure -- and they

4    might have been both ASA 2, one might have been

5    an ASA 1.

6        Q.      When she supervised them, what did

7    she do?

8        A.      Kept abreast of the permitting

9    process.

10       Q.      What's permitting?

11       A.      We issue about 6700 --

12       Q.      Oh, permitting -- so repeat it

13   again for me.  She kept up with the permitting?

14       A.      Yes, she stayed on top of the

15   permitting.  Someone else was doing -- was the

16   primary data person, but she would review the

17   applications and see if something needed to be

18   done differently, or needed to be sent back,

19   asked for more money or whatever might have been

20   the case.

21       Q.      So she did the permitting, what

22   else did she do supervisory?

23       A.      One of the clerical positions was

1    responsibile for issuing penalties.  She was

2    responsible to make sure that person did her

3    job.

4         Q.    When she worked for you, was she

5    an ASA 3 when she worked for you?

6         A.    Yes.

7         Q.    Is she currently an ASA 3?

8         A.    Yes.

9         Q.    In her position with Mr. Scott,

10   does she have any supervisory responsibilities?

11        A.    No.

12        Q.    Whose decision was it to remove

13   her supervisory responsibilities when she was

14   moved to Mr. Scott in March of '06?

15        A.    That is not when the supervisory

16   responsibilities changed -- that changed in May

17   of 2005.

18        Q.    They changed before she left you;

19   is that correct?

20        A.    Yes.

21        Q.    Why did they change before she

22   left you?

23        A.    Why?

1          Q.     Yes.

2          A.     We had complaints from the two

3     clerical employees:  Possible retaliation and

4     also one indicated that she had been asked to

5     tell the commissioner something that wasn't

6     true -- no, wait a minute -- it was primarily

7     concerns with retaliation from the two clerical

8     employees -- I'm trying to remember.

9          Q.     Take your time.

10         A.     There was a discussion between one

11    of the employees, myself and Dr. John Bloch.  It

12    was indicated that she had been asked to -- if

13    one of us came by and asked where Shannon was,

14    she was asked, according to this person, to --

15    this person was asked by Ms. Burton to call her

16    on her cell phone if somebody came by looking

17    for her.

18         Q.     So you're saying one of the people

19    that she supervised told you that?

20         A.     Yes.

21         Q.     Did you investigate that?

22         A.     We decided at that point that the

23    best action we could take to keep the office in

1 order was to -- that I would start supervising

2 those and Ms. Burton would no longer be

3 responsible for supervising or evaluating those

4 employees.

5   Q. Is that the way you handle

6 complaints from employees who complained about

7 their supervisor?  Do you just strip them of

8 their responsibility and not investigate it?

9     MR. WILSON:  Object to the

10 form.

11   Q. (By Mrs. Battle-Hodge) You can

12 answer.

13   A. I don't recall having that occur

14 before.

15   Q. Who is this person that told you

16 this?

17   A. Ann Williams.

18   Q. What was her position?

19   A. I believe it was ASA 2, could have

20 been 1.

21   Q. You've answered this, but upon her

22 reporting to you that Ms. Burton asked her to

23 call her on her cell phone if someone was

1    looking for her, you stripped her of her

2    supervisory duties?

3                MR. WILSON:   Object to the

4    form.  Go ahead.

5        A.     Her supervisory duties were

6    reassigned to me.

7        Q.     (By Mrs. Battle-Hodge) Did you

8    ever speak to Ms. Burton about the allegation?

9        A.     No.

10       Q.     So you said she supervised two

11   people, correct?

12       A.     Yes.

13       Q.     The second person, who is that?

14       A.     Mary Katric.

15       Q.     Why did you take her from under

16   Ms. Burton's supervision?

17       A.     They both came to me the same day,

18   and Ms. Katric said she feared that she would be

19   retaliated against in her evaluation, because

20   they had been -- I don't recall right now what

21   the specifics were.

22       Q.     At any rate, are you saying that a

23   person that Ms. Burton supervised complained

1    about her, and you removed her supervisory

2    duties?

3                    MR. WILSON:  Object to the

4    form.  You can answer.

5            Q.      (By Mrs. Battle-Hodge) Is that

6    what you are saying?

7            A.      I had -- prior to notification I

8    had noticed that a lot of times when I would go

9    by and Ms. Burton was not there, I would ask Ann

10   where she was and as soon as I walked out, she

11   would be dialing her up.  So it wasn't just her

12   saying that, I had suspected that before then.

13           Q.      Are you saying that both

14   Ms. Katric and the first young lady -- what's

15   her name again?

16           A.      Ann Williams.

17           Q.      Are you saying they both feared

18   retaliation on their evaluations, is that what

19   they told you?

20           A.      That's what they told me.

21           Q.      Have you ever seen any evaluations

22   that Ms. Burton did on these two young ladies?

23           A.      Yes.

1    Q.    Do you recall what the evaluations
2    were?
3    A.    They were good evaluations.
4    Q.    How long had these young ladies
5    worked under Ms. Burton?
6    A.    I don't recall.
7    Q.    Was it a month, more than a month,
8    a year?
9    A.    I would guess --
10    MR. WILSON:  Don't guess, just
11    tell her what you know.  If you know.
12    A.    I don't remember exactly how long
13    it was.
14    Q.    (By Mrs. Battle-Hodge) Do you know
15    how many evaluations Ms. Burton did on them?
16    A.    No, I do not.
17    Q.    Have you ever evaluated these
18    young ladies?
19    A.    Currently Ms. Katric answers
20    directly to me, I do her evaluation.
21    Q.    You currently do her evaluations?
22    A.    Yes.
23    Q.    At some point in 2004 or 2005, did

1    Ms. Burton leave the department that you were

2    in, when you supervised her?  Did you move her

3    out of that department?  Was she transferred out

4    of your department?

5                    MR. WILSON:  While he was her

6    supervisor?

7                    MRS. BATTLE-HODGE:  Yes.

8         A.    No.

9         Q.    (By Mrs. Battle-Hodge) So the

10   decision to remove Ms. Burton's supervisory

11   responsibilities, again, whose decision was

12   that?

13        A.    Dr. Bloch, my immediate supervisor

14   at the time, and I discussed it, and I would

15   have signed the letter that went to Ms. Burton

16   saying that.

17        Q.    Who is Dr. Bloch?

18        A.    He was my immediate supervisor at

19   that time -- he's got a long title.  I think it

20   was Agricultural and Plant Protection Division

21   Director or something like that.

22        Q.    So is he your supervisor?

23        A.    Currently?

```
 1          Q.    At that time.

 2          A.    Yes.

 3          Q.    He was your supervisor at that

 4    time?

 5          A.    Yes.

 6          Q.    When Ms. Burton's supervisory

 7    responsibilities were removed, did you give her

 8    any reason for doing it?

 9          A.    I don't recall.

10          Q.    You don't recall?

11          A.    No.

12          Q.    You testified earlier that you

13    didn't discuss the particular conversations that

14    the young ladies had with you regarding her?

15          A.    I don't recall having a

16    conversation about it with Ms. Burton.

17          Q.    So did you just one day come in

18    and inform her, you no longer have supervisory

19    duties?

20          A.    Yes.

21          Q.    Was that the end of that?

22          A.    Yes.

23          Q.    You have already answered this,
```

```
 1    but do you recognize this note here, letter here

 2    or, I guess, a memo?

 3         A.    Yes.

 4         Q.    I guess you initialed that, didn't

 5    you?

 6         A.    Yeah.

 7         Q.    This is the change of supervisory

 8    responsibilities that you delivered to

 9    Ms. Burton.  Did you give it to her on May 10th,

10    '05?

11         A.    I'm not for sure.

12         Q.    Around that time?

13         A.    Yes.

14         Q.    Have you ever had to --

15              MR. WILSON:  Are you going to

16    mark that?

17              MRS. BATTLE-HODGE:  Yes, I'll

18    mark it as Exhibit Number 1.

19              (WHEREUPON, a document was

20              marked as Plaintiff's Exhibit No.

21              1 and is attached to the original

22              transcript.)

23         Q.    (By Mrs. Battle-Hodge) Have you
```

1  ever had to change responsibilities or demote an

2  employee before, remove responsibilities from

3  employees before, in addition to other than

4  Ms. Burton?

5              MR. WILSON:  Object to the

6  form.

7              MRS. BATTLE-HODGE:  I'll

8  repeat it.

9      Q.    (By Mrs. Battle-Hodge) Have you

10 ever had occasion to change an employee's

11 responsibilities before?

12     A.    Yes.

13     Q.    Have you ever had to change an

14 employee's responsibilities based on complaints

15 or concerns about his or her performance before?

16     A.    I do not recall having to do it

17 because of complaints or concerns before.

18     Q.    You say you have changed

19 responsibilities before?

20     A.    Sure.

21     Q.    Have you ever changed

22 responsibilities in the way where you took away

23 some responsibility?

1          A.       Yeah.

2          Q.       Would you name those people?

3          A.       I don't remember specifics, but

4    during the course of management, there are

5    changes made every day as far as employee

6    responsibilities.  It may be due to

7    circumstances, it may be due to what personnel

8    you have available.

9          Q.       What procedure do you take when

10   you change responsibilities of an employee?

11         A.       I notify them that the change has

12   been made, and this will no longer be your

13   responsibility.

14         Q.       So you don't have a discussion

15   with the employee at all?

16         A.       I can't say I've never had a

17   discussion.

18         Q.       Are you saying that you usually

19   would discuss with an employee a concern or a

20   complaint that you have received regarding the

21   employee?

22                  MR. WILSON:  Object to the

23   form.

1      Q.      (By Mrs. Battle-Hodge) You can

2  answer.

3      A.      State it one more time, please, if

4  you can.

5      Q.      I'm going to change the question.

6  Have you had an occasion to have an employee

7  that you supervise complain -- someone comes to

8  you to complain about the employee -- when that

9  happens, do you investigate what has been said

10  by the person who's complaining, or do you just

11  unilaterally take action without discussing it

12  or investigating it at all?

13      A.      First of all, do I take all

14  complaints on face value?

15      Q.      Yes.

16      A.      No.

17      Q.      What do you do?

18      A.      If further investigation is

19  needed, then I will further investigate it.

20      Q.      What determines that further

21  investigation is needed?

22      A.      Are you talking about in general

23  terms with any employee, whether or not I had

1    complaints before, whether or not I might have

2    known something about what they were telling me,

3    that type of thing.

4         Q.    So had you had complaints before

5    on Ms. Burton?

6         A.    About -- from any employees under

7    her supervision, is that what you're asking?

8         Q.    Yes.

9         A.    I don't believe I have.

10        Q.    So this is the first complaint?

11        A.    From anybody that she supervised,

12   yes.

13        Q.    On the first complaint, are you

14   saying that without investigating it, you took

15   away her supervisory responsibilities?

16                  MR. WILSON:  Object to the

17   form.

18        A.    I'm saying that I did have some

19   prior knowledge of the potential problem.

20                  MRS. MARKS:  We've been going

21   for about an hour, can we take a break?

22                  MRS. BATTLE-HODGE:  Sure.

23                  10:51 AM

```
 1                      (Short break.)

 2                        11:08 AM

 3          Q.      (By Mrs. Battle-Hodge)

 4   Notwithstanding the two complaints you received

 5   from the young ladies, how did Ms. Burton

 6   perform her job on a daily basis?  How would you

 7   say as an assistant, was her work satisfactory?

 8                      MR. WILSON:  While he was her

 9   supervisor?

10          Q.      (By Mrs. Battle-Hodge) While you

11   were her supervisor.

12          A.      Her reports or evaluations

13   indicate that she was satisfactory.

14          Q.      Aside from evaluations, do you

15   recall what type of scores she received on her

16   evaluations?

17          A.      I believe it was in the exceeds

18   standard range.

19          Q.      So are you saying that you were --

20   with that if you give an employee an exceeds

21   score, are you saying that you are satisfied

22   with her performance?

23                      MR. WILSON:  Object to the
```

1  form.  You can answer.

2      A.    I felt like anything that I put on

3  that evaluation I had to prove beyond a shadow

4  of a doubt.

5      Q.    (By Mrs. Battle-Hodge) What do you

6  mean?

7      A.    Just what I said.

8      Q.    Say that again.

9      A.    If I lowered her evaluation, I'd

10 have to absolutely prove -- if I felt like that

11 there were times that she was away from her desk

12 and away from her office and things like that, I

13 would have to absolutely prove it in order to

14 reflect it on that evaluation.  I wasn't able to

15 do that -- there was a situation in the office

16 of the employees being afraid of her, being

17 concerned about retaliation not only on

18 evaluation, but also dealing with their

19 communications with her.  There had been

20 occasions where work that I assigned Ms. Burton

21 ended up on their desk.  They didn't tell me --

22 I found it on their desk -- but there was a lot

23 of that situation.  I didn't feel that I could

1    absolutely prove it to them to affect the

2    evaluation, so I had to go with what I knew

3    absolutely for a fact.

4         Q.    So you are saying as her

5    supervisor if you suspected that she was doing

6    something wrong and you said that you witnessed

7    her not being at her desk, you didn't have the

8    authority to put that on her evaluation?

9         A.    I should have done a better job of

10   documenting a lot of things like that.  I should

11   have done a better job.

12        Q.    So are you saying you lied when

13   you did her evaluations?

14               MR. WILSON:  Object to the

15   form.

16        A.    I'm saying the evaluation was

17   based on only what I could absolutely prove.

18        Q.    (By Mrs. Battle-Hodge) Is that the

19   way you evaluate all of your employees?

20        A.    Yes.  We are required to evaluate,

21   unless we have it documented we can't -- good or

22   bad.

23        Q.    Are you saying that Ms. Burton

1    wasn't an "exceeds" type of employee, are you

2    saying she was sub-par?

3                    MR. WILSON:   Object to the

4    form.  You can answer.

5        A.     I'm saying the evaluation

6    reflected only what I could document.

7        Q.     (By Mrs. Battle-Hodge) How many

8    evaluations do you usually do a year?

9        A.     There is one evaluation per year.

10       Q.     No, no, no.  Employees, how many

11   employees do you evaluate per year?

12       A.     Ten to 12.

13       Q.     Has that increased over the years,

14   or have you over the last 10, 12 years always

15   done about that many?

16       A.     It's been always probably close to

17   that.

18       Q.     What's the number again?

19       A.     About 10.

20       Q.     So if we were to pull those

21   evaluations, are you saying that you pretty much

22   lied --

23                    MRS. BATTLE-HODGE:  Let me

1    strike that.

2         Q.     (By Mrs. Battle-Hodge)  That we

3    cannot be sure that those evaluations are

4    accurate?

5                    MR. WILSON:  Object to the

6    form.

7         A.     They were accurate as far as what

8    I had documented.

9         Q.     (By Mrs. Battle-Hodge) So are you

10   saying you had been displeased with Ms. Burton

11   for a while before her duties were removed?

12        A.     Could you repeat that?

13        Q.     Are you testifying that you had

14   been displeased with Ms. Burton's performance

15   before you had her duties removed, before you

16   got the report from the young ladies?

17        A.     There were certain aspects, yes,

18   that I was displeased with.

19        Q.     Did those things warrant any

20   discipline?

21        A.     I did not document any that

22   warranted any discipline.

23        Q.     Before you discipline an employee,

1    do you always have 100 percent proof that what

2    you are speculating has happened?

3                    MR. WILSON:  Object to the

4    form.

5         A.    Could you state that again.

6         Q.    (By Mrs. Battle-Hodge)  Before you

7    discipline an employee, are you saying that you

8    always have 100 percent proof that whatever the

9    allegations are have happened?

10        A.    I would have documentation to

11   satisfy myself that the event had occurred.

12        Q.    So did you have documentation on

13   Ms. Burton?

14        A.    On what?

15        Q.    On removing her supervisory

16   duties?

17                   MR. WILSON:  Object to the

18   form.  You're talking about discipline in one

19   context and removing a duty in the other context

20   and suggesting that there has to be some kind of

21   documentation.  I think he testified duties can

22   be removed for no reason -- but go ahead.

23        Q.    (By Mrs. Battle-Hodge) Go ahead.

```
 1                    MR. WILSON:  I don't

 2     understand the question myself, so I'm going to

 3     ask you to repeat it.

 4          Q.    (By Mrs. Battle-Hodge)  Are you

 5     saying that, as Ham has stated, to remove

 6     responsibilities or to discipline an employee in

 7     any way, are you saying that you have to have

 8     100 percent proof that those things have

 9     occurred before you discipline that person or

10     remove that person's duties?

11                    MR. WILSON:  Object to the

12     form, but you can answer.

13          A.    Let me address the change of

14     responsibilities.

15          Q.    (By Mrs. Battle-Hodge) Go ahead.

16          A.    I don't have to have anything if I

17     want to change somebody's responsibilities.

18          Q.    Is that in your department's

19     policy?

20          A.    I don't know.

21          Q.    Or is that your policy?

22          A.    That's my understanding.

23          Q.    Who told you that?
```

60

1    A.    I don't know who told me that.

2    Q.    So --

3    A.    Their duties are changed daily.

4  So I don't know that there is anything in our

5  department or State Personnel Handbook that says

6  you don't have the authority to change

7  responsibilities.

8    Q.    So you don't know what rules there

9  are?

10         MR. WILSON:  Object to the

11  form.

12    A.    No, I don't know any specific

13  rules.

14    Q.    (By Mrs. Battle-Hodge) So you just

15  arbitrarily removed her duties because you gave

16  yourself that --

17    A.    No, I did not arbitrarily remove

18  the duties.

19    Q.    Let's move on to the complaint

20  that Ms. Burton filed.  Have you seen that

21  complaint -- the lawsuit, have you seen the

22  complaint?

23    A.    Yes.

1    Q.    Do you have a copy of the

2    complaint, Mr. Hester?

3    A.    Yes.

4    Q.    If you will go to page four.

5    A.    Let me correct something.  I don't

6    know that I've seen the amended complaint.

7    Q.    Take your time.

8    A.    I will say I have not read the

9    amended complaint.

10    Q.    You want to look at it?

11    A.    Sure.  Yeah, I have reviewed it,

12    yes.

13    Q.    If you'll turn to page four,

14    please, Paragraph 20.  It simply states that on

15    November 3rd, 2005, Lance Hester issued a

16    written reprimand and warning to Ms. Burton, the

17    plaintiff, for her statement or opinion.  Is it

18    true that you issued a reprimand on November

19    3rd, 2005?

20            (WHEREUPON, a document was

21            marked as Plaintiff's Exhibit No.

22            2 and is attached to the original

23            transcript.)

1          A.      It says a written reprimand and

2    warning -- that doesn't sound correct to me.

3          Q.      Let me let you see this.  Let me

4    let you look at that.

5          A.      This is a warning, not a

6    reprimand.

7          Q.      So you issued her a written

8    warning on November 3rd, 2005?

9          A.      Yes.

10         Q.      You are familiar with this

11   warning, right, with what you wrote in there?

12         A.      Yes.

13         Q.      Paragraph 21 says that you

14   indicated in the warning that the Plaintiff's

15   behavior was so severe that it warranted

16   immediate attention.  You directed Plaintiff to

17   write a response out, signing the warning.  You

18   instructed the Plaintiff to admit to disruptive

19   behavior and being insubordinate, failure to

20   submit to authority.  And she was also directed

21   to admit that her behavior was unacceptable and

22   advised that similar behavior in the future will

23   or would result in a reprimand and disciplinary

1    action; is that true?

2        A.      No.

3        Q.      Tell me what happened.

4        A.      It didn't say she had to admit to

5    anything.  It says that this should be an

6    acknowledgment that this referenced type of

7    behavior is inappropriate.

8        Q.      What's the difference in what I

9    said and what you wrote here?

10                  MR. WILSON:  Object to the

11   form.

12       A.      If I call someone a liar and I'm

13   told that's wrong, my boss tells me that's

14   wrong, if I'm going to do any better, I need to

15   acknowledge that.  Not that I said that, I don't

16   have to acknowledge that -- I do have to

17   acknowledge whether that's improper behavior or

18   not.

19       Q.      (By Mrs. Battle-Hodge) So are you

20   asking her to acknowledge something that she

21   said she didn't say?

22       A.      No.  I was asking her to indicate

23   back to us that calling someone a liar is not

1    proper.  Whether it's her or somebody else, the

2    employee-supervisor relationship --

3         Q.    So are you saying that you didn't

4    say she called you a liar, you were just asking

5    her to --

6         A.    In this part down here.

7         Q.    Go ahead and I'll let you explain.

8              MR. WILSON:  These are her

9    allegations.

10        A.    Her allegation says that she was

11   further directed to admit that her behavior was

12   unacceptable and was advised that similar

13   behavior in the future would result in a

14   reprimand and disciplinary action.

15        Q.    (By Mrs. Battle-Hodge) I guess my

16   question is:  Is that what you in essence said

17   in your warning?

18        A.    Which part of the warning are you

19   talking about?  Are you talking about where it

20   describes what happened, or are you citing in

21   the part here, state how the situation can be

22   resolved --

23        Q.    Right here, it says the employee

1    is requested --

2           A.    Above that --

3           Q.    No, no -- I'm not referring to

4    that.  If you want to explain, go ahead.

5           A.     Above it, it says:  Explain how

6    the situation can be resolved.  It says

7    discussion with employee and input from

8    employee.  In order for someone to change their

9    behavior, they've got to know what is proper and

10   what is not proper.  Right?  That's what I was

11   asking her, this type of behavior is not proper.

12          Q.     Are you asking her to admit that

13   she called you a liar, and that that's

14   incorrect, or what were you asking her to do, or

15   if you say --

16          A.     It says here, an acknowledgement

17   that referenced type of behavior is not

18   acceptable.

19          Q.     What reference-typed behavior?

20          A.     I'm not clear on what you are

21   asking.

22          Q.     What are you referring to when you

23   say, "referenced type of behavior is not

1  acceptable". What are you saying?

2       A.    If somebody don't show up for work

3  and I write a warning, they ain't got to admit

4  they don't show up for work. It says down here

5  that their signature does not denote an

6  agreement. Right? So we're asked to initiate

7  interaction that will help the employee know

8  what to do and what they did wrong, and what to

9  do next time, and what not to do. That

10  statement in here, the acknowledgement that I

11  was asking for, that calling somebody a liar,

12  anybody calling somebody a liar is not

13  appropriate behavior in the workplace.

14       Q.    So you weren't talking in

15  particular about your allegations about

16  Ms. Burton, you were just talking in general

17  calling someone a liar is not --

18       A.    Right.

19       Q.    How is she to know that? You say

20  referenced behavior. Did you explain to her

21  that you were just saying in general that

22  calling someone a liar is not correct. I'm not

23  saying that you called me a liar, but it just

1    generally is not correct.  Is that what you're

2    saying?

3        A.    That type of behavior is not

4    acceptable.

5        Q.    So are you saying that she called

6    you a liar?

7        A.    It's in my statement here what she

8    said.

9        Q.    What did she say?

10       A.    We were talking about the

11   paperwork, the mail, and said it wouldn't matter

12   anyway because you would lie about it anyway,

13   and that is what she said.

14       Q.    So are you asking her to

15   acknowledge or admit that she said that?

16       A.    I'm asking her to acknowledge that

17   that type behavior is not proper.

18       Q.    We will move on.  Is it true that

19   from Ms. Burton's information, she said she

20   didn't call you a liar, she said that you said

21   you probably wouldn't remember.

22       A.    That's not what she said.

23       Q.    Did she, in fact, say that you

1  probably wouldn't tell the truth if it were to

2  come up again?

3       A.    What she said is exactly what I

4  have written down right there.

5       Q.    So did she tell you why she said

6  that?  That she would tell you the truth if it

7  came up again?  Do you recall --

8       A.    At that time, no.

9       Q.    Later did she tell you?

10      A.    Later I did go back and ask her if

11 she really felt like I lied about it.

12      Q.    What did she say?

13      A.    Now, this was not the initial

14 thing.  I want to make that clear.

15      Q.    That's clear.

16      A.    She said something along the lines

17 of, well, I thought you might not tell the truth

18 about it.

19      Q.    Did she say why she thought you

20 might not tell the truth?

21      A.    No.

22      Q.    She just had a blanket statement

23 that you might not tell the truth?

1       A.      Yes.

2       Q.      I've talked to you over an hour or

3   so, and you've told me on a number of occasions

4   that you couldn't remember certain things I've

5   asked you; is that correct?

6       A.      Yeah, there are certain things

7   that happened three or four years ago or longer

8   about that you've asked me questions about that

9   I don't have immediate recall.

10      Q.      Have you had occasion to say about

11  yourself that my memory is not good or, you

12  know, have you ever said that about yourself?

13      A.      I sent a memo out one time.

14  Again, I have about 10 people that answer to me.

15  There have been some problems because I wouldn't

16  know when they had been off.  I might call a

17  secretary and leave a message on the phone, they

18  might do this or that or the other.  I had no

19  good way of keeping of with when they were going

20  to be off, when they were going to be on leave,

21  when they had doctors' appointments, things that

22  I'm supposed to keep up.  So I sent a memo out,

23  and I'm sure you probably have a copy of it, and

1   it simply stated that I need all of you to send

2   me something in writing because the current

3   system is not working.  Rather than being a

4   dogmatic -- look, this is the way I'm going to

5   do it and y'all just live with it, I just made a

6   general statement.  I think everybody that read

7   it understood what I was saying.  I said, with a

8   memory like mine, I can't keep up with all of

9   it.  I'll add to that now, if I may.  With a

10  memory like mine or with anyone having that many

11  people and that many phone calls and requests to

12  be off and requests to be off in the future, I

13  don't think anybody could keep up with it unless

14  they had a formal system.  It has nothing to do

15  with my ability to remember.

16          Q.      When you wrote this memo was

17  Ms. Burton working for you?

18          A.      Yes.

19          Q.      Did she type it?

20          A.      I believe so.

21          Q.      Could she have heard you talk

22  about your memory?  She worked with you closely,

23  didn't she?

1      A.      Pretty close.

2      Q.      In her explanation of why she said

3   that, that you often said that you didn't

4   remember things; is that correct?

5      A.      I don't recall.

6      Q.      You don't recall?

7      A.      I don't recall if I've said that

8   to her or not.  I don't know what the example

9   was, in what context it was.

10     Q.      You referred to the memo and this

11  is the memo that you were talking about; is that

12  correct?  I'm going to mark that Exhibit Number

13  3.  Is that the memo that you are talking about?

14  Is that the memo?

15     A.      Yes, it is.

16             (WHEREUPON, a document was

17             marked as Plaintiff's Exhibit No.

18             3 and is attached to the original

19             transcript.)

20     Q.      Would you read what's underlined?

21     A.      With a memory like mine.

22     Q.      Would you read the whole sentence?

23     A.      I have been receiving notice from

1    each of you in different ways.  With a memory

2    like mine, I need a more formal way to handle

3    information.

4         Q.     So you did in the memo, as you

5    said, you've admitted yourself that your memory

6    is not --

7         A.     I have not admitted that, no.

8              MR. WILSON:  Just for the

9    record, is that something that you underlined,

10   or your client underlined?

11             MRS. BATTLE-HODGE:  I did, I'm

12   sorry.

13        Q.     (By Mrs. Battle-Hodge)  Did you do

14   Ms. Burton's evaluation in December of 2005?

15        A.     Yes.

16        Q.     Let me back up a little bit to

17   Exhibit No. 2.  You initially submitted a

18   written warning, correct?

19        A.     Yes.

20        Q.     Would you state what ensued after

21   the warning up until, and we will talk about it

22   later, but the suspension, tell me what steps

23   were taken from the warning to the suspension.

1    A.    What do you mean by what steps?

2    Q.    First you gave her a written

3    warning; is that correct?

4    A.    Yes.

5    Q.    Then what happened?

6    A.    She refused to sign the warning.

7    All during this process, I talked with

8    Dr. Bloch, my immediate supervisor.  We talked

9    with Teresa Bronson in our Personnel Department

10   and we received advice from the State Personnel.

11   Q.    What advice did you get from State

12   Personnel?

13   A.    That it was a violation.  Let me

14   see -- I don't know if I have the right word,

15   but it was not acceptable for someone to refuse

16   to sign acknowledgement of the receipt of the

17   warning.

18   Q.    With that, what did you do?

19   A.    We wrote a --

20          MR. WILSON:  Just tell her

21   what you remember.

22   A.    We wrote a letter, a second

23   warning, stating that her refusal to sign the

1    document was a violation of policy and should

2    she elect not to sign it, then the next step

3    would be a reprimand.

4         Q.    (By Mrs. Battle-Hodge) Would this

5    be the reprimand?

6              MRS. BATTLE-HODGE:  I'm going

7    to enter that as Exhibit No. 4.

8              (WHEREUPON, a document was

9              marked as Plaintiff's Exhibit No.

10             4 and is attached to the original

11             transcript.)

12        Q.    (By Mrs. Battle-Hodge)  Is that

13   the reprimand?

14        A.    It lists attachments that are not

15   attached, but...

16        Q.    What's the date on the reprimand,

17   Mr. Hester?

18        A.    Which date?

19        Q.    On the letter, on the reprimand --

20   I think it might be on the end.

21        A.    Are you talking about back here?

22        Q.    Uh-huh.

23        A.    It says 10/11/05, but that's not

1    correct.

2        Q.    Is that why Ms. Burton said she

3    wasn't going to sign it because the date wasn't

4    correct?

5        A.    On the day that it was presented

6    to her, I was in a meeting in Anniston, Alabama.

7    It was presented to her by Dr. Bloch, Dr. John

8    Bloch, and he had knowledge that there was

9    confusion about the date, and he told me that he

10   indicated he would change the date -- it wasn't

11   a problem -- and that she still refused to sign

12   it.

13       Q.    Did he change the date?

14       A.    There is another document

15   somewhere.

16       Q.    Did he change the date this day?

17       A.    I don't know.

18       Q.    You say you got this advice from

19   State Personnel that she had to sign this.  Is

20   that what you testified to earlier?

21       A.    Yes.

22       Q.    Who at State Personnel told you

23   that?

1        A.     I didn't talk to them.  Teresa

2   Bronson talked to State Personnel.  It's one of

3   the attorneys with State Personnel.

4        Q.     Was it Alice?

5        A.     Say it again.

6        Q.     You don't know the attorney's

7   name?  Do you know if it was Alice Ann?

8        A.     Alice Ann, I believe it was, yes.

9        Q.     So you are saying that Alice Ann

10  told Teresa Bronson that Ms. Burton was required

11  to sign it, had to sign it?

12       A.     Yes.

13       Q.     Who is Teresa Bronson?

14       A.     She is our personnel person over

15  the department.

16       Q.     So when she didn't sign it, she

17  received a reprimand and the reprimand was to in

18  effect require her to sign it; is that what the

19  reprimand was for?

20       A.     The reprimand was for her refusing

21  a directive because it was put in a letter to

22  her that if she didn't sign, then we would have

23  to go to the next step in the disciplinary

1    process.

2        Q.    So are you saying that the

3    reprimand was two-fold, was it for the original

4    warning?  In addition to that, it was for not

5    signing; is that what you are saying?

6                    MR. WILSON:  Object to the

7    form.

8        A.    Please restate.

9        Q.    (By Mrs. Battle-Hodge)  Are you

10   saying that this reprimand was for the original

11   warning where you allege that Ms. Burton in

12   essence called you a liar?

13                   MR. WILSON:  Object to the

14   form.

15       Q.    (By Mrs. Battle-Hodge) Was the

16   reprimand still a part of the warning?

17       A.    The reprimand resulted because she

18   refused to sign.

19       Q.    Was the reprimand only for her

20   refusal to sign?

21       A.    If she had signed the warning,

22   that would have been it.

23       Q.    So we have the warning here --

1   correct me if I'm wrong -- the warning, which is

2   about the original allegation about her being

3   insubordinate, right?  Is that correct?  Is that

4   the original warning?

5        A.     Yes.

6        Q.     The reprimand was as a result of

7   her not signing the warning; is that correct?

8   Are there two separate issues?

9        A.     The reprimand was for her not

10  signing a warning.

11       Q.     After she got this reprimand, what

12  happened?

13       A.     She refused to sign the reprimand,

14  so the next step in the disciplinary process

15  would be suspension.

16       Q.     So was she suspended?

17       A.     Yes.

18       Q.     Tell me the particulars of her

19  suspension.

20       A.     I made a recommendation to the

21  commissioner based on her steps in the

22  disciplinary process, and we were at the point

23  where I recommended a suspension.

1      Q.    Was the suspension based on both

2   the warning and the reprimand, or just basically

3   the reprimand because she didn't sign it?  Were

4   there two issues or just one in the suspension?

5      A.      There's at least two issues.

6      Q.      What were those two issues?

7      A.      If she would have signed the

8   original warning, it would have never gone to

9   the next step.  If we got to the next step, if

10  she chose to sign it then, then a reprimand

11  would have been as far as it would have gone.

12     Q.      So everything just kind of added

13  on to each other.  We still have both issues,

14  the warning for being insubordinate and the

15  refusal to sign?

16              MR. WILSON:  Object to the

17  form.

18     A.      Yes.

19              MR. WILSON:  Don't confuse the

20  issue.  He's testified at least three times, if

21  she had signed the warning, that would have been

22  the end of it -- period.  Her failure to sign

23  the warning resulted in the disciplinary process

1  proceeding, and at each step thereafter, her

2  failure to comply resulted in the next step, and

3  that's a fact.   I just want to be clear about

4  it.

5      Q.     (By Mrs. Battle-Hodge) So are you

6  saying that by the time it got to suspension,

7  y'all weren't considering her being

8  insubordinate, you were just considering that

9  she didn't sign the document; is that what you

10  are saying?

11      A.     She failed to follow a direct

12  order.

13      Q.     Which was?

14      A.     Which was to sign the document --

15  and it was pointed out a number of times that

16  signing does not denote agreement.

17      Q.     So she was suspended for not

18  signing the document; is that what you are

19  saying?

20              MR. WILSON:  Object to the

21  form.   You can answer.

22      A.     The result was she didn't sign the

23  document.   She was given a directive to sign the

1  document, she failed to follow that directive.

2         Q.      (By Mrs. Battle-Hodge) The answer

3  is yes?

4         A.      The answer is what I just said.

5         Q.      Is it yes or no?

6         A.      She failed to follow the

7  directive.

8         Q.      The written warning that you gave

9  Ms. Burton, the allegation you made against her,

10  an allegation such as that, is it procedurally

11  proper to go straight to a written warning if

12  you say an employee has been insubordinate?  Is

13  that the first step?  If you say that an

14  employee has been insubordinate to you, is the

15  first step a written warning in the disciplinary

16  process?

17         A.      It can be.

18         Q.      Explain that to me.

19         A.      State Personnel said it can be.

20  Our Personnel said it can be.  Again, I

21  discussed this with my supervisor and our

22  in-house Personnel Department prior to ever

23  writing this up.  So I wanted to be sure that

```
 1    what I was doing --
 2            Q.      That this was proper?
 3            A.      Yes.
 4            Q.      Are you familiar with the State of
 5    Alabama's Progressive Discipline Manual?
 6            A.      Yes.
 7                    (WHEREUPON, a document was
 8                    marked as Plaintiff's Exhibit No.
 9                    5 and is attached to the original
10                    transcript.)
11            Q.      As a division director at that
12    time -- were you a program director at that time
13    or a division director at that time?
14            A.      I was a division director.
15            Q.      As a division director, do you
16    look to follow the Progressive Discipline Manual
17    that's set up by the State of Alabama?
18            A.      Yes.
19            Q.      Are you familiar with this
20    document?
21            A.      I know what the document is.
22            Q.      Are you familiar with what is in
23    it?
```

1          A.      I've read the document.

2          Q.      I'm turning to page eight, and I

3    did underline that.  Did you consult the manual

4    before you wrote the written warning?

5          A.      I met with Teresa Bronson, and

6    together we discussed it.  And she had the

7    manual there and it was decided due to the

8    severity of the insubordination and disruption

9    that the warning was warranted.

10         Q.      Why it was so severe in your

11   estimation?

12         A.      Her statements were disruptive.

13         Q.      Who were they disruptive to?

14         A.      The workplace area -- she was

15   speaking in a loud voice.  She was speaking in

16   an angry demeanor.

17         Q.      Where was she?

18         A.      In the doorway of my office.

19         Q.      Everybody heard it?

20         A.      I do not know who heard it.

21         Q.      Are you saying you believe that

22   people heard it, is that why it was so severe?

23         A.      I didn't say that -- people could

1   have heard it.

2       Q.      I asked you why was this alleged

3   infraction so severe, and you testified that it

4   was disruptive to the whole workplace there; is

5   that correct?

6       A.      It was disruptive to the

7   workplace.

8       Q.      I also asked you if all of the

9   people heard it.

10      A.      I do not know.  I can't say if

11  they heard it.  Could they have heard it, yes.

12      Q.      So how do you conclude that it was

13  disruptive to the workplace when you don't know

14  if anybody heard it or not?

15              MR. WILSON:  Object to the

16  form.

17      A.      I just considered it disruptive.

18      Q.      (By Mrs. Battle-Hodge) I'm going

19  to read that line that I highlighted and put a

20  line through it.

21              MR. WILSON:  Tell us what

22  page.

23              MRS. BATTLE-HODGE:  Page

1    eight, under counseling before discipline.

2         Q.    (By Mrs. Battle-Hodge) The first

3    sentence says:  It is easy to forget when faced

4    with a problem employee to stop, think and act

5    only after you have considered the proper

6    judgment call.  In performance appraisal -- it

7    goes on to say that you are advised to counsel

8    before taking a drastic step.  Is it your

9    testimony that this is such a horrific

10   infraction that it deserved immediate warning or

11   immediate written warning?

12        A.    Yes.

13        Q.    Have there ever been any

14   situations where employees have, in your

15   opinion, been insubordinate to a supervisor and

16   you say, these are your words, she called you a

17   liar?  Is that what you said?

18        A.    Yeah, you are paraphrasing.

19        Q.    In essence that's what you said.

20   Have employees disagreed or said anything

21   similar that you considered disrespectful?

22        A.    My employees?  Because I don't

23   know about other people's employees.  I can only

1    answer for my employees, my relationship with my

2    employees.

3         Q.    So you have never had an employee

4    be disrespectful to you?

5         A.    Certainly not to that degree.

6         Q.    Before you wrote the warning, did

7    you discuss this with Ms. Burton?  Did you-all

8    try to work something out before you wrote the

9    warning?

10        A.    I discussed it with my immediate

11   supervisor, and I discussed it with our

12   Department of Agriculture personnel.

13        Q.    Did you discuss it with

14   Ms. Burton?

15        A.    Whether or not I was going to give

16   her a warning?  Is that what you are asking?

17        Q.    Before you gave her a warning, did

18   you discuss the matter with her?  You said she

19   was disrespectful and disruptive, did you

20   discuss that at all with her?

21        A.    I simply told her that it was

22   improper.  But I didn't say, I'm going to go

23   consult and write it up or not -- no, I didn't

87

1    do that.

2         Q.    So the answer is you didn't

3    discuss it with her?

4              MR. WILSON:  Object to the

5    form.  He just said he told her he didn't think

6    it was proper.

7         Q.    (By Mrs. Battle-Hodge) Was that a

8    discussion or was that a statement?

9         A.    That's just what I said.  I said

10   it was not proper.

11        Q.    You stated that you spoke with

12   your superior and with State Personnel -- well,

13   on your behalf, Ms. Teresa spoke to State

14   Personnel on your behalf and the department told

15   you or advised you on how that situation should

16   be handled; is that correct?  The department and

17   State Personnel; is that correct?

18        A.    Our -- yes.

19        Q.    How you should handle the

20   situation; is that correct?

21        A.    Yes.

22        Q.    In your discussion with the

23   Department of Ag and personnel through your

1    superiors, did it ever come up that something

2    like this had happened in the past?  Do you know

3    if the department had ever come across an

4    employee who had said something to a supervisor

5    that the supervisor felt was disrespectful?

6         A.    I don't know.

7         Q.    Did you-all have a discussion?

8    Did you have that discussion with the

9    department?

10        A.    With our department personnel

11   whether it happened in other --

12        Q.    When you-all discussed it, did

13   you-all talk about --

14        A.    No, we talked about this situation

15   only.

16        Q.    Are you familiar with Jamie

17   Baxley?

18        A.    Who?

19        Q.    Jamie Baxley?

20        A.    Yes, I know Jamie Baxley.

21        Q.    Who is that?

22        A.    It was Mr. Murphy's ASA 3 at that

23   time, I believe.

```
 1          Q.      Is she still employed there?

 2          A.      No.

 3          Q.      How long has she been gone?

 4          A.      I don't know.

 5          Q.      Are you familiar about

 6   Ms. Baxley's using abusive language to her

 7   then-supervisor, Mr. Rigby?

 8          A.      Yes.

 9          Q.      Do you need me to repeat the

10   question?

11          A.      I knew her -- yes, repeat the

12   question.

13          Q.      My question was:  Who is Jamie

14   Baxley?

15          A.      At some point during the last five

16   years she worked with Mr. Murphy as an ASA 3,

17   but if you're talking about a particular time, I

18   couldn't say if she was working for somebody

19   else -- or I don't know.

20          Q.      I didn't ask that.  Who is Rigby?

21          A.      He is a Deputy Commissioner.

22          Q.      Would he be considered her

23   superior?
```

1      A.      I'm not sure because I wasn't
2    involved.
3      Q.      What's his position?
4      A.      Deputy commissioner.
5      Q.      She was, or is and was an ASA 3;
6    is that correct?
7      A.      Yes, I believe that's correct.
8      Q.      She was an ASA something; is that
9    correct?
10     A.      Yes.
11     Q.      Would an ASA whatever be
12   subordinate to Mr. Rigby?
13     A.      I don't know if she was or not.
14     Q.      When you say you don't know if she
15   was, what do you mean?  I'm asking you in
16   general, generally.  Would an ASA 3 be
17   subordinate to an assistant commissioner or a
18   deputy commissioner?
19     A.      Yeah, I thought you were asking me
20   if she was assigned as his ASA 3.
21     Q.      No, I didn't ask that.
22     A.      I'm still not understanding the
23   question.

1      Q.      You are not understanding the

2  question?

3      A.      No.

4      Q.      I will repeat it.

5      A.      Is an ASA 3 subordinate to a

6  deputy commissioner?

7      Q.      Yes.

8      A.      Yes.

9      Q.      Are you aware that she used

10  abusive language towards Mr. Rigby?

11      A.      No.

12      Q.      If I were to tell you that

13  Ms. Baxley used abusive language towards

14  Mr. Rigby and she was just sent home for the day

15  and paid, what would you say about that?

16              MR. WILSON:  Object to the

17  form.

18      A.      I would say I don't know what took

19  place, and I would try not to judge what

20  somebody else did.

21      Q.      (By Mrs. Battle-Hodge) You are

22  saying in your particular situation, you are

23  saying that Ms. Burton saying that if it came up

1    again, you probably wouldn't remember or tell

2    the truth.  You said that statement was so

3    abusive that it required a warning?

4                    MS. MARKS:  Object to the

5    form.

6         A.    I think I've already said I felt

7    like it was disruptive, insubordinate, and it

8    deserved, after careful consideration,

9    determined it deserved a warning.

10        Q.    (By Mrs. Battle-Hodge) With a

11   warning, do you know if it's a policy to monitor

12   an employee's behavior for at least 30 days

13   before moving forward?  If there is a written

14   warning, are you required to monitor an

15   employee's behavior?

16        A.    All I can say is State Personnel

17   did not indicate that to us.

18        Q.    You say you are familiar with this

19   document?

20        A.    Yes.

21        Q.    Do you know that's what this

22   document says?

23                    MRS. MARKS:  Can you show him

1    where?

2                    MRS. BATTLE-HODGE:  Yes.  We

3    will strike that question, and I won't take up

4    time by finding that.  We will come back to

5    that.

6                    MRS. MARKS:  That's fine.

7        Q.      (By Mrs. Battle-Hodge) We will

8    move to the suspension.  You said that since she

9    didn't sign the reprimand, she was suspended; is

10   that correct?

11       A.      Failed to follow the directive to

12   sign.

13       Q.      I'm just asking if after the

14   reprimand was she suspended?

15       A.      Yes.

16       Q.      Would you tell me for how many

17   days she was suspended or what the suspension

18   entailed?

19       A.      I'm not sure.  I remember exactly

20   because there was a suspension and then there

21   was a hearing within the department, and then it

22   was redone.

23       Q.      Would you explain?

94

1           MR. WILSON:  She's asking you

2    how many days was she suspended.

3           A.     Ten.

4           Q.     (By Mrs. Battle-Hodge) She was

5    suspended for 10 days and didn't you say

6    something was redone?  What do you mean by that?

7           A.     There was an internal hearing

8    within the department, and after that I think

9    the days that she would be suspended were

10   changed, not the time but the days.  The number

11   of days I don't think were changed, but the time

12   frame was changed.

13          Q.     When she was suspended, she was

14   suspended for 10 days; is that your testimony?

15          A.     I'm not sure when it started or

16   ended.

17          Q.     She was suspended for 10 days?

18          A.     I believe that's correct.

19          Q.     When did she serve her 10 days?

20          A.     I don't recall.

21          Q.     When you say that the times when

22   the dates were changed, what do you mean by

23   that?  She was suspended for 10 days; is that

1    correct?

2                    MR. WILSON:  We will stipulate

3    that she was suspended -- whatever the

4    suspension was it was.

5                    MRS. BATTLE-HODGE:  Right.

6         Q.    (By Mrs. Battle-Hodge) What I'm

7    trying to figure out is when you're talking

8    about something was changed and all of that,

9    what are you talking about?

10        A.    I believe before the suspension,

11   initial suspension went into effect, there was a

12   hearing.

13        Q.    What kind of hearing?

14        A.    Within the department.

15        Q.    What kind of hearing?

16        A.    I don't know the right term for

17   the hearing.

18        Q.    Describe it.

19        A.    It was a hearing to allow the --

20   Ms. Burton to be heard.

21        Q.    By whom?

22        A.    Commissioner -- I don't remember

23   who was there.

1      Q.      Were you there?

2      A.      Yes.

3      Q.      So you were there, the

4   commissioner was there?

5      A.      I think John Bloch was there -- I

6   don't remember -- it seemed like either Teresa

7   Smiley or maybe George Parrish, but I'm not

8   sure.   I'm sure there's records of that

9   somewhere.

10      Q.      Just for the record I think I'm

11   surmising what you are saying, and I'm going to

12   make a statement and it might be improper, but

13   are you referring to when she was suspended

14   initially for 10 days, is that correct -- and

15   then there was a hearing that interrupted that

16   and then you-all re-calendared the dates?   I

17   think you-all said to begin with she was going

18   to be suspended, let's just say, for the 1st

19   through the 10th, just for the sake of argument.

20   Are you saying that she had the hearing, and

21   then those dates were changed?   Is that what

22   you're saying?

23      A.      That's what I remember, yes.

1          Q.     In essence there were 10 days,

2    there was some confusion on when those 10 days

3    would be carried out; is that what you are

4    saying?

5                    MRS. MARKS:  Object to the

6    form.

7          A.     Yeah.

8          Q.     (By Mrs. Battle-Hodge) I'm just

9    trying to get some clarity on what are you

10   saying.  Is that correct?

11         A.     Yes.

12         Q.     Is it true that with that

13   confusion, Ms. Burton actually was out of work

14   for 12 days instead of 10; is that correct?

15                  MRS. MARKS:  Object to the

16   form.

17         A.     I believe that is correct.  I

18   think she was not -- I think she actually

19   received pay for two of those 12 days.

20         Q.     (By Mrs. Battle-Hodge) Once the

21   department figured that out, the department did

22   reimburse her those two days; is that correct?

23         A.     Yes.

1   Q.  That's the confusion we are

2 talking about; is that what are you saying?

3   A.  That's correct.

4   Q.  After the suspension and the

5 hearing, what did Ms. Burton do after that?

6         MRS. MARKS: Object to the

7 form.

8   Q.  (By Mrs. Battle-Hodge) What did

9 Ms. Burton do after she was suspended? Did she

10 have any more rights, appeal rights or anything

11 after that, after she was suspended?

12   A.  I don't know the legal terms, but

13 she asked for, I guess, a formal hearing in

14 front of an administrative law judge.

15   Q.  Did the hearing take place?

16   A.  Yes.

17   Q.  Do you remember which

18 administrative law judge that was before?

19   A.  No, I don't.

20   Q.  She had an administrative hearing

21 by an administrative law judge?

22   A.  Yes.

23   Q.  Do you recall what the

1    recommendation of the administrative law judge

2    was as a result of that hearing?

3         A.    I believe I read over it one time.

4               MR. WILSON:   Just what you

5    recall -- just answer the question.

6         A.    I don't recall exactly the bottom

7    line in the hearing judge's statements.  It was

8    turned over to our legal, and I was not --

9         Q.    (By Mrs. Battle-Hodge) So do you

10   recall if the administrative judge said that you

11   are correct in suspending her for the 10 days,

12   or do you recall anything from her conclusion?

13        A.    I know that our legal staff asked

14   for some input from State Personnel at that

15   point.

16        Q.    What happened?

17        A.    I don't know.

18        Q.    So to this date you have no idea

19   what the administrative law judge's decision

20   was?

21        A.    I read over it.

22        Q.    You don't recall what the decision

23   was?

 1          A.    Obviously, if we contact State

 2    Personnel for clarification, there must have

 3    been something in there that indicated perhaps

 4    there was something wrong in some aspect, but I

 5    don't remember what aspect.

 6                    (WHEREUPON, a document was

 7                    marked as Plaintiff's Exhibit No.

 8                    6 and is attached to the original

 9                    transcript.)

10          Q.    (By Mrs. Battle-Hodge) Have you

11    seen the recommendation of the administrative

12    law judge?

13                    MR. WILSON:   The

14    recommendation is what it is.

15                    MRS. BATTLE-HODGE:   I'm just

16    asking if he's seen it.

17          Q.    (By Mrs. Battle-Hodge) Have you

18    seen it?

19          A.    I read over it one time.

20          Q.    It's a recommendation, I

21    understand that.  On Page 25 of the

22    recommendation, would you read the conclusion?

23    You can read it to yourself.  Would you

```
1   summarize what you read?
2                   MRS. MARKS:  Object to the
3   form.
4                   MR. WILSON:  Tell her --
5       Q.      (By Mrs. Battle-Hodge) Read it
6   then.
7                   MR. WILSON:  Read it.
8       A.      A covered employee is not entitled
9   to directly appeal any disciplinary action taken
10  by the appointing authority prior to a
11  suspension stage of the progressive
12  discipline --
13      Q.      (By Mrs. Battle-Hodge) She's
14  writing this down.  If you can read just a
15  little slower.
16      A.      For the reasons stated herein, the
17  10 days' suspension imposed on Ms. Shannon
18  Burton, based upon a refusal to sign letters of
19  reprimand, was not justified based upon the law
20  and facts presented.  I recommend, pursuant to
21  36-26-28(b) of the Code of Alabama 1975, the
22  Handbook for Employees in the Ag and Industry
23  and the Handbook of Progressive Discipline 2005
```

1    edition, that the suspension of Ms. Shannon

2    Burton for 10 days without pay during the

3    November 25th, 2005, through December 7th, 2005,

4    is due to be rescinded.

5         Q.     Thank you.  As far as you know,

6    did the department take an action on the

7    administrative law judge's recommendation?

8         A.     I don't know.  You mean

9    immediately?

10        Q.     Do you know as of today?

11        A.     I don't know anything for a fact.

12   I've heard discussion that there has been no

13   action taken.

14        Q.     I'm just asking you what you know.

15        A.     So I don't know anything.  I don't

16   know for sure.

17        Q.     Did you perform Ms. Burton's

18   appraisal at the end of 2005, December 2005?

19        A.     Yes.

20        Q.     During the time you were supposed

21   to do her appraisal, did you hold it up a little

22   bit because this matter was going on with the

23   suspension and all of that?

1          A.      The time we did it -- let me go --
2    if you are talking about held up, as far as when
3    it would be processed downtown and did we get it
4    in time, I think we did.
5          Q.      I didn't ask that question.
6          A.      While some of this was going on,
7    we did not perform the evaluation because some
8    of it was taking place.
9          Q.      At some point did you decide that
10   this is still going on, we need to go ahead and
11   have your appraisal done; is that correct?
12         A.      That's correct.
13         Q.      Did you do her appraisal?
14         A.      Yes.
15                 (WHEREUPON, a document was
16                 marked as Plaintiff's Exhibit No.
17                 7 and is attached to the original
18                 transcript.)
19         Q.      (By Mrs. Battle-Hodge)  Do you
20   recall this letter here dated December 13th,
21   2005, from you?
22                 MR. WILSON:  Is it from you?
23         A.      Yes, and I do recall.

104

1    Q.    (By Mrs. Battle-Hodge) This letter

2    pretty much says what you just said, that your

3    performance appraisal is past due in our

4    personnel office.  I had delayed completion,

5    which is understandable, of the evaluation

6    because of the pending suspension, which you

7    just said.  It has become apparent that we must

8    move forward in completing the appraisal

9    process, which agree that you did; is that

10   correct?

11        A.    Correct.

12        Q.    Your appraisal for the

13   above-referenced time frame reflects a

14   suspension as the to most of your steps of

15   discipline taken with you during the appraisal

16   period.

17        A.    Correct.

18        Q.    At the time of this appraisal, you

19   have appealed your suspension and we are

20   awaiting the determination of the date to hear

21   your appeal.  If the hearing on your appeal of

22   the suspension determines that the suspension

23   was not proper, we will change or redo your

1    evaluation to reflect that decision.  Did you do

2    that?

3         A.    It also says --

4         Q.    No, no.  I'm just asking did you

5    do that?

6                    MRS. MARKS:  Object to the

7    form.

8         Q.    (By Mrs. Battle-Hodge) Did you

9    redo --

10        A.    No.

11        Q.    I will read the whole thing.  Also

12   if the hearing outcome results in a change in

13   your evaluation that affects step raises, it

14   will be handled in a manner that you would not

15   in any way be penalized monetarily.

16        A.    That's correct.

17        Q.    My question is -- and I'm going to

18   let you say what you want to say about that --

19   did you-all redo her appraisal?

20        A.    No.

21        Q.    Go ahead, you wanted to say

22   something.

23        A.    No, that's it.

1       Q.      Who is Teresa Smiley?

2       A.      She is a Deputy Commissioner.

3       Q.      She's currently a Deputy

4  Commissioner?

5       A.      Yes.

6       Q.      Do you have any idea how long

7  she's had that position?

8       A.      No idea.

9       Q.      Well, was she the Deputy

10  Commissioner at the time of this incident here?

11       A.      Yes.

12              MR. WILSON:  What is that,

13  2005?

14              MRS. BATTLE-HODGE:  Yes,

15  2005.  Thank you.

16       Q.      (By Mrs. Battle-Hodge) Have you

17  ever confided with Ms. Smiley about your racial

18  views?  Have you ever discussed your racial

19  views with Ms. Smiley?

20       A.      Probably -- I don't recall.

21       Q.      Is it probably, or you don't

22  recall?

23              MRS. MARKS:  Do you remember?

1          THE WITNESS:  I don't remember

2     a specific occasion.

3          Q.     (By Mrs. Battle-Hodge) If you

4     don't remember a specific occasion, can you

5     recall what that conversation might have been

6     about?

7          MRS. MARKS:  Object to the

8     form.  If you remember the conversation, you can

9     tell her what you remember.  If you don't

10     remember the conversation, then your answer is,

11     I don't remember.

12          A.     I remember one specific

13     conversation.

14          Q.     (By Mrs. Battle-Hodge) What was

15     that?

16          A.     We were in a meeting in

17     Gatlinburg, and she came to me and talked to me

18     and told me -- she said, do you remember making

19     a statement about -- we were up there, I think

20     they were in Shannon's office, they had been

21     selling cookie dough or something like that for

22     a school program, and I had made a comment.

23          Q.     What was that comment?

 1          A.     That comment was I was walking out

 2    the door at the end of the day and I said, are

 3    y'all doing drug deals in there.  So she --

 4    going back to Gatlinburg -- she says, Shannon

 5    took offense to that.  I said, well, I certainly

 6    meant no offense.  How did you take it?  She

 7    said, I knew you were just joking.  I said,

 8    yeah.  I said, I certainly wouldn't say anything

 9    like that and I don't believe that way.

10          Q.     What does that have to do with

11    race?  Was that a conversation about race?

12          A.     Ms. Smiley said that Shannon had

13    took that to be racial.  She said, she probably

14    try to get back at you with it.

15          Q.     I don't understand what you mean.

16          A.     That's what she said.  Shannon

17    will probably try to get back at you with it,

18    use it against me.

19          Q.     When that did that statement

20    happen?

21          A.     That was in September of 2005.

22          Q.     Have you ever seen the movie, "A

23    Long Walk Home"?

1          A.      I have.

2          Q.      What is that movie about?

3          A.      It's about the bus boycott, the

4    racial issues, back in the early '60s.  Yes, I

5    have seen that.

6          Q.      When did you see that movie?

7          A.      Fifteen, 20 years ago.

8          Q.      Did you make the statement that

9    you were once a racist?

10                  MR. WILSON:  Object to the

11   form.

12         A.      A racist?

13         Q.      (By Mrs. Battle-Hodge) A racist?

14         A.      No.

15                  MRS. BATTLE-HODGE:  Let's take

16   a quick break.

17                      12:24 PM

18                  (Short break.)

19                      12:32 PM

20         Q.      (By Mrs. Battle-Hodge) You

21   testified earlier that Ms. Burton was afforded

22   an opportunity to go before the administrative

23   law judge; is that correct?

1     A.    Yes.

2     Q.    You also testified that she

3 requested it, or did you testify to that?

4     A.    I don't know if I testified to

5 that, but...

6         (WHEREUPON, a document was

7         marked as Plaintiff's Exhibit No.

8         8 and is attached to the original

9         transcript.)

10    Q.    Just for the record, I'm going to

11 give you Exhibit No. 8.  Is that the letter

12 informing Ms. Burton that she will have the

13 opportunity to go before an administrative law

14 judge?

15    A.    Yes.

16    Q.    Who is that letter from?

17    A.    Commissioner Ron Sparks.

18    Q.    In this letter, it says:  Dear

19 Ms. Burton, in accordance with your request for

20 a post suspension review, as the appointment

21 authority, I decided to designate a hearing

22 officer to preside over this review.  The

23 hearing officer will be an administrative law

1    judge from the Attorney General's office,

2    Administrative Hearing division.   Is that

3    correct?

4         A.     Yes.

5         Q.     When was this done, this directive

6    given?

7         A.     December 7, 2005.

8         Q.     Would you agree that once

9    Ms. Burton went before the administrative judge

10   or even before that, when she went to the

11   administrative law judge, she was exercising one

12   of her legal rights within your department; is

13   that correct?

14        A.     That's my understanding.

15        Q.     Also it was your testimony that

16   per your letter to Ms. Burton, is it true that

17   you promised her that if the administrative law

18   judge recommended that a suspension not be had,

19   be taken back, that you would have her

20   re-evaluated; is that correct?

21             MRS. MARKS:   Object to the

22   form.

23        A.     That is part of the letter.

1          Q.      (By Mrs. Battle-Hodge) Is that
2     part of the letter?

3          A.      Uh-huh.

4          Q.      Did you testify that she was not
5     reevaluated?

6          A.      I did testify to that.

7          Q.      What is your explanation on why
8     she wasn't reevaluated?

9          A.      May I see the letter again?

10         Q.      Yes.

11         A.      It also states in there -- it
12    states also if the hearing outcome results in a
13    charge in your evaluation -- a change in your
14    evaluation, that will affect a step raise, it
15    would be -- it would not in any way be penalized
16    monetarily.

17         The hearing judge made their
18    recommendation.  To my knowledge, the
19    Commissioner has not overturned the suspension,
20    so there was no need to reevaluate.

21         Q.      Is it not true that you stated if
22    the hearing on your appeal of the suspension
23    determines that the suspension was not proper,

1  we will change.  Is that what you stated here?

2      A.     That's what is here.

3      Q.     It doesn't say if the Commissioner

4  acts on what the judge's recommendations, did

5  it?

6      A.     It does state relative to any

7  merit raises, that it would be based upon a

8  change or the hearing outcome did not result in

9  a change.

10         MRS. BATTLE-HODGE:  I have no

11  further questions.  We can take a break if

12  that's okay.

13         MR. WILSON:  Okay.

14              12:37 PM

15              (Lunch break.)

16              1:39 PM

17      Q.     (By Mrs. Battle-Hodge) Mr. Hester,

18  are you Ms. Fitzpatrick's current supervisor?

19      A.     Yes.

20      Q.     When did you become

21  Ms. Fitzpatrick's supervisor?

22      A.     In 2003 when I received my

23  promotion to division director.

114

```
 1          Q.     What is Ms. Fitzpatrick's
 2   position, what job does she hold?
 3          A.     She's currently a program
 4   director.
 5          Q.     Earlier you gave me a hierarchy,
 6   somewhat of how the department is set up.  She's
 7   one of the program directors that falls under
 8   your supervision; is that correct?
 9          A.     That's correct.
10          Q.     Before Ms. Fitzpatrick came under
11   your supervision, who was her supervisor?
12          A.     Ronnie Murphy -- Deputy
13   Commissioner Ronnie Murphy.
14          Q.     When Ms. Fitzpatrick came under
15   your supervision who was she supervising, or did
16   she supervise anyone?
17          A.     I believe she had responsibilities
18   for shipping-point inspection, seed laboratory
19   and audits and reports.
20          Q.     What other positions --
21          A.     And did warehouses.
22          Q.     What other positions did she
23   supervise when she first came under you in 2003?
```

1   A.  What position did she supervise?

2   Q.  Who did she supervise?

3   A.  A unit manager, a lab director, a

4 shipping-point inspector, chief -- I'm not sure

5 again what his title is -- and an Auditor 3, I

6 think it is.

7   Q.  Who held those positions at that

8 time?

9   A.  Unit manager for audits and

10 reports was Joe Cowart; Auditor 3 or audits and

11 reports is Donnie Walker; the shipping point

12 administrator Darrell Buckston; seed laboratory

13 was John Crayton.

14   Q.  John Crayton, what position did he

15 have at the time she was supervising him?

16   A.  I believe it was program director.

17   Q.  So Ms. Fitzpatrick's position is

18 and was a program director at that time; is that

19 correct?

20   A.  Yes.

21   Q.  She was supervising a program

22 director?

23   A.  He might have been a lab

1  director.  The title has changed somewhere in

2  the time frame there -- I'm not sure exactly

3  when the title has changed.

4  　　　　Q.　　So are you saying that at the time

5  Ms. Fitzpatrick supervised him, he was not a

6  program director?

7  　　　　A.　　I'm not sure.

8  　　　　Q.　　Does she supervise those same

9  position individuals today?

10  　　　　A.　　No.

11  　　　　Q.　　What has changed?

12  　　　　A.　　The responsibilities have

13  changed.  We needed a qualified person to work

14  with and coordinate with our laboratories, to

15  upgrade our safety issues, to upgrade our

16  quality issues, to upgrade our certification

17  issues.

18  　　　　Q.　　So with that change, all of these

19  people she supervised at one time, did they come

20  from under her supervision at that time?

21  　　　　A.　　Yes.

22  　　　　Q.　　When was that?

23  　　　　A.　　There was -- she initially was

1    assigned some of the laboratory work in January

2    of 2006, but as far as a full move into that

3    position, I believe it was later in the year,

4    maybe June or July of '06.

5         Q.    When did she move from the

6    position that she had when you first came in

7    2003 to the position that she currently has, the

8    position that you are talking about that she

9    moved to now?

10        A.    Her title hasn't changed at all.

11        Q.    She's still program director?

12        A.    She's still program director.

13        Q.    When did her duties change?

14        A.    Some of her duties changed in

15   January of '06.

16        Q.    Would you state again why they

17   changed?

18        A.    In January of '06?

19        Q.    Yes.

20        A.    Because of a need, as a matter of

21   fact, we had already had two or three complaints

22   filed in our seed laboratory with risk

23   management prior to that.  There was a need for

118

 1    us to be -- have someone to oversee our safety

 2    issues in our laboratory and quality assurance

 3    in our laboratories and there are new

 4    requirements coming along for certification

 5    that's also a part of our assignment in January

 6    of 2006.  Those were, at that time, were added

 7    to her current duties.

 8        Q.    Who does she supervise now?

 9        A.    She doesn't have direct

10    supervision with anyone.

11        Q.    So she has no supervisory --

12        A.    No direct supervision of anyone.

13        Q.    You mentioned that the laboratory

14    responsibilities were removed; is that correct?

15    Tell me what you said about the laboratory.

16        A.    In January of '06 she was assigned

17    some new duties to go along with her previous

18    duties that included the laboratories, the

19    safety, quality assurance, certification.

20        Q.    So are you saying she was not --

21        A.    At that time she still maintained

22    all of her supervisory that she had had before.

23        Q.    At what time?

119

1         A.      January of '06.

2         Q.      So January of '06 she had

3    supervisory --

4         A.      Yes.

5         Q.      So at what point did she lose

6    those responsibilities?

7         A.      In June of '06, six months later,

8    five months later --

9         Q.      So let's just say for the sake,

10   June, maybe early summer she lost her -- is that

11   what you're saying?

12                MR. WILSON:  Object to the

13   form.

14        A.      Her responsibilities had changed.

15        Q.      (By Mrs. Battle-Hodge) In January

16   of '06 are you saying that that's when you moved

17   her to the safety and quality and all of that

18   stuff, the needs for that came about; is that

19   January '06?

20        A.      We added those duties for her

21   current at that time.

22        Q.      So in addition to that she kept

23   her supervisory --

1         A.      At that time.

2         Q.      Then are you saying that in

3   whatever month, May, June, some six months

4   later, those supervisory responsibilities were

5   removed; is that what you are saying?

6                     MR. WILSON:  Object to the

7   form.

8         A.      Yes.

9         Q.      (By Mrs. Battle-Hodge) Who made

10  that decision?

11        A.      The decision was made.  I talked

12  with my supervisor, Deputy Commissioner Ronnie

13  Murphy, we evaluated the needs and the

14  laboratories, and we felt that was the best for

15  the department and with Ms. Fitzpatrick's

16  background.  We felt like that was a place where

17  she could use her background in these areas and

18  laboratories.

19        Q.      Was this decision made out of a

20  meeting, or how did that decision come about?

21        A.       I'm sure we talked about it a

22  number of times and came to that decision.

23        Q.      Who decided that she should not

1    supervise anyone?

2              MR. MARKS:  Object to the

3    form.

4         A.     It wasn't a decision that she need

5    not supervise anyone.  The decision was the need

6    is great in these areas, and we needed a person

7    of her background to be in that position and

8    handle all of the things that the laboratory is

9    faced with, that's all.

10        Q.     (By Mrs. Battle-Hodge) Does a

11   program director normally have a supervisory

12   responsibility?

13        A.     It's a management position.  It

14   can be a management of people or it can be a

15   management of programs.  So in Ms. Fitzpatrick's

16   case it's a management of programs.

17        Q.     You testified that the duties that

18   you changed, Ms. Fitzpatrick's, were some duties

19   and things the department really needed?

20        A.     Yes.

21        Q.     You say that there was a need for

22   safety in the laboratories and a person to

23   oversee the laboratories, and the food safety

122

1    and quality control in the laboratories?

2          A.      That's correct.

3          Q.      Who did that before?

4          A.      It would be various people at

5    different times in the laboratories.  They may

6    assign somebody to look at this or look at that,

7    but there was no formal program.  Therefore a

8    lot of it was falling through the cracks.

9          Q.      When you say various people?

10         A.      For instance, it might have been a

11   Chemist 3 and another -- whoever was available

12   at the time and some of them, the laboratory

13   directors handled it or assigned out parts of

14   it.  But again, there was no coordinated effort

15   to make sure that -- again, we already had

16   complaints in our seed laboratories that filed

17   risk management dealing with safety issues in

18   the state chemical laboratory.  Also the issue

19   of certification is -- used to not even be

20   thought about, but now one of the

21   responsibilities for our laboratory is to

22   maintain the ability for us to ship things

23   overseas.  ISO certification, international

1  standards, will soon be a requirement of any

2  laboratory that's going to do analysis for parts

3  overseas.  So that's an emergent one.  The

4  safety and quality assurance are every day, but

5  the emerging ones are the certification and it's

6  a long drawn out process to get ISO-certified.

7  There are also other certifications dealing with

8  something that is a fallout of 9/11, that is

9  food and emergency response network.  That is a

10  national organization that we currently have

11  certification to do certain type analysis in

12  case of a national event.  There are certain

13  types of samples that we can analyze now.  We

14  have to maintain certification in order to be a

15  member of that, be a part of it, so we can use

16  those services in other states and the FDA and

17  federal government should we need them.

18      Q.      What type qualifications does

19  Ms. Fitzpatrick have that warrant you moving a

20  program director to safety and quality?

21      A.      She spent a number of years as a

22  chemist.  She moved way up.  And I don't know

23  how long she had been a Chemist 3, probably more

```
 1   than 15, 20 years.  She had been a Chemist 3 for

 2   a number of times.  The issues in the laboratory

 3   safety-wise, she has abilities, and she has

 4   experience dealing with those type issues.

 5        Q.      So she was a program director at

 6   the time you transferred her and still is a

 7   program director; is that correct?

 8        A.      That's correct.

 9        Q.      You testified that individuals

10   that were not at the level of program directors,

11   you usually give those type duties to those

12   individuals who are not at the level of program

13   director; is that correct?

14                MR. WILSON:  Object to the

15   form.

16                MRS. MARKS:  Object to the

17   form.

18        A.      Could you restate that?

19        Q.      (By Mrs. Battle-Hodge) The safety

20   and quality, are those duties that ordinarily

21   you would give to someone who is not a program

22   director?

23        A.      Ordinarily means we didn't have a
```

125

1    program.  It was just a piecemeal program.

2    That's why we felt the need for a person, a

3    position to deal with these issues.

4         Q.    I'll move on from that.  Have you

5    ever talked to Ms. Fitzpatrick about any

6    problems she might be experiencing or hasn't

7    experienced in her employment as the person over

8    safety and quality?

9         A.    We've talked about her position

10   and what's expected, and offered any assistance

11   we could as far as the, you know -- we realize

12   there is going to be a learning curve.  We

13   realize that she's going to be exposed to some

14   things she hasn't been exposed to.  Yeah, we've

15   talked numerous times about what our goal was

16   and what we wanted to accomplish.

17        Q.    Did you-all come to a plan on how

18   to take care of those concerns?

19        A.    Certain aspects, certainly not all

20   that needs to be done, but certain aspects.

21        Q.    What aspects?

22        A.    Maintaining a manual for what each

23   lab was doing quality assurance-wise, and

1    developing graphs that will show very quickly if

2    there is a trend in a certain type of analysis,

3    check-sample analysis that we're getting the

4    kind of results that we should be getting,

5    reviewing the laboratories to see if there are

6    safety needs or even time issues, giving our

7    inspectors in the field, supply them with safety

8    glasses and things of that nature to do some of

9    our fieldwork.

10        Q.    With taking away Ms. Fitzpatrick's

11   supervisory responsibilities, would you consider

12   that a reduction in her responsibilities?

13        A.    No, I don't.

14        Q.    Do you have any other program

15   director who just oversees a program?

16        A.    I don't think so.

17        Q.    Were you influenced by anyone else

18   up the chain, or your boss or anyone --

19        A.    Let me restate that.

20        Q.    Go ahead.

21        A.    They all oversee programs.  Not

22   all of them -- she's the only one I know of that

23   does it without direct supervisory over any

127

1   individual, but they are all supervised

2   programs.  Some of them have managerial

3   relationships with people under them.

4          Q.    So she's the only person who

5   doesn't supervise individuals?

6          A.    I think that's right -- in mine --

7   in other divisions there may be some others.

8          Q.    Is it true that you took the

9   fertilizer and seed labs from Ms. Fitzpatrick in

10  '06, the people under that, and when you gave

11  her the responsibilities of the labs, in

12  essence, the seed and fertilizer labs fell under

13  that but she wasn't able to supervise the people

14  in seed and fertilizer; is that correct?

15                MR. WILSON:  Object to the

16  form.

17         A.    I apologize.  I left that one out.

18  The laboratory, the chemical laboratory in

19  Auburn did answer to her up until the time frame

20  we talked about.  So what was your question

21  about?  That it was under and it's not under

22  anymore as supervisory?

23         Q.    (By Mrs. Battle-Hodge) Right.

128

```
 1          A.      Yes.  That's correct.

 2          Q.      As program director, is

 3   Ms. Fitzpatrick the only female?

 4          A.      I believe that's correct.

 5          Q.      In these laboratories are there

 6   unit managers?

 7          A.      They have -- I believe the correct

 8   term is agricultural testing laboratory

 9   director.

10          Q.      So that's kind of the same thing?

11          A.      All three of them that we have

12   talked about would have that title, the head of

13   those laboratories.

14          Q.      All three of who?

15          A.      Food safety laboratory, pesticide

16   residue laboratory, and the ag chemical

17   laboratory.

18          Q.      Are you saying that the people

19   that are over those laboratories are unit --

20          A.      They are agricultural testing

21   laboratory directors.

22          Q.      Though Ms. Fitzpatrick doesn't

23   supervise these individuals, does she?
```

129

1        A.     That's correct.

2        Q.     Do you meet with these

3 individuals?

4        A.     Yes.

5        Q.     When you meet with them, do you

6 ever have discussions about the lab, the safety

7 and anything with regards to the lab?

8        A.     Yes.

9        Q.     Do you involve Ms. Fitzpatrick in

10 any of these meetings?

11        A.     Yes.  She may not be involved

12 directly in a meeting when we're in a meeting

13 room, but if they bring up a safety issue that

14 needs to be referred, like our food safety

15 laboratory, we're looking at making some changes

16 in it -- and I talked to Ms. Fitzpatrick about

17 that and asked her to look at ISO certificate

18 requirements and make sure that we didn't do

19 something that was going to mess things up --

20 and also she went over with us to visit the

21 micro lab and the diagnostic lab that is not

22 included in this group -- it's a separate

23 entity.

1      Q.     Is there a need for
2    Ms. Fitzpatrick to be involved in the meetings
3    when you-all are talking about the labs?
4      A.     If it were for the purpose of
5    talking about safety or quality assurance or
6    things like that, if it's to talk about the
7    workload and the employees and personnel issues,
8    no.
9      Q.     But you do talk about safety and
10   quality control in the meetings in addition to
11   other things of that nature?
12     A.     Sometimes.
13     Q.     Is she included in those meetings?
14     A.     If she's not there, then I include
15   her later.  I wouldn't set up a meeting to talk
16   about food and safety or laboratory safety, or
17   laboratory quality assurance without her.  I
18   would plan on having her there.
19     Q.     So are you saying that once you
20   have the unit managers -- and forgive me if I'm
21   using the wrong names -- those meetings, if
22   safety and quality come up, you bring her in a
23   meeting, is that what happens?

132

1   meet with them on an individual basis.

2        Q.    When you have meetings?

3        A.    Well, the last one was when she

4   went over there with us to the micro lab in

5   Auburn, the diagnostic lab.

6        Q.    When was that?

7        A.    I want to say a month ago, maybe

8   five weeks ago.

9        Q.    Do you recall when the new

10  governor, at that time there was a statewide

11  mandate that all state cars be taken up.  Are

12  you familiar with that?

13       A.    Somewhat.

14       Q.    At that time what was your

15  position?

16       A.    When?

17       Q.    I think it was in '03?

18            MR. WILSON:  I think that's

19  right.

20       A.    At one point in '03 I was division

21  director, the first half of the year I was a

22  program director.

23       Q.    (By Mrs. Battle-Hodge) Do you

1  recall the time that the cars were taken up?

2      A.    I recall some of that, yes.

3      Q.    Was your car taken?

4      A.    No, it wasn't.

5      Q.    Were you excepted out?  I know

6  there was some criteria, if you didn't travel a

7  whole lot --

8      A.    The food safety is on-call.

9      Q.    You didn't fall within the

10  category where your car had to be taken?

11      A.    Right.

12      Q.    Once the cars were taken, were

13  they ever given back to employees?

14      A.    I don't know who received one

15  back, who didn't or anything like that.  I

16  wasn't involved in that process.

17      Q.    Were you supervising

18  Ms. Fitzpatrick at that time?

19      A.    The latter part of 2003.

20      Q.    Do you recall if you were

21  supervising her at the time the cars were taken

22  up?

23      A.    I don't recall.

134

1       Q.    Has Ms. Fitzpatrick expressed to

2    you that she feels that the transfer of her

3    duties from supervising individuals to safety

4    and quality assurance, that she feels that

5    that's a demotion?

6       A.    I don't believe I've heard her

7    tell me that she felt like it was a demotion.

8       Q.    Has she ever expressed to you that

9    she wasn't satisfied with that move?

10       A.    I believe when we sat down and had

11    our initial discussion about it, she asked about

12    her supervisory authority and I don't recall

13    having any conversation with her since then.

14       Q.    When did you become division

15    director?

16       A.    It was effective I think June of

17    '03.

18       Q.    Do you know if Ms. Fitzpatrick

19    applied for one of those division director

20    positions?

21       A.    I don't know.

22       Q.    How many positions were open at

23    that time, do you know?

135

1          A.      I think just one.

2          Q.      What's his position, Tony Cofer?

3          A.      I believe he's division director,

4    I don't know.  I know who he is.

5          Q.      Do you know when he was appointed?

6    Am I correct that he was appointed as acting

7    division director initially, or do you know?

8          A.      I don't know.

9          Q.      Do you know when he became

10   division director?

11         A.      I don't know.

12         Q.      With regard to Ms. Fitzpatrick's

13   current position, you do supervise her,

14   correct?

15         A.      Yes, ma'am.

16         Q.      In 2003 did you have any concerns

17   with Ms. Fitzpatrick's ability to supervise

18   individuals and the way she was supervising them

19   as program director before her duties were

20   transferred?

21         A.      Any changes we made were not based

22   on her abilities or inabilities -- it was based

23   on the need.

136

        Q.    Are you aware that Ms. Fitzpatrick
filed a complaint with the State Employees
Association?

        A.    I am now.  Whenever the complaints
were filed with EEOC, that's the first knowledge
I had of it.

                MRS. BATTLE-HODGE:  Give me
one second.

                        2:09 PM
                (Short break.)
                        2:10 PM

        Q.    (By Mrs. Battle-Hodge) The
decision to reassign Ms. Fitzpatrick's duties,
whose ultimate decision was that?

        A.    It was mine and Mr. Murphy's.  It
had to go before the Commissioner.

                MRS. BATTLE-HODGE:  I have no
further questions.

                        2:11 PM
                (Short break.)
                        2:16 PM

        Q.    (By Mrs. Battle-Hodge) How are you
familiar with Mr. Crayton?

1    that that happened, and I think sometime later

2    during the next year it was changed where

3    Ms. Fitzpatrick no longer directly supervised

4    Mr. Crayton.

5         Q.    How did he originally come under

6    Ms. Fitzpatrick's supervision as a program

7    director?

8         A.    I'm not sure.

9         Q.    Was he a program director when you

10   first came to supervise him in 2003?

11        A.    Yes.

12        Q.    Was he under Ms. Fitzpatrick's

13   supervision before you became his supervisor?

14        A.    Yes.

15        Q.    Have you ever had to reprimand

16   Mr. Crayton?

17        A.    Yes.

18        Q.    Would you tell me about that?

19        A.    In or around the end of September

20   of '04, beginning of October of '04, we had a

21   power outage in the building.  Our computers

22   were shut down for a while and -- now the

23   analyzation process in the seed laboratory

1    doesn't involve computers, they are separate

2    from the computers.  We were still getting

3    results, but they were not being reported out.

4    I believe that was Hurricane Ivan, I'm not real

5    sure.  I had been in Mobile, and when I returned

6    back to the office, that's when we were

7    blindsided with half a dozen different

8    complaints in a short time, saying we've been

9    told that we can't get our results out, we can't

10   get our reports, we've got seeds sitting here,

11   need to be sold.  I've got some already sold, I

12   can't sell them until I get a certification from

13   the state.  That's my first knowledge of that

14   event.  Mr. Murphy and I sat down trying to go

15   through to figure out what happened, we had not

16   been told we were not reporting out any samples,

17   but after looking into it, it was determined

18   that a decision had been made by Mr. Crayton to

19   not report them out because he didn't have the

20   right form to report them out with.

21         Q.    How did the form come about?

22         A.    I'm sure over time.  You know,

23   probably five years before then, they probably

1     didn't have a computer-generated form.

2          Q.     There was a form that was supposed

3     to be --

4          A.     Not required.

5          Q.     But a form that you use; is that

6     correct?

7          A.     Yes.

8          Q.     How was that form generated?

9          A.     Through the computer system -- the

10    programs ends at the generation.

11         Q.     You just testified that you were

12    having problems with the computer system at the

13    time.

14         A.     That's correct.

15         Q.     Would that have affected his

16    ability to get those reports out?

17         A.     If he would have let somebody

18    know, we would have made sure that we had some

19    type form where we could get reports out, but we

20    didn't know that.  Apparently it had gone some

21    time without us knowing that.

22         Q.     Right, but it was -- he wasn't

23    able to get the reports out without the -- the

1  reports form wasn't able to be generated without

2  the computer; is that correct?

3                  MR. WILSON:   Object to the

4  form.

5       Q.     (By Mrs. Battle-Hodge) Is that

6  correct?

7       A.     Yes.  To do it the way he had been

8  doing it before, he wasn't even that far.

9       Q.     When was this?  Tell me the period

10 of time.

11      A.     That they were not reported out?

12      Q.     Right.

13      A.     I'm thinking it was a couple of

14 weeks.  And at that time they still were not

15 getting out, and according to Mr. Crayton he had

16 no intention of doing anything different except

17 waiting to get new forms.

18                (WHEREUPON, a document was

19                marked as Plaintiff's Exhibit No.

20                9 and is attached to the original

21                transcript.)

22      Q.     (By Mrs. Battle-Hodge) Is this the

23 form that you are saying is computer-generated?

1    A.    That is a form we use for a final

2  report.

3    Q.    And actually we have a big stack

4  of these, just examples, so are you saying this

5  is the report?

6    A.    This is an example of a report.

7    Q.    That wasn't then sent out?

8    A.    Correct.

9    Q.    After it was --

10    A.    I believe there were some other

11  forms.  I'm not sure about that.  That they used

12  to record the data on before it gets to this

13  point, but they would not be able to generate

14  this from the computer at that time -- that's

15  correct.

16    Q.    Did Mr. Crayton do anything to get

17  reports out?

18    A.    No.

19    Q.    This was, you said, latter of '04?

20            MR. WILSON:  This is

21  September/October '04.

22            MRS. BATTLE-HODGE:  Right.

23    Q.    (By Mrs. Battle-Hodge) Again, this

1    is just an example, and I want you to look at

2    it.  That was September of '04 and from August

3    of '04, who came up with that form?

4                    (WHEREUPON, a document was

5                    marked as Plaintiff's Exhibit No.

6                    10 and is attached to the original

7                    transcript.)

8        A.      I'm not sure.  I don't know.

9        Q.      Whose signature is that?

10       A.      John Crayton.

11       Q.      Is that a form, albeit not the --

12   this form here, it's a way to get out

13   information?

14       A.      Yes.

15                    MRS. MARKS:  When you say this

16   form here, just for the record.

17                    MRS. BATTLE-HODGE:  Exhibit

18   No. 10.

19       Q.      (By Mrs. Battle-Hodge) Is it true

20   that Mr. Crayton sent out these type forms from

21   August until September until the system came

22   back up once -- these type forms?

23                    MR. WILSON:  What you marked

1    as Exhibit No. 10?

2                    MRS. BATTLE-HODGE:   Right.

3    Thank you.

4        A.      State that question again.

5        Q.      (By Mrs. Battle-Hodge) Is it true

6    that since Mr. Crayton didn't have access to

7    this form, that he made up his own way of

8    getting the reports out?

9        A.      Sometime prior to this event he

10   may have done that, but not during this event.

11       Q.      When was this event?

12       A.       It was towards the latter part, I

13   think the reprimand was October 4th.

14       Q.       The reprimand was October 4th, but

15   isn't it true that Mr. Crayton sent these

16   reports out August and September of '04, the

17   ones he did himself?

18       A.       I don't know.

19       Q.       Tell me again what the reprimand

20   was about.

21       A.       During that time after I believe

22   Hurricane Ivan had passed, our computer was down

23   and during that time he made no effort that I

1  could see to notify the people out there that

2  were needing to sell their seed, needing

3  certification, they were calling in complaining.

4  We've got our seed, we need to sell them.  I

5  called Mr. Crayton and he said, our computer is

6  down and we can't get you any results.

7       Q.    Did these reports start after that

8  conversation, the ones he did himself?

9       A.    Not if it's dated September 1st.

10       Q.    Did he attempt to fix the problems

11  with these forms with this type letter?

12       A.    Not at the time that we had given

13  him the reprimand.

14       Q.    Did you write the reprimand?

15       A.    I did.

16       Q.    Was there a hearing held on the

17  reprimand?  With regard to the reprimand, was

18  there a meeting or anything to talk about the

19  reprimand?  I don't know your process.  When

20  someone is reprimanded, what happens?

21       A.    It's placed in the file, the

22  employee has an opportunity to rebuttal.

23       Q.    Did he rebut?

1          A.      Yes, he did.

2          Q.      Do you recall if he explained to

3     you in that rebuttal the difficulties he was

4     having with the computer?

5          A.      I believe he did.

6          Q.      He was given a reprimand; is that

7     correct?

8          A.      That's correct.

9          Q.      Why wasn't he given a warning or

10    talked to?

11         A.      Because of the severity of the

12    problem it had created, it created an

13    embarrassment for the department.  For some time

14    we had complaints from -- we have two-fold

15    reasons for having a seed laboratory.  One is to

16    serve the industry, so they can sell their

17    products.  The other has to make sure we have a

18    level playing field for the industry, so

19    whatever they put on their label is correct.

20    What was the question again?

21         Q.      I think you answered it.  Were

22    there any other employees affected by the

23    computer problems you-all were having?

1      A.      Probably were.

2      Q.      Was it pretty much anyone who used

3  the system, did they have problems getting

4  information out?

5      A.      I would assume so.

6              MR. WILSON:  Don't assume,

7  just tell her.

8      A.      I don't know how they handled it.

9  I don't know what problems everybody else

10  experienced or how they addressed it.

11      Q.      (By Mrs. Battle-Hodge) Under your

12  supervision, was this the only problem y'all

13  had?

14      A.      Certainly the only major problem

15  we had.

16      Q.      Was this the only problem you had?

17      A.      I don't remember.

18      Q.      While you were Mr. Crayton's

19  supervisor, did you have access to the seed

20  database?

21      A.      I had -- I'm trying to remember.

22  At some time I did get it to my computer in a

23  read-only fashion.  Prior to that I might have

1    been able to look on Mr. Benny Hitch's computer.

2        Q.    Did you look on Mr. Benny Hitch's

3    computer?

4        A.    Sure.

5        Q.    Is that a part of what you needed

6    to do, did you have a need to look at that

7    database?

8        A.    Periodically, yes.

9        Q.    Why would you look at the

10    database?

11        A.    To see what the status is.  How

12    many samples we have outstanding, how many were

13    reporting, what the trend was, different

14    aspects.

15        Q.    So it wasn't unusual because he

16    was under your supervision, so as supervisor you

17    would look at that; is that correct?

18        A.    Yes.

19        Q.    Did you have problems getting

20    reports out or doing what you needed to do with

21    the computer as a result of Ivan?

22        A.    Me personally?

23        Q.    You personally, yes.

```
 1          A.      I don't recall having any that I

 2   couldn't address through other means.

 3          Q.      Going back to the database, did

 4   you cause or were you responsible for having

 5   deleted three to four months of data, causing

 6   problems in the database yourself?

 7          A.      Absolutely not.

 8          Q.      Who is Mr. Tom Johnson?

 9          A.      Are you asking me?

10          Q.      Yes, I'm sorry.

11          A.      He's employee with the department.

12          Q.      At the time we are talking about

13   here, I guess in '05, what was his position?

14          A.      I believe at that time he was over

15   plant protection.

16          Q.      Who is Ms. Patterson?

17          A.      We had a Ms. Patterson that worked

18   in audits and reports.

19          Q.      Are you aware if they had any

20   problems when the server was out?

21          A.      I don't know.

22          Q.      Did you have any supervision over

23   them, or did you work with them?
```

1     A.     I didn't have any with Tom

2  Johnson.  Wilma would have been, I believe at

3  that time, over audits and reports -- that's

4  Ms. Fitzpatrick would have been over the audits

5  and reports, if that's the Ms. Fitzpatrick

6  you're talking about.

7     Q.     So are you saying these employees,

8  you didn't come into contact with them as it

9  relates to getting work done at the department?

10    A.     I wasn't the direct supervisor.

11    Q.     Did you work with them?

12    A.     I was over Ms. Fitzpatrick, and

13  Ms. Fitzpatrick was over Ms. Patterson.

14    Q.     Are you aware that they were

15  without a server during the time of Ivan?

16    A.     I'm aware that a lot of us were,

17  if not all of us.

18    Q.     Was Commissioner Sparks aware of

19  the reprimand that you filed against

20  Mr. Crayton?

21    A.     Yes.

22    Q.     Did he have any input on the

23  reprimand of what should be done as a result of

1    the reprimand?

2        A.    I don't recall any direct input.

3    We had a discussion, Mr. Murphy and myself and

4    the legal folks.

5        Q.    What was that discussion about?

6        A.    About the event and what had

7    happened and what were the disciplinary

8    concerns.

9        Q.    What was the final result of that

10   reprimand?  Was any action taken against

11   Mr. Crayton other than the written reprimand

12   being placed in his file?

13       A.    It affects the score, I don't know

14   if that's what you're asking.

15       Q.    Yes, it is.  And the score being

16   affected, what ramifications did that bring

17   about?

18       A.    He would have received the same --

19   been in the same range of "meets standards"

20   either way.  It would not have affected his pay.

21       Q.    At that time did you state to

22   Mr. Crayton that you were having problems with

23   your server?

```
1          A.      I don't recall.

2          Q.      You're sure that the reprimand

3    didn't affect Mr. Crayton's pay?

4          A.      I do not believe it affected his

5    pay.

6          Q.      Are you saying that it did not

7    today or you don't believe it did, or do you

8    know?

9          A.      We could go back and look.  I

10   don't believe it did.

11         Q.      So you can't testify --

12         A.      I do not believe it did.

13         Q.      But you don't know?

14                 MRS. MARKS:  Object to the

15   form.

16         Q.      (By Mrs. Battle-Hodge) Are you

17   saying you don't --

18         A.      I'm not a hundred percent certain,

19   yes.

20         Q.      How long was Mr. Crayton the seed

21   program director or program director?

22         A.      I'm not sure.

23         Q.      Look at the complaint, if you
```

1  would.  We have two here.  We have an amended

2  complaint -- and just a statement.  We've done

3  two complaints in this case, and we have the

4  amended complaint and the actual complaint, the

5  second complaint.  So I'm looking at the first

6  complaint, which we've amended.

7              MR. WILSON:  The amended?

8              MRS. BATTLE-HODGE:  Yes, the

9  amended.

10      Q.    (By Mrs. Battle-Hodge) If you look

11  on Page 3, No. 8 it states that Plaintiff from

12  January '02 to July of '06, the Plaintiff was

13  constantly harassed and discriminated with his

14  duties in the seed program director by Ronnie

15  Murphy and Lance Hester, Doug Rigby and Ron

16  Sparks.  Would you speak to that?

17              MR. WILSON:  Object to the

18  form.

19              MRS. MARKS:  Object to the

20  form.

21      A.    I can speak for myself.  I've

22  never harassed or discriminated against Mr. John

23  Crayton in any way, shape, form or fashion.

1        Q.      (By Mrs. Battle-Hodge) Do you have

2   any idea how long Mr. Crayton has worked for the

3   department?

4        A.      A long time -- I don't know.

5        Q.      Do you know whether he started

6   before you did or not?

7        A.      He probably did, but I don't know.

8        Q.      The position that you currently

9   have, division director, what were the

10  requirements for that position?

11       A.      You mean what were the State

12  Personnel qualifications?

13       Q.      Yes.

14       A.      I don't remember exactly what they

15  were.  I would have to go back and look at their

16  announcement.

17       Q.      You testified much earlier that

18  you started working it was 1979 for the

19  department?

20       A.      That's correct.

21       Q.      What's the highest degree you

22  have?

23       A.      BS.

155

1       Q.    Do you know if Mr. Crayton was

2    employed before you were?

3       A.    I don't know.

4       Q.    Do you believe he was?

5       A.    I think he was.

6       Q.    Do you know how much education

7    Mr. Crayton has?

8       A.    I believe he has a master's.

9       Q.    Do you know what area his master's

10    is in?

11       A.    Not exactly, no.

12       Q.    The division director, does it

13    require any education?

14             MR. WILSON:  Object to the

15    form.

16             MRS. MARKS:  Object to the

17    form.

18       A.    No, I didn't say that.

19       Q.    (By Mrs. Battle-Hodge) No.  I'm

20    asking.

21       A.    I don't remember what the

22    qualifications were when it was announced.

23       Q.    Is Mr. Crayton still the seed

1    program director?

2         A.    He is a program director.

3         Q.    But over the seed -- when you

4    first came he was the program director for --

5         A.    Over the seed laboratories.

6         Q.    Is he still the program director

7    for that lab?

8         A.    No.

9         Q.    What does he do now as program

10   director?

11        A.    It has to do with genetically

12   modified seed plants.

13        Q.    When did he start that position?

14        A.    I wasn't over Mr. Crayton at that

15   time, but I believe it was July of '06 or

16   somewhere in that neighborhood.

17        Q.    When were you over Mr. Crayton?

18        A.    2003.

19        Q.    Until?

20        A.    Until February, March of '06, I

21   believe.

22        Q.    Is it true that his

23   responsibilities were changed in July of '06?

```
 1           A.      I believe.  I may not have the
 2      exact date.
 3           Q.      Did you take on some of his
 4      responsibilities?
 5           A.      Mr. Crayton's?
 6           Q.      Yes.
 7           A.      No.
 8           Q.      Who took them on?
 9           A.      Are you talking about when he
10      changed his position?
11           Q.      Right.
12           A.      Ray Hillburn is the Deputy
13      Commissioner over the seed laboratory.  Are you
14      talking about within the seed laboratory?
15           Q.      Just whatever he did, who started
16      doing that?
17           A.      Primarily Andre McMillan.
18           Q.      He's the program director over?
19           A.      I'm not sure what his title is --
20      it may be unit manager -- I'm not sure.  And I
21      was not involved at that point.
22           Q.      Is it true that at the time that
23      Mr. Crayton's duties were changed that they went
```

1    to Mr. Benny Hitch?

2         A.      I don't believe that to be true.

3         Q.      What does Mr. Hitch do?

4         A.      He's over ag compliance, program

5    director.

6         Q.      What does Andre do?

7         A.      Seed laboratory, watches over the

8    analysis of the seed laboratory, he's the one

9    that signs the documents.

10        Q.      So you are saying that --

11        A.      They had already been -- there had

12   been changes made.  Benny Hitch was assigned

13   duties with communicating with the industries on

14   file to seeds -- that was done long before.

15        Q.      So you are saying that on the date

16   that Mr. Crayton's duties were reassigned they

17   were given to Andre; is that what you're saying?

18        A.      Yes, his duties.

19        Q.      Who did that?

20        A.      Again, I wasn't involved at that

21   time.  Ray Hillburn is the one over, the Deputy

22   Commissioner over the seed laboratory.

23        Q.      Even though you weren't over it,

1  you are telling me that you know that those

2  duties were given to Andre?

3       A.    I know that Mr. McMillan is

4  currently --

5       Q.    Not currently.  At that time.

6       A.    Yes.  I'm not back there, I don't

7  know exactly what Andre does every day.

8       Q.    I'm saying at that time.

9            MR. WILSON:  Tell her what you

10  know.

11       A.    At that time I wasn't back there,

12  so I'm going by what others have said, that

13  Andre is running the laboratory.

14       Q.    (By Mrs. Battle-Hodge)  Now, but

15  at that time you don't know?

16       A.    At the time of the change, he

17  received assignments.  I don't know.

18       Q.    So for clarity, you are saying

19  that at the time of the change, Andre McMillan

20  received Mr. Crayton's duties?

21       A.    I don't know if he assumed all of

22  them or part of them, or if it's set up

23  different now.  I was not involved, and I'm not

```
 1    involved now.
 2                    MRS. BATTLE-HODGE:  I'm about
 3    done.  I'm going to speak with Mr. Crayton.
 4                       2:46 PM
 5                    (Short break.)
 6                       2:47 PM
 7                    MRS. BATTLE-HODGE:  Thank
 8    you.  I'm done.
 9              * * * * * * * * * * * * * * * * * * * *
10                       2:47 PM
11              FURTHER DEPONENT SAITH NOT
12
13
14
15
16
17
18
19
20
21
22
23
```

161

C E R T I F I C A T E

STATE OF ALABAMA   )

MONTGOMERY COUNTY )

      I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the deposition given by said witness upon said hearing.

      I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

COPY

        SELAH M. DRYER, CCR

        ACCR#: 393

My Commission Expires
June 30, 2010



# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
### Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

December 13, 2005

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

## MEMORANDUM

**TO:**       **Shannon Burton**
              **ASA III**

**FROM:**     **Lance Hester, Program Director**
              **Food Safety Section**

**SUBJECT:**   Performance appraisal for 12/01/2004 to 12/01/2005

Your performance appraisal is past due in our personnel office. I had delayed completion of the evaluation because of the pending suspension. It has become apparent that we must move forward and complete the appraisal process.

Your appraisal for the above referenced time frame reflects a suspension as the most severe step of discipline taken with you during this appraisal period. At the time of this appraisal, you have appealed your suspension and we are awaiting the determination of the date to hear your appeal.

If the hearing on your appeal of the suspension determines that the suspension was not proper, we will change or re-do your evaluation to reflect that decision. Also, if the hearing outcome results in a change in your evaluation that affects step raises, it will be handled in a manner that you would not in any way be penalized monetarily.

A copy of this memorandum will be filed with the appraisal.

*Exhibit 15*



# STATE OF ALABAMA
## PERSONNEL DEPARTMENT
300 Folsom Administrative Building
Montgomery, Alabama 36130-4100
Telephone: (334) 242-3389 Fax: (334) 242-1110
www.personnel.state.al.us



Jackie Graham
**State Personnel Director**
Paul D. Thomas
**Deputy Director**

State Personnel Board
Joe Dickson
James Anderson
John McMillan
Ellen G McNair
Joyce P. O'Neal

April 27, 2006

Commissioner Ron Sparks
Alabama Department of Agriculture & Industries
1445 Federal Drive
Montgomery, Alabama 36107

RE:    In the Matter of Shannon Burton,
       Recommendation of the Administrative Law Judge

Dear Commissioner Sparks:

I have reviewed the Recommendation of the Administrative Law Judge, in which ALJ Tori Adams recommended that your suspension of Shannon Burton be rescinded because "the record as a whole does not support substantively the imposition of a suspension, in this case." The ALJ based her decision, in part, on the progressive discipline policies and procedures of the State Personnel Department ("SPD"). For the reasons stated below, I respectfully disagree with her interpretation of SPD policies in this matter.

Based on the facts that the ALJ adopted, your recommendation to suspend Ms. Burton was consistent with current SPD disciplinary policies and procedures. According to the facts, Ms. Burton engaged in and was suspended for several incidents of misconduct: (1) calling her supervisor a liar, (2) refusing written and oral instructions from her supervisor to sign a written warning, and (3) refusing to obey orders on two occasions to sign a letter of reprimand.

Citing the SPD Progressive Discipline Manual (2005), the ALJ stated that the suspension was not warranted, because, she says, SPD's policy does not notify a State employee that signing the disciplinary form is required and will subject the employee to separate discipline. The ALJ wrote that SPD's policy requires an employee to provide a signature as acknowledgment of receipt of the disciplinary form is not a mandate that the signature be on the form itself. Instead, the opinion states that "[a] preference is not a mandatory requirement."

*Exhibit 16*

Commissioner Sparks
Page 2
April 27, 2006

The ALJ misinterprets and misapplies this SPD policy in this case. The ALJ mischaracterizes Ms. Burton's conduct as a "failure to comply with an optional or preference recommendation in a manual" and does not amount to insubordination, or even "improper behavior." However, the preferred form of acknowledgment of signing the disciplinary form, which the ALJ terms "not a mandatory requirement," became mandatory when Ms. Burton's supervisor instructed her to sign the warning and the reprimand. Thereafter, Ms. Burton's refusals to sign the documents were acts of insubordination and subject to disciplinary action, including suspension.

Rule 670-X-19.01(2)(b) of the State Personnel Board Rules permits suspension or termination on the first offense for serious violations such as insubordination. Insubordination is defined as the "[f]ailure to follow an order; disobedience; failure to submit to authority as shown by demeanor or words, with the one exception of not following an order which the employee has good reason to believe is unsafe or illegal." Ms. Burton's refusal to follow the order of her supervisor to sign the documents is insubordination under this definition. Likewise, her statement in which she called her supervisor a liar is insubordination because she demonstrated a failure to submit to authority through words. The ALJ's characterization of Ms. Burton's conduct as "disrespectful or disruptive" is correct, but contrary to the ALJ's conclusion, is still insubordination and worthy of disciplinary action, including suspension or even termination, as determined by the appointing authority.

The State Personnel Board has had many occasions to interpret "insubordination" as that phrase is used in the SPD Rules. A few examples where the Board found that the employee was insubordinate are as follows:

- In the appeal of a Department of Corrections employee, the Board upheld the termination for the employee failing to obey a direct order as to the placement of his lunch bags.

- Another employee's dismissal for insubordination was upheld when an employee said an expletive in response to a supervisor's instruction and walked out of the room.

- An ABC employee's termination for insubordination was upheld when the employee refused to transfer to a particular ABC store.

- An employee of the Treasurer's Office was terminated for insubordination for failing to obey a direct order to provide a home telephone number and failure to return FMLA paperwork.

- An employee's termination from DOC was upheld for his refusal to provide his supervisor with a copy of documents that he was copying and became loud, abusive and disruptive when ordered to write a statement regarding the incident.

Commissioner Sparks
Page 3
April 27, 2006

- The Public Service Commission dismissed an employee for insubordination for telling her supervisor to "go to hell" and calling him a "horrible man."

- A DOC employee was terminated for becoming "agitated" with his supervisor and telling him to "go for it."

It is clear from the above examples that the State Personnel Board considers "disrespectful and disruptive conduct" to be insubordination. The State Personnel has consistently found that failure to obey a direct order is insubordination. The law is clear: "[S]ubstantial deference [must be given] to [the Personnel Board's] interpretation of its rules and regulations." *Mobile County Pers. Bd. v. Tillman,* 751 So. 2d 517, 518 (Ala. Civ. App. 1999). The Personnel Board's interpretation of its own regulations "must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation." *Ex parte Bd. of School Com'rs of Mobile County,* 824 So. 2d 759, 761 (Ala. 2001) (quoting *Ferlisi v. Alabama Medicaid Agency,* 481 So. 2d 400, 403 (Ala. Civ. App. 1985)). The Personnel Board's interpretation of its own policies "is controlling unless it is plainly erroneous." *Id.* Thus, under the Board's interpretation, Ms. Burton's conduct clearly was insubordinate.

Therefore, for the above-stated reasons, I respectfully disagree with the ALJ's interpretation of State Personnel Department's policies and procedures in relation to this situation. If you have any further questions, please do not hesitate to contact me.

Sincerely,

Jackie Graham
State Personnel Director

# VICTOR R. SPENCER, LLC
## Attorney At Law

3026 Ensley Avenue                                    Telephone (205) 780-3300
Birmingham, Alabama 35208                             Facsimile (205) 780-3355

April 10, 2006

Jeff Webb, Esq.
Department of Agriculture & Industries
Legal Division
1445 Federal Drive
Montgomery, Alabama 36107-1123

RE: Retaliation by the Department of Agriculture & Industries
    Against Shannon Burton

Dear Jeff:

    It has come to my attention that Commissioner Ron Sparks
of the Department of Agriculture & Industries has been
retaliating against Shannon Burton since her Appeal Hearing.
Retaliation constitutes a flagrant violation of my client's
rights and jeopardizes the Department of Agriculture &
Industries.  I advise you to advise the Commissioner to cease
and desist with any form of retaliation and/or harassment against
Mrs. Burton.  If the Commissioner and Department of Agriculture
and Industries fails to follow my advice, I will take the
appropriate legal action against the Commissioner and Department
of Agriculture and Industries.

    Please feel free to contact me regarding this matter.

                                    Sincerely,

                                    Victor R. Spencer

                                    Victor R. Spencer

VRS/gs

CC: Shannon Burton

*Exhibit 17*

# VICTOR R. SPENCER, LLC
## Attorney At Law

*3026 Ensley Avenue*
Birmingham, Alabama 35208

Telephone (205) 780-3300
Facsimile (205) 780-3355

August 4, 2006

Jeff Webb, Esq.
Department of Agriculture & Industries
Legal Division
1445 Federal Drive
Montgomery, Alabama 36107-1123

RE: Shannon Burton
    Request to Act on ALJ's Recommendation - Suspension Hearing

Dear Jeff:

As you know, on April 18, 2006, the Administrative Law Judge, Tori L. Adams, recommended that the suspension of Shannon Burton for ten (10) days without pay during the November 23, 2005 through December 7, 2005 period be rescinded. However, it is apparent that the Commissioner has still not acted upon the recommendation of Judge Adams. Given that more than ninety days have passed since the recommendation, I am requesting that the Commissioner officially accepts the recommendation and do the following:

1. Rescind the suspension.

2. Pay Shannon Burton for the ten days she was not paid as a result of the suspension.

3. Advance her to the next pay step, making it retroactive beginning February, 2006. The pay step increase would have occurred February, 2006 had she not been suspended.

4. Compensate Shannon Burton accordingly at the increased pay step from February, 2006 to the present.

5. Pay Shannon Burton's attorney fees for the legal services rendered.

I look forward to your prompt response and finalizing this matter in the near future.

Sincerely yours,

Victor R. Spencer

VRS/gs

CC: Mac McArthur
    Norbert Williams
    *Shannon Burton*

*Exhibit 18*

# STATE GOVERNMENT ORIENTATION
# MERIT SYSTEM
# AND
# PERSONNEL



State of Alabama Personnel Department
Training Division
2005 Edition

*Exhibit 19*

# PHASE ONE:  PREAPPRAISAL

## PHASE ONE:  PREAPPRAISAL

### Prepare for the Preappraisal

The first step is to define performance expectations as Responsibilities as outlined in the employee's job description.  In other words, a manager needs to think through the contribution needed from each employee in order to achieve the unit's overall Results. Responsibilities and Results must be written properly and appropriately in accordance with the State of Alabama Performance Appraisal Manual.  The primary purpose of the Preappraisal is to clarify what is expected of the employee's performance by the rating supervisor during the current Appraisal year.  The most important factor to consider in writing Responsibilities and Results is whether the way in which they are written conveys clarity to the employee of exactly what the rater is looking for in performance for each Responsibility level.  Responsibilities and Results are specific to the position. Define the essential functions of the job, set goals and exact levels to be achieved to "Meet Standards" at the end of the year.  It is important that the supervisor discuss how the Responsibilities and Results will be measured throughout the year.  In addition, the rater must be prepared to provide examples for each Responsibility demonstrating how an employee can go "above and beyond" in the performance to rate "Exceeds" or "Consistently Exceeds Standards."  Responsibilities and Results may change each year as the job changes.  If the job does not change but the goals or expectations levels change, then part of the Responsibility and Results statement should be modified to fit the new conditions.  Modifications may be made on the Preappraisal any time during the year.  Please consult the Midappraisal section of this Manual for more details.  An employee is to contact the agency Personnel Manager if an employee believes that the Responsibilities or Results are written in error.

A supervisor must also prepare for the Preappraisal Session by ensuring that proper paperwork is in order regarding the Work Habits section of the Preappraisal Form.  The policy should be set by the department.   A Work Habit includes not only the departmental policy but also the supervisory requirement of each Work Habit.  If there is no specific guidance from the agency, writing the policy for Work Habits becomes the Responsibility of the division, and/or supervisor.

### Conduct Preappraisal Session

After expectations and Results have been set for the position, expectations should be communicated to the employee.  The manager and employee need to sit down together to develop a performance plan for the employee. This plan, called Preappraisal, should be based on expectations, often called Results, which are measurable, specific, challenging, and attainable.

The Preappraisal Session should take place immediately upon the beginning of the employee's Appraisal cycle.  A Preappraisal Session is to be held each year to discuss

39

the Performance Appraisal system, to clarify the Responsibilities of the position, to make any changes on the form that may have occurred in the job, and set expected Results for performance. The supervisor should define the Responsibilities for the position and write Results for each Responsibility. It may be helpful for the supervisor to solicit the assistance of the employee if the employee has worked in the position for several years. It is the Responsibility of the rating supervisor to compile Responsibilities and Results whether employee chooses to be involved or not.

The four Work Habit areas are to be discussed with the employee during the Preappraisal Session and a written policy on attendance and punctuality should be provided. The written policy should contain specific information dealing with the expectations of the particular supervisor.

A Preappraisal Session denotes two-way communication. It is important to answer any questions the employee might have about the Appraisal process in general or in the specific position. This is a time when the employee may ask for examples on how to exceed for a particular Responsibility. The supervisor should be ready to provide one or two examples of how to exceed performance of the Responsibility. Many supervisors do not recognize the importance to productivity and legal liability that the Preappraisal plays in the State's process.

## Complete the Preappraisal Form

The Employee Preappraisal is a single ivory colored form. The Preappraisal form may be obtained through your agency Personnel Office or, as agency policy allows use of, found on State Personnel Website at www.personnel.state.al.us.

### Heading

The supervisor should review this heading information. It contains general employee information such as name, classification, social security number, and position number. It also includes department and division. Corrections of any information should be brought to the attention of Agency Personnel Office and changes made on the Preappraisal Form. The Personnel Manager may then document any necessary changes on a Form 11, which is sent to State Personnel Department for proper modification of employee records.

It is imperative to use ivory colored paper if a department or supervisor chooses to download a blank form from the website. If this process is used, then the supervisor must complete the heading section, which will be blank. The supervisor is responsible for accurate information in completing forms that are downloaded. An agency Personnel Office is the only other location where this information may be checked other than by the rating supervisor. In some cases, it may be that an agency's Personnel Office will download forms and complete the heading sections prior to distribution.

Examples of changes to think about include names, division (lateral transfer), or possible incorrect entry of position number.

**Responsibilities/Results**

The next section to be completed is the Responsibilities/Results Section of the Employee Performance Preappraisal.  The Section should contain the Responsibilities and Results.  At least four Responsibilities are to be provided for an employee evaluation.  The maximum number of Responsibilities depends on the job.  There have been some positions that may have fifteen or twenty Responsibilities.  However, when written correctly a typical state office job can usually be defined in six to ten Responsibilities.  Please note that when the word "Responsibility" is used it is defined as not only the essential function but inclusive of the Results or goals for the year also.  The expected goal or Results for a Responsibility is all provided in one statement.  A current Position Classification Questionnaire (Form 40) may be helpful in completing this section.  As part of this process, Forms 40 should be up to date and accurately reflect the essential position functions and important activities currently being performed.  Responsibilities and Results should be reviewed annually for accuracy.   Only those functions that are important activities or essential job functions of the employee's position should be included on the Preappraisal.   For assistance in developing Responsibilities and Results, refer to the "Responsibility and Results" section in this Manual.

During the Preappraisal Session with employees, supervisors should clearly indicate the relative importance of the Responsibilities to be rated, priorities placed on different aspects of the job, functions, and critical definitions and expectations for Results.  This Session is a time where the supervisor and employee should discuss performance that results in a "2" rating versus a "3" or "4" rating.  An example on how to exceed a Responsibility should be provided during the discussion.  The employee should be given a clear picture of the Responsibility and the authority the employee has to conduct the Responsibility.   This important discussion leaves the employee accountable for appropriate performance during the year.   The supervisor is responsible for daily instructions if a Preappraisal Session is not specific enough in details of an employee's job.

Ideally, the supervisor and the employee should reach agreement on the job Responsibilities and Results on performance evaluations.  Rating supervisors have the authority to make final decisions concerning the Responsibilities and Results, subject to the review and approval of higher departmental authorities.  Employees must then conduct those functions.

The same Responsibilities may be listed for subsequent Appraisal years as long as the employee's job does not change.  The rating supervisor and the employee should

always discuss the job Responsibilities and related expectation of Results during each annual Preappraisal Session to ensure the continued relevance.

If the rating supervisor has Responsibility for two or more employees in the same job classification, it may be appropriate to list the same Responsibilities for all employees in that classification if Responsibilities are truly identical. Expected Results for those employees may also be the same. Before imposing the same Responsibilities and Results on a group of employees, however, the supervisor must carefully consider each employee's job and determine if the work requirements are, in fact, identical. This will ensure that all employees are evaluated fairly and accurately.

If an employee no longer performs a particular Responsibility then the Responsibility should be deleted from the new Preappraisal. A Responsibility should be listed if there is a possibility the Responsibility may be performed during the year. On the final Appraisal, should the Responsibility not have come up during the Appraisal year, it is not listed nor rated on the Final Appraisal. Do not list the Responsibility and rate it as "N/A." The Responsibility is to be left off the Final Appraisal form completely. The next Preappraisal should, once again, list the Responsibility.

## Work Habits

The Work Habit section is used to discuss the employee's compliance with the terms and conditions of employment. The four areas are Attendance, Punctuality, Cooperation with Coworkers, and Compliance with Rules. To clarify expectations about the employee's Work Habits, the supervisor should consider the following definitions. In fact, it would be wise to make a copy for the employee.

(1) Attendance is defined as the use of leave in accordance with an agency's policy and procedures. The supervisor, as well the agency policy, should take into account all appropriate federal employment law. For example, FMLA and Military leave are two attendance areas that are to be provided to an employee that qualifies for said leave without consequences or retaliation to the employee's evaluation. Annual and sick leave is considered a benefit and not a right. Leave should be utilized in a way that productivity is maintained and work is not disrupted.

(2) Punctuality for the shift is defined as the timing of the employee's arrival in the morning, return from lunch and breaks, and departure from the shift. When the job/position requires that an employee routinely work outside an office, as a daily necessary requirement of the job description, the employee's dependability to keep or maintain the meetings should be considered as the definition for punctuality. It is difficult for the supervisor to be able to know or maintain an exact measurement of punctuality if an employee is not in the office at the beginning of shift, lunch hour, breaks, and end of shift. As with Attendance, supervisors must specify this

policy in detail for individual employees. The policy should be in writing and given to the employee during the Preappraisal.

(3)  Cooperation with coworkers is defined as the extent to which an employee works with and does not hinder coworkers/supervisors/vendors/contractors in their work to achieve work unit goals and directives. This Work Habit is not a measurement of attitude, but an identified area that can be documented with job related behavior. For example, there may be an employee that is the office instigator of rumors, gossip, etc. which leads to conflict in the office effecting the workflow. Another example is when two employees will not work harmoniously on the team. A supervisor cannot automatically rate an employee based on hearsay only but should seek first hand information and document the behavior which hindered work operations.

(4)  Compliance with rules is defined as the employee's conformance to departmental policies, division procedures, and areas outlined in the Rules of the State Personnel Board. It is important to note that Work Habits "Rules" are intended to focus on those State Personnel and departmental regulations that involve standards of conduct and apply to all (the majority of) of classified employees in an agency. Regulations or policies that are specific to the performance of a Responsibility (e.g., the appropriate procedures for conducting an audit or for delivering phone messages) should be included as a "Result" for the "Responsibility" and written into the Responsibility and Results.

At this time, the evaluation method of Work Habits Section should be discussed with the employee. A Work Habit area may be "rated" five levels depending upon the defined expectations of the supervisor and the performance of the employee during the year. The five levels are "Satisfactory," "Counseling," "Warning'" "Reprimand," or 'Suspension."

Satisfactory:  A mark this area means that the employee's conduct in that Habit has been according to the defined supervisory policies throughout the majority of the year. No points are to be deducted on the Appraisal. Thus, the "Discipline Score" is a "0."

Counseling:  A mark in this area means that the employee's conduct in that Habit has deviated at times during the year from the defined supervisory policies. Due to those infractions, the supervisor has formally counseled the employee in a private meeting. This supervisor made clear to the employee that this discussion would stand as counseling on the Work Habit. The counseling session may not be the Midappraisal session. Midappraisal is a discussion of the performance thus far during the period. It is not a counseling session alone. Documentation of the date and reason is to be placed in the "Disciplinary Action" section on the final Performance Appraisal. No points are to be deducted on the Appraisal. Thus the "Discipline Score" is a "0."

43

Warning:  A mark in this area means that the employee's conduct in that Habit, as defined by supervisory policies, has not been followed during the year.  Due to those infractions, the supervisor has given the employee a warning according to the Progressive Discipline Manual.  Documentation of the date and reason is to be placed in the "Disciplinary Action" section on the final Performance Appraisal.  No points are to be deducted on the Appraisal.  Thus, the "Discipline Score" is a "0."

Reprimand:  A mark in this area means that the employee's conduct in that Habit, as defined by supervisory policies, has not been followed during the year.  Due to the continued or severity nature of the infractions, the supervisor has given the employee a reprimand according to the Progressive Discipline Manual.  Documentation of the date and reason is to be placed in the "Disciplinary Action" section on the final Performance Appraisal.  The "Discipline Score" is a "7."

Suspension:  A mark in this area means that the employee's conduct in that Habit, as defined by supervisory policies, has not been followed during the year.  Due to the continued or severity nature of the infractions, the supervisor has given the employee a reprimand according to the Progressive Discipline Manual.  Documentation of the date and reason is to be placed in the "Disciplinary Action" section on the final Performance Appraisal.  The "Discipline Score" is a "17."

Again, Work Habits are terms and conditions of employment that are similar for many employees, yet job related, to all employees.  For example, when someone says "yes" to a job, they are saying "yes" to compliance with the four Work Habit areas as defined by the agency and supervisor.  It will help with consistency of Work Habit policies for a reviewing supervisor to monitor Work Habit definitions so to make the level of expectations similar in the same agency or unit.

**Preappraisal Signatures**

The signature section has designated places for the rating supervisor, the employee, and the reviewing supervisor to sign and date the form.  The employee's signature denotes discussion of the Appraisal process, not necessarily agreement.  Each signature is mandatory with consequence of discipline if not provided.

Any comments or "rebuttal" added by an employee can be made, submitted and attached to the Appraisal.  A reasonable time frame, as defined by agency guidelines, should be afforded to the employee to write the rebuttal.  However, if comments are written by the employee at a later date, the employee may send Preappraisal comments to the agency personnel office up to the day of the Midappraisal.  When comments are sent in, the agency must attach the document to the Appraisal located in the official agency personnel file.

In addition, the following areas should be discussed with the employee:

44

**Performance Appraisal Score**

Discuss with each employee the computation process for the Performance Appraisal Score by use of the numerical ratings. It is imperative that "Meets Standards" is defined as fully competent performance. In particular, inform the employee of the impact of the Work Habits and Disciplinary Score with the Responsibility Score to reach the Performance Appraisal Score. The employee should be informed as to how the individual supervisor is going to appraise performance.

**Disciplinary Actions and Score**

The supervisor should discuss the formal counseling session or step in the discipline process with the employee. Progressive discipline contains the following four steps in order of severity: warning, reprimand, suspension, and termination. In most cases, counseling should be conducted with the employee prior to a step being taken. However, as stated in the Progressive Discipline Manual, due to severity of an infraction, steps of discipline may be utilized without the sequence of counseling, warning, reprimand, suspension, and terminate. It should be discussed with the employee that a step of discipline during the year would affect an employee's Appraisal score. Points will be deducted if certain discipline actions occur during the year. If an employee follows policy or receives a warning or counseling on Work Habits, no points will be deducted in this section.

**<u>Maintain Records</u>**

Each employee should receive a copy of the Preappraisal containing Responsibilities and expected Results. Supervisors should include any additional documentation such as policies. It is the Responsibility of each agency to determine and disseminate the procedure as to whether the rating supervisor maintains the Employee Performance Preappraisal or the original is sent to the agency personnel office. It is wise for the rating supervisor to keep a copy of the Preappraisal each year. The back of this form is the Midappraisal and is needed for later use. Depending upon the agency, the Midappraisal may be returned in five months so the supervisor can have time to review and conduct a Midappraisal. Employee Performance Preappraisals are not to be sent to the State Personnel Department. Individual agency policy governs whether a copy of the Employee Preappraisal is sent to and maintained by the individual agency's personnel office.

**<u>Supervisory Checklist for Preappraisal</u>**

Supervisors should ask themselves the following questions to determine if proper procedures have been followed in the Preappraisal Phase. It is most beneficial if a rating supervisor reflects on each question and honestly answers the question after

each Preappraisal with each employee supervised.  If they can honestly answer "yes" to each, a successful Preappraisal Session has been conducted.

1.    Was the Preappraisal section completed according to this Manual?

2.    Are the Responsibilities written appropriately in compliance with the Manual and in accordance with ADA?

3.    Do you as the supervisor know, beyond a shadow of doubt, that you can monitor, observe, measure, and rate an employee on each Responsibility?  Have you written the measurement method rating into each Responsibility and Result?

4.    Does the employee understand the Responsibilities for the position?

5.    Does the employee understand the _expected_ Results or goals for each Responsibility?

6.    Does the employee understand what performance constitutes a "Meets Standards" versus ratings above or below the fully competent level?

7.    Does the employee understand the policy for each Work Habit?  Have you provided the attendance and punctuality policy in writing for the employee and added specifics to the general agency policy where needed?

8.    Does the employee know the disciplinary steps and the impact of each step on the Appraisal score?

9.    Does the employee understand the Midappraisal and Final Appraisal form and evaluation procedures for each area?

10.    Did you hold a "sit down" private Preappraisal Session with the employee?

**PHASE TWO:  MIDAPPRAISAL**

## PHASE TWO:  MIDAPPRAISAL

### Prepare for the Midappraisal

The Midappraisal Period is the timeframe during which the employee and supervisor perform assigned work Responsibilities in coordination with the services of the agency.  Supervisory Responsibilities contain Appraisal duties.  Appraisal related duties include observing employees, monitoring on-going performance, documenting examples of performance, completing the Midappraisal form, conducting a mid-year Session with employee, distributing copies of the form properly and coaching employees on performance.  Most importantly, effective performance management and performance Appraisal depend on two-way communication.  Today's employee wants to be involved.  Employees want to participate in their future -- want ownership in the decisions affecting their jobs.  In order for these employees to be motivated, supervisors need to listen to them and use their ideas if appropriate.

### Monitor and Observe Employee Performance

Performance Appraisal is not just one of those things that roll around every twelve months or so just to make life more difficult.  The job of a supervisor includes making daily observations of employee performance.  A planned system of performance Appraisal converts these daily, informal observations and evaluation into factual statements about the abilities of employees.

It is important for the supervisor to be aware of how well the employee is performing their Responsibilities and applying the Work Habits listed on the Employee Performance Preappraisal.  If a supervisor cannot personally observe performance or review a work product, then it is impossible for the supervisor to correctly measure performance.  A supervisor cannot measure or rate something that was never seen.  If performance cannot be measured, it cannot be rated.  If performance cannot be rated, the Responsibility does not belong on the Preappraisal form.

### Modify Responsibilities and Results

If an employee's Responsibilities change during the course of a Midappraisal Period, the changes in duties should be noted on the Employee Performance Preappraisal.  Any new Responsibilities should be added to the form with a corresponding date.  Any Responsibilities that are no longer being performed should be highlighted and a date added as to when the Responsibility was no longer performed by the employee.  Any modification to the Employee Performance Preappraisal should be initialed by the rating supervisor and employee.  If there are fewer than ninety days remaining in the Appraisal year, the employee should be rated on the current Responsibilities and Results.  Then, modifications should be made during the next Preappraisal Session.  Three months of performance is the minimal period of time sufficient to observe an employee for a reliable evaluation.  The supervisor should use good judgment of timing when modifying, adding, or deleting Responsibilities.  Obviously, it would be more of an impact to change all Responsibilities and Results than to modify one.  Supervisors should consider this fact when making a judgment of

whether to modify Employee Performance Preappraisal information when a few months or less is left in the Appraisal Period.

## Coach Employees

Some employees work at their satisfactory level when no one notices what they are doing. There are other employees who work above the standards when no one is watching. Either way, most employees flourish under supervision that includes positive reinforcement when work meets or exceeds expectations. In addition, studies and experience demonstrates that most employees respond positively to constructive help when a supervisor offers suggestions to help the employee's performance problems.

In order to understand the importance of ongoing feedback to Performance Appraisal, we need to recognize the role of effective Performance Appraisal -- not only to measure employee performance, but also to improve it. Whereas clearly defined and communicated expectations are needed to measure performance, ongoing feedback is needed to improve performance.

Quality feedback yields positive Results. One, there will be no surprises. Employees know from the beginning what is expected and have been kept informed of their progress in meeting the set Results. Secondly, feedback can help improve employee performance immediately. Receiving praise for meeting and/or exceeding expectations encourages employees to continue positive behavior. Assistance in correcting performance problems encourages them to improve in less satisfactory areas. Being held accountable on an ongoing basis helps employees develop consistency in good performance.

Informal communication and feedback should take place between the rating supervisor and the employee. This coaching consists of the daily, weekly, monthly discussion of work assignments, projects, performance Results, and Work Habits. Coaching means letting the employee know how well the employee is performing each assignment, project, etc. Coaching may be done with one word, by a discussion, or in writing. The idea is that a rater serves as a coach to employees.

Coaching is the process of recognizing, monitoring, and providing feedback regarding three levels of performance; exceptional, fully competent, and poor performance. Coaching means discussing performance levels with an employee but does not stop there.

Coaching includes the following:

1. Rewarding strong performance during the year,
2. Reinforcing fully competent performance during the year, and
3. Counseling employees with poor performance or unacceptable work conduct during the year.

Rewarding performance that is outstanding takes on more tangible benefits. Awards, parking spaces, conferences, breakfast biscuits, tickets to a movie, improved work conditions, or even

something as simple as candy can make the employee feel appreciated.  Rewards are given when the performance is seen by the supervisor – not weeks later.  Reinforcement takes on a similar meaning as rewarding.  Reinforcements, however, are mostly intangible.  Examples include praise, recognition in front of a higher-level manager, decision making, cross training or even a simple "thank you."

Some managers find that their efforts to improve performance do not come easy.  Below is a five-step model that can help deal more effectively with performance problems.  It is not the only approach to upgrading performance, but it has been shown to be 75 percent effective according to Supervisory Management.  It involves five steps.  1)  Looking at a subordinate's total performance and focusing on significant, not trivial, or insignificant, behavior requiring improvement.   2)  Agreeing on a description of current performance.  3)  Finding out why expectations are not being met.   4)  Developing a performance improvement plan as discussed in the next section under Documentation.  5)  Making sure improvement provides a positive Result for the employee.

## Document Performance

Most of the clear, specific objectives and much of the ongoing feedback will be lost if it is not documented.  The problem is that we all have faulty memories.  After two or three weeks or months, our memories cannot be depended upon.  Therefore, documentation is needed to insure proper follow-up.  It is also needed to insure sufficient data for an effective Performance Appraisal.  Without documentation, a supervisor may only remember one or two situations instead of using examples of an entire year's performance.

The documentation does not have to be fancy.  Documentation methods range from post-it notes, spiral notebooks, calendars, to file folders.  It is essential that the content of all performance management interactions be documented -- that is, written and dated, documentation should include job Responsibilities, specific Results, positive behavior, and performance problems.  Without documentation the Performance Appraisal reverts to "guesswork" and becomes and ineffective management tool.

Documentation is a necessary part of the entire Midappraisal phase.  The rating supervisor must document examples/samples of employee's performance, work conduct, work discussions, and the Midappraisal Session.  Documentation serves as a memory source and justification for ratings during the final Appraisal Period.   Both are for legal and managerial considerations.  Documentation may be conducted several ways including:

1.  Diary keeping -- making daily or weekly notations per employee.

2.  Critical incident -- documenting employee behavior and/or the situation surrounding any critical  event including strong and weak performance.

3.  Summary -- summarizing the performance of each employee for a certain time frame, possibly on a monthly basis.

52

The best documentation is a compliment between critical incident and summary. Diary keeping is best used in situations where there are daily/weekly shift changes or supervisor shift changes.

In addition, documentation should be a paper trail where someone that does not know the employee could review the supervisory file and come to similar conclusions of personnel actions that the supervisor or agency reached. A concise method of explaining proper documentation is the ABC Method:

A − Accurate − The supervisor should never falsify documentation to carry out an agenda. Similarly, a supervisor should never backdate documentation. The post dating of notes usually occurs when a supervisor has forgotten to document an incident. Months later, they may be reminded of the situation and date the documentation as if it was documented when the situation occurred. This    action would be falsifying the date on the documentation. It would be appropriate to date the document on the day that it is written and then refer to the date of the incident or event being documented.

B − Behavioral − The supervisor should document the behavior and actions that took place on the job just as the situation occurred. It is not proper to label people such as "worst employee." It is improper to label the behavior and not describe exact details. For example, "The employee is poor at typing." Behavioral documentation takes into account the situation in context, specific behavior actions and who conducted the actions, consequences of behavior as related to agency/division function, and how the incident is connected to job performance.

C − Consistent - The supervisor should consistently document work performance for all employees under his/her management. Documentation should be performed the entire year, not just the last few months or only around the Midappraisal Session.

Most documentation is maintained in an informal supervisory file. Only formal documents such as Appraisal forms, disciplinary steps, etc. are sent to agency personnel offices. Remember, a copy of any document to be used in the disciplinary process must be given to the employee within 10 days after inclusion in the formal personnel file. The employee must sign and date to acknowledge receipt/discussion of this documentation. Disciplinary signatures are mandatory. This "10 day rule" is in compliance with Section 36-26-27.1 of the Code of Alabama (1975). Any failure to provide this document to the employee will result in the document being removed from the personnel file. However, this law does not apply to informal notes that are taken by supervisors regarding daily, weekly performance of employees.

A corrective action plan is recommended anytime a step of discipline is taken with an employee. An action plan should be used with a warning, reprimand and suspension. In fact, an action plan is useful for any performance problem. The level of the problem may have not risen to the action of discipline and a corrective action plan can be developed by the supervisor. Once written, the corrective action plan must be discussed with the employee with the supervisor and employee signing the written plan.

53

**Develop a Corrective Action Plan**

A corrective action plan consists of five areas.  Each area needs to be communicated to the employee verbally and in writing.  This may be done through a memo or an informal form developed by the supervisor. It may be communicated during the disciplinary Session that is held in conjunction with the discipline process.  Again, remember that discipline is to assist an employee in changing undesirable behavior to desirable performance.  An action plan assists in this goal by providing an orderly, precise, and practical plan to overcome the weak area.
There are five areas included in a corrective action plan.  The supervisor should:

1.  State the behavior or area of conduct that is deficient and needs to change.  Be very specific in this explanation.  It is helpful to include the consequences that make the conduct undesirable.

2.  State the correct behavior, policy, or conduct.  Be specific as to what actions would be appropriate for the employee to take to get back on track.  Provide the method or steps necessary for change.

3.  Set a timeframe that will be used to monitor the behavior to assure that the employee changes the conduct to proper behavior.  This timeframe should be long enough such that the area in question can be observed enough times to ensure the proper behavior is occurring.  For example, a one-month period is appropriate for a punctuality problem.

4.  State any assistance that the supervisor or department will provide to the employee, if appropriate.  For example, the employee may need training or additional resources such as equipment or supplies.  If so, those should be outlined.  If the issue is in Work Habits, there is no assistance since attendance, punctuality, etc. is the employee's sole Responsibility.

5.  Set a follow-up date and time to meet with the employee.  This meeting should be at the end of the original timeframe that was set.  For example, a supervisor may set one month as the timeframe in which to monitor a change in employee behavior.  The supervisor should set a day and time for a meeting on the last day of the fourth workweek.  Actually set the date and time of a meeting.  Notes of this Session should be written on the action plan to record the end Result of employee performance.  It gives the employee a point of closure to determine whether a change in conduct has occurred or not.  It is important for this Session to be conducted and not neglected even if the employee's behavior appears to have improved.

A corrective action plan will clarify to the employee the importance of the situation.  An action plan demonstrates that conduct has gotten to a critical part of performance.  Again, an action plan is appropriate at any time an employee's performance is not up to standards, policies, or procedures.

**Conduct Midappraisal Session**

At least once during the Midappraisal phase, ideally at the six-month interval time, the rating supervisor is to conduct a formal "sit-down" Session with the employee to discuss performance. Discussion should include employee's performance in meeting Results and Work Habits including strengths and weaknesses. Identified weaknesses should be monitored in order to provide the employee an opportunity to change the behavior by the end of the Appraisal Period. Corrective action plans for weak areas are often useful at this point in the Appraisal year. The Session should also include praise regarding the strong points of the employee's performance. In particular, an employee should be informed if the performance is meeting the Responsibilities' Results or goals set in the Preappraisal. This candor allows an employee to know exactly where they stand. Thus, it is up to the employee to bring up performance if below goals in some areas or bring up performance if wanting to score in a category above standards on the Final Appraisal form.

**Complete the Midappraisal**

The date of the Midappraisal Session should be specified in the space provided below the performance documentation. The supervisor should complete the three areas on the form regarding employee's strengths, weaknesses, and fully competent performance and any corrective action plan to alleviate any uncertainty about what the supervisor expects regarding the employee's weaker performance.

Specific Responsibilities and Work Habit areas should be cited. Each of these areas should be discussed with the employee. This time is not to be used as a time to formally conduct counseling, warning, reprimand, or recommending suspension. Mid appraisal is a time to discuss what has occurred during the prior time since Preappraisal. It is not a disciplinary session. When applicable, the employee should be made fully aware of the correct expectations by developing a written corrective action plan. The action plan should include the consequences of failing to fulfill the goals. Reward the areas of strengths with praise and encouragement. There are other ways supervisors can choose to reward employees other than monetary rewards. If the supervisor is in doubt as to what might be a reward for an employee, they need to only ask the employee. If any discipline has occurred during the first half of the Appraisal year, corrective action plans and consequences of further noncompliance should be made clear. If the employee is "Meets Standards" in each Responsibility, the supervisor should be candid and tell the employee at the Midappraisal Session.

Remember, this is a time set aside to inform the employee how well they are performing. One reason for this discussion is to provide an opportunity for an employee to change performance that is not consistent with productive work as set out in the Preappraisal. The second reason for the Midappraisal discussion is so that the employee is not surprised by the outcome of the final Appraisal. Third reason is so the supervisor can reward or reinforce strong points of performance. Reinforcing and rewarding performance usually means the performance will be repeated in the second half of the Appraisal year. Both reasons are for legal and managerial considerations.

The rater, reviewer, and employee sign the Midappraisal. The signature denotes that the performance discussion has been conducted. It does not denote agreement with information written by the rater. Comments may be attached by the employee, rater, or reviewer for any reason. The appropriate space is to be initialed if comments are attached. All signatures are mandatory and, if refused, discipline can be taken with the individual.

Any comments or "rebuttal" added by an employee can be made, submitted and attached to the Midappraisal. A reasonable time frame, as defined by agency guidelines, should be afforded to the employee to write the rebuttal. However, if comments are written by the employee at a later date, the employee may send Midappraisal comments to the agency personnel office up to the day of the Final Appraisal. When comments are sent in, the agency must attach the document to the Midappraisal located in the official agency personnel file.

## Maintain Records

The Midappraisal Session is documented on the opposite side of the Preappraisal. A copy of the Midappraisal should be provided to the employee and reviewing supervisor. The rater should maintain a copy. Any other copy is dictated by agency policy. If the agency does not maintain copies of Preappraisals and Midappraisals, the rating supervisor maintains the original form to use in completing the Employee Performance Appraisal. Comments stay with the Preappraisal and Midappraisal.

## Supervisory Checklist for Midappraisal

During the Appraisal Period supervisors should ask themselves the following questions. If they can honestly answer "yes" to each, a successful Appraisal Period has occurred. If any question is in doubt, the rating supervisor must deal with the issue immediately.

1. Are you aware of how well the employee is performing? Have you observed the performance personally? Have you been able to monitor performance via telephone calls, reports, etc.? Is there a way to measure that performance?

2. Does the employee know how well you think the Responsibilities are being performed? Have you specifically told the employee if the performance is meeting standards, exceeding standards or above standards? Does the employee receive regular feedback/coaching on a daily, weekly, or monthly basis?

3. Does the employee know where they are in regard to the Work Habit areas? Does the employee receive regular feedback/coaching on a daily, weekly, or monthly basis?

4. Has a "sit down" Midappraisal Session been held with the employee at approximately six-months?

5. After the Midappraisal Session, did the employee understand the areas that need improvement in performance? Did you develop a corrective action plan for the employee?

6. After the Midappraisal Session, did the employee understand the areas that exceed goals in performance? Did you reward the employee?

7. After the Midappraisal Session, did the employee understand the areas that meet Results in performance as set in the Preappraisal? Did you reinforce the employee?

8. Have you documented examples of performance during the Midappraisal to serve as a memory source and to substantiate final ratings?

# STATE OF ALABAMA
# PROGRESSIVE DISCIPLINE

**State of Alabama Personnel Department**
**Training Division**
**2005 Edition**

# PROCEDURES

### DISCIPLINE PROCEDURES

## TABLE OF CONTENTS

**Steps of the Discipline Process** ......................................................86
    Step One:   Warning ...............................................................86
    Step Two:   Reprimand ...........................................................88
    Step Three: Suspension ..........................................................90
    Step Four:  Termination .........................................................92

## STEPS OF THE DISCIPLINE PROCESS

### STEP ONE: WARNING

The first step of discipline is a warning. A warning is written. A supervisor should hold a formal session (meeting) with the employee. This discussion should outline the unwanted behavior and desired changes. The supervisor should be specific in describing the issues and the change needed by the employee. Supervisors should not take for granted that employees automatically know what they are alluding to. It is best for supervisors to be direct but show that they care about the employee's performance. After all, the supervisor is the team coach of the office or group.

Supervisor would be wise to let the employee repeat back to them the suggested change in behavior. The most effective way to talk with the employee is for the supervisor to ask the employee about solutions to the performance issues. If employees are not just "told" what is wrong, but asked for solutions – the employee will be more apt to look at the discipline as constructive rather than punishment. In addition, the employee should be informed of further disciplinary actions that will occur if the behavior does not change.

It would be helpful to set up a corrective plan of action for the employee. This corrective action plan lets an employee know what behavior needs to be changed, the results that are desired, and a time period in which the behavior will be monitored. How the supervisor will assist and a follow-up date to review performance should also be included in the corrective action plan. To learn more about corrective action plans, please refer to Corrective Action Plan section of this Manual. The supervisor should document the discussion regarding the warning and corrective action plan) if used), in their own supervisory files. Supervisory file means the informal notes that each supervisor should maintain on each employee. These informal supervisory files are also mentioned in the Performance Appraisal Manual.

The supervisor waits until after the session with the employee and then proceeds to write a warning. The supervisor must provide the employee with a memo, letter, or form of the warning. Make sure that the hardcopy has the word "Warning" on it so that there is no doubt as to what step of discipline the supervisor has taken. This actual warning is given to the employee after the session has been held and the supervisor has written appropriate information regarding what occurred in the meeting with the employee. It should include the information as discussed in the session to include the problem area, the correct behavior, future consequences if behavior does not change, date of the session, and the agreement made between the employee and supervisor. A true corrective action plan is written for the employee – and an agreement. A copy of the warning and any corrective action plan is to be given to the employee immediately after the disciplinary session. A copy of the warning and corrective action plan should be kept in the supervisory file. A copy of

the warning must be sent to the central Personnel Office of the agency. Any other copies should be handled according to department policy. A sample form is included in this section or one may use a letter or memo format.

A warning is documented on the Employee Performance Appraisal at the end of the appraisal year for the employee. The documentation simply explains the situation for which a warning was given. In addition, a work habit area or responsibility should reflect that discipline took place. However, no points are deducted under "Disciplinary Score" on the Employee Performance Appraisal. Coaching and warning the employee are times that the employee will hopefully use to change behavior with no future action that would deduct points from the appraisal. This documentation of the appraisal form with no points deducted is also a record of when troublesome behavior started in case it continues into the next appraisal period. The appraisal will either support or refute future personnel actions.

The warning, or step one of the discipline process, requires that the employee should be told the problem, what to do to correct the problem, and what will occur if the problem continues. This session, openly labeled as a warning, should set the employee on the right track. However, there are those times when the conduct of an employee continues to deteriorate. In this case, the next step of the discipline system should be taken. The next step is a reprimand.

## **STEP TWO: REPRIMAND**

The second step of the discipline system is referred to as a reprimand. This involves a more serious approach to problem areas. A reprimand is written. A letter or memo should be written to the employee stating the continued or additional unwanted behavior and the necessity of the desired behavior. It should be stated that further disciplinary action would take place if the behavior does not come in line with the job standards. Again, a corrective action plan should be developed if possible. The letter or memo may include both the reprimand and the corrective action plan. A supervisor may choose to reprimand the employee in a letter and discuss the corrective action plan with the employee in a separate meeting. A sample form is included in this section or one may use a letter or memo to document the reprimand.

Regardless, the supervisor is to hold a disciplinary session with the employee. The supervisor should talk through the problem area including correct behavior and future consequences. The employee is handed the reprimand letter or form as the session ends. It is a summary of what has been talked about. A copy of the letter is given to the employee and the reviewing supervisor. One copy is kept with the supervisor's documentation file. Departmental procedure should dictate whether any other copies are to be maintained. The supervisor may choose to discuss the action plan then or in another session. Regardless, all sessions with the employee should be documented in supervisory files. Remember if, a warning is placed in a formal file of the employee, a copy should be given to the employee within ten days of receipt into the file. Failure to do so can result in the warning being made null or void.

A written reprimand is documented on the Employee Performance Appraisal at the end of the employee's appraisal year. The work habit area or responsibility of poor performance should reflect the discipline that occurred. This reprimand should be documented in the "Disciplinary Action" section of the Employee Performance Appraisal. In addition, one or more reprimands results in 7 points being calculated in the "Disciplinary Score" section of the Employee Performance Appraisal.

Unfortunately, there will be times when a warning and a reprimand does not change behavior. In this case, further disciplinary action should be taken. The next step of the discipline process is suspension.

## STEP THREE: SUSPENSION

The third step of the disciplinary procedure is suspension. This is a severe and extremely serious step in the employee's career in state government. It is important for the employee to realize this fact. Suspension is always Leave Without Pay.

The supervisor must contact the agency personnel office and legal staff regarding the recommendation for suspension. A letter should be written regarding the recommendation for suspension and include the continued problems of employee performance and the counseling and disciplinary actions that have been taken with the employee thus far. The letter may be written by the supervisor, division chief, attorney, or Personnel manager. The letter should be written based on the continued documentation of the supervisor to include dates of problems, dates of counseling/disciplinary sessions, goals, and discussions with the employee. Also, other pertinent information that provides detail and evidence of infractions and the opportunities provided to the employee to change behavior.

When proceeding with the suspension, the supervisor (and others as dictated by department policy) should hold a formal meeting with the employee. The discussion is to outline the continued offenses and desired behavior changes. At this point, a pre-suspension letter from the appointing authority should then be given to the employee. The letter states the recommendation for suspension, supported by the counseling and disciplinary actions taken by the supervisor thus far, and the continued problems since the last disciplinary step. In some cases, it might be that the appointing authority addresses the actual suspension details in the pre-suspension hearing letter and simply attaches the suspension recommendation letter or memo to provide facts of past performance and actions leading to the recommendation. The pre-suspension hearing letter tells the employee that he or she will have the opportunity to answer the charges made against the performance during the hearing. In addition, the pre-suspension letter to the employee should include the date, location, and time of a pre-suspension hearing in the agency. Also, the employee should be told in this letter there is an opportunity to sign a waiver if so desired, which waives the right to a pre-suspension hearing. An example of this waiver, as well as a several letters of suspension, is included after this section of the manual. Additionally, the pre-suspension letter should tell an employee that they may bring representation. However, the representation will not necessarily be allowed to speak. This role of representation is up to departmental discretion.

The pre-suspension hearing is to be held at the date and time mentioned. The appointing authority or someone designated by the appointing authority in the letter must conduct the hearing. The employee is allowed to bring representation. However, only the employee is allowed to speak in the hearing unless determined other wise by the agency policy. The employee is to answer the charges made against the past performance as mentioned in the suspension letter. The appointing authority's decision to suspend or overturn suspension is final in the agency. A letter must be written to the employee informing them of the decision

and dates of suspension. Departmental procedure governs any other necessary paperwork and communication processes.

No hearing is held and the suspension is immediately enacted if the employee signed the suspension-hearing waiver. The appointing authority determines whether to uphold or overturn the suspension recommendation, based on the facts. If overturned the employee simply continues to work without disruption. However, if the suspension is upheld, the employee is sent a letter of suspension including the duration of suspension and dates of suspension. Also, let the employee know to consider the criticality of the continued offenses and to decide if he or she would like to continue employment in state government. This decision is based upon whether the employee will change the undesirable behavior.

Upon the employee's return, the employee should be required to give the supervisor an answer as to their decision regarding behavior change and employment with the department.

The supervisor should carefully document each action and each discussion with the employee. Again, note that the agency personnel office and legal staff must be contacted before any action or discussion takes place between a supervisor and an employee regarding a suspension.

A suspension is documented on the Employee Performance Appraisal at the end of the employee's appraisal year. The work habit area or responsibility of poor performance should reflect discipline occurred. This suspension should be documented in the "Disciplinary Action" section of the Employee Performance Appraisal. In addition, one or more suspensions result in 17 points being deducted in the "Disciplinary Score" section of the Employee Performance Appraisal.

Unfortunately, there are a few cases where an employee's conduct does not change even after suspension. Perhaps the employee came back from the suspension and stated they were willing to change the deviant conduct and desired to continue employment with the department. However, the unwanted behavior starts again. In this case, it may be necessary to take the fourth step of the discipline process known as termination.

 **STEP FOUR: TERMINATION**

The fourth and final step of the discipline system is called termination. This is also referred to as separation. At this point, all necessary documentation and procedural paperwork should be completed. The supervisor must contact the agency personnel office and legal staff prior to taking any action. The supervisor does not have the authority to fire an employee. A supervisor makes a recommendation to the appointing authority of the department. The appointing authority for the department is the only one with the authority to terminate an employee's employment. The appointing authority should consult with the personnel and legal staff regarding prior events and proper actions.

Proper procedure and documentation trail is of utmost importance if an employee is to be terminated. Again, due process should be afforded to any permanent Merit System employee. This right to due process under the Merit System means the permanent employee is given notice of the intentions and is provided an opportunity to respond to the charges. The departmental personnel office and legal staff should handle the termination procedures.

Typically, a letter of recommendation for termination is forwarded to the appointing authority by the supervisor. The letter is to outline the offenses, actions taken with the employee in the past – counseling through disciplinary, the results of the suspension and continued non-performance and the recommendation to terminate. Similarly to the suspension process, a letter from the appointing authority is sent to the employee outlining the information that was included in the letter from the supervisor. In addition, this letter to the employee should include the opportunity for a pre-dismissal conference, opportunity to bring representation, time, location, and date. The letter must also inform the employee of the opportunity to sign a termination-hearing waiver thereby waiving the employee's right to the pre-dismissal conference.

The appointing authority or a designated individual by the appointing authority holds the pre-dismissal conference. The employee may bring representation to the pre-dismissal conference. However, only the employee may answer the charges listed against the performance in the letter from the appointing authority unless otherwise determined by department al policy. The pre-dismissal conference will result in a termination or the employee being put back to work.

If the employee is terminated, a letter is to be written listing the date of termination, reasons for termination, and the opportunity for the employee to contact the State Personnel Department. An employee is given 10 days in which to contact the State Personnel Department in writing for an opportunity to have a hearing before the State Personnel Board. This is all part of the due process rights of an employee. A sample of a termination letter is included in this section.

If the employee contacts the State Personnel Department within 10 days in writing to appeal the termination, an appeal process will begin. First, the employee will have a hearing before a hearing officer designated by State Personnel. This hearing is a full evidentiary hearing with attorneys, witnesses, evidence, and other formalities of hearings. The hearing officer will render a decision to recommend to terminate the employee or put the employee back to work.

This recommendation is given to the State Personnel Board in a report. The employee may then continue by attending a termination hearing before the State Personnel Board. A time and date is given to the employee for that hearing. The employee, with representation if desired, then appears before the Board. The agency attends with their appropriate representation. A limited hearing is held before the State Personnel Board members. From this hearing, the Board will either uphold termination or overturn the termination. The decision by the Board is final.


## IMMEDIATE TERMINATION

As mentioned, the discipline steps are followed in sequence for most cases. On occasion, it may be deemed necessary to skip lower steps such as warning and/or reprimand to proceed to suspension. However rare, there are situations that condone immediate termination.

Examples of conduct that may warrant immediate separation include, but are not limited to, safety violations of a serious nature, fighting, insubordination, abusive language, drugs, falsification of records, possessing weapons, sleeping on job, job abandonment, walking off the job, theft, and other serious violations. This list is not exhaustive. In addition, a supervisor needs to contact the personnel office and legal representatives of their department before taking actions associated with termination. Each situation needs to be looked at in context and in relation to the consequence of the violation. For example, a safety violation is listed as a possible reason for termination. Safety violations may vary in danger, consequence, and result. One of slight consequence may result in a lower step of the discipline process being taken. Another safety violation of a critical nature and costly consequence may result in immediate termination. The supervisor should carefully document all events and actions surrounding or leading up to the disciplinary action so personnel and legal experts can assess the situation appropriately.

**Form 13**
**Revised (01/2006)**

# EMPLOYEE PERFORMANCE *APPRAISAL*
## STATE OF ALABAMA
### Personnel Department

Employee Name: <u>SHANNON R BURTON</u>          Social Security Number: <u>XXX-XX-XXXX</u>

Agency: <u>001/AGRICULTURE & INDUSTRIES</u>          Division: <u>2100/FOOD SAFETY</u>

Classification: <u>ADMIN SUPPORT ASST III</u>          Class Code: <u>10198</u> Position #: <u>00XXX000</u>

Period Covered From: <u>12/01/2005</u> To: <u>12/01/2006</u>          Annual Raise Effective: <u>FEBRUARY 2007</u>

---

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN XXX-XX-01541 | | SSN XXX-XX-2233 |
| *Mark Scott* | *Shannon Burton* | *Lance Hester* |
| Rater Signature | Employee Signature | Reviewer Signature |
| MARK A. Sco TT | | Lance Hester |
| Rater Printed Name | Employee Signature | Reviewer Printed Name |
| Nov. 14 2006 | 11 / 14 / 06 | 11-17- |
| Date | Date | Date |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

|  30  | - |  0  | = |  30  |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

***WORK HABITS:*** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary. No disciplinary action has to be taken to mark a Work Habit "Unsatisfactory."

|  | **Unsatisfactory** | **Satisfactory** |
|---|---|---|
| Attendance | ___ | ✓ ___ |
| Punctuality | ___ | ✓ ___ |
| Cooperation with Coworkers | ___ | ✓ ___ |
| Compliance with Rules | ___ | ✓ ___ |

*Exhibit 20*

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

### Responsibility                                                                 Rating

1. ANSWER MAIN PHONE LINE FOR FOOD SAFETY                          3

2. PICK UP MAIL AND PROCESS MAIL                                          3

3. TYPE CORRESPONDENCE GENERATED BY MARK SCOTT               3

4. REVIEW PERMITTING TRANSMITTALS FOR ACCURACY               3

5. PER DIEM AND VEHICLE REPORTS FOR FOOD SAFETY               3

6.

7.

8.

9.

10.

**RESPONSIBILITY SCORE:**

| 15 | ÷ | 5 | = | 3 | × | 10 | = | 30 |
|----|---|---|---|---|---|----|----|----|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be documented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If no disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

**Warning**          **Reprimand**          **Suspension**          **Demotion**

0                          0                          0                          0

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps – reprimand, **suspension, and demotion only.** The Disciplinary Score does not include scores for counseling and warnings. To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If no most severe step was been taken, the Disciplinary Score will be 7. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

### DISCIPLINARY SCORE:        0

**Form 13F      EMPLOYEE  PROBATIONARY  PERFORMANCE  APPRAISAL**
Revised (6/1/1998)                    STATE  OF  ALABAMA
                                Personnel  Department

Employee Name: _SHANNON R BURTON_        Social Security Number: ▬▬▬▬

Agency: _001/AGRICULTURE & INDUSTRIES_        Division: _2100/FOOD SAFETY_

Classification: _ADMIN SUPPORT ASST III_        Class Code: _10198_

Period Covered From: _08/09/2003_  To: _02/08/2004_        Position Number: _0338000_

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

SSN _422_ - _76_ - _2233_   _Lance M. Hester_ (Signature)   _1-16-04_  Date / Initial if comments are attached
RATING SUPERVISOR

SSN _420_ - _64_ - _058_   EMPLOYEE Signature _Shannon Burton_   _1-16-04_  Date / Initial if comments are attached
REVIEWING SUPERVISOR   _Johnny A Clark_ (Signature)   _1/16/04_  Date / Initial if comments are attached

It is recommended that the employee be:
_____ Continued probationally in the position named (reason stated in Disciplinary Actions area)
__X__ Given permanent status in the position.  Probationary increase to $ _897.00_ Step _05_ Effective _02-21-04_
_____ Terminated before or at the end of the probationary period (reason stated in Disiplinary Actions Area)

_Ken Ray_ (Signature)   _1-21-04_
APPOINTING AUTHORITY Signature   Date

---

**PROBATIONARY PERFORMANCE APPRAISAL SCORE:**  Locate the Responsibility Score on the back of this form and write it in the appropriate  space.  Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space.  The Disciplinary Score is subtracted from the Responsibility Score to derive the Probationary Performance Appraisal Score.

| _28.3_ | — | _0_ | = | _28.3_ |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Probationary Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 – 40 ) |

---

**WORK HABITS :**  Check the appropriate box for each work habit area.  If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the probationary period.   See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

**RESPONSIBILITIES:** List an ab̶ ̶ ̶ed version of the employee's respo̶ ̶il̶ ̶ below as documented on and discussed during the Preappraisal. Record the appropriate rating in the b̶ ̶ for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this probationary period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| **Responsibility** | **Rating** |
|---|---|
| 1. Review and elvaluates documents to update and verify accuracy | 2 |
| 2. Trains and instructs subordinates | 2 |
| 3. ~~Observes and evaluates performance of subordinates~~ | 3 |
| 4. Compiles data such as quarterly and annual reports | 4 |
| 5. Posts and maintains records in order to retain current data | 3 |
| 6. Types and composes documents | 3 |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

$\underline{17}$ ÷ $\underline{6}$ = $\underline{2.83}$  x  10 = $\underline{28.3}$

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |
|---|---|---|---|---|

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this probationary period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this probationary period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    _____0_____

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

| | Number of Steps |
|---|---|

Employee Name: SHANNON R BURTON      Social Security Number: ~~XXXXXXX~~

Agency: 001/AGRICULTURE & INDUSTRIES      Division: 2100/FOOD SAFETY

Classification: ADMIN SUPPORT ASST III      Class Code: 20198

Period Covered From: 12/01/2003  To: 12/01/2004      Annual Raise Effective: FEBRUARY 2005

---

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN 422 - 76 - 2233 | | SSN 420 - 64 - 0581 |
| *Lane M. Welty* (Signature) | *Shannon Burton* (Signature) | (Signature) |
| 11-23-04 (Date) | 11 \| 23 \| 04 (Date) | 11/24/04 (Date) |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

***PERFORMANCE APPRAISAL SCORE:*** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$\underline{28.3} \quad - \quad \underline{0} \quad = \quad \underline{28.3}$$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

---

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

***WORK HABITS :*** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

**RESPONSIBILITIES:** List an ~~revised~~ version of the employee's resp~~onsibilities~~ below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1. Reviews and evaluates documents *I was a Supervisor & never allowed the main line* | 3 |
| 2. Trains and instructs subordinates | 3 |
| 3. Observes and evaluates performance of subordinates | 3 |
| 4. Compiles data such as quarterly and annual reports | 3 |
| 5. Post and maintains records | 2 |
| 6. Types and composes documents | 3 |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

$\underline{17}$ ÷ $\underline{6}$ = $\underline{2.83}$ x 10 = $\underline{28.3}$

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |
|---|---|---|---|---|

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _____

**Form 13**
**Revised (1/1/1999)**

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

☐ Number of Steps

Employee Name: SHANNON R BURTON

Social Security Number: ~~████████~~

Agency: 001/AGRICULTURE & INDUSTRIES

Division: 3340/AGRICULTURAL COMPLIANCE

Classification: ADMIN SUPPORT ASST II

Class Code: 10197

Period Covered From: 01/01/2002    To:    01/01/2003

Annual Raise Effective:    MARCH 2003

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN 423 . 60 . 6909 | | SSN 420 . 74 . 9322 |
| *Ben B. Htch* | *Shannon Burton* | *W. L. Fitzpatrick* |
| Signature | Signature | Signature |
| 12/16/02 | 12/16/02 | 12/16/02 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

|  32  | − |  0  | = |  32  |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

---

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

**RESPONSIBILITIES:** List an ab⁀⁀iated version of the employee's respons⁀⁀⁀⁀⁀ below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

---

| *Responsibility* | *Rating* |
|---|---|
| 1. Open/sorts/distributes mail following oral and/or written supervisory directives | 3 |
| 2. Receives/routes/screens phone calls, visitors and other departmental personnel | 3 |
| 3. Writes/composes documents to include letters and memos | 4 |
| 4. Process leave cards, vehicle reports, and all administration paper work | 3 |
| 5. Office records liaison, manage office and field personnel inventory | 3 |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

---

**RESPONSIBILITY SCORE:**

| 16 | ÷ | 5 | = | 3.2 | x | 10 | = | 32 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

---

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

---

**DISCIPLINARY SCORE: This section should include the use of the discipline steps of reprimand and suspension only.** The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _____0_____

**Form 13P**        EM.. .. .EE PERFORMANCE API _.. AL
Revised (1/1/1998)
### STATE OF ALABAMA
**Personnel Department**

*PREAPPRAISAL*

Employee Name: SHANNON R BURTON       Social Security Number

Agency: 001/AGRICULTURE & INDUSTRIES      Division: 3340/AGRICULTURAL COMPLIANCE

Classification: ADMIN SUPPORT ASST II      Class Code: 10197

Period Covered From: 01/01/2002   To:   01/01/2003

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

### RESPONSIBILITIES/RESULTS

A. Open/sorts/distributes mail following oral and/or written supervisory directives, standard office procedures and own initiative in order to maintain updated departmental communications.

B. Receives/routes/screens phone calls and visitors and other departmental personnel following oral and/or written supervisory directives, standard office procedures in order to facilitate the functioning of the office/division/department and present a positive image to the public and employees.

C. Writes/composes documents to include letters, memos, and directives following oral and/or written supervisory directives, follow standard office procedures, process office personnel and inspector's form 13p (Preappraisal) and form 13 (Annual Appraisal), ensure that forms are in Agriculture's Personnel Office by due date and keeping up with each employee's mid-appraisal and annual appraisal dates by departmental rules and regulations, and own initiative in order to comply with requests and provide records and information as needed.

D. Processes leave cards, automotive reports and gas receipts, reimbursement vouchers, per diem reports and receipts, itineraries and time sheets for seventeen inspectors, purchase orders, attaching invoices with material receipts to submit to accounting for prompt payment, follow standard office procedures in order to determine accurate financial and numerical records and enter reports of inspection for compliance in Microsoft Access.

**WORK HABITS:** Provide    heck in the appropriate space when th    olicies and procedures concerning the following areas have been discussed with the employee. In particular, the attendance and punctuality policies should be provided to the employee in writing. For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED: _____ ✓ Attendance

_____ ✓ Punctuality

_____ ✓ Cooperation with Coworkers

_____ ✓ Compliance with Rules

---

**PREAPPRAISAL SIGNATURES:** Date of Session: _1/3/02_____

Employee Signature: _Shannon Burton_____

Rater Signature: _Ben B. Hitch_____

Reviewer Signature: _____

---

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_Employee works well with others and is very reliable_

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

Document the action plan that has been discussed to improve the areas of weakness.

A midappraisal has been held and performance has been discussed:

Date: _7/31/02_ Employee Signature: _Shannon Burton_ Rater Signature: _Benny Hitch_

**Form 13**
**Revised (1/1/1999)**

## EMPLOYEE PERFORMANCE APPRAISAL
### STATE OF ALABAMA
#### Personnel Department

| | Number of Steps |

Employee Name: SHANNON R BURTON

Social Security Number: ~~[redacted]~~

Agency: 001/AGRICULTURE & INDUSTRIES

Division: 3340/AGRICULTURE COMPLIANCE

Classification: ADMIN SUPPORT ASST II

Class Code: 10197

Period Covered From: 01/01/2001 To: 01/01/2002

Annual Raise Effective: MARCH 2002

---

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN 423 - 60 - 6909 | | SSN 421 - 68 - 8679 |
| *Ben B. Hitch* | *Shannon Burton* | *(signature)* |
| Signature | Signature | Signature |
| 1/3/02 | 1\3\02 | 1-3-02 |
| Date | Date | Date |
| BBH | | |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

***PERFORMANCE APPRAISAL SCORE:*** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 28.0 | − | 0 | = | 28.0 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

---

***WORK HABITS :*** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

**ESPONSIBILITIES:** List an abbrevia⸍ /ersion of the employee's responsibiliti⸍ elow as documented on and scussed during the Preappraisal. ⸍ecoru the appropriate rating in the bo⸍ r eau⸍ responsibility. Rating(s) of ⸍ppropriate responsibilities should ⸍eflect any disciplinary action(s) that ha⸍ been taken during this appraisal ⸍riod.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| ⸍esponsibility | Rating |
|---|---|
| Open/sorts/distributes mail following oral and/or written supervisory directives | 2 |
| Receives/routes/screens phone calls, visitors and other departmental personnel | 3 |
| Writes/composes documents to include letters and memos | 3 |
| Process office personnel and inspector's preappraisal and annual appraisal forms | 3 |
| Process leave cards, vehicle reports, and all administration paper work | 3 |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

_14_ ÷ _5_ = _2.8_ x 10 = _28.0_

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and **suspension only**. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:  0

**Form 13**                      **EMPLOYEE PERFORMANCE APPRAISAL**
**Revised (06/2005)**                      **STATE OF ALABAMA**
                                 **Personnel Department**

Employee Name: <u>SHANNON R BURTON</u>                Social Security Number: ~~XXXXXXXX~~

Agency: <u>001/AGRICULTURE & INDUSTRIES</u>           Division: <u>2100/FOOD SAFETY</u>

Classification: <u>ADMIN SUPPORT ASST III</u>         Class Code: <u>10198</u> Position #: <u>00338000</u>

Period Covered From: <u>12/01/2004</u> To: <u>12/01/2005</u>     Annual Raise Effective: <u>FEBRUARY 2006</u>

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN _422_-_76_-_2233_ | | SSN _420_-_64_-_0581_ |
| _Jane M. Hutto_ | _Shannon Burton_ | _[signature]_ |
| Rater Signature | Employee Signature | Reviewer Signature |
| _11-30-05_ | _12/13/05_ | _12/13/05_ |
| Date | Date | Date |
| _JH_ _12-13-05_ | _S Burton_ _12/15/05_ | |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

|  _28.3_   -   _17_   =   _11.3_  |
|---|
| Responsibility Score — Disciplinary Score = Performance Appraisal Score |

This employee's work:

| ☐ | ☒ | ☐ | ☐ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |

**WORK HABITS:** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary.

|  | **Unsatisfactory** | **Satisfactory** | |
|---|---|---|---|
| Attendance | | ✓ | |
| Punctuality | | ✓ | |
| Cooperation with Coworkers | | ✓ | How is this Satisfactory! and you still |
| Compliance with Rules | | ✓ | suspend me??? |

This evaluation was never Redone! The Suspension was Resended 4/18/06!

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1. Write/composes documents | 3 |
| 2. Monitors/distributes FAX information documents | 3 |
| 3. Reviews processes reports | 2 |
| 4. Compiles/constructs quarterly and annual reports | 3 |
| 5. Assist Program Director by performance of special projects | 3 |
| 6. Opens/sorts/distributes mail | 3 |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

| 17 | ÷ | 6 | = | |
|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Re |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with ⎯ period is to be documented below. Provide the number of disciplinary actions and s⎯ ⎯⎯yee during the appraisal year. If no disciplinary action has been taken, a "0" should be mark⎯ ⎯. provided. Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| Warning | Reprimand | Suspension | Demotion |
|---|---|---|---|
| _____ | _____ | X _____ | _____ |

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand, suspension, and demotion only. The Disciplinary Score does not include scores for counseling and warnings. To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:** _____17_____

**Form 13P**   **EMPLOYEE PERFORMANCE *PREAPPRAISAL***
**Revised (06/2005)**   **STATE OF ALABAMA**
       **Personnel Department**

Employee Name: <u>SHANNON R BURTON</u>   Social Security Number: ▉▉▉▉▉▉▉▉

Agency: <u>001/AGRICULTURE & INDUSTRIES</u>  Division: <u>2100/FOOD SAFETY</u>

Classification: <u>ADMIN SUPPORT ASST III</u>   Class Code: <u>10198</u>

Period Covered From: <u>12/01/2005</u> To: <u>12/01/2006</u>  Position Number: <u>00338000</u>

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These factors should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on specifics of preparing, conducting, and completing the Preappraisal. Refer to the same manual for information concerning how to develop responsibilities and results.

*[Handwritten: As you can see,*
*Answer the main line was never my duty!*
*Process Returned checks was never my duty!]*

A. Writes/composes documents to include letters, memorandums, and directives following oral and/or written supervisory directives in order to comply with requests and provide records and information as needed.

B. Monitors/distributes information that comes in through our FAX system to include notification of Food Safety Supervisor and the appropriate warehouse in the case of destination inspection requirements, distribution of food safety alerts and recalls to the Program Director, and maintain FAX equipment to include assurance that paper is installed in both treys, and notify the Program Director immediately if equipment is not properly functioning in order to provide timely delivery of received documents, process of destination inspection notification is initiated quickly, and assure an orderly flow of information that in many instances is time sensitive.

C. Reviews/processes per diem reports, automotive reports, purchase orders, and time sheets for Food Safety Section so that per diem reports are delivered to Accounting section within three working days of receipt in your office, time sheets are delivered to accounting no later than the Thursday following the end of the pay period, automotive reports are delivered to General Services in the time frame specified, records are maintained that reflect dates received and delivered for the respective reports, and the Program Director is notified if the date we receive the reports from the employee prohibits the time specification from being met.

D. Compiles/constructs quarterly and annual reports regarding inspectional activities, samples collected, and permits issued so that the reports are accurate and are completed in a timely manner.

E. Assist Program Director by performance of special projects as assigned, responds to routine instructions from the Commissioner's office that requires notification and coordination with other Section Employees, maintains Program Director's calendar schedule, and updates the Program Director concerning equipment or supply needs.

F. Opens/sorts/distributes mail following oral and or written supervisory directives, standard office procedures and own initiative in order to maintain work flow efficiency and productivity.

**WORK HABITS:** Provide a check in the appropriate space to document that the policies and procedures concerning the following areas have been discussed with the employee. For instructions, refer to the Performance Appraisal Manual and policies of the agency.

CHECK WHEN DISCUSSED:

_____ ✓ Attendance

_____ ✓ Punctuality

_____ ✓ Cooperation with Coworkers

_____ ✓ Compliance with Rules

---

**PREAPPRAISAL SIGNATURES:** Signatures are mandatory.

Date the Preappraisal Session was held with the employee: _____ 12-13-05

Employee Signature: (denotes discussion and receipt of form, not agreement) _____ Shannon Burton

Rater Signature: (denotes discussion and employee receipt of form) _____ Lance M. Lester

Reviewer Signature: _____

---

### EMPLOYEE PERFORMANCE *MIDAPPRAISAL*

Describe any employee's strength(s) in performing responsibilities and/or conducting work habits, as observed, during the first half of the appraisal period.

Employee has a good knowledge of office management, and reacts quickly to disintegrate information to the proper person.

Describe any area(s) that the employee needs to improve in performance of responsibilities and/or work habits, as observed, during the first half of the appraisal period. Document any actions taken or the corrective action plan that was developed to improve the areas of weakness. If a plan has not been developed, it is appropriate for the rater to consider developing a plan at this time.

_____

_____

_____

State the areas where the employee has performed in a fully competent manner during the first half of the appraisal period. Documentation in this area means that the employee performed to the expected level of performance as discussed in the Preappraisal session. If there is no documentation in the first two areas, this section should be completed.

_____

_____

_____

A Midappraisal session has been held on this date and performance has been discussed: _____ 07-07-06

Employee Signature: Shannon Burton  7/11/06      Initial if comments attached: _____

Rater Signature: Mark Scott      Initial if comments attached: _____

Reviewer Signature: Lance Lest      Initial if comments attached: _____

(Signatures denote that a Midappraisal session has been held between the supervisor and employee. Signatures are mandatory. Employee signature does not denote agreement but discussion of the form and rater comments. Comments may be attached. The person attaching comments must initial in the appropriate space.)

**Form 13P**
Revised (01/2006)

**EMPLOYEE PERFORMANCE** *PREAPPRAISAL*
**STATE OF ALABAMA**
**Personnel Department**

Employee Name: SHANNON R BURTON

Social Security Number: XXX-XX-9###

Agency: 001/AGRICULTURE & INDUSTRIES

Division: 2100/FOOD SAFETY

Classification: ADMIN SUPPORT ASST III

Class Code: 10198

Period Covered From: 12/01/2006 To: 12/01/2007

Position Number: 00338000

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be ra### should be listed below. These factors should be discussed with the employee during the Preappraisal session at the ###inning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on specifics of prepari### ###nducting, and completing the Preappraisal. Refer to the same manual for information concerning how to develop ###ponsibilities and results.

*[handwritten: Nothing is on here about Answering Food Safety's main line]*

**RESPONSIBILITES/RESULTS**

**ADMINISTRATIVE SUPPORT ASSISTANT III**

A) Receives/places telephone calls to assist Unit Manager through communication of in###ation and instructions and provide assistance in a courteous and prompt manner with no more ### two valid complaints per reporting period.

B) Writes/composes documents to include letters, memorandums and directives followi### ###al and/or written supervisory directives in order to comply with requests and provide records ### ###formation as needed.

C) Monitors/distributes information that comes in through our FAX system to include n###ation of Supervisor and the appropriate warehouse in the case of destination inspection requi###ents.

D) Reviews/processes per diem reports and automotive reports for the Food Safety Sect### ### that per diem reports are delivered to Accounting section within three working days of receip### ###our office, automotive reports are delivered to General Services in the time frame specified, rec###are maintained that reflect dates received and delivered for the respective reports. The U###Manager is notified if the date we receive the reports from the employee prohibits the time speci###on from being met.

E) Complies/constructs quarterly and annual reports regarding inspectional activities, sa###s collected and permits issued so that the reports are accurate and are completed in a timely man###

F) Opens/sorts/distributes mail following oral and/or written supervisory directives, star###office procedures and own initiative in order to maintain work flow efficiency and producti###

**WORK HABITS:** Provide a check in the appropriate space to document that the policies and proce???? concerning the following areas have been discussed with the employee. For instructions, refer to the Performance ???isal Manual and policies of the agency.
CHECK WHEN DISCUSSED:

✓    Attendance

✓    Punctuality

✓    Cooperation with Coworkers

✓    Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Signatures are mandatory.

Date the Preappraisal Session was held with the employee: _____ *Nov, 14 2006*

Employee Signature: (denotes discussion and receipt of form, not agreement) *Shannon ???*

Rater Signature: (denotes discussion and employee receipt of form) _____ *Mark Scott*

Reviewer Signature: _____

## EMPLOYEE PERFORMANCE *MIDAPPRAISAL*

Describe any employee's strength(s) in performing responsibilities and/or conducting work habits, as ??ved, during the first half of the appraisal period.

_____

_____

_____

Describe any area(s) that the employee needs to improve in performance of responsibilities and/o ??k habits, as observed, during the first half of the appraisal period. Document any actions taken or the corrective ??on plan that was developed to improve the areas of weakness. If a plan has not been developed, it is appropriat ??? the rater to consider developing a plan at this time.

_____

_____

_____

State the areas where the employee has performed in a fully competent manner during the first half ??the appraisal period. Documentation in this area means that the employee performed to the expected level of ??ormance as discussed in the Preappraisal session. If there is no documentation in the first two areas, this s??? should be completed.

_____

_____

_____

A Midappraisal session has been held on this date and performance has been discussed: _____

Employee Signature: _____    Initial if comments attached: _____

Rater Signature: _____    Initial if comments attached: _____

Reviewer Signature: _____    Initial if comments attached: _____

(Signatures denote that a Midappraisal session has been held between the supervisor and employee. Signatures are m? ??y. Employee signature does not denote agreement but discussion of the form and rater comments. Comments may be attached. T? ??son attaching comments must initial in the appropriate space.)

# EXHIBIT 21

# HELD CONVENTIONALLY IN THE CLERK'S OFFICE FOR VIEWING