IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| SHANNON BURTON, | ) |
| Plaintiff, | ) |
| v. | ) Case No: 2:07-CV-548 |
| STATE OF ALABAMA DEPARTMENT OF AGRICULTURE & INDUSTRIES, | ) ) |
| Defendant. | ) |

## MOTION FOR LEAVE TO AMEND AFFIDAVIT

COMES NOW the Plaintiff, by and through her counsel, and respectfully moves this Court for leave to amend her affidavit. As grounds for said motion, Plaintiff represents unto this Court as follows:

1. That the Plaintiff filed her response to Defendant's Motion for Summary Judgment on May 30, 2008.

2. That in support of said response Plaintiff submitted an affidavit.

3. That the Plaintiff has edited said affidavit in accordance with Rule 56 (e) of the Federal Rules of Civil Procedure.

4. That this affidavit is critical to her response.

5. That as a result, the undersigned attorney requests leave to amend her affidavit.

WHEREFORE, the premises considered, the Plaintiff respectfully prays that she be granted leave to amend her affidavit.

Respectfully submitted,

*[signature]*

Juraldine Battle-Hodge (BAT033)
Attorney for the Plaintiff

OF COUNSEL:
LAW OFFICES OF JURALDINE BATTLE-HODGE, P.C.
318 N. Decatur Street
Montgomery, AL 36104
Telephone:    (334) 262-1177
Facsimile:    (334) 263-5569

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been served upon the following by electronic filing and addressed as follows on the 7th day of July 2008.

Hon. E. Ham Wilson, Jr.
Hon. Emily C. Marks
Ball, Ball, Matthews & Novak, P.A.
P.O. Box 2148
Montgomery, AL 36102-2148

*[signature]*
_____
Of Counsel

## AMENDED AFFIDAVIT OF SHANNON BURTON

My name is Shannon Burton and I have personal knowledge of the following:

1. I am currently an Administrative Support Assistant III with Alabama Department of Agriculture and Industries. I have been employed with Alabama Department of Agriculture and Industries since September 2001. I started employment in the Agriculture's Compliance Division. Benny Hitch was my immediate supervisor. I worked in this division until I was promoted and moved to the Food Safety Division August 2003. I was assigned to Food Safety at Lance Hester's and Dr. John Bloch's request. Lance Hester was my immediate supervisor until April of 2006.

2. On Monday October 31, 2005, I came in to work to discover mail in my chair and on my desk that had not been open for an entire week. The week of October 24-28, 2005 I was serving on jury duty. When I returned, I was shocked to find so much mail unopened for an entire week. The first thing I thought, no permits have been processed, penalties did not post, nor emergency requisitions approved and sent to accounting and procurement for processing. We receive regular requisitions weekly, but often one of the labs will call me and ask what process is one of their requisitions in, because it is an emergency for the product. When I started opening the mail, I discovered several requisitions that had been sitting on my desk the entire week I was away on jury duty. No one took the requisitions to the proper sections of the department for completion. It was very clear that no one cared to open the mail.

3. I went into Mr. Hester's office and stated in a question form, "Are you aware that the mail has not been opened for an entire week?" Mr. Hester responded, "I was under the assumption that Mary Catrett was opening the mail." I told Mr. Hester that could not have been the case because I have postmark dates on the mail from everyday of the week and it was a tremendous amount of mail. Mary Catrett was on leave October 24-25. That is two days I know for a fact that the mail was not opened. I went to my immediate

supervisor because I no longer supervised Anne Williams and Mary Catrett. Lance Hester is the Division Director and he delegated office tasks. The person who usually brings the mail noticed it accumulating in my chair and asked Anne Williams what did she want her to do with the mail because it was a lot and Mrs. Williams told the young lady to put the mail in my chair. I asked Mr. Hester if he would like to look at the mail in my hands to see the postmarked dates. He stated that he did not think it was necessary, but if it would make me happy, he would look at the mail. I told Mr. Hester it was not about making me happy, it was about the productivity of the office.

4. I stated that if I had left the mail unopened for an entire week a federal case would have been made out of the situation. At this time, Ms. Wilma Fitzpatrick entered into my office, took a seat, and waited to see Mr. Hester. When I noticed someone was waiting to see Mr. Hester, I made my last comments, which were "it does not matter anyway because if this incident ever comes up again about the mail not being opened, you probably would not remember I told you about the postmark dates on the mail of everyday of the week and probably would not tell the truth about the dates anyway." After my last comments, Ms. Fitzpatrick enters Mr. Hester's office and meets with him for about ten minutes. Mr. Hester came to my desk after Ms. Fitzpatrick left the office and stated, "I have a rebuttal and question for the last comments you made."

5. I then asked Mr. Hester what he needed to know, he stated, "Do you honestly believe I would not tell the truth about the postmark dates on the mail even if I looked at the mail?" I stated, "Yes, I honestly believe that you would not tell the truth." Mr. Hester tells people all the time he has a bad memory. He addressed a memorandum to me and seven other supervisors dated April 11, 2005 that stated, "I have been receiving notices from each of you in different ways. **With a memory like mine**, I need a more formal way to handle the information." **This was my belief not an accusation.** Mr. Hester asked me to come into his office and discuss how we could get pass this so we all could

be on the same team. I stated I am willing to be a team player but it takes the entire office of employees to be willing. Mr. Hester and I talked in his office for approximately 45 minutes about how he wants all of the employees of the food safety section to be team players. Not once did Mr. Hester elaborate on how he felt my comments about he would probably not tell the truth about the mail were unacceptable to him, disruptive, indicated a demeanor of insubordination, lack of respect for his position, nor how it demonstrated a failure to submit to authority. I can elaborate on how Mr. Hester's comments to me in 2005 were unacceptable.

6. Mr. Hester saw Joe Barnes come to my office one afternoon about ten minutes after five, I gave Joe some money. The next day he saw Ms. Teresa Smiley (Deputy Commissioner) giving me money and stated, "This is the second day after five I have seen money being exchanged, **what are you doing, dealing drugs**?" I informed Mr. Hester that Joe borrowed money for gas and Ms. Smiley was buying Girl Scout cookies. Mr. Hester spoke to me in a disrespectful, demeaning and racist manner.

7. I spoke with the Deputy Commissioner Teresa Smiley about the comments that Mr. Hester made to me. Ms. Smiley was present when Mr. Hester made the comments about dealing drugs. Ms. Smiley told me that Lance Hester's comments about me **dealing drugs** were offensive to her.

8. I spoke to Mr. Hester regarding his comments in a respectful manner. I was not disruptive. Mr. Hester did not ask me to perform a task when he spoke to me about the unopened mail. I did not refuse to complete a task. I only stated to Mr. Hester that this was my belief. I did not accuse Mr. Hester of being untruthful.

9. I expressed to Mr. Hester that the unopening of the mail demonstrated a lack of supervision of work productivity and a lack of concern for the consumers of the State of Alabama by Mr. Hester.

**10.** I commented that unopened mail for an entire week means no productivity of work in the

Food Safety Division. I am personally aware that the Food Safety Division did not receive the consumer's applications and payments.

11. I am personally aware that the Food Safety Division has over seven thousand consumers that require a Food Safety Permit. I am also aware that opening the mail is very important.

12. Mr. Hester stated in his letter that my behavior was so severe it warranted immediate attention and that I should write a response after signing his letter. He also indicated that in my response to his letter, I should admit to disruptive behavior, insubordination, failure to submit to authority and state how the behavior is unacceptable and similar behavior in the future will result in a reprimand and disciplinary action. I need to know, if my response is to tell my side of the story, why Mr. Hester told me to admit to his accusations in my response. In Mr. Hester's letter a question was asked, what actions have been taken with the employee prior to this step of discipline (include counseling, coaching and/or any disciplinary step)? Mr. Hester's statement to this question was, "this is an attempt to document improper behavior. This was necessary because of the severity of the behavior." I have never had a documented or verbal counseling, coaching or any disciplinary steps.

13. The warning letter that I received from Mr. Hester stated that, my behavior "disrupted the department, interfered with work productivity." I stated that my stating my opinion was not insubordinate and I did not fail to submit to authority.

14. I do not have to have **"FAITH"** in Mr. Hester to work for him. How in the world can Mr. Hester convict me on an opinion he asked for? The question was, "**If this situation comes up in the future, do you honestly believe I would not tell the truth about the postmark dates?**" I was suspended for a **FUTURE INCIDENT.** How was that possible?

15. Based on my personal knowledge of State Personnel Policies and Procedures, Lance

Hester and Commissioner Ron Sparks did not comply with relevant portions of State Personnel Polices and Procedures and the Department of Agriculture and Industries Polices and Procedures regarding "Progressive Discipline.

16. Prior to 2005, I had no discipline action letters in my immediate supervisor's file (Benny Hitch). No discipline action letters in Lance Hester's supervisory file. All of my evaluations since 1999 are **Exceed Standards**. **My evaluations for 2006-2007 and 2007-2008 are Exceed Standards**. The State Government Orientation Merit System and Personnel Training Guide 2005 page 52 states that the supervisor should look at a subordinate's total performance and focus on significant, not trivial, or insignificant behavior requiring improvement. The warning letter Lance Hester issued me alluded to disruptive behavior, failure to submit to authority and insubordination.

17. The last statement on the warning letter states, "If a corrective action plan is developed in conjunction with the discipline, include the timeframe that is being monitored for change in performance and the follow-up meeting date". Lance Hester stated that he followed all of State Personnel's Training Manuals for disciplining an employee. If so, why wasn't I given a corrective action plan and a time frame to be monitored?

18. I have never had a documented or verbal warning, coaching, counseling, reprimand or suspension. My evaluation score during the suspension was **Exceed Standards. In the Work Habits Section** of the evaluation Attendance, Punctuality, Cooperation with Coworkers and Compliance with Rules all were checked satisfactory, but Lance Hester still recommended suspension. The suspension decreased my score to **Partially Meets Standards**. Alabama State's Personnel Performance Appraisal Manual states that an employee should be evaluated the entire year. Progressive Discipline process was started with me the same month my annual evaluation was done. My evaluation is due in December. The warning, reprimand and suspension all occurred within a **two week time frame (11/3-11/15)**.

19. I was given a letter of suspension dated November 15, 2005 that stated I was suspended starting November 21, 2005 through December 2, 2005. I was instructed to return to work Monday December 5, 2005.

20. I returned to work on the 5th of December and was told by Attorney Jeff Webb that I was not supposed to return to work until the 7th of December 2005. Jeff Webb told me he came by house during the Thanksgiving Holidays and put a second letter of suspension in the side door of my house. I did not get the second letter of suspension until I returned to work on the 5th of December. I asked Jeff Webb why the Department of Agriculture and Industries did not send the second letter of suspension certified mail with return receipt of my signature so the department would know I received the second letter of suspension. I was suspended before Commissioner Ron Sparks granted a hearing for me to address the charges for suspension. The Commissioner only granted the hearing after Sharleen Smith (Training Coordinator from State Personnel called Teresa Brunson and notified them of their mistake. This is why I received a letter from Teresa Brunson about a hearing at 4:45 p.m. November 17, 2005.

21. The letter that I received from the Commissioner on November 17, 2005, scheduled a hearing at 10:30 am Friday November 18, 2005. I was not given enough time to secure legal representation. Based on my personal knowledge of the State of Alabama Law and the State Personnel Board Rules, these rules require that the employer give the employee who is about to be suspended, a reasonable amount of notice for his or her hearing. I was given less than 24 hours. I was not given enough time to secure representation

22. I was given a letter at 4:45 p.m. November 17, 2005, that stated I will be able to rebut the suspension in a hearing before the Commissioner on Friday, November 18, 2005 at 10:30 a.m. I need to know why this letter was not given to me with the suspension letter dated November 15, 2005. In the suspension letter a Waiver for Suspension Hearing for me to sign away my rights to a hearing that expired November 17, 2005 at 3:00 p.m., but

failed to include the letter of hearing for November 18, 2005 at 10:30 a.m.

23. Lance Hester nor the Commissioner told me the final decision of the hearing that took place that morning. I already received a letter of suspension dated November 15, 2005; this is why I left work on the 18th of November expecting to return to work on the 5th of December. I did a time sheet that reflects the dates of suspension that Deputy Commissioner Teresa Smiley approved before I left for suspension. A copy of a second timesheet was given to me by Jeff Webb when I returned to work on the 5th of December. Jeff Webb stated Lance Hester completed another timesheet to reflect the new dates of suspensions. By returning to work on the 7th of December I was suspended a total of 12 days.

24. I am personally aware that the proposed suspension was not consistent with Agriculture's actions in similar circumstances in the past (2004). **Example:** I am personally aware that when Jamie Baxley used abusive language toward the Asst. Commissioner Doug Rigney, Mrs. Baxley was sent home for the rest of that day. I am personally aware that she came to work the next day and was not given a written reprimand nor was she suspended. Deputy Commissioner Teresa Smiley told me that, "Charlenthia Canidate heard the abusive language because her office at that time was directly across from Doug Rigney." I feel like I was treated differently. I am personally aware that the Department of Agriculture and Industries is not fair or consistent with punishment for actions of employees.

25. I tried to tell the Commissioner I was on jury duty for an entire week and the mail was not open. He did not want to hear my side of the story because Mr. Hester and Dr. Bloch had done such a good job of explaining my side of the story to the Commissioner. How is it possible for Dr. Bloch to explain anything when he was on leave on November the third, the date Mr. Hester presented me with the written warning?

26. I worked for Dr. Bloch in October 2004. Due to my position, I was personally aware that

in October of 2004, over a hundred thousand dollars in unprocessed checks and money orders for renewals from Consumers of The State of Alabama were found in Pat Burgess's office and there was still a problem in 2005. I am aware that Ms. Burgess was not given a reprimand nor suspended. In the beginning of 2004 the Food Safety Section was seeking to fill an ASA 1 position. Mr. Hester asked me if I knew of anyone that was interested and I told him Mary Catrett had mentioned Pat Burgess. Mr. Hester stated, "He had already spoken to Dr. Bloch about Pat and Dr. Bloch told him we (The Food Safety Section) did not need that headache." After Mr. Hester made this statement to me, he personally informed me that there was a problem with Pat Burgess failure to perform her job properly and inconsistencies with punishment for the action.

27. In March of 2004 Commissioner Sparks called a minority meeting where only black employees of the Department of Agriculture and Industries attended the meeting. The only white employees present were David Hooks (retired), Doug Rigney (Asst. Commissioner) and Sharon Fulmer (Executive Assistant).

28. I was in attendance in a meeting that Ron Sparks called with the black employees at the Department of Agriculture. I have not personally observed any improvements in race relations as result of the meeting. I am still personally aware of mistreatment of minorities in the building. It appears to me to be a pattern of inconsistency with what constitute punishment for an employee's action.

29. I personally witnessed April Lovelady cry after she was called a fat broad by Dr. Hester. Dr. Hester is a federal employee that works in the Richard Beard Building. I am personally aware that April Lovelady is no longer employed with the Department of Agriculture (as of 2006). I, alone with several others saw April crying after that comment made by Dr. Hester. I am aware that o actions were taken against Dr Hester?

30. Lance Hester gave me a letter dated December 13, 2005 that stated, "**If the hearing on your appeal of the suspension determines that the suspension was not proper,**

**we will change or re-do your evaluation to reflect that decision. Also, if the hearing outcome results in a change in your evaluation that affects step raises, it will be handled in a manner that you would not in any way be penalized monetarily."** As of May 29, 2008 my evaluation has not been re-done.

31. Lance Hester and Mary Catrett moved out of the Food Safety Division to the first floor. I knew nothing about this move until General Services came to move the office furniture to the first floor. No one told me anything. General Services had the inmates paint Lance Hester's old office and during this time I asked why the office is being painted and I was told that Mark Scott would be moving into Lance Hester old office.

32. In May of 2006, Lance Hester had a meeting with the Food Safety Division office employees. This is when I was assigned additional duties and told that Mark Scott would be my immediate supervisor. I was assigned the duty of answering Food Safety Division's main phone line. This was always Mary Catrett's duty. Processing returned checks, monthly sample schedule and PY 156 egg inspection reports were all Mary Catrett's duties.

_____
Shannon Burton

STATE OF ALABAMA         )
                         )
MONTGOMERY COUNTY        )

    I, _____, a Notary Public for the State at Large, hereby certify that **Shannon Burton,** whose name is signed to the foregoing Affidavit, and who is known to me, acknowledged before me on this day that being informed of, and understanding the contents of same, she executed the same voluntarily on the same bears date.
    GIVEN under my hand and seal on this _____ day of _____, 2008.

_____
Notary Public
Commission Expires _____