IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| SHANNON BURTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:07cv548-MHT |
| | ) | (WO) |
| ALABAMA DEPARTMENT OF | ) | |
| AGRICULTURE & INDUSTRIES, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

Plaintiff Shannon Burton, an American of African

descent, brings this lawsuit against defendant Alabama

Department of Agriculture and Industries, asserting a

procedural-due-process violation under the Fourteenth

Amendment to the United States Constitution as enforced

by 42 U.S.C. § 1983, as well as race discrimination and

retaliation in violation of Title VII of the Civil Rights

Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e to

2000e-17.[1]   Jurisdiction is proper under 42 U.S.C.

_____

1. At pretrial conference, counsel for Burton
clarified that the race-discrimination and retaliation
claims were based solely on Title VII and not on 42
U.S.C. § 1981.

§ 2000e-5(f) (Title VII) and 28 U.S.C. § 1343 (civil rights).

This case is currently before the court on the department's motion for summary judgment. For the reasons that follow, the motion will be granted in part and denied in part.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding whether summary judgment should be granted, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

2

## II. BACKGROUND

In September 2001, Burton began to work for the department as an Administrative Support Assistant in Agriculture Compliance.  In 2003, she was promoted to the position of Administrative Support Assistant III; as part of this promotion, she received a pay raise and a transfer to the Food Safety Division, where she began supervising two other employees.

Burton's lawsuit primarily concerns a series of events set in motion in October 2005.  Burton had been out of the office for five days for jury duty, and upon her return she found that other employees had not opened all of the department mail received in her absence.  She reported to her supervisor that important, time-sensitive mail had not been opened.  Her supervisor, Lance Hester, appeared unconcerned.  She told Hester that if she had been the one to leave the mail unopened, he would have made it "a federal case."  Pl.'s Ex. 5 (Doc. 20), at 2. Apparently believing that the unopened mail would become

3

a significant problem for her in the future, she showed him the postmarks on the mail and stated that she believed Hester would either not remember or not tell the truth about the matter if it were to come up again.

After thinking about the incident for three days, Hester decided that Burton had been disruptive and insubordinate; he issued her a written warning.  Hester and Burton met to discuss the warning, and Burton did not sign the warning despite being instructed to do so.  A week later, Burton submitted a written response to the warning in which she asserted that it was merely her opinion and belief that Hester would not tell the truth about the mail and that she refused to sign the warning because she would not "sign a false statement."  Pl.'s Ex. 9 (Doc. 20), at 8.  Burton received a memorandum informing her that she would receive a written reprimand if she failed to sign the warning, and she did receive such a reprimand.  Burton eventually signed the original warning, but she twice refused to sign the written

4

reprimand.  Commissioner Ron Sparks suspended Burton for 10 days, from November 21 through December 5, 2005.

Pursuant to the department's regulations, any suspended employee may receive a hearing before the commissioner prior to a suspension.  Although Burton received notice of her hearing late in the afternoon on the day prior to the hearing, she did appear before the commissioner the next morning.  Burton was given a chance in this informal hearing to tell her side of the story. Afterward, the commissioner imposed the suspension and informed Burton of her right to a post-suspension review before an Administrative Law Judge (ALJ).

Burton immediately appealed her suspension.  The post-suspension hearing was eventually held in February 2006, and Burton was able to present witnesses and other evidence and make arguments about the propriety of her suspension under department policies.  The ALJ issued an opinion on April 18 recommending that the suspension be rescinded.  Even though the ALJ found that the suspension

was not justified, state regulations make clear that the commissioner, as the final decisionmaker regarding the appeal, is not bound by the ALJ's recommendation. Nonetheless, department regulations require the commissioner "to inform the employee in writing of [the ALJ's] findings and his final decision."  Pl.'s Ex. 7 (Doc. 20), at 1.  Accordingly, the ALJ opinion indicated that, "No rights are finally determined until the commissioner decides whether to accept, reject, or modify this recommendation."  Pl.'s Ex. 9 (Doc. 20), at 26.

Commissioner Sparks took absolutely no action on the recommendation until August 11, 2008, when this court inquired about the status of the ALJ's recommendation during pretrial conference in this litigation and counsel for the department indicated that no action had yet been taken on the recommendation. At the suggestion of the court, the commissioner promptly issued a final determination in writing that same day; he rejected the ALJ's recommendation and upheld Burton's suspension.

In the meantime, on June 23, 2006, Burton and other black department employees met with the Alabama State Employees Association (ASEA) to express complaints about race discrimination at the department. They discussed disparities in both hiring and promotion practices, as well as in the issuance of state cars. Burton also discussed her suspension.

Burton asserts that, in the aftermath of her appeal of her suspension and her meeting with the employee association, the department took a number of retaliatory actions against her, including:

- The commissioner's continued refusal to accept, reject, or modify the ALJ's recommendation for approximately 2 1/3 years, despite Burton's counsel's requests that he do so.

- Changes in Burton's job duties during a division office meeting to include answering the main phone line, a job that had previously been

7

performed by one of the employees Burton supervised until May 2005.

Burton also complains of several other retaliatory practices, but, as acknowledged by Burton's counsel at pretrial conference, these claims were not timely raised in an EEOC complaint and are therefore barred. Among these are the deduction of 17 points from Burton's annual performance review, held on November 30, 2005, which had the effect of decreasing her score from "exceeds standards" to "partially meets standards."[2] Burton contends that her evaluation was unduly affected by events occurring in a short period before her review, as the evaluation should cover the entire year. Also time-barred is Burton's claim of changes to her office, particularly the removal of a refrigerator from her office and a cubicle privacy wall from around her desk almost immediately after her decision to appeal the

---

2. Burton asserts that each of her other evaluations since 1999 indicated that she "Exceeds Standards," including her evaluations for 2006-2007 and 2007-2008.

suspension.   Burton also claims that she was followed outside work on at least one occasion.   Finally, Burton asserts that her supervisory authority was removed from her without the proper completion of a Form 40.   However, while Burton casts this removal of her authority as retaliation for having appealed her suspension, the department has produced a memorandum demonstrating that the change in Burton's supervisory responsibilities occurred on May 10, 2005, several months before the events leading to Burton's suspension.   Def.'s Ex. 1 (Doc. No. 16), at 6.   Burton also acknowledged in her deposition that this removal of authority occurred in May 2005, well before the incidents in question here.

Burton filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on September 27, 2006.   She filed this federal lawsuit on June 20, 2007.

### III. DISCUSSION

### A. Procedural Due-Process Claim

Burton claims both that she was not given timely notice of her initial pre-suspension hearing and that she was never given a final decision on her appeal as required by department policy and due process. This latter contention essentially amounts to an argument that she never received a completed post-suspension hearing.

A protected property interest exists if an employee "has a legitimate claim of entitlement to continued employment." Perry v. Sindermann, 408 U.S. 593, 601 (1972). That determination is made using state law. Epps v. Watson, 492 F.3d 1240, 1246 (11th Cir. 2007). Under Alabama law, Burton plainly had a right to continued employment. See Best v. Boswell, 696 F.2d 1282, 1290 (11th Cir. 1983) ("The Alabama Code invests state merit system employees with a protected property interest.").

10

When employees have a protected property interest in continued employment, temporary suspensions without pay are considered deprivations and are evaluated under the same basic framework as permanent actions such as terminations.  See, e.g., Barry v. Barchi, 443 U.S. 55, 66 (1979) (holding that temporary suspension of horse training license implicated protected property right); FDIC v. Mallen, 486 U.S. 230 (1988) (employing balancing test of Mathews v. Eldridge, 424 U.S. 319 (1976), to determine the procedures required when a property interest in employment deprived by suspension); Gilbert v. Homar, 520 U.S. 924 (1997) (assuming that suspension affected a protected property interest and finding that a pre-suspension hearing is not required in all cases but emphasizing the presence of a post-suspension hearing and its likely importance to a balancing of due-process concerns); Hardiman v. Jefferson County Bd. of Education, 709 F.2d 635, 638 n.1 (11th Cir. 1983) ("The parties do not dispute, and we hold, that Hardiman, as a tenured

11

teacher in the midst of his contract, had a due process property interest in his position. Thus, absent an extraordinary situation, Hardiman would have been entitled to some form of hearing prior to being suspended without pay.") (internal quotation and citation omitted).

Here, Burton's suspension worked a significant deprivation of a protected property interest. She lost two weeks' wages--a significant amount for any individual or family--and received a substantially downgraded yearly evaluation pursuant to the department's suspension policy, which resulted in her ineligibility for a more permanent salary increase. See Mallen, 486 U.S. at 243 (evaluating procedures required for suspensions and noting that an employee's "interest in continued employment is without doubt an important interest that ought not be interrupted without substantial justification" and emphasizing that "[w]e have repeatedly recognized the severity of depriving someone of his or her livelihood"). Burton also received a permanent

letter in her file, affecting her chances of promotion and advancement within state government.

Both state and department regulations recognize the seriousness of Burton's deprivation.   State personnel regulations indicate that suspension "is a severe and extremely serious step in the employee's career in state government."   State of Alabama Progressive Discipline Manual, Pl.'s Ex. 7 (Doc. 20), at 14.   Moreover, department and state rules--specifically citing the State's interpretation of the mandates of due process--require both a pre-suspension hearing with the commissioner and a full post-suspension review before a neutral hearing officer.   See id.

The department may not deprive Burton of this important property interest without "appropriate procedural safeguards."   Cleveland Bd. Of Educ. V. Loudermill, 470 U.S. 532, 541 (1985) (internal quotations removed).   In calibrating the proper procedural requirements accompanying any particular deprivation,

courts employ the three-factor balancing test set forth
in <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (1976).  <u>See</u>
<u>Homar</u>, 520 U.S. at 931-934 (applying <u>Mathews</u> factors to
determine process required for a suspension without pay).
Thus, pursuant to <u>Mathews</u>, "[i]n determining how long a
delay is justified in affording a post-suspension hearing
and decision, it is appropriate to examine the importance
of the private interest and the harm to this interest
occasioned by delay; the justification offered by the
Government for delay and its relation to the underlying
governmental interest; and the likelihood that the
interim decision may have been mistaken."  <u>Mallen</u>, 486
U.S. at 242.

    After applying this balancing test, courts
consistently require a prompt post-suspension hearing
when the full process required was not provided prior to
the suspension.  In <u>Barchi</u>, the Supreme Court noted that
"the consequences ... of even a temporary suspension can
be severe; and we have held that the opportunity to be

14

heard must be at a meaningful time and in a meaningful manner." 443 U.S. at 66 (internal quotations omitted). In <u>Barchi</u>, the plaintiff had utilized some pre-deprivation procedures before the State suspended his horse-training license. The Court found that the minimal procedures at this hearing were sufficient provided that, after the suspension, the plaintiff had the opportunity for a more full determination of the issues. The Court wrote: "That the State's presuspension procedures were satisfactory, however, still leaves unresolved how and when the adequacy of the grounds for suspension is ultimately to be determined." <u>Id</u>. Of crucial importance in <u>Barchi</u> was the finding that there was "little or no state interest, and the State has suggested none, in an appreciable delay in going forward with a full hearing." <u>Id</u>. As a result, the Court held that: "In these circumstances, it was necessary that Barchi be assured a prompt postsuspension hearing, one that would proceed and be concluded without appreciable delay." <u>Id</u>.

15

Similarly, in <u>Mallen</u>, the Supreme Court had to decide if the employee's post-suspension hearing occurred within a reasonable time.  There, but for the court case, the plaintiff could have received a decision within 49 days of his request for a full hearing.  At a maximum, the statute at issue provided that employees could receive a decision within 90 days.  <u>Mallen</u>, 486 U.S. at 242-43. The Court found that, under the circumstances, the delay was "not so long that it will always violate due process."  <u>Id</u>. at 244.  Crucial to the Court's decision was the uniquely low risk of erroneous deprivation in <u>Mallen</u> because the employee had already been indicted by a grand jury.  Thus, a neutral factfinder had already determined that there was probable cause for the suspension.[3]  Thus, in some special cases, a delay of 49

---

3.  The Court also stressed that the somewhat lengthy period was justified in <u>Mallen</u> because the federal statute at issue recognized the importance of maintaining confidence in the banking system, and thus the longer delay before the full hearing on the bank executive's conduct enhanced public confidence in the regulatory scheme and provided more time for a thorough hearing. (continued...)

to 90 days before a hearing on a suspension without pay
would not violate due process.

The delay between Burton's request for a full hearing
and a final decision on her suspension was far more
significant and far less justified than in either <u>Barchi</u>
or <u>Mallen</u>. While Burton received a full hearing in early
2006, the commissioner--the final decisionmaker with
respect to the appeal--did not make a decision until this
court suggested that he do so at pretrial conference in
this case in August 2008, some 2 1/3 years later. Even
though he was the final decisionmaker over Burton's
appeal, there is no evidence that, over the 2 1/3-year
period, the commissioner even examined the ALJ's
recommendation, reviewed the evidence from the full
hearing, or gave even a moment's thought to the decision
he was required to make in order to make the suspension
final; nor does anything or anyone suggest any state
interest possibly served by withholding the decision for

---

3.   (...continued)
Nothing resembling this public interest is present here.

17

so long.   Moreover, no independent determinations have been made as to Burton's culpability or the propriety of her suspension as in <u>Mallen</u>.   To the contrary, the only independent agent formally to review the case found that the suspension was unjustified.   Because the hearing and appeal obviously cannot be complete without the decisionmaker considering the evidence and rendering a decision, Burton did not receive a completed post-suspension review for 2 1/3 years.

Burton, for her part, went through all of the motions of the full hearing and appeal to which she had a right. She never received, however, a crucial component of that right: an evaluation of the evidence and a decision by the appropriate decisionmaker.   The department correctly argues that its policies do not explicitly require the commissioner's decision to come within any specific time period.   Due process, however, takes greater offense to such unjustifiable delay.

18

Burton's claim that the notice was inadequate prior to her pre-suspension hearing is of less import. Despite the short notice, Burton appeared at the informal hearing with the commissioner and told her story. Nothing indicates that the short notice prevented Burton from participating in this hearing to the extent called for by the nature of the proceeding. Provided that an employee is given more complete post-suspension process, this kind of informal "hearing" is all that is required at that stage. See Loudermill, 470 U.S. at 545-46 (holding that pre-termination hearing "need not be elaborate" and that the employee is "entitled [only] to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story"). But the procedural protections received by an employee must be viewed in their entirety. Burton, of course, did not receive proper post-suspension process. Thus, the problem lies not in the notice provided prior to the pre-suspension hearing, but rather

19

in the "total package" of process that Burton received.

The department could obviously have avoided the need for a prompt post-suspension review process had it provided Burton a complete pre-suspension review. Indeed, the State's own manuals give the option of a complete pre-deprivation hearing in which the employee can present exhibits and evidence. Neither party argues that Burton received such a hearing. She was told about the initial hearing only the day before, the hearing was referred to by the parties as "informal," and all the evidence indicates that Burton merely told her side of the story. Moreover, the parties chose to have a more complete post-suspension hearing, at which Burton put on witnesses and was able to argue more fully about the propriety of her suspension pursuant to department policies. Thus, while the short notice before the initial hearing is not itself problematic, the initial hearing itself was insufficient to ensure Burton's rights without a properly completed post-suspension hearing.

20

Therefore, Burton's due-process rights were violated only by the lengthy and inexplicable delay in the commissioner's decision. The department's motion for summary judgement with respect to that issue is therefore denied.

## B. Title VII Claims

### 1. Timeliness of EEOC complaint

The department argues that, because Burton's EEOC charge was filed on September 27, 2006, any claims arising from acts prior to March 31, 2006, are barred because Burton did not file her EEOC charge within 180 days of those acts. Congress intentionally chose the short 180-day deadline "to encourage the prompt processing of all charges of employment discrimination," and the department is correct that in the event of a "series of actionable wrongs, a timely EEOC charge must be filed with respect to each discrete alleged violation." Ledbetter v. Goodyear Tire & Rubber Co., 550

21

U.S. 618, 127 S.Ct. 2162, 2170, 2175 (2007) (emphasis added).  As such, the court may examine only violations that took place in the 180 days prior to Burton's filing of her EEOC complaint--that is, violations that occurred between March 31, 2006, and September 27, 2006.  The only relevant events in Burton's complaint that occurred in this window are the ALJ's rendering her recommendation, on April 18, 2006, that Burton's suspension be rescinded and the changes in Burton's job responsibilities (answering the main phone line) in May 2006.  As such, she may pursue her discrimination and retaliation claims on the basis of the commissioner's inaction following the ALJ's recommendation and her supervisor's reallocation of her duties.  She may not pursue claims based on the other incidents--including Burton's actual suspension and the physical changes made to her office--that took place prior to March 31, 2006.[4]

_____

4. As discussed in more detail above, at pretrial conference, Burton's counsel admitted that events before March 31, 2006 could not be the basis for Burton's Title
(continued...)

22

## 2. Scope of EEOC complaint

The department contends that a number of Burton's allegations were not presented in her EEOC complaint and are therefore barred.  The starting point in ascertaining the permissible scope of a judicial complaint alleging employment discrimination is the administrative charge and investigation.  <u>Griffin v. Carlin</u>, 755 F.2d 1516, 1522 (11th Cir. 1985).  No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely filed EEOC charge.  <u>Alexander v. Fulton County</u>, 207 F.3d 1303, 1332 (11th Cir. 2000); <u>see also</u> 29 U.S.C.A. § 626(d).  Not all acts complained of, however, need have been included in the EEOC charge; rather, an employee may include in her lawsuit a claim for injury resulting from any practice which "was or should have been included in a reasonable investigation of the administrative

_____

4.  (...continued)
VII claims and thus acknowledged that Burton's initial suspension could not qualify.

complaint." <u>Griffin</u>, 755 F.2d at 1522. Thus, an employee's lawsuit is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of a charge of discrimination. <u>Evans v. U.S. Pipe & Foundry Co.</u>, 696 F.2d 925, 929 (11th Cir. 1983).

Burton's EEOC charge states as follows:

> "I began my employment with the employer named above as an administrative assistant on September 1, 2001. Since on or about February 21, 2006, I have been subjected to adverse terms and conditions of employment to include my having to remove my personal refrigerator from my office, having the privacy wall removed from around my desk, having my job duties and responsibilities changed to include being given duties that a White female did not want. I have been followed by a member of management when I was off work on annual leave. In August of 2006, I was denied a promotion to the position of agriculture marketing specialist based on my lack of education, although I have a master's degree. However, a lesser qualified white was selected for the position.
>
> "I believe that I was discriminated against in violation of Title VII of the 1964 Civil Rights Act, as amended because of my race, Black and in

> retaliation to my complaint that I was
> suspended because of my race."[5]

Def.'s Ex. 11 (Doc. No. 16).  The department argues that Burton's EEOC charge failed to mention any discrimination or retaliation in connection with the commissioner's inaction with respect to the ALJ's recommendation that Burton's suspension be rescinded.  While the EEOC charge does not specifically mention this ground for retaliation, the charge clearly states that Burton believed she was subject to retaliation resulting from her complaint that she was suspended because of her race. Any investigation into Burton's suspension would quickly reveal the events that took place before and after the suspension and would consider any role that retaliation might have played in those decisions, including the significant and related decision of whether to act on the

_____

5.  Burton is not pursuing relief for not having been promoted to the position of agriculture marketing specialist.  Additionally, Burton does not pursue relief for having been denied a promotion to a nutrition program; the department attributes this claim to Burton, but it is present nowhere in her filings.

ALJ's recommendation.  Therefore, the more specific allegation in Burton's judicial complaint does not exceed the scope of her EEOC charge of discrimination.  <u>See Alexander</u>, 207 F.3d at 1333 (finding that claims not mentioned in EEOC charge were "sufficiently similar" to claims in the charge "to be fairly characterized as arising out of similar discriminatory treatment to that specifically alleged before the EEOC").

### 3. Prima-facie cases
### for discrimination and retaliation

#### a. Discrimination

Burton's Title VII claim is governed by the familiar framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Burton must first establish a prima-facie case of illegal discrimination.  <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1331 (11th Cir. 1998).  If Burton establishes a prima-facie case, the department must produce a legitimate, nondiscriminatory reason for its actions.  The burden is then shifted back

to Burton to produce "sufficient evidence to find that the employer's asserted justification is false" and a pretext for unlawful intentional discrimination.  <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 148 (2000).

Pursuant to the <u>McDonnell Douglas</u> framework, the court begins its discriminatory-treatment analysis by determining whether Burton can establish a prima-facie case.  To make such a case, Burton must show that she (1) is a member of a protected class; (2) suffered an adverse-employment action; and (3) was treated less favorably than a similarly situated individual not in the protected class.  See <u>Wilson v. B/E Aerospace Inc.</u>, 376 F.3d 1079, 1087 (11th Cir. 2004); <u>see also</u> <u>Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.</u>, 342 F.3d 1281, 1289 (11th Cir. 2003).  There is no dispute that Burton is a member of a protected class.  But even if the court were to assume that Burton could meet the second element, she has simply not offered any evidence

demonstrating that she was treated less favorably than similarly situated white employees.

Burton offers absolutely no evidence that the commissioner's failure to act on the ALJ's recommendation was inconsistent with the commissioner's treatment of other similarly situated employees. Moreover, Burton offers almost no evidence whatsoever concerning the changes in her job duties. She asserts briefly without any explanation or factual development that the person responsible for answering the main phone line prior to her being given that duty was Mary Catrett (who is white). It is unclear from Burton's affidavit what other aspects of Catrett's job duties, if any, were shifted to Burton. There is also no evidence how Catrett's duties may have changed or why.[6] Burton does not even offer Catrett as a similarly situated comparator let alone provide evidence by which to make any comparison. There

_____

6. In fact, Burton's affidavit indicates that Catrett simply moved out of the Food Safety Division, which may explain why some of her duties may have been given to another employee.

28

is similarly no claim--let alone evidence--that the duties of other employees were not reshuffled at the same time as Burton's (perhaps even at the same Food Safety Division office meeting) or that the type of changes in Burton's duties was inconsistent with the kinds of changes commonly experienced by other similar employees of the department.  The fact that an employee previously assigned certain responsibilities happened to be white, without any claim that the employee is similarly situated and without any other evidence about that employee, those responsibilities, or the circumstances behind the changes, cannot establish that Burton was treated differently from a similarly situated white employee.

## b. Retaliation

Title VII forbids "discrimination against an employee or job applicant who, inter alia, has 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation."   Burlington Northern &

<u>Santa Fe Ry. v. White</u>, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e-3(a)).  The same <u>McDonnell Douglas</u> burden-shifting framework applies.

To establish a prima-facie case of illegal retaliation, Burton must show (1) that she engaged in statutorily protected conduct; (2) that she suffered an adverse-employment action; and (3) that there is some causal relation between the two events.  <u>See</u> <u>McCann v. Tillman</u>, 526 F.3d 1370, 1376 (11th Cir. 2008).

Here, the parties agree that Burton's protected conduct was her decision to appeal the suspension in November 2005 and her complaint to the ASEA in June 2006.[7]

To establish that a particular decision was adverse, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded

_____

7.  Because the parties do not dispute this issue, the court will not decide whether Burton's conduct constitutes the kind of activity protected by Title VII's anti-retaliation provisions.  The court will assume that Burton has met this first element.

30

a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 68 (internal quotations omitted). In making this determination, Burlington instructs that "context" is crucial. Id. The commissioner's refusal to act on the ALJ recommendation, which maintained the status quo for 2 1/3 years, certainly could discourage employees from expending the time, effort, money, and discomfort involved in filing such appeals. More simply, had the commissioner rescinded the suspension, it would have led to changes in Burton's personnel file relevant to her future advancement, as well as to compensation to make up for the pay she missed during her suspension and the pay that would have been due to her had her suspension not reduced her performance rating.[8] It is true that Burton's suspension has now been finally affirmed. However, but

---

8. The record includes a memorandum from Hester to Burton confirming that if the ALJ review process determined that her suspension was improper, then they would redo her evaluation and make sure that she was not "in any way be penalized monetarily." Memorandum from Lance Hester to Shannon Burton, Pl.'s Ex. 15 (Doc. 20).

31

for the court's suggestion, there is no indication Burton would ever have received a final determination.   As discussed above, Burton should have received a sufficiently prompt plenary hearing reviewing her suspension. Such an interminable delay, contrary to department policy of notifying employees in writing, could no doubt greatly discourage employees from engaging in protected activity, because the delay indicates that they can be suspended without ever getting the completed hearing to which they are entitled on appeal.

Burton has not made any showing, however, that the change in her job duties, including requiring her to answer the main telephone, is an action that a jury could find "might well dissuade" a reasonable employee from filing a complaint.  Burton only vaguely asserts that she was given the additional duty of answering the main phone line and otherwise completely fails to develop factually

this claim, support for which is also absent from her
brief in opposition to summary judgment.[9]

Because <u>Burlington</u> emphasizes context, Burton's
complete failure to provide any context renders the court
unable to judge whether requiring Burton to answer the
phone should be considered an adverse action considering
both Burton's previous duties and the particular
employment environment of the department.  It is simply
not enough to allege merely that she was required to
answer phones--a task that might well be an improvement
in job duties for many employees depending on the
situation.  <u>See Burlington</u>, 548 U.S. at 68 ("The real
social impact of workplace behavior often depends on a
constellation of surrounding circumstances, expectations,
and relationships which are not fully captured by a

---

9.  Although Burton's affidavit it extremely unclear,
it could be read to suggest that in addition to being
given phone-answering duties, she was also given other
tasks that had previously been performed by Catrett,
including processing checks and handling egg-inspection
reports.  Nothing about these potentially changed duties
suggests that they were adverse.

33

simple recitation of the words used or the physical acts performed." (quoting <u>Oncale v. Sundowner Offshore Servs.</u>, 523 U.S. 75, 81-82 (1998)).  For example, Burton might have provided evidence about who usually answers the main phone line--for instance whether people of her level (Administrative Support Assistance III) usually performed that task at the department.  Indeed, in some workplaces, employees of all ranks answer the phone.  Similarly, if a vice president is suddenly told to answer phones it would presumably be more adverse than if a lower level employee were assigned the same task.

<u>Burlington</u> explained its focus on factual context by offering an example: a mere change in work schedules would be of little significance to many employees but could very well constitute an adverse action for a young mother with schoolage children.  548 U.S. at 68.  Perhaps forcing Burton to answer phones could be adverse if it required her now to work a daytime shift when she had previously worked only during the evenings because of

family constraints.  However, based on the complete lack
of factual context within which to place Burton's new job
duties, there is simply no way to determine that the
changes to Burton's duties were adverse.  Thus, only
Burton's claim regarding the refusal to act on the ALJ's
recommendation (the commissioner's failure to provide her
with the completed hearing to which she was entitled) is
an adverse action sufficient to meet the second element
for a prima-facie showing.

A more complicated question is whether Burton has
put forward any evidence to satisfy the third element: a
causal relationship between her protected activity and
the putatively retaliatory action.  The causal link is
interpreted broadly, so that "a plaintiff merely has to
prove that the protected activity and the negative
employment action are not completely unrelated." Olmsted
v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).
In the absence of any evidence to indicate retaliation,
"close temporal proximity" alone can suffice to show a

causal connection.  <u>McCann v. Tillman</u>, 526 F.3d 1370, 1376 (11th Cir. 2008).

Here, Burton has provided some circumstantial evidence to suggest a retaliatory motive.  While her claims regarding the destruction of her office and being followed outside work cannot themselves form the basis of an actionable claim for the reasons discussed earlier, they can nonetheless be used as evidence to show that a retaliatory motive lay behind the refusal to act on the ALJ's recommendation.  These earlier actions by the department, combined with the refusal to act on the ALJ recommendation and the change in Burton's duties must be considered together with other evidence provided by Burton, such as her employment evaluations, in which she scored "Exceeds Standards" in every year since 1999 (other than the year of her suspension).  Moreover, Burton has provided a letter from Hester indicating that if the ALJ found her suspension improper, her evaluation would be redone and her compensation restored; neither

36

promise was fulfilled in the wake of the ALJ's opinion, and no explanation was given.  While Burton certainly has not offered detailed, comprehensive evidence, she has provided enough context reasonably to question whether the department's inaction was improperly influenced by her persistent pursuit of a forum to complain about her suspension, first in front of the commissioner, then before the ALJ, and finally before the ASEA.  This is sufficient circumstantial evidence to establish a prima-facie case of causal connection.

If Burton had not produced any evidence that suggested a retaliatory motive, Burton's claim of retaliation based on the failure to act on the ALJ's recommendation would present a more difficult question. The department correctly notes that the ALJ did not issue her recommendation until April 18, 2006, and thus the commissioner's failure to act on that recommendation did not begin until at least five months after Burton's protected conduct.  The Supreme Court has not often

examined this issue, but it has found a period of 20 months to be too lengthy by itself to suggest causality. Clark County Sch. Dist. V. Breeden, 532 U.S. 268, 273-74 (2001). Nonetheless, there are no bright-lines rules establishing the length of time within which causality is presumed. Indeed, if there were, any employer could simply wait out that period before retaliating. Given the context-dependent nature of the retaliation inquiry after Burlington and the Court's sensitivity to the exigencies of real employment environments, courts must be prepared to examine context in determining whether a given action is sufficiently temporally proximate.

The kind of retaliation claimed by Burton would, by its very nature, have been impossible until the ALJ had ruled. Thus, while the commissioner had notice of Burton's protected conduct in November, he could not have retaliated by ignoring the ALJ's recommendation until April, when that recommendation was issued. Thus, the context of the putatively retaliatory action here

demonstrates that the alleged retaliation began as soon as it possibly could have.  Moreover, Burton's visit to ASEA occurred in June 2006, and after that complaint the commissioner continued to withhold any action on the ALJ's recommendation, despite a formal request from Burton's counsel to do so.  Ignoring the findings of the ALJ, by simply refusing to accept, reject, or modify them, is contrary to the policy of the department, which requires the commissioner to inform the employee of the final decision in writing.  This inaction, contrary to policy, began immediately after the ALJ's recommendation was issued, and thus, given the total circumstances, is sufficiently proximate in time to suggest that Burton's protected conduct was not completely unrelated.[10]

---

10. The common use of temporal proximity as a prima-facie suggestion of causation is, at first, an awkward fit in Burton's case because she complains of an <u>omission</u>, not a discrete act.  Here, the "retaliatory omission" stretched for a period of years, and it is thus difficult to identify discrete moments of decision from which to engage in the calculus of temporal proximity. Ironically, the longer the commissioner abstained, the further in time each moment of omission from Burton's
(continued...)

The department offers no explanation for the commissioner's failure to issue a final decision after the ALJ's recommendation.[11]  The department simply asserts that nothing in the regulations requires the mandated written decision to be issued within any period of time. This explanation is hardly, however, a reason that such a written decision was not issued in this case for 2 1/3 years.  In many Title VII cases the action at issue--perhaps a suspension or a termination or a demotion--was technically within the proper power of the employer.  The burden-shifting framework, however, requires some legitimate, non-retaliatory reason why that action was taken <u>at that time against that particular</u>

---

10. (...continued)
protected conduct.  But omitting to act, particularly when one is required to do so, constitutes <u>an active decision at each moment,</u> and thus temporal proximity can be calculated beginning roughly at the moment the commissioner could have acted--namely, when he received the ALJ's recommendation.

11. By notable contrast, the department was able to at least suggest alternative explanations for many of Burton's other claims of retaliatory behavior made throughout this litigation.

<u>employee</u>.   The  department  has  provided  nothing  of  the sort,  and  its  motion  for  summary  judgement  with  respect to  the  retaliation  claim  based  on  the  commissioner's inaction must therefore be denied.

* * *

For  the  foregoing  reasons,  it  is  ORDERED  that defendant  Alabama  Department  of  Agriculture  & Industries's  motion  for  summary  judgment  (Doc.  14)  is denied  with  respect  to  plaintiff  Shannon  Burton's  due-process  and  retaliation  claims  that  the  Commissioner  of the  Alabama  Department  of  Agriculture  and  Industries failed  to  provide  her  with  a  completed  hearing  in  a timely  manner,  and  the  motion  is  granted  in  all  other respects.

DONE, this the 20th day of November, 2008.

    /s/ Myron H. Thompson    
UNITED STATES DISTRICT JUDGE